**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Patrice Gordon, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:21-cv-549 |
| | ) | |
| v. | ) | Judge Maldonado |
| | ) | |
| Board of Education for the City of Chicago, | ) | Magistrate Judge Kim |
| et al., | ) | |
| | ) | ***DAUBERT* HEARING REQUESTED** |
| Defendants. | ) | |

**DEFENDANTS' OPPOSED MOTION TO EXCLUDE
PLAINTIFF'S EXPERT COLIN MCMAHON**

Defendants, by one their attorneys, Gordon Rees Scully Mansukhani, LLP, pursuant to

Rule 702 and other authorities cited herein, and for their Motion to Exclude Plaintiff's Expert

Colin McMahon, state as follows:[1]

**INTRODUCTION**

At bottom, this is a defamation, false light, and emotional distress case arising out of

statements allegedly made by defendants and then republished or newly published by the media.

Central to these claims are issues on publication and falsity of the statements, reputational and

other injury to plaintiff, and the knowledge and intent of defendants. The jury will decide these

issues. Still, plaintiff intends to offer expert testimony, apparently to "help" (*see* Rule 702) the

jury in their decision-making.

One of two experts proffered by plaintiff is Colin McMahon. McMahon is a media

professional who seeks to testify at trial that defendants and the media published statements that

---

[1] Unless otherwise indicated, all rule references refer to the Federal Rules of Evidence.

1

were false and defamatory, caused injury to plaintiff, and were made maliciously. McMahon and this testimony should be excluded.[2]

First, McMahon is not qualified to give expert testimony on conclusions such as whether statements were false and defamatory, caused injury, and were made willfully and wantonly. He is not a lawyer, medical or health professional, expert on falsity or intent, or expert on how defamatory statements are understood by others. He is a former journalist and editor of the Chicago Tribune. But this case is not against the media and does not concern journalistic practices of a newspaper. Second, McMahon's testimony will not help the jury. Instead, it invades their province and would confuse and mislead them on one person's "expert" views on the conclusions above, which are reserved for the jury. Third, McMahon's testimony lacks any reliable and testable foundation. All he did was review some materials in the record, interview Gordon, run internet searches on Lincoln Park High School, and consider media data untethered to the specific claims in this case. And McMahon reached conclusions using what he calls a "journalistic process," which simply involved asking questions, doing research, and getting lost in "rabbit holes along the way."

## BACKGROUND

Colin McMahon is one of two experts proffered by plaintiff. (The other expert is Sameer Somal, a claimed online reputation expert, and defendants seek to exclude him as well.) McMahon owns a media start-up company; consults on media culture change, newsroom organization, and audience development; and used to work at the Chicago Tribune as an editor

---

[2] On December 12, 2023, pursuant to the Court's Standing Order, the parties met via video to confer on the opinions offered by plaintiff's experts. In follow up to the meeting, plaintiff's counsel confirmed that he "will not seek to introduce any opinion testimony that CPS made false statements" because "both of our experts assume liability." *See* Ex. 4, 2023-12-12 Email Chain. However, both experts offer numerous other improper opinions on liability and damages resulting in this motion.

and journalist. *See* Ex. 1 (Report of Colin McMahon) ("McMahon Rep.") at 63-65. With this background, McMahon offers conclusions and opinions on publication, defamation, falsity, injury, causation, intent, and motive. For example, McMahon seeks to testify on the following:

- "**False statements**: CPS officials made false statements and caused hurt and suffering to Pat Gordon through public statements that were, at best, grossly and carelessly inaccurate. One could also argue, as the arbitrator in the case did, that the handling of the case and the public statements were spiteful or malicious. I agree with this. CPS officials either took little care in crafting their public messaging about the Lincoln Park case so as to provide some fairness and due process, or they deliberately crafted their messaging to allow for ambiguity and confusion about who might have been accused of what." McMahon Rep. at 4-5, ¶ 1 (emphasis in original).[3]

- "**A break with usual practice**: The way CPS officials handled the cases at Lincoln Park broke with usual practice." "...they exposed Coach Gordon and the other victims to pain, embarrassment, and ill-informed scrutiny. Typically, an internal investigation of a CPS employee would be done without publicly naming the target or detailing the allegations. Normally, if that investigation ended with dismissal, the person subject to it would be let go quietly, often leaving co-workers and others in the school community to try to figure out who the person was and what had happened." *Id.* at 5, ¶ 2 (emphasis in original).

- "**Unprecedented spotlight**: The news coverage of the Lincoln Park story itself also was an aberration...Certainly this was the most coverage of Lincoln Park High School in many years if not the most coverage of any single Chicago school in years. And it was all focused on Coach Gordon and the other targeted CPS personnel." *Id.* ¶ 3 (emphasis in original).

- "**Defamation never mitigated**: CPS officials had several opportunities to fix their errors and do right by Coach Gordon and the others. Yet they either ignored those opportunities. CPS officials, as emails records show, were quick to reach out to news reporters to address coverage they deemed inaccurate or that reflected poorly on CPS and the Defendants. But when it came time to reach out to the media to clear Coach Gordon's name regarding any allegations of sexual misconduct, they stayed silent, allowing the original false statements and false impressions to remain intact, unchallenged and embedded in the minds of the large public audience." *Id.* ¶ 4 (emphasis in original).

- "**An audience of millions**:...By a conservative estimate, the statements relating to Gordon reached the eyes or ears of **more than 2.6 million people**." *Id.* ¶ 5 (emphasis in original).

- "**The why behind the scenes**: I have attempted to figure out why CPS and the Defendants acted as they did and landed on what I believe is the most likely conclusion: ..." *Id.* ¶ 6 (emphasis in original).

---

[3] Plaintiff represents that McMahon will not offer expert testimony on falsity because he assumes liability.

- "Although Coach Gordon had not committed or even been accused of any sexual misconduct, you would not know that from the public statements, written or spoken, made by CPS and the Defendants. To the contrary, **the 'average' news consumer was left with the impression that Coach Gordon and/or his colleagues had committed both 'serious misconduct' and 'sexual misconduct**.'" *Id.* at 6 (emphasis added).

- "In the newsroom, **I would consider [CPS] testimony an indication of ill will toward the disciplined CPS employees. I would consider it evidence of a deliberate attempt to criticize and correct Coach Gordon and the others** not for something they had done but for their unwillingness to go along obediently with the false allegations and accept that serious misconduct had occurred." *Id.* at 10 (emphasis added); *see also* McMahon Rep. at 35, 56-61.

To arrive at his conclusions and opinions, McMahon principally relies on his media experience and a "journalistic" methodology or process. *See* Ex. 2 (Transcript of Colin McMahon Deposition) ("McMahon Dep.") at 45:15-24. That methodology consists of asking questions, doing research, and getting lost in "rabbit holes along the way." *Id*. McMahon believes this approach and his background qualify him to figure out how people work:

> I would say no one can do that, so whatever the expert qualification is for determining someone's motive, I would say I am more skilled at determining someone's motive than the average person, just because of what I talked about with the journalistic experience and practice, but I don't claim to know to say that I can determine someone's motive. Without fail, no, of course not.
>
> \*\*\*
>
> That I have – I have a lot of experience in assessing out people's lives, and I believe I am more qualified and have more experience in assessing out people's lives than the average person through my journalistic experience and I'm sure there are people that are more expert at it than I am.

*Id.* at 19:6-14, 21:9-15.

## LEGAL STANDARD

In federal court, the admission of expert testimony is governed by Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The court exercises a "gatekeeping" role to determine the relevance and reliability of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) (scientific experts); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (technical and other specialized experts). But the burden rests with the proponent of that testimony to meet the requirements of Rule 702 and *Daubert*/*Kumho Tire*. *See Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).[4]

Experts may be excluded for lack of qualifications, absence of any need for expert testimony, and unreliable methodologies or principles. *See, e.g., Varlen*, *supra*, at 460 (affirming exclusion of geologist for unreliable, "beyond a simple say-so" methodology as to cause of groundwater contamination); *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (affirming exclusion of engineer because he "has neither a medical degree nor any medical training, and an individual with a degree in mechanical engineering is not qualified to give expert testimony on medical questions, including the cause of an eye injury"); *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 835 (N.D. Ill. 2013) (excluding legal expert for "effectively acting as an arbiter of facts" and his opinion "does not add anything that would be of help to the jury in resolving the factual dispute"). All these reasons apply in this case.[5]

---

[4] Recent amendments to Rule 702 became effective December 1, 2023. Those amendments clarify that the proponent of expert testimony bears the burden on admissibility under a "more likely than not" standard for each proffered opinion. FED. R. EVID. 702 (effective December 1, 2023). The amendments were made necessary because many courts incorrectly determined that "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." FED. R. EVID. 702 advisory committee notes to 2023 amendments.

[5] In a related state-court case with different named plaintiffs, McMahon was allowed to give expert

## ARGUMENT

### I.    McMahon Is Not Qualified To Offer Expert Testimony

A witness may testify in the form of expert "opinion or otherwise" if qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. The testimony, however, must match the expert's qualifications. *See Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.").

McMahon claims to be qualified as an expert because of his background as former editor of the Chicago Tribune and "a leader in the news publishing industry in understanding how to evaluate content performance, how to increase the digital audience for that content and how to measure success using data and research." McMahon Rep. at 2. But his conclusions and opinions on publication, defamation, injury, causation, intent, and motive go well beyond these qualifications. He is not qualified to give them. He is not a lawyer or expert on defamation law. McMahon Dep. at 15:6-7, 24:6-8. He is not a doctor or health expert on physical or emotional injuries. *Id.* at 16:5-14. He is not an expert on Chicago Public Schools ("CPS") practices, procedures, or investigations. *Id*. at 23:15-24:5. Nor is he an expert on the mindset, intent, or motives of others, whether that of CPS or defendants. *Id*. at 18:24-20:6. In short, McMahon's qualifications do not fit with the variety of topics for which he espouses expert conclusions and opinions. He would have a better argument that his qualifications match his opinions if this case

---

testimony over the admissibility objections of defendants. That case was governed by Illinois' *Frye* standard for the admissibility of expert testimony. The court there, noting that "Illinois is very liberal in allowing experts" and state courts are not "gatekeepers" for expert testimony, denied defendants' motion to exclude McMahon in a single sentence without reasoning. *See* Ex. 3 (containing Order, *Robinson & Johnson v. Board of Education for the City of Chicago*, Nos. 2021 L 001047, 1072 (Cir. Ct. Cook Co., Ill. July 20, 2023) ("court denies Defendants' Motion *in limine* #18 and #19"); Mot. Hr'g Tr. 66-67, July 14, 2023).

were against and about the media, but it is not. Accordingly, McMahon is not qualified to offer expert testimony in this matter.[6]

## II. McMahon Will Not Help The Jury

An expert may only offer testimony that will "help the trier of fact to understand the evidence or to determine a fact in issue[.]" FED. R. EVID. 702. "Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Sanders v. City of Chi. Heights*, No. 13 C 0221, 2016 WL 4398011, at *4 (N.D. Ill. Aug. 18, 2016) (quotations and citations omitted); *see Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) ("An expert must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the jury.") (cleaned up) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1988)). And while expert testimony may indeed "embrace[] an ultimate issue," FED. R. EVID. 704, expert testimony "about a matter of everyday experience . . . is less likely to be admissible." *Florek v. Village of Mundelein, Ill.*, 649 F.3d 594, 602-03 (7th Cir. 2011); *see U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F.Supp.2d 768, 775 (N.D. Ill. 2009) (excluding expert testimony on intent).

This requirement of helpfulness has been applied in defamation cases. In *Grayson v. No Labels, Inc.*, a former congressman alleged that the defendants defamed him in political advertisements that suggested, among other things, he laundered money through the Cayman

---

[6] Much of McMahon's purported testimony is also inadmissible as improper summary testimony. *See* Fed. R. Civ. P. 1006. For example, in his report, McMahon collected a sample of social media posts "that buttressed my conclusions that people infer that this was a case of sexual misconduct and that people were sharing their impressions about what this case was about[.]" McMahon Dep. at 110:17-21. Federal Civil Rule 1006 allows for use of a summary, chart, or calculation to prove the content of voluminous writings, but "is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004) (citing evidence/procedure commentaries); *see AMPAT/Midwest, Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035, 1045 (7th Cir. 1990) ("[I]nadmissible documents are not made admissible by being summarized.").

Islands. 599 F. Supp. 3d 1184, 1188 (M.D. Fla. 2022). A federal court excluded the plaintiff's expert in part because the expert's opinions were "mere *ipse dixit*" and "several of the proffered opinions do not require specialized knowledge." *Id*. at 1192. The court reasoned that the expert would not assist the jury by offering his opinion on the interpretation of the alleged defamatory statements, *i.e.*, that the Cayman Islands are associated with fraud and that U.S. citizens are easily shocked by offshore accounts, as the jury was "capable of arriving at that conclusion." *Id*.; *see Tilton v. Capital Cities/ABC, Inc.,* 938 F. Supp. 751, 753 (N.D. Okla. 1995) (excluding defamation expert opinion on meaning of television broadcast statements).

Similarly, McMahon's opinions on publication, the meaning of the alleged defamatory statements, and how those statements were defamatory, malicious, and caused injury are not backed by any specialized knowledge and would not uniquely assist the jury. The jury is fully capable of arriving at these conclusions on its own. *See, e.g., OAO Alfa Bank v. Center for Public Integrity,* 387 F. Supp. 2d 20, 56 (D.D.C. 2005) (excluding defamation expert opinion on actual malice); *Lohrenz v. Donnelly,* 223 F. Supp. 2d 25, 36 (D.D.C. 2002), *aff'd,* 350 F.3d 1272 (D.C. Cir. 2003) (same); *World Boxing Council v. Cosell,* 715 F. Supp. 1259, 1264-1265 (S.D.N.Y. 1989) (same). McMahon should not give them any "expert gloss on a conclusion the jury should draw." *United States v. Gan*, 54 F.4th 467, 474-75 (7th Cir. 2022). Moreover, these opinions concern defamation issues that are squarely within the province of the jury. *See, e.g., Tamburo v. Dworkin*, 974 F. Supp. 2d 1199, 1213 (N.D. Ill. 2013) (truth or falsity); *Qvyjt v. Lin*, 932 F. Supp. 1100, 1109 (N.D. Ill. 1996) (actual malice); *Alberti v. First Del. Life Ins. Co.*, No. 89 C 5877, 1990 WL 43302, at *2 (N.D. Ill. Mar. 27, 1990) (meaning of alleged defamatory statement).[7]

---

[7] *See also Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 16 (1992) (holding that whether radio statements were understood as harmless jokes or as defamatory statements is for trier of fact to determine); *Chapski v. Copley Press*, 92 Ill.2d 344, 352 (1982) ("whether the publication was in fact

Simply put, McMahon is no better able than the jury to reach his conclusions and opinions. Accordingly, he will not uniquely help the jury in this matter and will only prejudice defendants and confuse the jury with an "expert" opinion on jury-reserved issues.

### III.  McMahon Followed No Reliable Methodology Or Principles

Assuming an expert is qualified to offer an opinion that helps the jury, the expert may testify in the form of opinion or otherwise, provided a "reliable foundation" for that testimony is laid. *Kumho Tire*, 526 U.S. at 141 (quoting *Daubert*, 509 U.S. at 597). *See* FED. R. EVID. 702(c). While the test of reliability is "flexible," a number of factors are helpful in the analysis:

> whether the theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether it has a high known or potential rate of error; whether it has standards controlling its operation; and whether it enjoys general acceptance within a relevant scientific community.

*Kumho Tire*, 526 U.S. at 149-50 (cleaned up) (citing *Daubert*, 509 U.S. at 592-94). These and other factors apply for "experience-based" testimony in the same way as scientific testimony:

> In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experienced-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

*Kumho Tire*, 526 U.S. at 151. And in the "less usual or more complex cases where cause for questioning the expert's reliability arises," the trial court may require additional "reliability" proceedings. *Id*. at 152.

Here, McMahon followed no method or process to reach his opinions, much less one that can be tested or is generally accepted by experts. Instead, he read case materials and depositions, interviewed plaintiff, ran internet searches, and compiled media data unspecific to the alleged defamation in this case. Then, he drew conclusions using a "journalistic methodology":

---

understood to be defamatory or to refer to the plaintiff is a question for the jury").

9

> I would say I followed my journalistic training and practice, and that is the journalistic methodology, which is ask questions, look at sources, compare what people say with what they do….Look at the incidents in the context of other developments, ask more questions. Ask for more research. Do some more research. Get lost in a couple rabbit holes along the way.

McMahon Dep. at 45:15-24. This approach is not a methodology worthy of expert opinion. It is the same general approach followed by anyone curious about an issue, whether that be what favorite Netflix show to watch over a long weekend, or what recipe is best for deep-dish pizza.

Even for his numerical "reach" opinions (*see, e.g.,* McMahon Rep. at 5), McMahon's estimates lack any methodological basis. He estimated, for example, that, "thousands, if not tens of thousands of [Google search results] associate[] Pat Gordon with unproven allegations that involve sexual activity with high school students." *Id*. at 17. McMahon used no analysis to arrive at this estimate. It was simply a guess. He just picked a range between 1 and the number of Google search results returned on random queries that did not even mention plaintiff:

> Q. I understand that, but did you do any math using those result figures that you testified about to arrive at the thousands, if not tens of thousands, conclusions at Page 17 of your report?
>
> A. The math was knowing that it was somewhere between 1 and 4.22 million and 1 and 9.5 million, and seeing how many stories were proved to be about that. That knowing how the internet works where thing get regenerated. It was an estimate without an equation if that is what you're asking for.

McMahon Dep. at 76:13-23; *see* McMahon Rep. at 18-19 (showing the two search queries).

McMahon also estimated that "the statements relating to Gordon reached the eyes or ears of more than 2.6 million people," including TV, radio, print, internet, and social media audiences. McMahon Rep. at 5, ¶ 5. Here, too, McMahon used no analysis to arrive at this estimate. True, McMahon added together numerical ranges for different types of audiences:

> Given reach like that on digital platforms, plus the continued power of print and broadcast radio and television, by my conservative estimate, the statements about Coach Gordon reached the eyes or ears of more than 2,627,000 people.
>
> - Broadcast television news: 1.25 million+
> - Broadcast radio news: 200,000+
> - Print: 560,000+
> - Digital news sites: 617,000 to millions"
> - **Total: 2,627,000+**
>
> The implications of all this for managing one's reputation are huge, particularly for a typical, private citizen like Coach Gordon.

*Id.* at 47. But each of these ranges—rather minimum floor figures—were themselves guesses built from other data. *Id.* at 37 (estimating 1.25 million television viewers from Nielsen ratings and using that figure to estimate 250 thousand radio listeners); 41 (estimating 560 thousand print readers by multiplying 2.5 times 225 thousand average weekday buyers/subscribers of newspapers); 42-47 (estimating 617 thousand digital readers based on limited page view data on chicagotribune.com). And for each of them, McMahon focused only on the broad "Lincoln Park story," not plaintiff. *See* McMahon Dep. at 11:22-12:1; *id.* at 12:18-13:12 (describing components of Lincoln Park Story). Nor did McMahon discount his estimates to account for the over-inclusive nature of his reach opinions. *Id.* at 50:17-22, 52:9-14; *see Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773-74 (7th Cir. 2014) (holding that failure to account for potential other causes of injury fatal to expert opinion).

Worse yet, McMahon assumed that these 2.6 million-plus people read or listened to the Lincoln Park story, understood the story to be about plaintiff, and then thought the less of him:

> Q. For your 2.6 million reach conclusion, did you assume that people were reading, watching, or listening to coverage about Lincoln Park High School events and thought negatively of Pat Gordon?
>
> A. Yes.

11

McMahon Dep. at 55:5-10. McMahon conceded, however, that he had no television or print media data to verify people watched or read coverage of the Lincoln Park story; that he never conducted any surveys or polls; and that he could not read others' minds. *Id*. at 51:22-23, 54:8-55:4, 56:10-16. Still, McMahon did not "see how anybody could argue that such coverage would not leave a bad impression of Coach Gordon." *Id*. at 55:22-24. More is required to establish reach and defamatory injury. *See Ciolino v. Simon*, 170 N.E.3d 992, 1004 (Ill. App. 2020) (holding "[w]hether a publication has occurred at all is a question for the jury" and requiring evidence that persons read alleged defamatory statements) (citations omitted).[8]

In sum, McMahon's reach and other opinions should be excluded as speculation and conjecture. They lack methodological foundation, incorporate unsupported assumptions, fail to account for differing components of the Lincoln Park story, and, at most, represent a guess on who and how many understood the alleged defamatory statements and thought the less of plaintiff.

### CONCLUSION

WHEREFORE, defendants request that this Court exclude plaintiff's expert Colin McMahon from offering expert testimony in this matter and for any other and further relief this Court deems just and proper under the circumstances.

Dated: January 9, 2024        Respectfully submitted,

                                     **DEFENDANTS BOARD OF EDUCATION OF THE CITY OF CHICAGO, JACKSON, LEMONE, CHOU, PASSMAN, CHKOUMBOVA, AND SPRAGGINS**

---

[8] McMahon's media reach testimony is also cumulative, and therefore inadmissible under Federal Civil Rule 403, to testimony proffered by plaintiff's other expert, Sameer Somal, who also intends to testify about the extent of publication of the alleged defamatory statements.

Ruchi Verma, General Counsel

By: /s/ *Joseph L. Meadows*      
   One of the Attorneys for Defendants

Elizabeth K. Barton / ekbarton@cps.edu
Board of Education of the City of Chicago
One North Dearborn Street
Law Department, Suite 900
Chicago, Illinois 60602
(773) 553-1700

Susan J. Best / sbest@grsm.com
Joseph L. Meadows / jmeadows@grsm.com
Gordon Rees Scully Mansukhani, LLP
1 North Franklin, Suite 800
Chicago, Illinois 60606
(312) 565-1400

## CERTIFICATE OF SERVICE

I, Maximilian J. Bungert, an attorney of record, hereby certify that I caused the attached **Defendants' Opposed Motion to Exclude Plaintiff's Expert Colin McMahon** to be filed with the Clerk of Court on January 9, 2024 using the CM/ECF system which sent notification of such filing to all counsel of record.

By: /s/ *Maximilian J. Bungert*
Maximilian J. Bungert, Atty No. 6338774

14