**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Patrice Gordon, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:21-cv-549 |
| | ) | |
| v. | ) | Judge Maldonado |
| | ) | |
| Board of Education for the City of Chicago, | ) | Magistrate Judge Kim |
| et al., | ) | |
| | ) | ***DAUBERT* HEARING REQUESTED** |
| Defendants. | ) | |

**DEFENDANTS' OPPOSED MOTION TO EXCLUDE
PLAINTIFF'S EXPERT SAMEER SOMAL**

Defendants, by one their attorneys, Gordon Rees Scully Mansukhani, LLP, pursuant to Rule 702 and other authorities cited herein, and for their Motion to Exclude Plaintiff's Proffered Expert Sameer Somal, state as follows:[1]

**INTRODUCTION**

At bottom, this is a defamation, false light, and emotional distress case arising out of statements allegedly made by defendants and then republished or newly published by the media. Central to these claims are issues on publication and falsity of the statements, reputational and other injury to plaintiff, and the knowledge and intent of defendants. The jury will decide these issues. Still, plaintiff intends to offer expert testimony, apparently to "help" (*see* Rule 702) the jury in their decision-making.

One of two experts proffered by plaintiff is Sameer Somal. Somal presents himself as an online defamation and reputation repair expert, as well as an investment analyst and frequent speaker on a range of business topics. He seeks to testify at trial that defendants and the media

---

[1] Unless otherwise indicated, all rule references refer to the Federal Rules of Evidence.

1

published statements that were false and defamatory, caused injury to plaintiff, and were made intentionally. Somal and this testimony should be excluded.[2]

First, Somal is not qualified to give expert testimony on conclusions such as whether statements were false and defamatory, caused injury, and were made willfully or intentionally. He is not a lawyer, medical or health professional, expert on falsity or intent, or expert on how defamatory statements are understood by others. Second, Somal's testimony will not help the jury. Instead, it invades their province and would confuse and mislead them on one person's "expert" views on the conclusions above, which are reserved for the jury. Third, Somal's testimony lacks any reliable and testable foundation. His conclusions and opinions are based on his understanding of defamation and "similar" defamation cases. Although Somal attempts to apply a methodology to what he admits are "inherently subjective" reputational damages, his methods are not recognized by anyone other than Somal.

## BACKGROUND

Sameer Somal is one of two experts proffered by plaintiff. (The other expert is Colin McMahon, a claimed media expert, and defendants seek to exclude him as well.) Somal is the CEO of Blue Ocean Global Technology and claims to be an expert on defamation and reputation repair. *See* Ex. 1 (Online Reputation Assessment, Damage & Repair Expert Witness Report) ("Somal Rep.") at 18. He is also an investment analyst, holding CFA, CFP, and CAIA licenses, and speaker on a range of topics, including "diversity and inclusion," "relationship capital and

---

[2] On December 12, 2023, pursuant to the Court's Standing Order, the parties met via video to confer on the opinions offered by plaintiff's experts. In follow up to the meeting, plaintiff's counsel confirmed that he "will not seek to introduce any opinion testimony that CPS made false statements" because "both of our experts assume liability." *See* Ex. 4, 2023-12-12 Email Chain. However, both experts offer numerous other improper opinions on liability and damages resulting in this motion.

ethics," "entrepreneurship," "leadership," "digital marketing," and "business networking." *See* Ex. 2 (Transcript of Sameer Somal Deposition) ("Somal Dep.") at 38:1-39:1.

Somal estimates damages in this case at no less than $6.3 million and potentially reaching $35 million. *See* Somal Rep. at 5, 87. He breaks down damages into five categories and totals them at the end:

- No amount of money or time can fully rehabilitate Coach Gordon's reputation. At best his reputation can only be partially restored with a several years campaign cost of $486,000 (the Rehabilitative component of damages). A breakdown of all damages totals:
  - Economic Damages: $1,300,000 - $3,500,000+
  - Rehabilitative Damages: $486,000 - $621,000
  - Physical Damages: $100,000 - $1,000,000
  - Emotional Damages: $250,000 - $2,000,000.
  - Reputational Damages: $4,250,000 *plus* a substantial, appropriate amount for the millions of strangers who only know Coach Gordon as someone who was accused of committing "sexual misconduct" or "serious misconduct" against a student.
  - **Total Damages: $6,386,000 – $11,371,000 *plus* a substantial, appropriate amount for the millions of strangers who only know Coach Gordon as someone who was accused of committing "sexual misconduct" or "serious misconduct" against a student.**

*Id*. at 5.

In particular, Somal calculates economic damages as lost opportunity costs per year of at least $50,000 for the number of years remaining (26) before a standard retirement age of 65. *Id.* at 75. He reasons that, "[t]hough Coach Gordon was likely to – and eventually did – receive a job that replaced his school security officer salary, obtaining a coaching position (his chosen career) is foreclosed as a result of the false statements and media reach of the original stories." *Id.* Somal calculates physical damages of at least $100,000, based on "similar cases," because plaintiff suffered various "traditional physical and medical-related damages, including his reports of anxiety, insomnia, hypertension and stress." *Id.* at 77. And he calculates emotional damages

3

of at least $250,000, also based on "similar cases," because the "false statements and subsequent media storm have inflicted significant and lasting damage to Coach Gordon's mental well-being and overall quality of life." *Id.* at 78-79.

For reputation damages, Somal used a "suppression campaign" model to compute "rehabilitative" damages of at least $486,000, and a "reputational rings" "structure" to compute "reputation" damages of at least $4,250,000 "plus a potentially even higher amount for Ring 3 damages." *Id.* at 76, 87. The former consists of an estimate that it would cost between $18,000 and $23,000 per month for 27 months to pay a reputation management company to create positive online content about plaintiff that would "suppress" negative content. *Id*. at 76.[3] The latter consists of an estimate for three groups of damages, with each "Ring" group representing types of persons who were allegedly exposed to the defamation:

Ring 1 (Inner Circle - Family and Close Friends): …

For Ring 1, given my experience in similar cases, I calculate damages at no less than $1,500,000.

Ring 2 (Secondary Circle - Acquaintances, Neighbors, Co-Workers, Etc.): …

For Ring 2, given my experience in similar cases, I calculate damages at no less than $2,750,000.

Ring 3 (Outer Circle - Millions of Strangers): …

For Ring 3, a logical basis for damages is attaching a dollar amount for each of the 3.5 million people who only learned of Coach Gordon through these false statements and thus only forever have the most negative opinion of his reputation possible. For instance, awarding just $1 for each of the 3.5 million who were exposed to this falsehood about Coach Gordon translates to $3,500,000. If instead we award $10 to each of the millions who had or have only a negative opinion of Coach Gordon, that is $35,000,000.

---

[3] Alternatively, Somal estimates a "suppression campaign" cost at "between $2,000-$2,500" per "250 pieces" of positive online content. *See* Somal Rep. at 76.

*Id*. at 86-87.

Damages aside, Somal offers conclusions and opinions on defamation, the meaning of the alleged defamatory statements, falsity, media reach, causation, intent, and motive. For example, Somal seeks to testify on the following:

- "As stated in Colin McMahon's report, which I did not rely upon, conservatively at least 2.6 million people were exposed to these stories about Coach Gordon and his colleagues….As my focus is more so on internet and viral exposure, **I estimate the total exposure at no less than 3.5 million people worldwide**." *Id.* at 5 (emphasis added).

- "**Defendants' statements (mis)attributed Coach Gordon of having committed**, or at least being accused of having committed, at least three things … Sexual misconduct … Adult on-student sexual misconduct . . . Serious misconduct[.]" *Id.* at 26 (emphasis added).

- "Coach Gordon was not even accused of committing 'sexual misconduct,' and he also committed no 'serious misconduct' either, yet the **false public comments by CPS officials** while referring (or inferring) to him **give the appearance to the public** at large that he did or may have." *Id.* at 69 (emphasis added).

- "The **media impact generated by the false statements** related to Coach Gordon was substantial" / "like the large volume of cohesive, negative, and **false statements** made by the Defendants about Coach Gordon" / "Defendants' **false statements**" / "impact of the Defendants' actions and reach of the **false accusations** are catastrophic" / "Defendants issued a succession of **false statements** on multiple occasions." / "At least 3.5 million people's only exposure to Coach Gordon and knowledge of him is from these **false reports** of 'sexual misconduct.'" *Id*. at 5, 25, 64, 69, 73, 86 (emphasis added).[4]

- "The **negative and false information** that disseminated across all available media and news channels **directly resulted from the Defendants' actions**." *Id.* at 30 (emphasis added).

- "Because of Defendants' numerous false statements that they proactively disseminated, some of which incorporated pieces of truth to enhance the believability of their statements, **it seems clear that Defendants actively sought to create, and then maintain, a narrative that placed and then maintained Coach Gordon in a false light**." *Id.* at 39 (emphasis added).

- "The reason the category of '**defamation per se**' exists is precisely because precisely calculating damages in such heinous contexts as this is impossible. That

---

[4] Plaintiff represents that Somal will not offer expert testimony on falsity because he assumes liability.

is why **damages are presumed, because defamation is so devastating to a person's reputation in such cases, like this**." *Id*. at 85 (emphasis added).

To arrive at his conclusions and opinions, Somal principally relies on his understanding of defamation and claimed experience handling reputation matters. "Though I am not a lawyer, I have studied defamation and, again, been retained in dozens of defamation cases to assess damages." Somal Rep. at 85; *see id*. at 77, 79, 86-87 (referring to reliance on "similar cases"). Somal, however, never identifies defamation cases upon which he relied, clients for whom he has repaired reputations, or writings or industry literature recognizing his self-developed methods for quantifying what he admits are the "subjective" nature of reputational damages. *Id*. at 85.

## LEGAL STANDARD

In federal court, the admission of expert testimony is governed by Rule 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The court exercises a "gatekeeping" role to determine the relevance and reliability of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) (scientific experts); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (technical and other specialized experts). But the burden rests with the proponent of that testimony to meet the requirements of Rule 702 and *Daubert/Kumho Tire*. *See Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).[5]

---

[5] Recent amendments to Rule 702 became effective December 1, 2023. Those amendments clarify that the proponent of expert testimony bears the burden on admissibility under a "more likely than not" standard for each proffered opinion. FED. R. EVID. 702 (effective December 1, 2023). The amendments were made necessary because many courts incorrectly determined that "critical questions of the

Experts may be excluded for lack of qualifications, absence of any need for expert testimony, and unreliable methodologies or principles. *See, e.g., Varlen*, *supra*, at 460 (affirming exclusion of geologist for unreliable, "beyond a simple say-so" methodology as to cause of groundwater contamination); *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (affirming exclusion of engineer because he "has neither a medical degree nor any medical training, and an individual with a degree in mechanical engineering is not qualified to give expert testimony on medical questions, including the cause of an eye injury"); *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 835 (N.D. Ill. 2013) (excluding legal expert for "effectively acting as an arbiter of facts" and his opinion "does not add anything that would be of help to the jury in resolving the factual dispute"). All these reasons apply in this case.[6]

## ARGUMENT

### I. Somal Is Not Qualified To Offer Expert Testimony

A witness may testify in the form of expert "opinion or otherwise" if qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. The testimony, however, must match the expert's qualifications. *See Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.") (citations omitted).

---

sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." FED. R. EVID. 702 advisory committee notes to 2023 amendments.

[6] In a related state-court case with different named plaintiffs, Somal was allowed to give expert testimony over the admissibility objections of defendants. That case was governed by Illinois' *Frye* standard for the admissibility of expert testimony. The court there, noting that "Illinois is very liberal in allowing experts" and state courts are not "gatekeepers" for expert testimony, denied defendants' motion to exclude Somal in a single sentence without reasoning. *See* Ex. 3 (containing Order, *Robinson & Johnson v. Board of Education for the City of Chicago*, Nos. 2021 L 001047, 1072 (Cir. Ct. Cook Co., Ill. July 20, 2023) ("court denies Defendants' Motion *in limine* #18 and #19"); Mot. Hr'g Tr. 66-67, July 14, 2023).

Somal fashions himself as a "defamation expert" based on his experience and work with lawyers. *See* Somal Dep. at 24:16-25:24. He offers conclusions and opinions on defamation, defamation-related injuries (including reputational, vocational, physical, and emotional), causation, intent, and motive. But Somal is not qualified to offer testimony on these legal and factual topics. He admits that he is none of the following:

- Lawyer
- Doctor or health professional
- Vocational expert
- Basketball coach expert
- Truth/falsity expert
- Words/interpretation expert
- Intent/motive expert
- Chicago Public Schools expert

Somal Dep. at 18:24-19:22, 20:4-21:4, 22:5-15, 22:21-23:1, 24:3-15. Moreover, his claimed reputation-repair expertise does not match the breadth of other topics for which he espouses expert conclusions and opinions. Accordingly, Somal is not qualified to offer expert testimony in this matter.[7]

## II.   Somal Will Not Help The Jury

An expert may only offer testimony that will "help the trier of fact to understand the evidence or to determine a fact in issue[.]" FED. R. EVID. 702. "Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Sanders v. City of Chi. Heights*, No. 13 C 0221, 2016 WL 4398011, at *4 (N.D. Ill. Aug. 18, 2016) (quotations and citations omitted); *see Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) ("An

---

[7] Somal knows better than to admit he is offering legal opinions, yet he offers them nonetheless. *Compare* Somal Dep. at 26:1-4 ("I am not a lawyer, so I'm not offering any legal opinions.") *with*, *e.g.*, Somal Rep. at 5, 35, 73 (causation), 30 ("compromised Coach Gordon's standing in society"), 39 (false light), 48 (defamation), 67 (same and Section 230 of the Communications Decency Act), 70 (defamation), 73 (foreseeability), 85 & 87 (defamation per se and presumed damages).

expert must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the jury.") (cleaned up) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998)). And while expert testimony may indeed "embrace[] an ultimate issue," FED. R. EVID. 704, expert testimony "about a matter of everyday experience . . . is less likely to be admissible." *Florek v. Village of Mundelein, Ill.*, 649 F.3d 594, 602-03 (7th Cir. 2011); *see U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 768, 775 (N.D. Ill. 2009) (excluding expert testimony on intent).

This requirement of helpfulness has been applied in defamation cases. In *Grayson v. No Labels, Inc.*, a former congressman alleged that the defendants defamed him in political advertisements that suggested, among other things, he laundered money through the Cayman Islands. 599 F. Supp. 3d 1184, 1188 (M.D. Fla. 2022). A federal court excluded the plaintiff's expert in part because the expert's opinions were "mere *ipse dixit*" and "several of the proffered opinions do not require specialized knowledge." *Id*. at 1192. The court reasoned that the expert would not assist the jury by offering his opinion on the interpretation of the alleged defamatory statements, *i.e.*, that the Cayman Islands are associated with fraud and that U.S. citizens are easily shocked by offshore accounts, as the jury was "capable of arriving at that conclusion." *Id*.; *see Tilton v. Capital Cities/ABC, Inc.,* 938 F. Supp. 751, 753 (N.D. Okla. 1995) (excluding defamation expert opinion on meaning of television broadcast statements).

Similarly, Somal's opinions on the meaning of alleged defamatory statements and how they attributed false and defamatory information about plaintiff would not uniquely help the jury. The same is true for Somal's other opinions that address defendants' state of mind or the strength of plaintiff's case. He concludes that defendants "(mis)attributed" plaintiff of having committed sexual or serious misconduct, Somal Rep. at 26, and defendants "actively sought to create and

9

then maintain" false narratives about plaintiff. *Id*. at 39. He believes this case "may be the worst example of a media storm tarnishing a private individual's reputation that I have been retained to examine," *id*. at 78, and that "in all my expert work, I haven't seen a case like this that is, and I paused, so egregious." Somal Dep. at 104:24-105:2.[8]

These opinions are not beyond the common knowledge of the average juror and should be excluded. *See, e.g., OAO Alfa Bank v. Center for Public Integrity,* 387 F. Supp. 2d 20, 56 (D.D.C. 2005) (excluding defamation expert opinion on actual malice); *Lohrenz v. Donnelly,* 223 F. Supp. 2d 25, 36 (D.D.C. 2002), *aff'd,* 350 F.3d 1272 (D.C. Cir. 2003) (same); *World Boxing Council v. Cosell,* 715 F. Supp. 1259, 1264-1265 (S.D.N.Y. 1989) (same). Somal should not give them any "expert gloss on a conclusion the jury should draw." *United States v. Gan*, 54 F.4th 467, 474-75 (7th Cir. 2022). Moreover, these opinions concern defamation issues that are squarely within the province of the jury. *See, e.g., Tamburo v. Dworkin*, 974 F. Supp. 2d 1199, 1213 (N.D. Ill. 2013) (truth or falsity); *Qvyjt v. Lin*, 932 F. Supp. 1100, 1109 (N.D. Ill. 1996) (actual malice); *Alberti v. First Del. Life Ins. Co.*, No. 89 C 5877, 1990 WL 43302, at *2 (N.D. Ill. Mar. 27, 1990) (meaning of alleged defamatory statement).[9]

---

[8] Somal's proffered testimony regarding any "media storm" is not testimony that is admissible under Federal Civil Rule 1006, which allows for use of a summary, chart or calculation to prove the content of voluminous writings, recordings, or photographs. Similarly, Somal's video montage of cherry-picked news reports in Appendix F of his report is not an admissible summary, chart or calculation. *See Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004) ("Rule 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible.") (citing evidence/procedure commentaries); *see AMPAT/Midwest, Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035, 1045 (7th Cir. 1990) ("[I]nadmissible documents are not made admissible by being summarized.").

[9] *See also Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 16 (1992) (holding that whether radio statements were understood as harmless jokes or as defamatory statements is for trier of fact to determine); *Chapski v. Copley Press*, 92 Ill.2d 344, 352 (1982) ("whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury").

Simply put, Somal is no better able than the jury to reach his conclusions and opinions. Accordingly, his testimony will not uniquely help the jury in this matter and will only prejudice defendants and confuse the jury with an "expert" opinion on jury-reserved issues.

### III. Somal Followed No Reliable Methodology Or Principles

Assuming an expert is qualified to offer an opinion that helps the jury, the expert may testify in the form of opinion or otherwise, provided a "reliable foundation" for that testimony is laid. *Kumho Tire*, 526 U.S. at 141 (quoting *Daubert*, 509 U.S. at 597). *See* FED. R. EVID. 702(c). While the test of reliability is "flexible," a number of factors are helpful in the analysis:

> whether the theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether it has a high known or potential rate of error; whether it has standards controlling its operation; and whether it enjoys general acceptance within a relevant scientific community.

*Kumho Tire*, 526 U.S. at 149-50 (cleaned up) (citing *Daubert*, 509 U.S. at 592-94). These and other factors apply for "experience-based" testimony in the same way as scientific testimony:

> In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experienced-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

*Kumho Tire*, 526 U.S. at 151. And in the "less usual or more complex cases where cause for questioning the expert's reliability arises," the trial court may require additional "reliability" proceedings. *Id*. at 152.

The focus of Somal's testimony is on damages. It was the "purpose" of his expert report. Somal Dep. at 27:3-5. He opines that plaintiff suffered broad ranges of lost pay ($1.3 million to over $3.5 million), physical damages ($100 thousand to $1 million), emotional damages ($250 thousand to $2 million), and reputational harm ($486-621 thousand for "Rehabilitative

11

Damages" and $4.25 million to $35 million for "Reputational Damage (Defamation Per Se)").

Somal Rep. at 5, 74-87.

Overall, Somal's damages opinions lack a reliable foundation. They are not based on any recognized methodology. "Yes, I don't believe there's an endorsed recognized methodology for calculating the subjective nature of damages in a defamation case." Somal Dep. at 80:13-15. They concern reputational harm that is "inherently subjective" and "difficult to quantify":

> Reputations hold immense value because they are built on perceptions, beliefs, and opinions that others hold about an individual or entity…While it's difficult to quantify reputations in concrete terms, their impact is undeniable.
>
> ***
>
> Assessing the extent of harm to one's reputation is inherently subjective. Reputation is a complex and intangible concept that varies from person to person and can be influenced by numerous factors. Different individuals may interpret the same defamatory statement differently and there is no objective measure of reputation damage.

Somal Rep. at 80 and 85.

As in *Kumho Tire*, these admissions weigh against reliability. *See Kumho Tire*, 526 U.S. at 155 (noting that trial court's reliability concerns "might have been augmented by [the expert's] repeated reliance on the 'subjective[ness]' of his mode of analysis"). In sum, Somal's damages opinions amount to nothing more than impermissible *ipse dixit* ("he himself said it") reasoning.

### A.    Economic, Physical, Emotional Damages

Somal computed lost pay (economic damage) and physical and emotional damages by interviewing plaintiff, referencing a couple sources, and applying his claimed experience in and knowledge of (uncited) defamation cases. *See* Somal Rep. at 75, 77-79. As such, Somal's computations reflect no reliable methodology, much less computations based on "sufficient facts or data." *See* Rule 702(b)-(c); *see* Rule 702 advisory committee notes to 2000 amendments (discussing experience-based expert testimony). Moreover, any testimony on damage awards in

other defamation cases would be irrelevant, unfairly prejudicial, and confusing. FED. R. EVID. 401-03; *see Fields v. City of Chicago*, No. 12 C 1306, 2018 WL 1652093, at *11 (N.D. Ill. Apr. 5, 2018) (excluding evidence of non-party damages in other cases) (citing FED. R. EVID. 401-03). Indeed, just last year, a federal court in Florida barred Somal from attempting to do there what he attempts here.

In *Ludwin v. Proman*, No. 20-CV-81755-RS, 2023 WL 315909 (S.D. Fla. Jan. 19, 2023), Somal tried to offer expert testimony in a defamation case that plaintiffs had suffered over $12 million in reputational damage based on his understanding of other defamation cases. The court excluded that testimony as not based on a reliable foundation, as well as speculative and unhelpful:

> Somal opines that Plaintiffs are entitled to an award of $12,060,000.00 in damages based in large part on his collection and analysis of defamation-case precedents nationwide. This methodology is not sufficiently reliable, in particular when employed by a non-lawyer, and it is not generally accepted as a means to prove damages in any given defamation action. Furthermore, testimony on this speculative damage amount would needlessly confuse rather than assist the trier of fact in determining the proper scope of damages. Accordingly, Somal may not testify as to a suggested damages calculation based on his collection and review of prior defamation cases.

*Id.* at *2 (citation omitted). The court also barred Somal from offering legal conclusions on defamation and malicious intent. *Id.* at *1 (citations omitted). While the court did allow Somal to testify on reputational repair costs, *see id.* at *2, neither the court's decision nor the docket record in that case reflects that any Rule 702 or *Daubert/Kumho Tire* proceedings took place.[10]

Accordingly, Somal's testimony on economic, physical, and emotional damages is unreliable and otherwise inadmissible.

---

[10] Somal was not deposed in the *Ludwin* case. His deposition testimony in this case, on the other hand, underscores the unreliability of his methods and overall inadmissibility of his testimony.

**B.**      **Reputation Damages**

Somal computed reputation damages by using (1) a "suppression campaign" estimate for "Rehabilitative Damages" and (2) a "reputational rings" "structure" for "Reputational Damages (Defamation Per Se)." Here, too, the computations are unreliable.

First, the premise for Somal's computations, *i.e.*, that at least 3.5 million people were "exposed" to the alleged defamation, lacks a reliable foundation. *See* Somal Rep. at 5. Somal employed no methodology or calculation to estimate this figure. He simply guessed it was roughly one million higher than plaintiff's other expert's 2.6 million figure:

> As stated in Colin McMahon's report, which I did not rely upon, conservatively at least 2.6 million people were exposed to these stories about Coach Gordon and his colleagues. As my focus is more so on internet and viral exposure, I estimate the total exposure at no less than 3.5 million people worldwide.

*Id*. at 5.[11]

Second, Somal's damage methods cannot be tested. *See Kumho Tire*, 526 U.S. at 149-50 (citing *Daubert*, 509 U.S. at 592-94). He provided no formula for calculating reputation-repair costs of $18-23K per month; he gave no rate for the success or failure of his reputation repair services; and he referenced no other reputation-repair "campaigns" or clients he worked on or with for comparison. *See* Somal Dep. at 82:3-84:18, 175:1-6, 179:15-21, 187:4-21. In short, there is no way to verify Somal's methods or conclusions. *See Daubert*, 509 U.S. at 593 ("Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.")

---

[11] Somal's exposure testimony is also cumulative, and therefore inadmissible under Federal Civil Rule 403, to testimony proffered by plaintiff's other expert, Colin McMahon, who also intends to testify about the extent of publication of the alleged defamatory statements.

Third, Somal's damage methods are not recognized. Thus, the methods have not been peer reviewed, generally accepted, or subjected to governing standards or principles. *See Kumho Tire*, 526 U.S. at 149-50 (citing *Daubert*, 509 U.S. at 592-94). Somal admits that he knows of no "endorsed recognized methodology for calculating the subjective nature of damages in a defamation case." Somal Dep. at 80:13-15. But he is proud that he came up with one for this case:

> I have not seen that three-ring or three-layer structure anywhere else. I mean, no, I – I have not seen that. I can claim in earnest on the record, Joe, that I did not see that anywhere else, and I put that together myself.
>
> ***
>
> It's something that as an expert, and as an entrepreneur, I'm proud of the fact that I came up with a [damages] construct, because this case provided me more clarity on how to look at damages, because it's so egregious.

Somal Dep. at 81:14-18, 198:8-12. Naturally, Somal could not identify any writings or industry literature, much less anything peer reviewed, that mentions his made-up methods for quantifying rehabilitative and reputational damages.[12]

Like the expert in *Kumho Tire*, who used his own "two-factor test" and "visual/tactile inspection" to opine on manufacturing or design defects, Somal's suppression campaigns and reputational rings are not acceptable methodologies for computing reputation damages:

> The particular issue in this case concerned the use of Carlson's two-factor test and his related use of visual/tactile inspection to draw conclusions on the basis of what seemed small observational differences. We have found no indication in the record that other experts in the industry use Carlson's two-factor test or that tire experts such as Carlson normally make the very fine distinctions about, say, the symmetry of comparatively greater shoulder tread wear that were necessary, on Carlson's own theory, to support his conclusions. Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate Carlson's approach.

---

[12] Most of the articles included in Appendix A to the Somal Report are Somal's writings on reputation and brand management that he publishes on platforms he owns, controls, or likely pays for.

*Kumho Tire*, 526 U.S. at 157. Accordingly, Somal's testimony on rehabilitative and reputational damages is unreliable and should be excluded.

## CONCLUSION

WHEREFORE, defendants request that this Court exclude plaintiff's expert Sameer Somal from offering expert testimony in this matter and for any other and further relief this Court deems just and proper under the circumstances.

Dated: January 9, 2024

Respectfully submitted,

**DEFENDANTS BOARD OF EDUCATION OF THE CITY OF CHICAGO, JACKSON, LEMONE, CHOU, PASSMAN, CHKOUMBOVA, AND SPRAGGINS**

Ruchi Verma, General Counsel

By:      /s/ *Joseph L. Meadows*
         One of the Attorneys for Defendants

Elizabeth K. Barton / ekbarton@cps.edu
Board of Education of the City of Chicago
One North Dearborn Street
Law Department, Suite 900
Chicago, Illinois 60602
(773) 553-1700

Susan J. Best / sbest@grsm.com
Joseph L. Meadows / jmeadows@grsm.com
Gordon Rees Scully Mansukhani, LLP
1 North Franklin, Suite 800
Chicago, Illinois 60606
(312) 565-1400

16

## CERTIFICATE OF SERVICE

I, Maximilian J. Bungert, an attorney of record, hereby certify that I caused the attached **Defendants' Opposed Motion to Exclude Plaintiff's Expert Sameer Somal** to be filed with the Clerk of Court on January 9, 2024 using the CM/ECF system which sent notification of such filing to all counsel of record.

By: /s/ *Maximilian J. Bungert*
Maximilian J. Bungert, Atty No. 6338774