# EXHIBIT 2

Case: 1:21-cv-00549 Document #: 133-2 Filed: 01/09/24 Page 2 of 315 PageID #:1401

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

PATRICE GORDON, )
)
  Plaintiff, )
)
vs. )  Case No. 1:21-cv-00549
)
BOARD OF EDUCATION FOR )
THE CITY OF CHICAGO, et )
al., )
)
  Defendants. )
_____)


VIDEOCONFERENCE DEPOSITION OF

SAMEER SOMAL

APPEARING REMOTELY

BUCKS COUNTY, PENNSYLVANIA

AUGUST 17, 2023, 9:32 A.M.


REPORTED BY:  A. Christine Hylton, CSR, RPR

Page 2

REMOTE APPEARANCES

FOR THE PLAINTIFF:
WILLIAM CHOSLOVSKY, ESQ.
Gingsberg Jacobs, LLC
300 S. Wacker Drive, Suite 2750
Chicago, Illinois  60606
Wchoslovsky@ginsbergjacobs.com

FOR DEFENDANTS:

JOSEPH MEADOWS, ESQ.
SUSAN BEST, ESQ.
Gordon Rees Scully Mansukhani LLP
1 N. Franklin Street, Suite 800
Chicago, Illinois  60606
Jmeadows@grsm.com
Sbest@grsm.com

I N D E X

WITNESS                                                          PAGE

SAMEER SOMAL

    Direct Examination By Mr. Meadows............4

    Cross-Examination By Mr. Choslovsky........224

    Redirect Examination By Mr. Meadows........236

E X H I B I T S

Exhibit 1 - Expert Report                              212

Exhibit 2 - C.V.                                       212

Exhibit 3 - LinkedIn Profile                           212

Exhibit 4 - YouTube Channel Page                       212

Exhibit 5 - Wititia Profile                            213

Exhibit 6 - Instagram Profile                          213

Exhibit 7 - Personal Profile from Web page    214

Exhibit 8 - Google Reviews                             214

Exhibit 9 - Google Reviews Filtered from

  Lowest                                               215

    (Exhibits retained by counsel.)

Page 4

MR. MEADOWS:  Well, good morning, everybody.  My name is Joe Meadows.  I'm an attorney with Gordon Rees on behalf of the defendants, working with my colleague, Susan Best, also with Gordon Rees.

Before we begin, perhaps we could go around and have everybody introduce themselves, starting with you, Mr. Somal.

THE WITNESS:  Yes, hi.  Sameer Somal, CEO of Blue Ocean Global Technology, and expert witness for the plaintiff, Pat Gordon.

MR. CHOSLOVSKY:  William Choslovsky, lawyer for the plaintiff, Pat Gordon.

SAMEER SOMAL,
Called as a witness after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MEADOWS:

Q.  We have Susan Best, who may be joining intermittently during the deposition.

There's nobody else, and so we'll begin.

Sameer, as we did in the June deposition in the other case, I hope you don't mind if I call you Sameer.

A.  Yes, that's fine, Mr. Meadows.

Page 5

Do you prefer Joe, or do you prefer Mr. Meadows?

Q. You can -- you can call me Joe.

A. Okay, Joe. Sounds good.

Q. Sameer, for the record, can you state your full name and address?

A. Yes. My full name is Sameer, S-a-m-e-e-r. My last name is Somal, S-o-m-a-l. My address is 4251 Lynn Circle, Doylestown, PA 18902.

Q. Even though we are not in person, we're doing this deposition remotely, you've been sworn in, and you understand your testimony is under oath?

A. I do.

Q. You don't plan on communicating with anyone today in connection with your deposition?

A. Aside from the Zoom, no.

Q. I'm sorry, aside -- aside from assume?

A. Oh, from this Zoom. This is where I'm communicating, yeah.

No, so nowhere else.

Q. Right.

You're not going to be communicating electronically or otherwise with anyone while this deposition is taking place?

Page 6

A.   No.

Q.   Is anyone else in the room with you, Sameer?

A.   No.

Q.   If you don't understand a question during the deposition, let me know, and I'll try to clarify it; but I'm going to assume that if you answer the question, you understood the question that I -- that I gave you; is that okay?

A.   Yes, that sounds good, Joe.

Q.   Is there any reason, medical or otherwise, why you can't give me full, complete, and truthful testimony today?

A.   No.

Q.   If you need to take a break, let me know; I'm happy to accommodate you.

We will take breaks throughout the deposition, but I'm happy to take one any time you need, all right?

A.   Sounds good.

Q.   What did you do to prepare for your deposition testimony today?

A.   I reviewed my report.  I reviewed some of the case documents.  I know there -- there are a lot

Page 7

of them.  Yeah, so that's what I did to prepare.

Q.    Did you review anything from the John Johnson and Donovan Robinson case?

A.    I did not, no, I -- I didn't necessarily look at that, no.

Q.    For purposes of this deposition, if I refer to the John Johnson and Donovan Robinson case as the State case, you'll understand what I mean, right?

A.    Yes, I will understand.

I was -- yes, I was an expert in those two cases, correct.

Q.    Did you read any of the motions that were filed in the State case?

A.    I did previously, what was shared with me from counsel, although it's been -- it's been a little while.  I read a lot of documents, so if we have to look at anything, I'm happy to pull it up on what I have, or you can show me, if there's something in reference.

Q.    Did you read your deposition testimony from the State case?

A.    My deposition transcript?

Q.    (Nodding head.)

A.    I believe I saw that following.  Yeah, I

Page 8

believe I saw that, following that deposition.

Q.   Did you read a deposition transcript for the other proposed expert in this case, Colin McMahon?

A.   I did not.

I don't believe I received that, either.

Q.   In the deposition of --

A.   I did read -- I did read your motion, I think, to exclude -- to exclude me.  I did read that. I did receive that from Mr. Choslovsky.

Q.   You read the response to that motion?

A.   I -- I'm not sure if I read the response. I'd have to check and see what I received.

One second, please.

Q.   No, that's okay.  If you don't recall, we'll move on.

So the deposition that I took of you in the State case, that was June 28th, 2023, correct?

A.   Yes.

Q.   With respect to your expert report in this case, the Gordon case, did you do anything with that expert report, based on deposition questions I asked of you in the State case?

A.   No.

Page 9

MR. CHOSLOVSKY: I'll make a belated objection of vague.

BY MR. MEADOWS:

Q. Do you recall, in the State case, I asked you, in your June 2023 deposition, about various publication links that you had provided in the report in that State case?

MR. CHOSLOVSKY: I'll object on -- -

THE WITNESS: I'll --

MR. CHOSLOVSKY: Hold on.

I'll object on relevance, since he's asking about different cases.

With that objection made, answer his question.

THE WITNESS: Yes. Can you repeat the question?

MR. MEADOWS: Do you recall, in the June deposition that I took of you, we discussed some public -- publication links that weren't working in your expert report?

THE WITNESS: Yes.

BY MR. MEADOWS:

Q. Did you fix those?

A. I instructed -- yes, I instructed our team

to double-check any links, because there have been some publication changes on those.

Q. Did they fix the links?

A. I believe so.

Q. Who did you talk to?

A. What do you mean by "who I did talk to"?

Q. You said you instructed your team.

Who did you talk to?

A. Yes, I have a colleague named Aashna, and she was preparing some of the reports. She gets together some of those documents, and so I asked her to double-check.

I think there were a very small percentage of links provided that were 404 errors, and I had those updated.

Q. What is Aashna's name?

A. Her name is Aashna.

Q. Last name?

A. Duggal.

Q. Can you --

THE COURT REPORTER: Duggal?

MR. MEADOWS: Can you spell that for the court reporter?

THE WITNESS: Yes, A-a-s-h-n-a. Last

Page 11

name Duggal, D-u-g-g-a-l.

BY MR. MEADOWS:

Q.   Where is she located?

A.   She's located in India.

Q.   What was her involvement in your expert report in this case?

A.   She's an administrative report, so when I need some help putting together appendices, she creates documents; so, yeah.

Q.   Did anybody else help you with your expert report in this case?

A.   No, from the standpoint of help me.

I put together the report but, you know, administratively, just like any attorney has people that help them put together things and format, so she formats documents for me.

Q.   Did anyone else help you with your expert report in this case other than Aashna?

A.   In Pat Gordon's case?

Q.   Correct.

A.   No.

Q.   Do you remember your deposition in the State case we discussed what looked like fake Google reviews for your company, Blue Ocean Global Tech-

Page 12

nology?

MR. CHOSLOVSKY: Objection as to charac-terization.

MR. MEADOWS: You can answer.

THE WITNESS: Yes, I remember you asking me about those, Joe.

BY MR. MEADOWS:

Q. There were some suspicious Google reviews of your company, correct?

A. Correct. I believe I even stated in the last deposition, they looked like spammy reviews.

Q. You said in your deposition in the State case that you were going to address that, correct?

A. Yeah. We have a process internally that monitors our own reputation, so, yeah.

I mean, I didn't personally address it.

Q. Did anybody address it?

A. I believe our team who handles Google reviews probably saw those as spammy, and I would assume they addressed it.

Q. So you didn't speak with anybody on your team about addressing those reviews?

MR. CHOSLOVSKY: Objection, relevance.

THE WITNESS: When you sent me a document

containing those reviews, I mentioned to our team that there could be some spammy reviews.  I don't recognize those names, so not since the deposition.

BY MR. MEADOWS:

Q.   I don't understand.

What do you mean, not since the deposition?

A.   Meaning I believe I mentioned it in passing that it looks like there's some spammy reviews.  I found it interesting that you were submitting those.

I shared with you in the last deposition that we had, Joe, that they didn't look to be authentic to me, either, and we get those all the time.

Q.   Who did you speak with on your team about the spammy reviews?

A.   I believe my colleague, Angus.

Q.   Full name, please?

A.   Angus Robertson.

Q.   Can you spell that for the court reporter?

A.   A-n-g-u-s, Robertson, R-o-b-e-r-t-s-o-n.

Q.   Where does Angus Robertson reside?

A.   In Canada.

Q.   To your knowledge, has anything been done

Page 14

about correcting the spammy reviews?

MR. CHOSLOVSKY: Objection, relevance.

THE WITNESS: I do not know.

BY MR. MEADOWS:

Q. You're the CEO of Blue Ocean Global Technology, right?

A. That's correct, Joe.

Are you implying that the CEO of every company should be monitoring the reviews across all platforms?

Q. There was no further question. Thank you, Sameer.

Here's my next question.

Online reputation management also goes by the acronym ORM?

A. Yes. That is an abbreviation.

Q. Blue Ocean Global Technology prepares ORM plans for clients?

A. Yes, we prepare and implement on those campaigns.

Q. What is the process for putting together an ORM plan for a client?

A. That would be client dependent. It would start with understanding what a client's business is,

Page 15

what their goals are, what they currently have in place, from a marketing branding and reputation standpoint, discussing on those elements of reputation, which can expand from websites to written content to public relations and press releases to what's on each of the social media channels to videos to podcasts, to landing pages to (inaudible) optimization --

THE COURT REPORTER:  Wait a minute.

To what optimization?

THE WITNESS:  Search engine optimization.

So it starts with having an open conversation to understand what is currently in place from an online reputation management standpoint, be it for an individual or a company.

After understanding what's currently in place, and understanding what a client potentially wants, there's a dialogue about what options they may have, and how to address their specific goals, be it build their reputation, monitor their reputation, enhance their reputation.

So our process, of course, follows some general guidelines, but it's always client specific.

BY MR. MEADOWS:

Page 16

Q. How long does it take to put together an ORM plan for a client?

A. That will depend upon the client.

ORM is a pretty large discipline, if we're talking about building and a marketing campaign. And we're including digital advertising, that, of course, is very different, whether we're including content or not, whether we're looking at monitoring, we're looking at community engagement and, of course, whether we're looking at repair and addressing negative content out there.

Q. Do you have any ballpark kind of number of hours that it takes to -- to put together the ORM plan? Not execute on it, but put together the ORM plan?

A. It's a pretty wide range, Joe. I would say, you know, anywhere from a couple of hours to, you know, it could be more than 50 hours.

Q. Who on your team prepares the ORM plan for a client?

A. I am a primary source of preparing the ORM plans for clients, especially, you know, I would say campaigns that are over 5 to 10,000 a month.

Q. Other than you as the primary person, can

you give me some names of some people on your team that help put together the ORM plan?

A. I mean, as mentioned, I'm the primary person. I -- I could certainly -- I could certainly give some names.

Q. Okay. Can you do that?

A. Sure, Frankie, Frankie Piccasso.

Q. If you could give full names, spell, and tell me where they live.

A. Okay. Frankie, Frankie Piccasso, F-r-an -- a-n-k-i-e, Piccasso, P-i-c-c-a-s-s-o, Toronto, Canada; Mostapha -- I have to spell his last name -- Mostapha Khalifeh, K-h-a-l-i-f-e-h, in Lebanon. I believe I gave his name.

THE COURT REPORTER: Spell his first name.

THE WITNESS: Yeah, I'm sorry.

First name, Mostapha, M-o-s-t-a-p-h-a.

Sudhansu, Sudhansu Batra, S-u-d-h-a-n-s-u, Batra, B-a-t-r-a.

BY MR. MEADOWS:

Q. Where are they located?

A. He's located in India.

John, John Sailors.

Page 18

Q. Can you spell that?

A. S-a-i-l-o-r-s, located in California.

Q. All right, that's great. I appreciate some of those names.

Did you speak with any of those people that you just identified in connection with your expert report in this case?

A. No, I did not --

Oh, did I speak with anyone?

Q. About your expert report in this case?

A. I would have spoken with -- did I speak with anyone -- I may have spoken with Sudhansu on this case. I did on the previous case, Johnson and Robertson. I may have spoken with Sudhansu on this case.

Q. Did Sudhansu help prepare any part of your expert report in this case?

A. No. I was the one who prepared the report, but I believe he helped on the previous one.

Q. Not Gordon?

A. No. I did most of the work on Gordon.

As I said, I had Aashna prepare some of the documents, as well.

Q. Sameer, you're not a lawyer, correct?

Page 19

A.   No, Joe, I'm not.

Q.   You're not licensed to provide legal advice?

A.   No, I'm not.

Q.   You do not practice law?

A.   No, Joe, I do not.

Q.   You're not a doctor, correct?

A.   No, I am not a doctor.

Q.   You're not a health professional?

A.   No, I am not.

Q.   You don't practice medicine, correct?

A.   No, I do not, Joe.

Q.   You don't practice any health services for clients, correct?

A.   No, I do not.

Q.   You're not a vocational expert, correct?

A.   No, I am not a vocational expert.

Q.   You're not an expert on basketball coach- ing?

A.   No, I -- I wouldn't classify myself as an expert on basketball coaching, although I play pick- up basketball.  I'm pretty good.

Q.   What's your position?

A.   I'm the Dennis Rodman on the court.

Page 20

Q.   You like to rebound.

A.   I'm a hustler anywhere in life; so, yes, you'll find me on the floor.

Q.   You're not an expert on determining truth?

A.   I don't believe I can call myself an expert on determining truth.

Q.   Conversely, you're not an expert on deter-mining falsity?

A.   I have never held myself out an as expert on falsity.

Q.   Would you hold yourself out as an expert on falsity?

A.   Would I hold myself out as an expert on falsity; no, I don't think so.

Q.   You're not an expert on linguistics?

A.   In what context, when you say linguistics?

Q.   Linguistics means the scientific study of language and its structure.

A.   No.

Q.   You're not an expert on the meaning of words?

A.   The meaning of words, I think I have a pretty advanced lexicon but, no, I'm -- I'm not somebody -- I'm not Samuel Johnson, for sure.

Page 21

Q. You're not an expert on how others interpret words?

A. No, Joe, I've -- I've never been -- I've never held myself out as an expert on those things.

Q. You're not a mind reader, correct?

A. I am not a mind reader, though I think have a pretty good intuition on people.

Q. But you don't have what the State case judge said is ESP, or extrasensory perception, cor- rect?

A. Can you refresh me what the State judge said, and where that came from, just so I don't agree to anything I don't understand?

Q. Sure.

I'll represent to you that the State case judge referenced ESP or extrasensory perception in connection with that case, and you don't have ESP or extrasensory perception, correct?

A. I'm -- I don't recall the State judge.

I believe the State Judge Donnelly, what he said on that, but I do know that a State judge did deny your motion and allowed me to testify on all my opinions.

Q. You don't have ESP or extrasensory percep-

Page 22

tion, correct?

A. What does ESP stand for?

Q. Extrasensory perception.

A. I don't -- I don't believe so.

Q. You're not an expert on determining motive, correct?

A. I'm not an expert, per se, on determining motive.

Q. You're not an expert on determining if someone has ill will?

A. If someone has ill will, I mean I -- I review literature according to these things as part of defamation cases, but none of those are my domain or necessary for being a defamation and damages expert.

Q. You're not an expert on determining whether somebody is lying, correct?

A. No. Again, not in my domain or necessary for being a defamation or damages or IP expert, some of the areas I've been an expert in.

Q. You're not an expert on determining someone's intent, are you?

A. No, I don't hold myself out as an expert on intent, although I do, you know, proffer opinions,

and sometimes that may surround intent.

I don't know if that's the case in this case, but...

Q.   You're not -- you're not an expert on school administration, correct?

A.   No, I am not an expert in school administration.

Q.   You're not an expert on school investigations, correct?

A.   No, I'm -- I'm not an expert on school investigations, though I've never heard of that as an expert category.

Q.   You're not an expert on school public relations?

A.   School public relations, I -- I wouldn't hold myself out as "an expert," although I am a public relations expert, having worked with many public relations firms and having been hired for public relations on a vast range of campaigns related to nonprofits or profit individuals, so --

Q.   You're not an expert school public relations, correct?

A.   I would certainly say I'm an expert on how a school should manage public relations and their

Page 24

presence, but I've never held myself out as a school specific public relations expert.

Q. You're not an expert on Chicago Public Schools' public relations, correct?

A. No, but I can tell you they probably need some help.

Q. You're not an expert on Chicago Public Schools' policies, correct?

A. No.

Q. You're not an expert on Chicago Public Schools' investigations, correct?

A. No, my -- my knowledge on Chicago Public Schools' investigations has been limited to the interviews and information that I've reviewed in this case.

Q. You said you're a defamation and damages expert. Let's start with the first part.

What makes you a defamation expert?

A. What makes me --

Well, one, I'm somebody that has worked with hundreds of clients with respect to harmful, erroneous, false and defamatory content, and so I've worked to address issues related to harmful content and defamatory content that led me to work on

Page 25

situations with lawyers and to help educate lawyers. I've started a company that has a niche expertise in that arena.

Q. Anything else?

A. Yeah. Through experience, I've become an expert in defamation and harmful content, and been retained in dozens of cases and worked with dozens of other attorneys to look at their cases.

Q. Anything else?

A. Written articles quite extensively that you've asked me about with respect to defamatory and harmful content, have spoken at events on the risks associated with defamatory and harmful content, how to address defamatory and harmful content, strategies for inoculating and mitigating that risk ahead of time, and how one can be thoughtful about looking at defamatory content.

Q. Anything else?

A. You know, I can say attorneys and officials ask me to speak at their events on defamation, in- cluding Bar Associations and lawyer groups.

Q. Well, we're starting to repeat ourselves, but anything else that you can think of?

A. Nothing else comes to mind, Joe.

Page 26

Q.    Your expert report, you're not offering any legal conclusions or opinions in this case, are you?

A.    No.  I am not a lawyer, so I'm not offering any legal opinions.

Q.    In connection with your expert report, did you rely on any defamation cases?

A.    Did I rely on any defamation cases?  What do you mean by rely?

Q.    Did you consider any defamation cases as part of forming your conclusions and opinions in your expert report in this case?

A.    Well, I -- I don't think there's any specific case I consider.

I think I -- like many people who have been involved in defamation cases and legal proceedings, there are many cases that, you know, I've reviewed and looked at, but there's nothing specific that I cited in my report.

Q.    You, in fact, did not cite any defamation cases in your expert report in this case?

A.    No, I -- I -- I can pull up the report, but I don't recall citing any other cases.

Q.    For purposes of your conclusions and opinions in this case, you assumed liability for

Page 27

defamation, correct?

A. Yes, I did assume liability.

Q. Fair to say, you focused on damages?

A. Yes. That was the purpose of my report, correct.

Q. You graduated from Georgetown University in 2005, correct?

A. That's correct.

Q. With a Bachelor of Science in finance and accounting?

A. Correct.

Q. You -- you don't have any secondary schooling beyond your 2005 Georgetown Bachelor of Science degree, correct?

A. Correct.

Q. Did you ever apply to law school?

A. No. I thought about it, but I never applied. I never took the LSAT, but I thought -- I thought about that, too.

Q. You are a chartered financial analyst, correct?

A. Correct, Joe.

Q. That license is abbreviated CFA?

A. That is correct.

Q. That's an investment management license?

A. That is a curriculum geared towards finance, economics, investments, and valuation.

Q. You are a licensed certified financial planner?

A. That is correct.

Q. That is known as a CFP?

A. Yes.

Q. That's another investment management-type license?

A. Financial planning type license that I used previously, yeah, when I was employed by some major financial institutions, but I haven't necessarily practiced or utilized the curriculum from that.

Q. You're a licensed chartered alternative investment analyst?

A. Yes.

Q. That's known as a CAIA?

A. Yes.

Q. That's a license for investing in alternative investments, like hedge funds, real estate commodities?

A. That's correct.

Q. You started your work in the online

Page 29

reputation area around 2012?

A.    Well, prior to that, I worked at Merrill Lynch, Bank of America and at Scotia Bank.  I led our efforts to establish a digital presence for Dundee Wealth mutual funds, and to manage the online reputation as they were moving into the United States market.

Q.    When did you co-found -- when did you co-found Blue Ocean Global Technology?

A.    I believe in 2012.

Q.    When did you come up with the name, Blue Ocean Global Technology?

A.    Where, or why?

Q.    Either?

A.    Okay.  Well, I was inspired, Joe, by the book Blue Ocean Strategy, by Professors Mauborgne and Kim, whom I have corresponded with and met Professor Mauborgne, this notion that companies typically compete in a red ocean, where there's proverbial blood, Coke versus Pepsi, and they're competing for the same market.

Blue Ocean companies are different.  They don't operate by the same value curves.  So, for instance, an example utilized in that book would be

Page 30

Cirque du Soleil, elements of theater, elements of circus, a hybrid performance, and a new market.

Another would be Yellow Tail Wines; how did a seemingly insignificant brand create and capture so much market share? They took elements that attracted beer drinkers, that attracted liquor drinker, and they had innovated marketing associated, and they created what is known as a Blue Ocean one, where you're expanding your market potential and clients, and not operating in the typical way.

So I took inspiration from that to build an organization that wasn't operating by the typical parameters in technology development, the digital marketing, the online reputation management industry and recognizing that the world has changed. It used to be Henry Ford and the assembly line, and now it's a disassembly line.

Companies are arranged according to their comparative advantage. If you look at the largest companies in the United States, many of them have a disproportionate amount of their operations outside of the United States, but they're considered blue chips, like IBM, with 300,000 people on the ground on a country like India, for instance.

So I took inspiration from that book to create a different type of organization, and that's why I kept the name Blue Ocean, in reference to that.

Q. You use that name also for the investment company Blue Ocean Global Wealth, as well, correct?

A. Correct.

Q. When did you form -- when did you form that company?

A. At the same time.

Q. Are there any other companies that you were part of that also go by a Blue Ocean name?

A. No. As mentioned, I think, in our previous conversation, I'm no longer a part of Blue Ocean Global Wealth.

Q. When did your involvement end?

A. I think officially at the end of 2019, although the time spent on Blue Ocean Global Wealth was essentially part time, and quite limited.

Q. The person --

A. Global companies under Blue Ocean that I can think of, I don't know if you found any, but, yeah.

Q. The person that runs Blue Ocean Global Wealth is the co-founder of Blue Ocean Global

Page 32

Technology, correct?

A.    Correct.

Q.    What's her name?

A.    Her name is Rita, Rita Cheng.

Q.    Can you spell that for me, and where she resides?

A.    I think it's -- her full name is Marguerita, M-a-r-g-u-e-r-i-t-a, last name Cheng, Cheng, C-h-e-n-g, and she resides in I think Rockville, Maryland.

Q.    When was the last time you spoke with her?

A.    I don't recall, but it's been over a year.

Q.    Blue Ocean Global Technology, they do website repair?

A.    Yes, among many things that we do for clients.

      What do you mean by website repair.

Q.    Well, the website for services, it says repair.

      I assume that's website repair?

A.    I'm sorry.  You mean on our company website?

Q.    Yeah.

A.    That's probably reputation repair.

Page 33

I mean I can pull it up, but I have never used the term website repair.

Q. Okay. Well, one of the services for Blue Ocean Global Technology is website development, correct?

A. Yes, that's correct.

Q. So your company does website development, correct?

A. Yes, that is one of the things that we do.

Q. Your company does website maintenance and security, correct?

A. Correct.

Q. Your company does cyber investigations?

A. Correct.

Q. Your company does personal reputation management for lawyers, correct?

A. That's correct.

Q. Why is it specific to lawyers, as opposed to other professionals?

A. I found a proclivity and affinity for collaborating with lawyers. I also found that many times, lawyers represent a unique group of people that are oftentimes too busy to be proactively involved in their reputation.

Page 34

I help people. I also work on personal reputations for doctors, for executives, for people agnostic of industry.

As I think you've asked me questions about, and you've seen in my background, I work with a lot of lawyers and law firms, and so that's been an area of niche expertise, though I work agnostic of industry.

Because of my experience in finance, I work with a lot of companies and financial services professionals; but specific to lawyers, because of my involvement in organizations like the legal marketing association, because I'm trusted by lawyers and help them with strategy on their firms and their individual reputation.

I've represented our organization as helping the personal reputation management of lawyers. I believe you're referring to, I think, a page on our website.

Q. By working with the lawyers, does that help you also get expert witness casework?

A. I don't think there's -- I can't recall an instance of cross pollination with respect to expert -- with respect to personal reputation

Page 35

management for lawyers.

Having said that, I think the whole reason I've been asked to become an expert witness going back, I don't know, eight, nine years or so is because of my work with law firms and their clients to help on the reputation front, and lawyers said that they think I would make a good expert.

Q. You said nine years ago?

A. I don't have, yeah, the exact date, but I believe I was originally approached -- maybe it was 2017, maybe. I don't have the exact date -- but I was approached several times.

Then, yeah, I ended up doing a case, my first case -- maybe it wasn't nine years ago, but I was approached before that.

Q. So your first case retained as an expert witness was in 2018, right?

A. I think 2018, maybe '17. I'm not sure of the exact date.

Q. The N-o-k-a-j --

A. Yes.

Q. -- case?

A. Yeah.

Q. 2018, right?

Page 36

A.   Yes.  I may have -- I may have spoken with them in 2017; but, yes, 2018, sure.

Q.   That was the first case that you were ever deposed as an expert witness, right?

A.   Correct.  That was the first official case where I -- yes, did an report was hired by the law firm Nixon Peabody.

Q.   Now, you're also the co-founder of an organization called Girl Power Talk, correct?

A.   That is correct.

Q.   That's a company that's dedicated to empowering women, correct?

A.   Ostensively, sure.

Q.   You're also the managing director of a company called Grupo Yaquedo?

THE COURT REPORTER:  Spell that.

THE WITNESS:  Yes.

MR. MEADOWS:  That is spelled G-r-u-p-o, Y-a-q-u-e-d-o, correct?

THE COURT REPORTER:  Thank you.

THE WITNESS:  Correct.  That is a data science and artificial intelligence company based in Mexico.

BY MR. MEADOWS:

Page 37

Q. Girl Power Talk is somehow affiliated with that Mexican company?

A. No, there's no direct affiliation.

Q. You're also the senior advisor of Oxprox, O-x-p-r-o-x?

A. Yes. That is a social enterprise and joint venture partnership -- joint ownership with Oxford University.

Q. That's not a company associated with Proxy Voting Records?

A. That is a social enterprise that is associated with Proxy Voting Records. That is jointly owned by Oxford University.

Q. That company is involved in voting records of institutional investors?

A. That's correct.

Q. Institutional investors would include asset owners and asset managers?

A. That would be correct, Joe, yes.

Q. You speak on online reputation management, correct?

A. Correct.

Q. You speak on digital transformation?

A. Correct.

Page 38

Q.   You speak on diversity and inclusion?

A.   Yes.

Q.   You speak on relationship capital and ethics?

A.   Yes, Joe.

Q.   You speak on financial matters, like succession planning?

A.   I have spoken on that, although it's been at least five years.

Q.   You speak on entrepreneurship?

A.   Yes.  As an entrepreneur, I do speak on entrepreneurship; but my primary area of speaking is the first one you mentioned, online reputation man-agement, public relations, defamation.  Those are the main areas that I speak on the vast majority of engagements over the last five years.

Q.   Do you speak on leadership?

A.   Yes.  Yes, I have spoken on leadership.

Q.   Do you speak on digital marketing?

A.   Definitely spoken on digital marketing, yes.

Q.   Do you speak on business networking?

A.   Yes, I've spoken on business networking on occasion, not as much as defamation and online

Page 39

reputation management.

Q.   Do you speak on sales?

A.   I speak on sales within the context of online reputation management and digital marketing, and I've, of course, spoken at sales conferences.

Q.   Do you consider yourself a motivational speaker?

A.   I believe that any speaking engagement should motivate others.  I think that's just a general classification of the type of speaker I am.

Q.   Do you consider yourself a humanitarian?

A.   Yes, I do consider myself a humanitarian.

Q.   Back to Blue Ocean Global Technology, you are the CEO of that company, correct?

A.   Correct.

Q.   You're the co-founder of that company?

A.   Correct.

Q.   There are no other executives?

A.   There are no other executives.

As mentioned previously, Joe, we have a number of independent contractors and people that work directly for us.

Q.   I'm talking about C-suite.

A.   The CEO of Girl Power Talk, Rachita Sharma,

Page 40

is our chief marketing officer.

THE COURT REPORTER:  What was the name?

THE WITNESS:  Rachita, R-a-c-h-i-t-a,
last name Sharma, S-h-r-a-m-a (sic).

No, I've chosen not to list other C-level
executives.

Q.   Well, putting aside lists --

A.   Okay.

Q.   -- can you identify for me who are the
C-suite executives for Blue Ocean Global Technology?

A.   There -- there are none, other than me.
I'm the primary shareholder.

Q.   Thank you.

You're the sole owner, right?

A.   Yes, I am.

Q.   Blue Ocean Global Technology doesn't have
any employees, correct?

A.   Yes, we have a different type of business
model.  We've chosen not to add employees onto the
books directly.  We have independent contractors, and
we work in collaboration with other companies.

Q.   How many independent contractors does Blue
Ocean Global Technology have?

A.   I don't know.  We've used 25 plus.  It

Page 41

varies --

Q.   Now back in --

A.   -- in time based upon work flow --

Q.   Okay.

A.   -- clients.

Also, Blue Ocean Global Technology does business through other entities.

Q.   Back in 2018, Blue Ocean Global Technology had 90 employees?

THE COURT REPORTER:  90, 9-0?

MR. MEADOWS:  9-0.

Is that right?

THE WITNESS:  Again, employees being people that we've paid for work that has been done?

MR. MEADOWS:  I'm asking you, back in 2018, did Blue Ocean Global Technology have 90 employees?

THE WITNESS:  We had people that received compensation, yes, that were over 90 people, I'm sure.

BY MR. MEADOWS:

Q.   Have you referred to those people back in 2018 as employees?

MR. CHOSLOVSKY:  Objection --

Page 42

THE WITNESS:  I've --

MR. CHOSLOVSKY:  Objection, relevance.

THE WITNESS:  Yeah, I'm not sure what you mean by that.

Even to this day, Joe, there are more than 25 people that we remit compensation to, and we refer to them as -- as employees, though they're not necessarily based in the United States.

BY MR. MEADOWS:

Q.  Do you recall ever referring to the people that worked for Blue Ocean Global Technology as employees back in 2018?

MR. CHOSLOVSKY:  Objection, relevance.

THE WITNESS:  Yeah.  I mean, even to this day, if we're -- if we're paying them compensation, as we do, and we use a number of transfer services to pay many more than officially 20, 25 contractors all over the world.  We send a lot of payments to people every month.

MR. MEADOWS:  Objection, nonresponsive.

Do you recall ever referring to people that worked for Blue Ocean Global Technology as employees back in 2018?

MR. CHOSLOVSKY:  Objection, relevance.

Page 43

THE WITNESS: I -- I don't recall, but I would say we -- we, certainly going back to 2018, we've had more than -- we've had that number of people that we've paid and that I would call employees.

BY MR. MEADOWS:

Q. They lived in India, correct?

A. Different parts of the world, Joe, as mentioned: India, Mexico, Canada.

Q. The corporate address for Blue Ocean Global Technology, that's 70 Pine Street, No. 1324, New York City, New York, correct?

A. Yes, that is an address, correct, a mailing address.

Q. That's an apartment, correct?

A. Correct.

Q. You use that corporate address as just a mailing address?

A. Yes, I use it as a mailing address.

Q. Why?

A. Well, because one of our consultants was based out of there, and I wanted to use that as our address.

Q. So who collects the mail at the New York

Page 44

City apartment, if it's addressed to Blue Ocean Global Technology?

A. Mail is forwarded to me.

I've also gone through the process of changing our address. For instance, on any sort of invoices or official correspondence I'm listing now my home address, as the model has shifted to more remote work.

Q. So is the corporate address for Blue Ocean Global Technology, is that your home address outside Philadelphia, or is it the apartment address in New York City?

MR. CHOSLOVSKY: Objection --

THE WITNESS: I believe --

MR. CHOSLOVSKY: Well, hold on. Hold on.

Objection, relevance.

THE WITNESS: Yes, Joe, still using that as a mailing address.

I also use my personal home address, as well.

BY MR. MEADOWS:

Q. Does anybody associated with Blue Ocean Global Technology live at the corporate New York City apartment address?

Page 45

A.   Not any official employee, no.

Q.   How about any unofficial employee?

A.   As mentioned previously, Joe, a gentleman named Chris Orlando, who we've done work with, has been at that address.

Q.   During what time period?

A.   I don't know; the last five years or so.

Q.   Chris Orlando is still there?

MR. CHOSLOVSKY:  Objection --

THE WITNESS:  (Inaudible).

MR. CHOSLOVSKY:  -- relevance.

If you answered, I didn't hear it.

Sameer, you can answer.

THE WITNESS:  No, Chris Orlando is still not there.

BY MR. MEADOWS:

Q.   When did Chris Orlando leave the corporate address for Blue Ocean Global Technology in New York?

MR. CHOSLOVSKY:  Objection, relevance.

THE WITNESS:  (Inaudible) exactly when.

THE COURT REPORTER:  I'm sorry?

THE WITNESS:  I said, I'm not sure exactly when; that's why I have the mail forwarded.

Like I said, I use our other address on

Page 46

invoices and elsewhere.

You asked me my address earlier, Joe, and I stated it as being 4251 Lynne Circle.

BY MR. MEADOWS:

Q. So who lives at the corporate address in New York City now?

MR. CHOSLOVSKY: Objection, relevance.

THE WITNESS: I -- I haven't gone there, so I don't know.

BY MR. MEADOWS:

Q. You don't know who lives at the corporate address for Blue Ocean Global Technology?

A. As mentioned, my mail is forwarded from there, Joe.

Q. You don't know who lives at the corporate address for Blue Ocean Global Technology?

A. I don't know the exact name, no.

Q. Do you have any ownership interest in the corporate address for Blue Ocean Global Technology?

A. No.

Q. Did you ever have an ownership interest in that New York City apartment?

A. No.

Q. You didn't lease it?

Page 47

A.   I had an arrangement with the owner.

Q.   Who is the owner of that New York City apartment?

A.   Chris --

MR. CHOSLOVSKY:  Objection, relevance.

THE WITNESS:  -- Orlando.

MR. MEADOWS:  We're talking over each other.

Bill, I know you know that the relevance objections are -- are reserved, but if you want to continue to keep doing that, that's up to you.

Let's go back to the question, Sameer.

THE WITNESS:  Chris Orlando had a lease on that, Joe, and I had an arrangement with Chris Orlando.

BY MR. MEADOWS:

Q.   What was the arrangement with Chris Orlando?

A.   That I would cover some of the lease.

Q.   In exchange for what?

A.   In exchange for using the address and having mail forwarded.

Q.   Why did you want to use that address?

A.   Well, I was often in New York, and I have

Page 48

clients in New York.

Now, I don't go to New York as much, and so it's not as needed.

Q. Was this some sort of idea for marketing to say that you had an New York City presence?

A. No, it was because I was in New York a lot, and working with him, and spending time there.

Q. When was the last time you spoke with Chris Orlando?

A. Maybe two weeks ago.

Q. Do you have his address, where he lives now?

A. No.

Q. Do you know what state he lives in now?

A. I don't know what state he lives in.

He has several residences.

Q. Where are those residences?

A. He has a residence in New York, he has a residence in Connecticut, he has a residence in Pennsylvania.

Q. What is Chris Orlando's involvement, if at all, in Blue Ocean Global Technology?

A. He's a consultant.

Q. On what?

A.   On marketing, on --

Q.   Does Chris --

A.   -- business development.

Q.   I thought you were done, but if you weren't...

You said consultant on marketing, correct?

A.   Marketing, yes, business development.

Q.   Does Chris Orlando get any money out of Blue Ocean Global Technology?

A.   He has, yes, in the past.

Q.   He doesn't have an ownership interest in the company?

A.   No, he does not.

Q.   The company pays him for his consulting work?

A.   Yes, he has received compensation.

Q.   How much?

A.   I don't know want to --

MR. CHOSLOVSKY:  Objection --

THE WITNESS:  -- disclose that.

MR. CHOSLOVSKY:  -- objection, relevance.

BY MR. MEADOWS:

Q.   You don't want to disclose that?

Page 50

A.    No, I don't want to disclose information about compensation for specific consultants.

Q.    For using his New York City apartment as the corporate address for Blue Ocean Global Technology, how much did you pay Chris Orlando for that?

A.    I -- I -- I don't recall the exact amount.

Q.    No ballpark figure?

A.    Several thousand dollars.

Q.    Per month?

A.    Yeah.

Q.    Do you still contribute that amount, to this day?

A.    No, I don't.

Q.    When did you stop?

A.    When we started doing more business to-gether several years ago.  I don't recall the exact date, Joe.

Q.    So if I want to check with Chris Orlando on -- on this corporate address thing, how would I reach him?

A.    I don't know.  Reach him by email.

Q.    What's his email address?

A.    I don't have that.

Page 51

I can follow up with you and get that for you.

Q.   You said you spoke with him a couple of weeks ago.

How did you speak with him?

A.   I believe he messaged me, and we talked through audio on Zoom.

Q.   Do you ever talk to him by phone?

A.   Yes, I talk to him by phone.

Q.   What's his phone number?

A.   I can get that for you.

Q.   Well, we're going to be here all day today, so maybe we'll take a break, and then later on today you can provide me his contact information; is that okay?

A.   Sure.

Q.   What percentage of your work, Sameer, is expert witness work, versus other work that you do?

A.   Maybe -- I don't -- I don't know.  That's hard -- that's hard to come up with, Joe.

Q.   Do you know rough estimates?

A.   Not offhand.

Q.   You've been an expert witness how many times?

Page 52

A.   I don't know, several dozen times, and created reports.  Certainly it's a substantial portion, and it's increasing, as more lawyers seek to retain me.

Q.   Your -- your first expert witness case was the N-o-k-a-j case in the Southern District of New York?

MR. CHOSLOVSKY:  Objection, asked and answered.

THE WITNESS:  Yes.

BY MR. MEADOWS:

Q.   Do you know how many times you have been challenged as an expert witness in court?

MR. CHOSLOVSKY:  Objection, vague.

Can you specify what you mean by challenge?

MR. MEADOWS:  Objection to the speaking objection.

Sameer, do you know what I mean when I'm saying challenged as an expert witness in court?

THE WITNESS:  I think you're always challenged as an expert witness because, you know, like here, you're challenging me.  Whenever I take the stand, I'm being challenged, so I would concur

Page 53

with counsel.

What do you mean by challenged?

MR. MEADOWS: I'll reiterate the objec-
tion to the speaking objection which led to that
testimony from the witness.

So let's try a different way, Sameer.

Do you know how many times motions have
been filed in court to exclude you as an expert
witness?

THE WITNESS: There have been multiple
motions. I mean I think you filed one that was to
exclude me that was denied.

BY MR. MEADOWS:

Q. Okay. That's one.

A. Okay.

Q. How many others?

A. I'm not sure, Joe. There's been multiple.

There's only been one case where I was
denied partial testimony. I was never excluded.

That was because counsel in the case
wanted me to include some legal references and cases.

That's for the lawyers to handle, not me,
Joe. I'm not a lawyer, as you might recall.

Q. You're talking about the Ludwin case?

Page 54

A.    Yes.

Q.    That's the case --

A.    I've been challenged in every case, but never been barred.

Q.    That's the case -- the Ludwin case was in the Southern District of Florida, correct?

A.    That's correct, Joe.

Q.    That was a defamation case?

A.    That's correct.

Q.    You gave an expert report?

A.    That's correct.

Q.    You gave an opinion that the plaintiff's damages were 12 million dollars?

A.    That's correct.

Q.    In terms of reputational harm?

A.    That's correct.

Q.    You didn't testify at trial, correct?

A.    There was no trial.  The case --

Q.    The case settled?  The case settled?

A.    Correct.

Q.    The court excluded some of your opinions, but not all of them, correct?

A.    The court excluded opinions related to legal conclusions and legal cases that were cited

Page 55

that were included at the request of counsel.

That has been the single and only isolated place where anything I've ever submitted has been excluded.

Joe, you focus on one case, but none of the others, like Robinson or Johnson, where a lawyer like you challenged me and lost.

Q. The court in the Ludwin case said that you may not testify as to a suggested damages calculation based on your collection and review of prior defamation cases, correct?

A. Don't know. Don't have it in front of me, Joe.

Q. You've read it, though, right?

A. Have I read it? Maybe some time ago. I don't know.

Q. Well, you told me in June that you hadn't read it.

A. I said -- I said maybe.

Q. You're also offering yourself up as an expert witness in the Delaware Golo case; is that correct?

A. Correct.

Q. That's a trademark infringement case?

Page 56

A.   Correct.

Q.   Do you have any special expertise with trademark infringement?

A.   As it relates to online reputation and digital advertising, I do.

Q.   What --

A.   When companies are -- when companies are advertising online, they oftentimes are utilizing trademarks.  When they're competing for digital real estate and market share across Google, across Amazon, across other platforms, there is, of course, elements of copyright, intellectual property, and how that relates to one's online reputation, digital advertis-ing and whether companies are infringing upon one another.

That's become another area of niche expertise for me, and so I do opine and provide testimony with respect to how companies are doing that.

Q.   Have you -- Do you have any experience doing trademark infringement work other than in connection with reputation issues?

A.   Well, as mentioned, I have experience with respect to trademark infringement and how that's

Page 57

applied online in a digital context, and that's where most companies spend a significant amount of time doing business.

Q. How about any expertise in trademark infringement other than in connection with reputation or digital issues?

A. Yeah, those expansive disciplines of digital marketing and reputation are -- are pretty big, and that's where I fall into.

Q. The trial in that case starts next week?

A. Yes, it does.

Q. When do you testify?

A. It's not known yet.

Q. You're also -- Strike that.

You have been used as an expert witness in a couple California cases against Damen Dash, correct?

A. Yes.

Q. Those cases involve defamation, correct?

A. Yes, those cases were defamation cases.

Q. You submitted an expert report in those cases?

A. Yes, I did.

Q. You opined that the reputational harm was

Page 58

11 million dollars for the plaintiff?

A.   I think in one of those cases perhaps, yeah.

Q.   You testified at trial in -- in those cases?

A.   Yes, I did.

Q.   No motions were filed to exclude you, however, correct?

A.   I don't believe so.

Q.   Your --

A.   Testimony was fully allowed, so I -- I don't recall any motions to exclude.

Q.   You were used as an expert witness in the California Nested Bean case?

THE COURT REPORTER:  Nested Bean?

MR. MEADOWS:  Nested, N-e-s-t-e-d, Bean, B-e-a-n.

THE COURT REPORTER:  Thank you.

THE WITNESS:  Yes, there's an ongoing case related to Nested Bean.

BY MR. MEADOWS:

Q.   That's a patent infringement case?

A.   Yes, that relates to patent infringement, correct.

Page 59

Q.   Do you have expertise in patent infringement?

A.   As it relates to the application of patents and trademarks on the Internet with respect to digital advertising and products where most people advertise their products, all these cases involve my specialty, which includes digital advertising and damages.

Q.   So that's sort of like the same answer you gave me with the Delaware Golo case?

A.   That's for you to determine.

That's my answer to this question.

Q.   Is there a trial date set in the Nested Bean case?

A.   No, I don't --

Q.   Have you submitted --

A.   -- believe so.

Q.   Have you submitted an expert report in that case?

A.   I have not yet.

Q.   Is there one due?

A.   It hasn't been determined if we will be using one.

I've been advising and working with

Page 60

counsel and the client on the same, but there is not one due, to answer your question at this point.

Q.   Have you been disclosed as an expert in that case?

A.   I don't know.  That's for the lawyers.  I'm not sure.  I've been working on that case, yes.

In fact, I have a meeting on that case coming up, I think in the next -- if I looked on my calendar, in the next few days.

Q.   Have you formed any opinions on the damages in that case?

A.   I have not yet formed any concrete opinions on damages.

Q.   You were also used as an expert report in the California Olaplex case, O-l-a-p-l-e-x, correct?

A.   Yes, that is an ongoing case, correct, a relatively new case.

Q.   No trial date?

A.   Not yet, no.  I haven't received any trial date on that yet.

Q.   Have you submitted an expert report in that case?

A.   No, I have not yet.

Q.   Do you know if one's due?

A.   No, I -- I don't believe one is due. There's -- I don't know how it works with lawyers in cases.  It's going back and forth a little bit at this point.

Q.   Have you been disclosed as an expert in that case?

A.   I don't know.  When I'm disclosed as an expert, I -- I don't make that determination.  I don't submit anything.  I believe that's done pro-actively or reactively by lawyers, that's for lawyers.  Lawyers do motions and disclosures, I think you know that, Joe.  I don't do those.

Q.   Have you formed any opinions in that case on the damages?

A.   I have not formed any formal opinions on damages in that case yet.

Q.   That's a securities laws case, correct?

A.   That relates to -- there's some elements of securities law.

I don't know if I would classify it as a securities laws case.  I think it's about loss of valuation related to securities, and my expertise and where I come in is to look at the online presence with respect to why the securities and valuation has

Page 62

been adversely impacted.

Q.   That sounds a lot like your testimony about your expertise with the Nested Bean and Golo cases.

A.   Yes, because your question is the same.

Q.   What's the hourly rate you're getting paid in this Gordon case?

A.   $650 an hour.

Q.   How many hours have you spent in connection with this case?

A.   I am not sure.

Q.   I asked you in June how many hours you'd spent in the State case, and you estimated around 100.

How about for this Gordon case?  Does that help you figure out how much time you spent?

A.   Less for this case, less than that.  Less than -- less than that for sure, much less than that.

MR. MEADOWS:  All right.  Let's take a ten-minute break.

THE WITNESS:  Okay.

MR. MEADOWS:  It's about 11:00 a.m. Central, noon.  Let's do 12:05 Eastern, 11:05 Central.

MR. CHOSLOVSKY:  Thanks, Joe.

Page 63

(Recess taken.)

DIRECT EXAMINATION CONTINUED

BY MR. MEADOWS:

Q.   If everybody is ready, we're back on the record.

Sameer, the report that you submitted in this Gordon case follows the same format as the report you submitted in the State case?

A.   Yes, there are similarities, but they're -- they're different plaintiffs.

Q.   Well, describe for me what's -- generally what's different between the report you did in this Gordon case versus the report you did in the State case?

A.   Well, in order to look at the digital presence and assess the situation, you follow a process.  Just because you have a similar case, I believe there's four total plaintiffs, you've still got to follow a process to come up with a report.

Q.   Was the process the same for all the reports that you've done in connection with these plaintiffs, the Chicago Public Schools cases?

A.   I mean, again, because it's specific to Coach Pat Gordon as opposed to coach or Dean Johnson

Page 64

or Dean Robinson, it's going to be -- the information is going to be specific to Coach Gordon.

Q. Let's go back to my first question. Format --

A. Okay.

Q. -- format-wise, your expert report in this case has a report and Appendices A through F, correct?

A. Yes. The ultimate report structure is similar because your clients, I don't know, handled them all together, so they're -- the four cases and the four plaintiffs against Chicago Public Schools are -- the report structure is similar for those.

Q. For this case in the -- Strike that.

For your report in the Gordon case, you looked at the alleged defamatory statements?

A. Yes, I certainly looked at statements and context related to sexual misconduct and serious misconduct that are bearing his name.

Q. Do you know how many alleged defamatory statements there are in this case?

A. Do I know how many alleged defamatory statements, alleged by, I mean, alleged by the plaintiff?

Page 65

Q. Yes.

A. I mean, I believe they're -- if you include all the sources of media, there are thousands.

Q. Well, let's exclude the media, because Gordon didn't sue the media, right?

A. Yeah, Gordon didn't sue the media, but the media's the medium from whereby the statements were published as a result.

Q. Do you know how many alleged -- do you know how many alleged defamatory statements were made by the defendants in this case?

A. Do I know how many statements were made by the defendants --

Q. No --

A. -- I mean --

Q. -- that's not what I asked, so let's start over.

A. Okay.

Q. Do you -- do you know how many alleged defamatory statements were made by the defendants in this case?

A. I don't know how many.

I know there are two basic types related to sexual misconduct and related to serious

Page 66

misconduct.  That's what I -- my understanding of the alleged defamatory statements.

Q.   Your analysis, did it look at alleged defamatory statements made by defendants versus defamatory statements made in the media?

A.   My analysis looked at -- The defamatory statements made in the media were a result of the actions of your client.

Q.   When you say "were the result," do you mean that the media quoted statements made by defendants?

A.   No, I mean by Chicago Public Schools saying that there are allegations of sexual and serious misconduct.

We're not saying who they are, but it's this group of four people, thereby, by default, saying that those four people are representing those allegations.  That's what the media reported on.

Your clients made statements, they were republished in the media.  I believe, based on a bunch of the correspondence I saw, that your client, Chicago Public Schools, actually actively pressed and pursued those statements to be published in the media.

I think that's a fair statement, based

Page 67

on --

Q.   Is your --

A.   -- the correspondence and the proactive nature of having media publicize and publish.  I mean, that was proactive.

So going back to your question, yes, I believe that those statements made by the media is a direct result of the actions of the defendant, Chicago Public Schools, in this case.

Q.   Is that an expert opinion of yours?

A.   I read the emails from, what was it, Matt or Michael -- Michael -- Michael Passman was, I think, one of them.  I hope I'm right on that, but I believe Michael Passman, I saw emails from him.

Q.   Yeah.

Are you giving -- are you giving an expert opinion in this case that statements in the media were the result of statements made by the defendants?

A.   No, Joe.  I think that's self evident.

I -- as stated in the report, as you mentioned earlier, I assumed liability in order to come to my conclusions.

Q.   You make reference in your expert report to

Page 68

this term, undifferentiated statements.  Do you recall that?

A.    Yes, but I -- maybe could you just show me one of the references, or just tell me what it is?

Q.    We'll get to that later --

A.    Okay.

Q.    -- but do you recall -- do you recall what you meant by undifferentiated?

MR. CHOSLOVSKY:  Objection.  He already -- asked and answered.

As you said, if you want to point him to it, please do.

THE WITNESS:  Yeah.  You said we'd get to that later, but then you asked me again on it, so I -- if we're not getting to it later, then show me where it is, and then I can answer it.

MR. MEADOWS:  If you don't mind, Sameer, can I ask you the questions?

THE WITNESS:  If you don't mind, Joe, am I allowed to talk when you ask me questions?

MR. MEADOWS:  You're allowed to answer the questions that I ask you, if that's fair.

THE WITNESS:  Okay.  I mean, I know you wish you could just have me answer the questions the

Page 69

way you want to, but I, you know, I'm an expert in this case, and I'm going to do my best.

BY MR. MEADOWS:

Q.   I want the truth and nothing but the truth, Sameer; is that okay?

A.   Yeah.  That's why I'm here, Joe.

Q.   All right.  Let's proceed, if you don't mind.

The question is, do you recall using the term undifferentiated in your expert report?

A.   I -- I believe that term may have been used.  It's a long report, you know.  Yeah, I mean, this case is about the truth.

I'm happy -- if you can tell me where I used undifferentiated, obviously I and apparently I did use it, because you're mentioning it.  I just want to make sure, if I'm going to comment on it, I'm taking it within context of where I used it.

Q.   Other than me showing you the report, you don't have any recollection of what you meant by the term undifferentiated?

A.   Joe, it's -- it's 80 pages, and so I just want to make sure that I'm answering truthfully and accurately.

Page 70

Q.   Okay.  I'll take that as an answer, you can't tell me what you meant, other than by looking at your report, and we can move on.

A.   I didn't say that.

Q.   Then tell me what you meant by undifferentiated, Sameer?

A.   I'd like to know where in the report.

To pick out a particular word, Joe, and say, what did you mean by this particular word, Sameer, let me at least look at the paragraph where I used it.

Q.   Do you recall you also used that term when I deposed you in June?

A.   I've done a lot of things since -- since June; so, no, I don't.

Q.   All right.  Fair enough.

Was there any information that you requested for purposes of your expert report in this case that you were not able to obtain?

A.   From who, anyone?  Could you repeat the question?  Is there any information that I wanted to obtain that I couldn't obtain?

Q.   Yes.

A.   No, I believe I -- I had what I needed.

Page 71

Q.   The mathala -- Strike that.

The methodology that you followed for your report in this case, is that the same metho-dology you followed in the State case?

A.   I would say it would be -- I would follow the process that was more similar in this case than it would be in other cases, but --

Q.   I'm not talking about the results, I'm talking about a methodology.

With that understanding, did you follow a methodology for your report in this case that was the same methodology you used in the State case?

A.   Well, generally, since your clients made the statements against four people, yes, there's certainly overlap of methodology.

I know the Gordon case is different, because Gordon has a federal claim, and Gordon was terminated.

Coach Pat Gordon was terminated, and that's certainly significantly different.

Q.   Pat Gordon's name wasn't mentioned by the defendants at the community meeting in 2020, correct?

A.   You mean that -- that February -- the February 2020 meeting, I think?

Page 72

Q. Yes. That's the community meeting.

A. Yeah, the community meeting, I think, because I saw the video was a short presentation, and then the majority of the meeting was audience questions and Q and A, in which it was mentioned many times.

Q. Yeah, I'm not asking about the audience, I'm asking about the defendants at the community -- community meeting.

They didn't mention Pat Gordon's name, did they?

A. They mentioned coach.

The meeting was about issues or things that had taken place with the men's basketball team, which is definitely Coach Pat Gordon. I mean, he's --

Q. Does --

A. I mean, the slides that I saw, Joe, talk about the boy's basketball team, which if you're talking about issues that took place with the boy's basketball team, and you have suspended and ultimately then thereafter terminated the coach, I think it's self evident that he was being talked about.

Page 73

Q.   So the defendants at the community meeting mentioned coach?

A.   He was identified.  I -- I -- I don't know if the word Pat Gordon was not said or said, but -- but all I think literally knew, I mean --

If you mean, you know, plausible deniability because the word Pat Gordon, when they're talking about issues related to the men's basketball team, and they're putting that up on a slide.

Prior to that, I think in early January, he was the first one who was suspended.  I believe that's -- that's clear and obvious.

Q.   Did you --

A.   That's why -- that's why the news coverage I think that night said his name, because it's pretty clear.

I know your client probably wants you to have a technicality, or your strategy is probably about, oh, they didn't use his exact name.

It's pretty obvious to any layman that they're talking about Pat Gordon, when they're talking about the men's basketball team and they're talking about the issues.

Q.   At the community meeting, the defendants

Page 74

did not use the word coach, did they?

A.    I don't recall if they used it.

I know when he was mentioned multiple times by the audience, I don't recall anyone from CPS saying, no, no, wait a minute, this meeting is not about Coach Pat Gordon.  He has nothing to do with this.  I don't believe that was the case.

Q.    Prior to the community meeting, there was a suspension letter.  The defendants didn't use Pat Gordon's name in that suspension letter, either?

A.    Can you -- can you just show me that sus-pension letter?

Q.    Do you recall that?

A.    I do recall it.  I just want to make sure, yeah.

Q.    You either know or don't know.

I mean, are you looking up something right now?  It looks like you are.

A.    No, I'm trying to find the letter in the documents.

Q.    Yeah, so you're looking it up.

I'm not asking you --

A.    I'm looking for the letter.

Q.    I'm not showing you anything.  I'm not

Page 75

asking you to look at anything, Sameer.

A.   You're asking me about the letter.

I want to know -- I want to look at the letter.  I believe I have that letter in evidence.

Q.   Let's pause for a minute.  Sameer --

A.   You can screen share, if you'd like.

Q.   Sameer, this is my deposition.  I will ask the questions.  I will show you the documents.

I don't want you looking at anything else right now.  I don't want you communicating with anyone or looking at anything; is that okay?

A.   Yes, that's okay.  I've already said that's the case.

When you ask me about a letter that I did read, but I don't recall exactly what it said, I think it's fair for me to want to pull up the letter.

MR. CHOSLOVSKY:  Hold on a second, Sameer.

Sameer, I agree with Mr. Meadows.  If he doesn't put a document in front of you, as earnest as you are, do not, on your own, try to pull something up to refresh your own memory.

If Joe wants you to see it, you could say, like you've said before, can you show me it.  He

Page 76

can say no, and then answer his question.

BY MR. MEADOWS:

Q.   Is that fair, Sameer?  Can we follow those rules?

A.   Yes, Joe, we'll follow those rules.  I am following those rules.

I merely wanted to know the letter in question.  There's been many documents.  I've looked at this case.  There's many cases I'm involved in.  You --

Q.   I just -- Sameer, I just asked if it's fair we can follow those rules.  I didn't ask anything else.

If you're frustrated, and you want to take a break, we'll take a break, Sameer.

A.   Oh, I'm not frustrated.  I'd be frustrated if I were on the other side and I had such a weak case.  That's probably where I'd be frustrated.

Q.   You're supposed to be independent expert, aren't you, Sameer?

A.   Yeah, I'm an independent expert.

You ask me obvious questions about Pat Gordon being mentioned, and there was no denial of Pat Gordon when he was -- when he was referenced,

Page 77

so --

Q. You're making accusations about people's cases being weak. I don't understand.

A. Well, to me, it's -- it's an obvious case. I've had to listen to Pat Gordon and see what took place, and that's why, you know, I genuinely understand what's taken place.

Q. How long did you talk to Pat Gordon?

A. I believe it was a couple of hours.

Q. That was virtual, right?

A. Yeah, I didn't -- I didn't go to Chicago to meet him.

Q. You didn't even arrange so you could sit in front of him face-to-face and talk to him about a report that you're doing about him?

A. I did not go and meet him face-to-face.

Q. Your SEO suppression campaign model that you used in this case, can you describe it for me generally?

A. Reviewing a vast body of negative content, understanding the key words in searches that appear for the negative, defamatory, erroneous content, testing where that content shows up, looking at the primary key words, not only that bear Coach Pat

Page 78

Gordon's name, but looking at all key words that bear those articles, and being able to address the negative content online, following the process and strategy to outline what that may take, based upon many other clients where we've implemented campaigns.

Q. You used an SEO suppression campaign model to come up with what you call rehabilitative damages, correct?

A. I don't know if there's a model. I'd be hard pressed to find someone used a model.

I researched and looked at the specific harmful and vast, I would say, quantum of content that's out there.

I think within the report I cited around 35 articles as examples that populate bearing or featuring Coach Pat Gordon's name. I think 31 or so of those mention it directly in the article.

Of the other three or four, I think one's in a URL, another one is in the slug, but there's no model where you can put in some inputs and say, okay, this is what it will cost.

There's, you know, a whole bunch of factors, qualitatively and quantitatively, that you look at to come up with how you will address negative

Page 79

content; but rehabilitation damages and addressing harmful content or a negative, erroneous, defamatory narrative online is something that I spend time on every day.

Q. You said there's no model for the damages, but you did follow a process to come up with your rehabilitative damages figure?

A. Yes, there's no simple model, because the algorithm and search results and the resource -- resources required for every campaign is unique in that body of resources, and the amount of time and the efforts put in is constantly evolving, based upon the way that Google is a moving target.

So a model wouldn't work but there, of course, is a framework that I mentioned, some of which, of course, analyzing where that negative content is coming from, the strength of the websites where that negative content is posted, the depth and breadth of the particular key words that feature that negative content, and the validity, and I would say the strength of that negative content based upon some of the words used.

Like Google is very sensitive to the words sexual and misconduct, and wants to feature

Page 80

negative content and, you know, I -- I think --

Q. No, thank you. That was great. That was great.

Now, in the June deposition that I took of you, Sameer, I asked you about your damages methodology, and you told me that you didn't believe there was a recognized methology -- methodology. Do you recall that?

A. For defamation damages?

Q. Correct.

A. Yes.

Q. Yes, that's correct?

A. Yes, I don't believe there's an endorsed recognized methodology for calculating the subjective nature of damages in a defamation case.

Q. What about your three-ring structure of reputational damages --

A. Okay.

Q. -- where did you come up with that struc-ture?

A. Well, when you think about the ways that you look at somebody who's harmed, there are dif-ferent layers. As a defamation expert, as a consultant, as a witness, I believe that breaking

Page 81

down the harm with respect to defamation into different layers or, as I term them, rings, is an earnest and honest attempt from my side at precision and at being able to explain to a potential judge or jury, just the depth and breadth and, again, the different layers or categories of where harmful defamatory content has an impact on someone's life; in this case, Coach Pat Gordon.

Q.   You came up with the three-ring structure for reputational damages on your own, correct?

A.   Correct.

Q.   You've not seen that anywhere?  You've not seen that anywhere else?

A.   I have not seen that three-ring or three-layer structure anywhere else.  I mean, no, I -- I have not seen that.  I can claim in earnest on the record, Joe, that I did not see that anywhere else, and I put that together myself.

Q.   How many clients --

A.   Have you seen that?  Is there somewhere I should know that maybe I found it?  I don't -- I don't recall.  I don't recall, nor I did find anywhere else somebody had broken it down like that.

I, because of wanting to do my best for

Page 82

the truth in this case, I found that to be a helpful way to help explain the layers of damages.

Q. How many reputation repair campaigns has Blue Ocean Global Technology performed that have cost clients more than $100,000?

A. I -- I don't recall, but over -- over a dozen, you know, easily. I mean, I think when you're talking about in totality, you know, more than several dozen. I mean, I don't know offhand. I don't keep track of the number over a specific amount, but there have been many.

Q. You didn't list those other campaigns in your expert report?

A. No, we -- we don't share the names of our clients. In fact, if -- I oftentimes point this out when -- I just had that conversation earlier this week, when somebody was referred to us, and they said, can you share with us some of the campaigns?

I said, when we're done with your campaign, would you want us to put your name out there to other people? The answer was no.

So we, especially on reputation repair, not only are a number of our biggest campaigns done on mutual and strict non-disclosure with other

Page 83

agencies, especially public relations firms or law firms and their clients, but even people approaching us direct who are referred. We don't use their names.

In fact, that is -- I think that confidentiality has helped our business, although at times, it has caused people not to work with us, because we won't share names. In confidence --

Q. How many --

A. -- (inaudible) references --

THE COURT REPORTER: In confidence, what?

THE WITNESS: Oh, I said in confidence, I do give -- I have given, of course, a few references to clients, but I -- I -- I would be loath to cite names or campaigns, because when people have moved on from a reputation campaign, they don't want it talked about, and that's understandable.

BY MR. MEADOWS:

Q. How many reputation repair campaigns has Blue Ocean Global Technology done that cost the client more than $500,000?

A. Several. I don't recall how many, but certainly a few.

Q. Well, for reference purposes, would you be

Page 84

able to identify the names of those clients for me?

A.    No, because those -- those campaigns have been done, where I'm not allowed to actually share the names.

Q.    Well, all right.  How about any of your reputation repair campaigns for reference purposes? Can you give me a list of ten clients that you've done reputation repair campaigns for?

A.    It's rare it costs more than 500,000, because when you get damage that bad, it's not that often.  That is the case in this particular one.

No, I'm not comfortable sharing names of reputation repair clients.

I can give you one client that -- I would have to check with him.  He's an attorney, as well.

Again, as mentioned, this is confidential work.  This is why people hire us, because I don't disclose their names.

Q.    Google has roughly 85 to 95 percent of the Internet search volume market, correct?

A.    Yes.

Q.    Ninety percent of people stay on page 1 of search results, correct?

A.    I've seen that statistic before.

Page 85

Q. You've testified to that effect, correct?

A. Yes. The average person, yes, 90 percent, sure, that's been a statistic I've seen.

Q. There is not a model of reputation damages -- Strike that.

There's not a model for determining reputation damages because each person or business is unique, correct?

A. When I think of a model, I think of being able to plug in numbers and get an output.

There's a structure that's often the same, but in terms of a model that is applicable, no, it requires a human element. It's not something that you can just easily scale and put numbers into a formula, it's subjective.

Q. For your report in this case, you didn't perform any social media engagement analysis, did you?

A. Social media engagement analysis, I -- what does that mean?

Q. Well, did you -- did you analyze social media followers of the stories that you analyzed in this case?

A. I looked and saw that the content had been

Page 86

shared widely, of course publicized by publications and across multiple media outlets:  Television --

Q.   Did you drill down further into impressions?

A.   Well, first off, there's a huge degree of subjectivity with respect to how many people saw content on social media.

What I do know is that it was exposed, and that's why I came up with a conservative number aggregate across all mediums.

I did not dive down specifically into social media and quantify a specific number of people that I think came from social media, I merely shared a few examples that because this was a breaking news story, people had shared it on Facebook and shared it elsewhere.

I didn't feel the need to do -- to dive down into a real detailed social media analysis, because I gave such conservative estimates on the total number of people exposed and likely saw this.

Q.   You weren't able to determine whether anybody had read stories about Pat Gordon, correct?

A.   Well, you know, for the record, whether it was three or ten million, it wouldn't change my

Page 87

opinion, but social media posts make it clear that people saw that.

No one is sitting next to somebody when they're viewing it on the screen as to whether they read it and how much they read it, but you are able to, and our company is hired for this very purpose, to not only have people view content and see it, but also to ascertain what is a reasonable number of people that would have been exposed and saw it.

There's nobody that can have an absolute. Certainly people read many stories. Stories get republished, precisely because people are reading them, like the stories in this case.

Q. You used the word exposed.

Exposed doesn't mean that somebody actually read the story?

A. Exposed means that there's a likely -- again, Joe, this is a question I've been asked many times.

You, nor I, nor Bill, nor anybody else would be able to say that, oh, because the readership is in the millions of individual unique users at Chicago Tribune, or one of the publications, X number of people actually sat down and read that.

Page 88

What we do know is that if it was featured prominently, and people saw that, it was exposed in the headlines and the article, there's a strong percentage chance they read it, but nobody is sitting there with the person.

Q. You didn't conduct any surveys in this case?

A. I did not conduct any formal surveys, though several people that I know that have nothing to do with this case that live in Chicago, I did ask them about that, if they heard about it --

Q. And --

A. -- which they did.

Q. -- that information that you learned, you didn't put that in your expert report?

A. No. I believe that may have been after the fact. I -- I didn't need to. These were all prom-inent stories.

I was just curious. I think I may have -- I think it was actually at the time of the other deposition that we had.

Yeah, there's a woman on the Board of Directors at the Future Business Leaders of America who is a teacher at a school, I don't know, in the

Page 89

Chicago vicinity, and she heard of the story defini-tively.

Q. Yeah, and you didn't put what she told you in your expert report in this case?

A. No, because I didn't conduct a formal survey. I asked, and I said, you know, would somebody from another district that's, I think, an hour-and-a- half outside of Chicago --

Q. You didn't conduct -- you didn't conduct any polls in this case?

A. No, I -- I didn't need to. I think the volume of content across the different mediums speaks for itself.

Q. You didn't -- Strike that.

You didn't do any click engagement analysis of online stories, correct?

A. Click engagement analysis, now in order -- in order to look at --

First off, I'm not sure exactly what you're referring to with respect to click engagement analysis, because the information to actually determine how many people clicked on a particular website would require Google consult, Google analytics, and more information direct to that which

Page 90

is privy to the actual website owner; but I didn't need to.

My damage calculations aren't dependent on whether there were three million or 33 million people who were exposed. My conservative estimate, again, was conservative because it was broadcast across not just the Internet, but traditional media, as well.

I think I submitted in the appendix a video showing that it was breaking news.

Q. Well, you're jumping ahead, and I haven't asked the question, but, you know --

A. I'm sorry if I'm not --

Q. I'll be flexible here.

You're talking about Appendix F?

A. I think that, yeah, the -- the video compilation of the braking news.

Q. I didn't hear any accusations that were directed at Pat Gordon --

A. Uh-huh.

Q. -- in that Appendix F, did you?

A. I believe his name was all over it with respect to the scandal and the breaking news.

Q. Did you hear any accusations against Pat

Page 91

Gordon in that video clip you prepared?

A. His name was repeatedly broadcast in those clips.

Q. Not my question.

A. There -- there was not a lawyer with a formal accusation. It was easily inferred, again, him being Coach Pat Gordon of the basketball team, suspended and then terminated.

Should we play it?

Q. Did you hear any accusations that were made against Pat Gordon in the video clip that you pre-pared and submitted as Appendix F in your report?

A. Yes. The report says sexual misconduct.

Q. That people accused Pat Gordon of sexual misconduct?

A. His name was used in tandem with those breaking news stories.

Q. In tandem, what does that mean?

A. In tandem means that anybody, any person who does or doesn't know Pat Gordon, that's seeing that his name is mentioned alongside the very sensitive sexual misconduct, means an average person would associate him with that.

Q. So are you talking about indirect accusa-

Page 92

tions, not direct accusations?

A.    I think that mentioning his name in a 30 second report, along with the scandal and the sexual misconduct, in my opinion, that's very direct.

Q.    For all the Internet search results you did, and the news stories you put in your expert report, did you break out any of them in terms of whether or not Pat Gordon's name was mentioned in a news story?

A.    Of the 35 examples shared, and if you'll allow me, I can click and pull up the report, because I don't want to be accused of searching for something --

Q.    No, that's okay.  We're going to follow the rules that me and Bill talked about earlier.

A.    Okay.  Thanks, Bill.  Nice to see you.

I remember 35 of the articles I believe I cited, I -- I believe 31 of those mention his name in the report submitted for Pat Gordon, and of the three or four that don't, one has since been taken down.

The other has his name in the actual URL title, and so his name, sexual misconduct, serious misconduct linked in those articles, many of them.

Again, I could read you some of the

Page 93

headlines, if you'd like to pull them up, which you're not, so --

Q.   Okay, Sameer, now we can go to your expert report.

Do you have that in front of you?

A.   I can, in a moment.

MR. CHOSLOVSKY:  Hold on.  I'm going to have to do some work and actually pull it up, if it's not going to be published; so let me pull it up, as well, please.

MR. MEADOWS:  You guys let me know when you're ready.

MR. CHOSLOVSKY:  I'm ready.

BY MR. MEADOWS:

Q.   Sameer, do you have your expert report up?

A.   Do I need to pull the appendices?

Q.   Not yet.

A.   Okay.  Yes, it's I think 92 two pages. Yes, I have it here.

Q.   This is your expert report in this case, correct?

A.   Correct, yes, against Pat Gordon, correct.

Q.   Directing your attention to page 5, these are your Basic Findings and Conclusions, correct?

Page 94

A.   Yes, Basic Findings and Conclusions.  I am there, page 5.

Q.   The first line you say -- strike that.

The first line you make reference to analyzing the record and media content "generated surrounding Coach Gordon."

Do you see that phrase?

A.   Yes.

Q.   What did you mean by surrounding Coach Gordon?

A.   I mean the content that is linking and linked to his name associated with the two major types of accusations of sexual conduct and serious misconduct.

Q.   So you only looked at media content that mentioned his name?

A.   I looked at media content that populated related to his name.

Q.   And --

A.   It was featured related to his name because that's the content that ultimately is relevant for his digital presence and what is harmful to him.

Q.   The media content surrounding Coach Gordon, according to your report, also surrounded a trip to

Page 95

Detroit?

A.    I believe there was some media content that referenced that trip to Detroit.  I think that was classified as, I think, unauthorized.

Q.    Media content that concerned cancellation of the basketball season?

A.    There was -- yeah, there was certainly media content that referenced cancellation of the basketball season there.

Q.    There was --

A.    Stories about Gordon were tied to those things.

Q.    The media content cancellation of the basketball season, you included that in your Appendix F video montage?

A.    Yes.

Q.    There was media content about Chicago Board of Education investigation?

A.    Yes, there was media content.  There was an investigation that took place.

Q.    There was media content about John Johnson?

A.    Well, yeah, there -- there was media content about John Johnson certainly.

Q.    Media content about Donovan Robinson?

Page 96

A.   I mean, there was media content about those two, you know, State cases that you were mentioning, yes.

I mean, media content -- I mean, there was content about all of them because your client, Chicago Public Schools, tied them together.

I think, as I'm recalling, that's where I used the word undifferentiated.

Q.   So what did you mean by undifferentiated?

A.   I meant that Chicago Public Schools said that there are allegations and issues related to sexual misconduct, serious misconduct, and they put four names kind of on the hook there together.

CPS, you know, dealt with them, I don't know, in the same way I would say just like at the community meeting, when his name was mentioned so often by the audience in questions, the main part of that was a Q and A.

Not once did I recall CPS administrator saying, no, this is not -- this is not relevant for Coach Pat Gordon, this has nothing to do with him.

Q.   Did your report break down the news stories by category, such as, the Detroit trip news stories, basketball cancellation news stories, CPS investiga-

Page 97

tion news stories?

A. No, we did not classify them by category, we --

Q. Why?

A. -- we looked at -- well, because I provided some examples.

Most of the stories themselves, Joe, dealt with multiple topics, and so they would fall under several different categories.

When somebody is finding a news story related to a particular individual, and the headlines are negative, and it's about the crisis or the situation or the fallout, and someone's name is mentioned, they're associating them with those accusations. That's kind of the undifferentiated. The media grouped the events together, which stems from how CPS handled and what it actually published and stated; not just stated, but proactively made sure was in coverage.

So the first domino was your client, CPS, and then the media reacted to it. Then there's, I think, a conscious trail of effort from CPS to make sure that these things reached the media, as per the documents I received, and the email correspondence.

Page 98

Q. How do you know others associated media stories and linked them to misconduct allegations against Pat Gordon?

A. Can you please repeat that question? How do I know others -- Say that again, please.

Q. Yeah.

You've testified a number of times that there were stories out there in the context of your undifferentiated -- people made associations of misconduct having been taken by Pat Gordon.

I'm just curious how you know what others were thinking about Pat Gordon, based on what was in the news?

A. Well, because his name was in many of the stories. They're talking about allegations related to sexual misconduct, serious misconduct. There's reference to Coach Pat Gordon being suspended. Probably the biggest source of evidence is that he has pretty much a zero percent success rate in getting a job since then, a coaching job.

He was doing a good job there before his reputation was compromised as outlined from the media content surrounding this story.

Q. Sticking with page 5 of your report --

Page 99

A.    Okay.

Q.    -- at the end of the first bullet, you state "As my focus is more so on internet and viral exposure, I estimate the total exposure at no less than 3.5 million people worldwide."

Did I read that correctly?

A.    Hold on.  You said that's still on page 5.

Yeah, okay.  Yeah, I see that 3.5 million, okay.

Q.    How did you calculate total exposure at no less than 3.5 million people worldwide?

A.    Well, Joe, first, that's a conservative estimate.  The damages calculation is not dependent upon it.  When you look at traditional media and, you know, there's statistics and widely recognized surveys from, for instance, the Pew Institute, that show that the breakdown of average adults and where they get media from -- from the Internet, from news, from radio, and you look at even just the number of adults in the Chicago area and how this was a leading story on the news for a period of a number of days.

We're talking about not just exposure on the news, on radio, we're talking about this story being a major headline on some of the most prominent

Page 100

news websites in a major metropolitan area that have millions of monthly visitors.

I took a very conservative estimate to say that I'm comfortable saying that there were at least 3.5 million people across traditional media and Internet media.

I mean, even if you think about the number of monthly unique visitors, so now we're talking about, okay, in traditional media, there's something like, I don't know, maybe it's eight, ten million adults, maybe, in the Chicago metropolitan area. If a percentage of adults get their news from TV, they get their news from radio, and others get their news from the Internet, you're easily getting to a figure of 3.5 million, because the number of monthly visitors on, I think it's -- I'm just going to look at the articles that I cited, so I can give you some of the publications, but I looked at the number of monthly visitors for the cite --

Q. Sameer, I've let you go on for a long time here --

A. Okay.

Q. -- and I want to get back to my question, how you calculated the figure. I understand, because

you said it several times that you say it's a conservative estimate.

I'm asking you a very clear question. Here's the question: How did you calculate exposure at no less than 3.5 million people worldwide?

A. I think it frankly was a lot more than that.

MR. MEADOWS: Objection, nonresponsive.

How did you calculate total exposure at no less than 3.5 million people worldwide?

THE WITNESS: This was the lead story, Chicago breaking news, live from Lincoln Park on Friday and on Monday on every station.

So if you just looked at nine million people in the metropolitan area, since this was the lead story, and let's just call it for a week's period, we were only looking at.

If -- according, of course, to Pew research -- if 20 percent of the people, adults, watched the news from these different sources, that's easily leading you to a very large figure, just from TV exposure within that time period.

BY MR. MEADOWS:

Q. What you just testified to, that's not in

Page 102

your expert report, is it?

A. No, Joe, I thought the expert report was long enough.

Again, traditional print, broadcast radio, plus Internet, I think we covered this in the last deposition.

MR. MEADOWS: All right. We'll move on.

I am going to state for the record, any -- an objection to any attempted supplemental -- supplementation of the expert report through Mr. Sameer Somal's testimony, and now we're going to go on to my next question.

THE WITNESS: Wait --

MR. MEADOWS: At the bottom of page 5 -- at the bottom of page 5, Sameer --

THE WITNESS: Bill, can you explain to me what that objection was that Mr. Meadows, that Joe just had? I didn't understand.

MR. CHOSLOVSKY: He can make whatever objection he wants.

He's moving on to his next question, so you don't have to worry about it.

THE WITNESS: Okay.

BY MR. MEADOWS:

Q.    At the bottom of page 5, Sameer, Total Damages, do you see that?

A.    Yes, 6, yes, I have a range there.

Q.    Your range of total damages in this case with respect to the injury to Pat Gordon is between 6.4 and 11 million dollars, correct?

A.    Correct.

Q.    That's a minimum range, correct?

A.    Yes.  I put plus that, Ring 3, which I believe is original to me in coming up with, because all of the millions of people wouldn't have known about Coach Gordon, but now they know about him in association with sexual or serious misconduct, as mentioned.

Q.    So you have an added component of potential damages on top of the 6.4 to 11 million dollars, correct?

A.    Yes, defamation --

Q.    That -- that added amount, potential added amount is related to your estimate range of what you call stranger damages?

A.    Yes.

Q.    The stranger damages could be anywhere from 3.5 million dollars to 35 million dollars?

Page 104

A. It can be anything, actually. I believe that's for a judge or jury to make the determination.

I didn't put a range on that. I gave an example and a framework that that is a layer of damages with respect to all the people that only know Coach Gordon as someone associated with the scandal -- the terminated Coach Gordon associated with the scandal of sexual or serious misconduct.

Q. Are you aware of any defamation case that is close to the allegations and facts and damage calculations that you worked on for this case?

A. It's interesting, Joe, because, you know, I don't think there's anything quite like this, because the conduct of your clients was unprecedented.

Q. So what's the answer to my question?

A. Well, the answer to your question is so, no, in my expert work, I haven't seen a case like this.

Q. Let's go to page 7 of your expert report.

A. That's so egregious.

Q. I'm sorry. I didn't ask a question.

Were you -- were you saying something? I didn't ask a question.

A. Yes, for the -- for the court record, yes,

Page 105

I said, so in all my expert work, I haven't seen a case like this that is, and I paused, so egregious.

Q.   Page 7 of your expert report.

A.   Yes, I'm there.

Q.   The second line of the first paragraph, the phrase "false statements made, broadcasted, and published by Chicago Public Schools."

Do you see that?

A.   Yes, I do.

Q.   Your report does not break down false statements by the category of those that were made, those that were broadcast, and those that were published, correct?

A.   I mean, the harm and damage is all the same to Coach Pat Gordon.  He's associated with those stories.

So, correct, there's no breakdown.  All of the stories resulted from the actions of the Chicago Public Schools, CPS.  Without them, there are no stories out there.

Q.   Page 15 of your expert report.

A.   Okay.

Q.   At the bottom, No. 10.

A.   You mean the numbered -- the numbered page

15, right?

Q.   Page 15 of your report.

A.   Yes.

Q.   No. 10 --

A.   Yes, okay.

Q.   -- at the bottom.

A.   Okay.

Q.   Sameer, we have to stop kind of talking over each other.

A.   Sorry.

Q.   That's hard for the -- that's hard for the court reporter.

A.   Okay.  I was just confirming, to make sure I was where you said.

Sorry.

Q.   I didn't know anything I said was not clear or slow.

At the bottom of page 15 of your expert report, item No. 10, you have a sentence that says, "During the course of the Meeting, Coach Gordon was identified by name amidst the repeated discussion and reference to 'sexual misconduct,' 'adult miscon-duct,' conduct, and serious misconduct," correct?

A.   Yes.

Q.   At that meeting, the defendants in this case did not identify Coach Gordon by name, correct?

A.   In their presentation, they did not identify Coach Gordon by name, they identified the basketball team and the issues therein.

Then, to my point from earlier, that when his name was repeatedly used, nobody from CPS refuted or said this has -- this has nothing to do with Coach Pat Gordon.

So it's obvious to me, having watched the video, that that is talking about Coach Pat Gordon. Somebody asked about Coach Pat Gordon.  The questions are addressed and discussed, and not once is there a denial that this is not about Coach Pat Gordon.

I think that's as clear as it could be for someone like myself in watching the video.

Q.   That's defamation, according to you, as a defamation expert?

A.   Again, I assume liability as mentioned.

Q.   Page 16 of your expert report, paragraph 15, you include a sentence here that states, "Not surprisingly, the false statements made by Defendants and related publicity have ended all inquiries and discussions."

Page 108

Do you see that?

A.    I do.

Q.    How do you know that Coach Gordon has been unable to find other coach employment because of the alleged false statements in this case?

A.    Because he told me, and --

Q.    Any other reason?

A.    He has wanted to, and I discussed with him, he's wanted to have a job, and he's applied for jobs with respect to being able to coach, and he has zero percent success rate.

Q.    Did you look at his job applications?

A.    Did I look at his job applications?

I mean, the discovery answers also said -- and I think that was in discovery, I'd have to recall.  I know the rules are not to allow me to go refresh my memory.

Q.    No, did you look at his job applications?

A.    I know the results.

I believe your -- I believe, if I recall correctly, your client, CPS, asked him to list his job applications, and I saw all those names.

MR. MEADOWS:  Objection, nonresponsive.

Did you look at his job applications?

Page 109

THE WITNESS:  I mean, did I need to, knowing that he hasn't had a job, and he has zero percent success rate after being a successful coach?

MR. MEADOWS:  Objection, nonresponsive.

Bill, do you want to help me out?

THE WITNESS:  What he submitted to the three hundred or several hundred applications, no, I did not see what he submitted.  I know the end result is a no.

BY MR. MEADOWS:

Q.  Thank you, Sameer.

Did you ever contact any people who passed on considering Gordon for employment?

A.  Didn't need to.  He's -- you know, zero percent for several hundred speaks for itself.

Q.  Is it fair to say, for purposes of your report in this case, you made an assumption, the assumption that the reason that Gordon hasn't been able to find other coach employment was because of the alleged false statements in this case?

A.  No.  Based upon my experience, Joe, and having worked with many people who have harmful and defamatory content about them defining their presence on the Internet, I know that their professional

Page 110

opportunities are compromised, which is certainly extended to Coach Pat Gordon here.

Being a hot commodity, relatively speaking, and seeing that he has had a zero percent success rate, and knowing firsthand about how professional opportunities sets are compromised, that is my conclusion, and not an assumption.

I understand that when you have harmful content, it is very difficult, if not impossible to get a job.

Q. You told me already in this deposition that, you know, reputation assessment matters that you do, it's all case-by-case, unique to the specific facts, right?

A. Each case is different, it's unique to the facts. Harm, and some of the results of reputa-tional harm, there is common ground there.

Like I said, when someone has harmful content on their name, it compromises their professional opportunities. That's certainly no different in the case of Pat Gordon in my opinion.

Q. Page 34 of your expert report, in the middle of the page there is a lone italicized sentence that reads the following: "The meeting

Page 111

largely formed the basis for the media storm that followed."

Do you see that?

A. Yes, I do, italicized on its own between grooming and the series of posts.

Q. What did you mean by using the words largely formed?

A. I would say the origination, meaning where all of the harmful content came from.

Prior to that, there was minimal coverage. Even when the announcement came about him, it was from and following that meeting that the vast majority of content featuring and defining his name is harmful.

I would say largely formed means -- I would say also I could have said the meeting originated would have also, I would have also been comfortable using.

Q. Page 40 of your expert report, this section is entitled "Heightened Scrutiny with Educators and Coaches," correct?

A. Yes, that is the title, correct, page 40.

Q. Do you have any skills, experience, train- ing associated with educators and coaches?

A. Well, I've certainly worked on situations and cases both involving reputation with respect to people in the education field or schools.

Q. Who?

A. (Inaudible) Preparatory Academy and --

THE COURT REPORTER: What was the name, I'm sorry?

THE WITNESS: Yes, Coastal Preparatory Academy in North Carolina.

I wouldn't say that, again, it's important to note I believe in this section that I highlighted why someone who is entrusted to be an administrator, educator, teacher, coach is sensitive, that's even more sensitive to the nuanced allegations here.

I don't think I need to be an expert on that. Reputation matters for anyone, but it's heightened in the education field, especially when you're dealing with children and minors, and even more so exacerbated when you have accusations of adult on student sexual misconduct.

I think that's self-evident, and I think that anybody who isn't deemed an expert on the education field would agree that those terms would be

especially sensitive to a teacher or coach.

BY MR. MEADOWS:

Q.   Well, are you an expert in the education field?

A.   I believe you asked me that before.

I wouldn't call myself an expert in the education field, but as it --

Q.   Do you have some expertise, other than self-evident other people, as to why these issues are more heightened in the education/coaching field?

A.   As it relates to assessing damages for defamation, yes.

Q.   What is the basis for that expertise in the education and coaching field?

A.   Seeing the harm, reviewing the literature, and understanding the harmful impact, I don't need to be an expert in general, but I do know that from a harmful content and defamatory standpoint, that particularly within the education field, harmful content especially related to conduct with students would be adverse.

Q.   Yeah.  How do you know that?  That's my question.

I mean, we can pick a different field,

day care centers or, you know, elderly folk homes.

What gives you some expertise to be able to opine on reputational issues that are unique to the educator and coaching field?

A. Well, certainly a review of the literature cited in this section, which is why I put it together. I believe that if you were -- I believe that it's quite logical, with respect to my review.

Q. Okay. So it's whatever you cited in this section, is that what you're telling me?

A. Again, the heightened sensitivity is independent of the damages calculations.

Based on my experience and the literature cited and what I shared here, I was providing context about why this is particularly sensitive because somebody is involved in the education field and why that is the case.

Q. You don't have any unique experience in the education field?

A. As mentioned, yes, I provide detail on what is pretty self-evident.

Q. Page 43 of your report at the bottom, you state in the last sentence, "In identifying Coach Gordon, Defendants appear to have violated their own

policies."

A.    I'm sorry.  I do not find where that is.

Q.    All right.  Let's start over.

Directing your attention, Sameer, to page 43 of your expert report --

A.    Okay.

Q.    -- the last sentence at the bottom of that page, it reads, "In identifying Coach Gordon, Defendants appear to have violated their own policies."

Did I read that right?

A.    You did.  Thank you for clarifying.

Q.    What's the basis for that statement that you made?

A.    Well, yes, discovery showed that, meaning I saw emails and other documents where I believe CPS says it's their policy not to identify.  Even in, I think, turned over templates or documents that I saw, they omit names.

I think -- I forget if it was Matt or Michael, Michael Passman, I believe, also said so in his -- in his deposition that I received and read.

Q.    All right.  So the first part of that sentence, when you say "In identifying Coach Gordon,"

Page 116

what's that in reference to?

A.    I believe in putting his name out there publicly.

Q.    When?

A.    When?  Whether what, I don't understand?

Q.    When did they identify Coach Gordon?

A.    I think we're going backwards, Joe.

At the community meeting, I believe in the June letter -- I mean, I -- I know this is one-sided, but I'll have to state again, we're at a community meeting.  We're putting up slides about the basketball team.  The basketball coach has been suspended, and the vast majority of the meeting is audience members asking questions to which they're mentioning Coach Pat Gordon, to which CPS officials never once make one statement saying, no, we're not talking about Coach Pat.  We never mentioned his name.  This is not about him.

I also believe, as mentioned, Passman, Michael, and his department put, I believe -- I'm not -- I know, following your rules, I'm not going to try to pull anything up, but I believe that his name is in emails to the press.

I remember those emails.  I reviewed

those emails a couple of times.

Q.   Your reference to defendants' policies, which policies are you talking about?

A.   I believe the practice of, you know, not identifying or, you know, putting out -- letting removed employees, I believe that is common practice that was typically employed.

Q.   Yeah, but you used the word policies.

Which policies are you talking about?

A.   I think in their own template it said not to identify.

Again, Passman testified to it, and if -- if I made a mistake in using policies instead of practice, which could be used interchangeably, maybe practice is a better fit there, but the reality of it is that their standard procedure was not to identify; and with him, they did.

Q.   Well, I'm just using your word, policy.

Did you review any CPS policies?

A.   I -- I saw the templates.  Based on my understanding, they have a usual practice, if not a stated policy, an unstated policy where they don't identify somebody who has been terminated unless, I think -- unless Mr. Passman, you know, who -- who I

Page 118

think runs the department, unless he was lying and not telling the truth, it's his policy, or the way that he goes about doing his job.

Q. Did you review any CPS policies in this case?

A. Did I review any CPS policies?

I believe I remember seeing some. I would have to pull up the volume of documentation received.

Q. Sitting here right now, you can't remember?

A. No, I can't remember, because I've been asked as an expert to focus on damages, which is my expertise.

As mentioned earlier, I'm not an expert in CPS policies or practices. I don't remember.

Q. Earlier in the deposition we were talking about ORM plans. Do you recall that?

A. Yes.

Q. Did Blue Ocean Global Technology do an ORM plan for Pat Gordon?

A. We -- did we?

I looked at and analyzed and followed a process. I would not call that an ORM plan. I looked at what a rehabilitation campaign would entail

Page 119

from a resource and time standpoint.

Q.   Unique to Pat Gordon?

A.   Yes, unique to Pat Gordon.

Q.   How long did it take you to put together an ORM plan as you described for Pat Gordon?

A.   I'd say I probably spent, I don't know, ten to maybe 20 hours on that.

Q.   The -- the specifics of this ORM plan for Pat Gordon, that's what you included in your expert report?

A.   I included a summary of the costs, and I highlighted the depth and breadth of the reach of the harmful digital content across multiple search engines and across a fairly large group of key words that populate that harmful content.

Q.   Page 61 of your expert report you state "Appendix B includes sample list of websites and profiles which would be created and integrated within a comprehensive ORM for individuals like Coach Gordon."

Did I read that correctly?

A.   Uh-huh.

THE COURT REPORTER:  Yes?

THE WITNESS:  Yes.

Page 120

THE COURT REPORTER: Thank you.

THE WITNESS: You read that correctly.

BY MR. MEADOWS:

Q. So as part of this ORM plan for the plaintiff, Coach Gordon, you put together Appendix B?

A. No. That is a standard group of websites and profiles that we consider.

Naturally, because this was not actually moving forward with the campaign, but rather outlining it, should we were to move forward with the campaign, in this case, for instance, I would include and probably do extensive research and outlining on sports-specific coaching, teaching, mentorship, all the qualities of Pat Gordon, and include a customized list.

For the sake of example, and many times when you are conducting these campaigns, you are utilizing websites that ostensively don't have so much to do with the actual person, but that was not prepared specific for this campaign. That was just a standard list of websites and profiles.

Many of the ones we use, we consider somewhat proprietary, because I know that these reports are found, and I don't include a number of

Page 121

them.  I simply cited, hey, there's a large volume of websites and profiles that need to be created and considered in order to get the results we want. These are some of the ones that we've included, and --

Q.  So Appendix B has nothing to do with any ORM plan that's unique to Pat Gordon?

A.  It has to do with a general ORM plan, and we would consider those and have used those.

Again, some of the best ones, and the most impactful ones, for the sake of giving away competitive intelligence, I never share those, nor do I even put those in monthly client reports that we provide clients when they're hiring us for reputation management campaigns, because I feel that we've done an excellent job of either creating and building those digital assets and platforms that we do own independently or we've built relationships, and so I don't include those.

Then also, in every specific campaign, you have to look at industry niche publications and information that would align with Coach Pat Gordon.

Having said that, as part of every online reputation management repair campaign, there's a

whole bunch of content and work that has to be done that people won't see that are used to getting results, and that is this generalized grouping that was not prepared specifically.

Apologies for my long-winded answer.

Q. You testified earlier that the ORM plan for Pat Gordon that -- that you outlined it.

What did you mean by just outlining the ORM plan for Pat Gordon?

A. Outlining, meaning I looked at what it would take and what it would mean from a cost perspective for a client.

Q. How can you figure out what the cost is going to be, without putting together the full ORM plan?

A. Well, one, Joe, as mentioned, based on my experience with looking and conducting many of these campaigns -- it's the same way that you provide any sort of professional job estimate.

If you are -- you know, somebody is being hired to consult or address a particular issue, that's why I believe I included a range with respect to the cost.

As you move forward, many times is the

Page 123

case, things -- you have more clarity.  Again, I'm at a point where I'm outlining, as any professional would, an estimate of the work that we will require.

You know, my roofer gives me a range, you know, without buying the supplies and, you know, the -- the shingles.  The same way here, I give a range about it.

Q.    Why -- why didn't you just prepare a complete ORM plan for Pat Gordon?

A.    Well, one, Joe, you have to be smart and sensitive.

Where I'm different than many of the experts is that my primary source of work, now expert witness, has become a bigger component, is that we actually conduct and work on these campaigns, and so I have to be sensitive.

I wouldn't want to put a complete ORM campaign outline in something like this, because I don't necessarily want that to be out there publicly and on record.  That wouldn't be smart, as an entrepreneur, frankly.

Having said that, I went through the process, and it would also probably add a huge amount of time to this bill for Mr. Gordon, given that I

Page 124

followed a similar process, a similar case.

That's why there would be less time put in on Mr. Gordon, because I -- because there is a similar one.  I don't want to double or triple my time.  I don't think the client or, you know, probably Bill or his team would be happy about that, either.

Q.   Page 65 of your report.

A.   Sorry.  I didn't mean to talk over you.  Sorry.

You said page 65?

Q.   Correct.

At the bottom you make reference to Blue Ocean Global Technology's "established proprietary network of PR, media, and publication partners."

A.   65.

Q.   What did you mean by that?

A.   I meant relationship capital.  We work with public relation firms to implement on their cam-paign.  We often time leverage them for help.  We also have relationships with a number of publications whereby they're -- we're able to reach out to people in senior positions, people of influence and afflu-ence, and that allows us to either get content pub-

Page 125

lished or have them potentially address and review content that should be removed.

Q. Did -- did you speak with any PR companies about Pat Gordon?

A. No, I did not.

Q. Did you speak with any media about Pat Gordon?

A. No, I did not.

Q. Did you speak with any publication partners about Pat Gordon?

A. No, I did not.

That would be something I did on the next step, if we were moving forward with the campaign; but this was to, as I said, outline the campaign.

Q. Can you identify for me your network of PR media and publication partners?

A. I mean, we have relationships across -- some of those public relations firms -- I could certainly come back to you with a list of places we have strategic relationships, but I think that's why I say proprietary.

Q. I'm not sure what you -- what that -- any of that meant.

Do you mean it's confidential?

Page 126

A. Yes, I mean we -- we've worked, for instance, we've worked a gentleman named Casey Boggs. We have worked on CLE programs. He --

Q. Well, Casey Boggs, I saw your interview with him online.

A. Okay.

Q. Did you do anything with him other than just interview him?

A. Well, we have CLE programs that we're jointly offering, and he's been involved in, I would say, strategic developments at our company.

Q. Have you guys worked together on actual paying business? Have you paid him? Has he paid you?

A. No, I have not.

Q. What did you mean in the second to last line of this section of your report where you say "Our network of PR partners expands in perpetuity"?

A. That means that we're constantly working with public relations agencies.

For instance, I may have mentioned this previously, but one of the firms that I have published with, and I was allowed to speak about was, you know, the public policy firm Levick

Communications.

THE COURT REPORTER: Levick?

THE WITNESS: Levick Communications, L-e-v-i-c-k.

THE COURT REPORTER: Thank you.

BY MR. MEADOWS:

Q. Maybe I got thrown off by your choice of the word perpetuity.

A. Yeah, maybe that wasn't the most appropriate word there, Joe. I just meant that it continuously grows, as we take on new clients and work with others; for instance, it evolves, based upon the evolution of our business.

As I always share in, when I'm asked to introduce myself and asked to talk about the journey of Blue Ocean Global Technology, I would say that a big part of our business and how we've gotten to this point is strictly confidential relationships with public relations firms and said, hey, we produce a lot of content. We do a lot of spray and pray.

Sameer, through your outreach or through referral, we would like to hire you on our campaigns, but our clients can never know that you actually worked on their case, and nor do we want it to ever

Page 128

get out that we're not doing this work in-house, because it's part of our business model.

So, anyway, that -- we did transcend that a bunch with Levick.

MR. MEADOWS:  Okay.  Let's take an abbreviated kind of lunch break, 30 minutes, if that's okay with everybody; so call it 2:20 Eastern, 1:20 Central Time.

THE WITNESS:  Okay.

MR. MEADOWS:  See you all then.

Off the record.

(Recess taken.)

DIRECT EXAMINATION CONTINUED

BY MR. MEADOWS:

Q.  Okay.  We are back on the record after a short lunch break.

Sameer, if you could turn to page 70 of your report.

A.  Okay.

Q.  At the top, No. 3, it states, "Damages Compromise Coach Gordon's local (Chicago) national, and international reputation."

Do you see that?

A.  Yes.

Page 129

Q.   Now, on what basis did you do an analysis of Coach Gordon's national reputation outside the Chicago area?

A.   That summary finding is based upon my review and analysis on his digital presence with respect to checking search results bearing his name or Coach Gordon, Coach Pat Gordon, outside of the Chicago area, be it from other cities and locations in the United States that were outlined in the Appendix C.

Q.   No, I understand that.  I understand that, Sameer.

I'm asking you why you looked at his alleged reputation damage outside the local Chicago area?

A.   Because, Joe, when I look at a digital reputation, and when I look at being able to assess damages, I'm naturally in where the proliferation of that negative digital content and that presence has gone.

That certainly is not just local.  While some of the media outlets on the news and radio may have -- may have been local, digitally it's shared and proliferated what transcends local and Chicago to

national and international audiences.

Q. You make reference in this section to hypothetically Coach Gordon relocating to another state.

Do you have any basis for that, not being a hypothetical, that Coach Gordon planned on relocating to another state?

A. He'd like to get a coaching job anywhere, and that would certainly not be limited to Chicago.

So my basis, of course, for that is that he wants to coach, and this compromises his ability to continue in the profession that he has made a living and had success in outside of the Chicago area, because he wants to be a national college coach, a head coach, hopefully, one day, but at least an assistant coach.

In fact, I think he moved to -- I think he moved to Florida for a period after this happened and -- and ran into similar obstacles, as we've talked about, because of his digital reputation, not getting opportunities there, too.

Q. Did Coach Gordon tell you that he was going to relocate or wanted to relocate outside the country?

Page 131

A.   He told me in an interview he's open to coaching jobs anywhere.

Q.   Did he tell --

A.   He did not tell me he was going to relo-cate, but he was, I think he was looking -- funny you mention that.  He was looking, I think, in the US Virgin Islands, so he, based on my conversation, he certainly was open to relocation.

Q.   You didn't do any reputation damage analysis focused on the Virgin Islands, correct?

A.   No.  That was just a place that he men-tioned.

Q.   You didn't do any reputation damage analysis -- Strike that.

You did do damage -- Strike that.

You did do reputation damage analysis associated with Toronto and London, correct?

A.   Correct.

Q.   Why did you pick Toronto and London?

A.   I picked two examples of international locations where if you looked at search results, it certainly was different, and not the same, based on Google, than looking at it domestically in the United States.

Page 132

I looked at, you know, two major English-speaking cities. With respect to, you know, looking in every geographic location that he mentioned, I mean, I found his zero percent success rate on applications to speak for itself.

Q. I'm asking you why you picked Toronto and London. I mean, you could have picked, I guess, Sidney, according to what you just testified about in terms of English-speaking other countries?

A. I picked ones with proximity, Joe. I could have picked, you know, a dozen more. I used two examples in there. I could have made the appendix longer by using other examples.

I used examples internationally of cities that are English-speaking, whereby if he was going to go to them, that would be a viable option. I could have done 25 cities, I could have 100. The results would have been the same.

His reputation, when you look up his name, is compromised as a result of the media and content that was generated relating to sexual misconduct and serious misconduct.

Q. On the assumption of a hypothetical that he would travel to those other countries?

Page 133

A.   You can try to get me on hypothetical, Joe, but I'm talking about his reputation is compromised for people across the world who look -- who look him up.

He told me he would move for a job.  He told me he would move for a coaching job, and he hasn't been able to get one.

Q.   Did he have any coaching opportunities in Toronto?

A.   Not that I recall.  Again, I could have used multiple international examples.

My point in doing Toronto and London was to show that his reputation for people who seek to learn about him in international markets outside of the United States is, indeed, influenced and defined by the harmful content.

Q.   Did he have any coaching opportunities in London?

A.   Not that I know of.

Q.   Did he have any coaching opportunities in New York?

A.   I don't recall specific.  He has no coaching opportunities anywhere, because he is zero for several hundred.

Page 134

Q.   Did he have any coaching opportunities in San Francisco?

A.   To reiterate my answer, Joe, he has no coaching opportunities because of the content out there on his name.

Q.   So the answer to my question is you don't know whether he has coaching opportunities in San Francisco?

A.   I know he has no -- no opportunities anywhere.

You're wrong.  Nowhere, zero, zero opportunities, Joe.  (Witness indicating.)

Q.   According to what he told you?

A.   According to his applications, yes, correct.  According to his zero for 300 or 200 or whatever it is, 400, I know it's several hundred applications.

His record on being able to gain employment in coaching, despite being a good coach, and there being a record of how he turned that program around, is zero.

Q.   Applications that you didn't read?

A.   As mentioned earlier, Joe, no, I did not go back and read or request all the applications he sent

anywhere else. I think if I would have read them, then you would have asked me why I read them. I'm not an expert on that.

Q. Page 75 of your report.

A. 75.

Q. The second to last full paragraph, you state, "Though Coach Gordon was likely to, and eventually did, receive a job that replaced his school security officer salary," and then it goes on.

My question is, what job replaced his school security officer position?

A. I think he's working in a school now, as of earlier this year, through a third party. The school wouldn't hire him directly.

I can't recall if it came from a friend, or it was referred, but he's working in a school now. The school wouldn't hire him directly, but a third -- he's hired through a third party.

Q. What's he doing?

A. I -- I just know he has a job as of earlier this year. I don't know the specifics.

Q. Is it a job --

A. It's -- Sorry.

Q. Is it a job for a school?

Page 136

A.   Something to do with a school.

What I recall, he told me the school would not hire him directly, wouldn't put him on payroll.  It's in a school, but it is definitely not what he wants to do, as he explained.  It's not coaching, is what he said.

It's something that is keeping him from, you know, being able to rely upon government assistance.  It's something that -- it's something to help him pay his bills, that's what he's doing.

He said, you know, because of his reputation, he was not hired directly.  I mean, he's terrified.  I interviewed him about the fact that he might not ever be able to coach again.  I don't know what he's doing there.

Q.   You said "there."

Is that a school in the Chicago area?

A.   I think so.  I think so.

Q.   When did -- when did he get that job?

A.   Earlier, I think, at some point this year, in 2023.

I mean, I spoke with him only a few months earlier.

I think, if I recall his narrative and

the way the timeline works, he was unemployed.

I know he got a few months of compensation based on the CPS, you know, policy, you could say, after 60 days of being suspended, there's not a resolution. Then he was unemployed, after he was terminated. Then he was unemployed for three years.

Then he's since gotten some sort of admin job in a school, but he made it clear that it's not coaching, and it's -- he continues to try for those.

Q. Did he apply for that job?

A. I don't recall exactly. I'd assume nobody called him and offered it to him. I think he would -- he would have to have applied to it.

You can maybe tell me, Joe, how else somebody would get a job. He probably would have had to apply in some way, shape, or form, or be referred by somebody.

Q. Is he on contract with this school em-ployer?

A. I don't know, but he made it clear to me that the school would not hire him; however, he got some sort of work. He -- he had to go through a third party.

As he, I think, put it, that's because they don't want to take the risk with respect to saying they directly hired him should, I don't know, something else happen that looks like it happened to him. I -- I -- I don't know the exact specifics. That's what I got from my conversation with him.

Q. And how much is he getting paid in this new job?

A. Not -- I mean, he made it clear, not as much as he would coaching. I -- I don't -- I don't know exactly how much he's -- I -- I don't recall if he even shared how much he's making.

I remember him saying that he's -- he's doing something to help make ends meet, but not as much as he would get coaching. I think comparable likely to -- to his security job salary, but I don't -- I don't know the exact amount.

Q. How much was that, as a security officer?

A. I -- I think as security officer, it was around 40, 40,000 a year.

Q. Do you know if he's on salary or, you know, he's a non-exempt employee, or anything like that?

A. I don't know. He made it clear that, I don't know, it was kind of like a -- yeah, he made it

clear that it wasn't -- because of his reputation, he's not working, he's not officially working directly for the school.

I don't know.  I believe -- I believe if I recall your colleague, I think, had deposed him, the answer might be there.

Q.   Did you factor into your economic damages that he has this new job?

A.   Yes.  Yes, I definitely did.

Q.   How?

A.   Well, rather, you know, I think if I -- if I just go to that section, I'm right here.  Let's see what page am I on; economic damages.  Let me read that.

Yeah, so I -- I said here, Coach Gordon's lost pay for almost three years is approximately 100,000, given that he made roughly 40,000 as a school security officer.

Then in just calculating, hey, what is his lost opportunity cost, I used a conservative number in 50,000 of lost income.  I made that clear.

I said that, though -- I put this in writing -- I said "Though Coach Gordon was likely to, and eventually did, receive a job that replaced his

school security officer salary. Obtaining a coaching position, his chosen career, is foreclosed as a result of the false statements and media that reached the original stories."

Q. Sameer, I don't -- I didn't ask you to read your report.

The question was, how did you factor into your economic damages calculation that he found a new job?

A. Well, by mentioning it and saying that rather than, you know, I -- I didn't add that into damages. I said that his lost opportunity costs conservatively, you know, calculating was $50,000.

So I factored it in by instead of saying that, hey, his lost opportunity cost is $100,000, I factored it in.

Q. The way you calculate economic damages, you take 26 years, because you estimate that's how much he's got left in work life, correct?

A. Correct.

Q. Then you multiply that times your average lost coaching potential salary of $50,000 a year, correct?

A. Yeah, opportunity costs for not coaching,

Page 141

correct.

Q. You estimate that amount at $50,000 a year, correct?

A. Yeah, I believe that's conservative. I didn't do a delta that changes, sure, maybe you could say that his lost coaching, one could argue could -- could be 50,000, maybe one could say less; but as someone progresses through coaching and has success, their salary goes up.

Q. I understand that.

You used -- you used an average figure of $50,000 in your report, correct?

A. Yeah. Correct.

Q. That came from your cite to the college assistant basketball coach salary in the United States 2023, footnote 19, correct?

A. I estimated conservatively, correct.

Q. Based on what you cited in your report here at footnote 19?

A. Among other sources. So, you know, you wouldn't use the lowest end of the range. If you estimated that he was going to get $90,000 in salary, and his lost opportunity cost is 50,000, I thought that was quite a conservative number to assume that

for the rest of his career, he wouldn't exceed a lost opportunity cost of 50,000 career.

I could have easily done time value of money and the fact that, hey, he would progress as an assistant coach.

We're not even considering, Joe, and being so conservative, that he could be a head coach, and he wants to be a head coach.

Q. You got the $50,000 figure from what you cited at this footnote or end note No. 19, correct?

A. No. I said that the salary loss of 50,000, so I --

Q. How did you come up -- how did you come up with 50,000?

A. I didn't think it was fair to say, okay, we're going to use the lowest end of the lowest coaching assistant coach salary for his entire career, so I used the number on the lower end in saying, let's say $90,000, and $40,000 was approximately what he's receiving now, and so his opportunity cost I estimated conservatively to be $50,000.

Q. The source that you used to come up with the 50,000, that was a source you cited in your

Page 143

report?

A. Yeah. Among other sources, that was the source I cited.

I certainly looked at multiple sources to come up with it.

Q. You didn't cite any other multiple sources in your report, just the one at page 75, correct?

A. Correct.

Q. Thanks.

So let's move on to my next question.

Wouldn't you want to, in calculating economic damages, factor in whether or not Gordon found other employment? I mean, you're not assuming he's just going to remain unemployed for 26 years, right?

A. No, I -- I did factor that in.

Q. I don't see how you factored that in in the math.

A. Well, because I'm saying that even on the lower end of the range, at 90,000, if he's getting 40,000 now, I think -- and I -- and I apologize, I'm happy to add an addendum.

I think you're taking that 50,000 from the lower end and saying that I'm just using -- he

wouldn't get the lowest coaching salary as an assistant basketball coach listed till the end of time. Odds are he would get something in the middle of that range, at least at some point. I still took the lower end of the range.

Q. Well, let's take the higher end.

How did you get to 3.5 million plus at the higher end of your economic damages?

A. Again, the lower end of the range, if you took something moderate, it certainly wouldn't be on the lower end of that range, and so I gave a range, because a precise figure, I think, isn't appropriate.

MR. MEADOWS: Objection, nonresponsive.

How did you come up with the high end 3.5 million dollars plus for your economic damages?

THE WITNESS: I did mention because if I came up with the 50,000 was conservative and on the lower end, a more reasonable amount would be higher than that.

MR. MEADOWS: Objection, nonresponsive.

How did you come up with the high end of 3.5 million dollars plus for your economic damages?

THE WITNESS: Twenty-six years of lost income, as someone who can't be an assistant coach or

Page 145

even a head coach.

BY MR. MEADOWS:

Q.    Twenty-six years times what?

A.    I mean, head coaches make millions of dollars, Joe.  Even on -- even on the lower -- even on the lower end, head coaches do quite well.

I think the head coach -- I cited in the report, head coach for college basketball coaches generally ranges from 150 to a lot more money than that.

Q.    Do you have any prior experience to esti-mating coaching salaries?

A.    I -- I didn't cite my experience.  I cited what the actual salaries are.  I estimate loss of income all the time; that's part of economic damages. That's part of when somebody's reputation is com-promised.

So lost income as a result of standard salaries that are out there, I don't think, looking at it, that's why I said 3.5 million plus.

If -- you know, if you went, you know, three times -- if you took the lowest end of the head coaching salary in 150,000, the lowest end, you're reaching a figure around 3.5, which is still being

conservative.

The 50,000 in lost income times 26 is the 1.3 million, and 150,000 times 26 is a little more than 3.5, like 4 or 3.9.

MR. MEADOWS:  Objection, nonresponsive.

Do you have --

THE WITNESS:  How is --

MR. MEADOWS:  -- do you have any experi- ence, Sameer, in estimating coaches' salaries?

THE WITNESS:  I have experience in calculating loss of income across all fields.  I don't believe that it's specific.

That's why I cited the salary ranges here, because that's not an area of expertise, so I cited a reputable source for head coaching and assistant coaching salaries.

BY MR. MEADOWS:

Q.   One source, correct?

A.   Yes, I cited one reputable source.  Other sources confirmed that that source is accurate.  I cited one source.

Q.   Did you --

A.   You could go retroactively and say, well, Sameer, you should have cited five sources there.  I

Page 147

cited one source.

Q. Did you do any survey, Sameer, of coaches salaries in the nation?

A. No, I didn't have to. That's why you would go to reputable cite.

If I did a survey on coaches' salaries, you would point to the validity of did I have a large enough sample size.

Why did I survey? You'd probably ask me why I didn't use a reputable source, if I went to the survey.

No, I did not do a survey on coaches' salaries.

Q. After Gordon was let go as coach at Lincoln Park High School until the new job that you testified about, was he employed at all?

A. No, I don't believe so.

Q. Did that dovetail into your opinions earlier about how significant the reputational harm was to Pat Gordon?

A. Yes, it dovetails.

I mean, little, if anything. I mean, nothing. You've got nothing permanent or full time.

He certainly hasn't gotten a coaching job

Page 148

he wants.

Q.    Page 76, this describes the rehabilitative damages that you estimated in this case, correct?

A.    Correct.

Q.    Which is based on your SEO suppression model, correct?

A.    Which is, based on the outline and looking at the specific search results and content, you would have to address to rehabilitate his reputation.

Q.    You didn't do a full ORM plan; this was the outline of your ORM plan for Pat Gordon?

A.    I followed the same process, an outline plan.

So the answer is, Joe, it seems to be like you're implying I didn't do the full amount of work.

In any client situation, we would start, and during month one, we would do a full ORM plan, and we would go kind of go that extra mile to lay out all the nuances of where we're going to publish content, and to meet with the client and find out you would never do a full plan at this stage, because it's not practical to invest such an extraordinary amount of time would without somebody actually paying

Page 149

you some money to do the work.

So I did all the work that I would do up to this point otherwise, either my time investment.

You don't get that back, if a client decides not to go with you who's hiring you for reputation.

Or in this case, specific to Pat Gordon, my hourly rate and investment of time would be three times as much, if I did more than this. I feel very comfortable on this range.

I actually just had a conversation with an ORM firm that somebody had -- somebody had much less information out there, and --

Q. Blue Ocean -- Blue Ocean Global Technology ORM plans, are they -- do they get documented into an actual written plan?

A. Well, we have an engagement outline. We develop a plan with a client, and that plan evolves based upon the nuances of that campaign.

Q. Yeah, is that in a -- is that in a written form, the plan?

A. Yes. What we're going to do with a client, there's an engagement proposal. Then, of course, that factors into the monthly reporting that we have

Page 150

with the client, and how we're showing the results.

When you have a complicated plan and a complicated case such as this one, with Pat Gordon or anyone else's, there are multiple levels and stages that you have to go through.

For instance, you're not going to just focus on publishing all the content in month one. You're going to have to do the things so that when you publish, it's actually having an impact on search results, so it's complicated.

Yes, there's a process and written documentation internally that we follow. What we typically share with clients is we document and outline their goals, and we track in monthly reporting towards reaching the goals of suppressing or removing content from targeted key words at a set number of pages and the total number of search results across search engines and looking at geography.

So the way that I outline the suppression campaign here is the exact process that we would follow when we are actually implementing a campaign and how we're communicating with a client.

Q.   Going back to your use of the word stages,

how many stages are apart of an ORM plan?

A.    That's going to be client and case speci-fic.  The stages are going to be based upon how long it takes to get results, and the stages are going to overlap.

For instance, within the first month, you're doing a lot of testing to see, hey, look, what are the nuances, and what are the places that would make the most sense to actually publish the content.

Then, of course, writing content, because you can't -- even though there's AI places to use content, in order to have a real voice, you've got to actually have real people write content, especially when someone is nuanced on that, so there's no set number of stages.

What I mean is that you can't deploy all of the work specifically at the beginning.  You have to look at, okay, here are some of the hardest links we want to attract, here are groups of key words that if we can have success on this particular key word, that will allow us to have more success on a shorter tail key word, and there's a push and pull.

So why there's no set stages, and why it's a little bit of an ambiguous process -- this is

something that I explain speaking at events -- this is something I speak in one-on-one conversations with attorneys.  This is something I explain in deposition.  This is something I explain when people are thinking about hiring us -- is that not only are the search results specific to each person, but how Google reacts to all the work that you do with respect to creating profiles, back linking new content that's going to push out old content.  There are thousands of factors, and the only way to know about going and doing it is to actually do it.

We leverage the fact that we have, at any given point, several dozen campaigns in motion at one time for different parts of ORM, and so the stages are -- are going to blend together.

What we do know is once we start to see progress, and something works, then we can double and triple our efforts up on content.

So what we don't do is we don't run ahead and say, okay, this is how we're going to approach it because it worked on another campaign.  There's a lot of push and pull.  It's the nature of "beast of online reputation management."

Being at the mercy of Google's algorithm

is that there's a lot more art than there is science. That's why many of the questions that we get about how we work for other clients, what are our methods --

Q.   Okay, Sameer, I've let you go on a long time, and you just can't narrate.  I'm going to object to the narrating of your testimony.

Let's move on to my question.  The next question, here's the question --

A.   You asked about stages, Joe, and I answered your question.

Q.   Thank you, Sameer.

Here's -- here's the question.

A.   Let's put that on record:  I don't answer questions in the way Joe Meadows wants me to for his benefit.

Q.   Thank you, Sameer.

A.   You're welcome.

Q.   Did you -- did you prepare a written ORM plan for Pat Gordon?

A.   Didn't I mention, Joe, that I wouldn't do that at this stage?

I outlined a rehabilitation campaign, like I would for any client at this stage, by doing the

Page 154

actual work looking at the search results.

Q.   I want to clarify:  You did not prepare a written ORM plan for Pat Gordon?

A.   I want to reiterate that I followed the exact process as I would at this stage before we're being hired.

MR. MEADOWS:  Objection, nonresponsive.

Did you prepare a written ORM plan for Pat Gordon?

THE WITNESS:  I prepared a written outline that I included in here.  A written outline, I did -- I did prepare in this report, as you know.

I would never do that at this stage without a client engaging us and moving forward.

BY MR. MEADOWS:

Q.   So the answer to my question is no, you did not prepare a written ORM plan for Pat Gordon?

A.   My answer to the question is, no, I would never prepare a full written outline.  No answer to this would -- would be ridiculous to do so.

I did everything that I could to outline and make a reasonable estimate and provide a range at this case, looking at the specifics of Pat Gordon's search results.

Page 155

Q.   You did not prepare a written ORM plan for Pat Gordon?

A.   I prepared a written outline as to how to follow.

That could also -- I would say that if a prospective client looked at this, as I do in any case at this stage, my written ORM plan is included in this expert report.

Q.   The outline is documented at page 76 of your report?

A.   These are other parts that explain about online reputation management, content creation, content --

Q.   I'm not asking about that; I'm asking about part of the plan you create.

The outline that you say you prepared for Pat Gordon, that's at page 76 of your report, correct?

A.   That's also including the appendices that show the content that's out there.  That is part of the outline, not just the one page.

Q.   Well, let's get into page 76 here in the first paragraph --

No, actually, I want to go back for a

Page 156

minute.  Strike that.

I think you said that your rate would be three times what you normally or what you're getting paid in this case, if you were asked to actually do a full ORM plan; is that right?

A.   No, I said that the amount of time to actually take a rehabilitation campaign right to the point of where we're implementing and moving forward would require a significant more amount of time than I invested here.

It would be what I would do during month one when a client hired us.

The outline was -- the outline was --

Q.   Your rate doesn't change?

A.   Huh?

Q.   Your rate wouldn't change?

A.   I'm merely talking about the quantum of time investment in order to get this moved forward.

Q.   I'm sorry, then; I misheard.

I thought you said your rate would be higher if you were actually doing an ORM plan?

A.   Oh, I apologize.

All I meant was that I would have to spend -- I interpreted the question as what I would

Page 157

be doing during one -- month one, which is what we do during the first month of an online reputation campaign. We work on a much more detailed strategy than we would in outlining it for a client.

I merely meant that my time investment and what I did here would be three times as much doing that during the first month, which I would only do during the first month of a campaign when it started.

My bill would be higher because I'm spending more time to do exactly what you're asking me to do, that I never do at this stage, before actually starting and being engaged by a client.

Q. Okay. First paragraph, page 76, for your rehabilitative damages, third line from the bottom, you make a reference to "our timeline."

Do you see that?

A. Uh-huh.

THE COURT REPORTER: Yes? You said uh-huh. Yes?

THE WITNESS: Yes. Yes.

Sorry, Christine.

THE COURT REPORTER: Thank you.

BY MR. MEADOWS:

Page 158

Q.   The timeline is indicated further down the page at the second to last bullet that says "Estimated timeline:  24 to 30 months"; is that right?

A.   Correct.

Q.   Now, how did you arrive at 24 to 30 months?

A.   Well, we've had 3.5 years of damages here. More delay and the amount of time it takes means that it's going to be harder and it's going to take more work.  Based upon the volume of content as cited by the examples here, this is going to be a long-term campaign, and that was my estimate.

Q.   Was that estimate based on some sort of mathematical calculation or standard scale?

A.   There's no such thing as a standard scale.

That estimate was based upon my experience and knowing the volume of content and the difficulty of the word sexual with respect to Google's algorithm, liking that word and wanting to feature it.

Q.   Going back to the first paragraph again, the next phrase I want to talk about is the phrase that you use, "target pages."

Do you see that?

Page 159

A.   Yes.

Q.   What did you mean by target pages?

A.   Target pages mean that when a key word is searched, that's known as a search engine results page.  So when Coach Pat Gordon is searched, there are pages and pages of results.

Our campaign goal would be to suppress and push, and in other words, make the target harmful negative or assume defamatory content pushed beyond page 15.

Q.   So target pages, in this instance in your report, that doesn't mean target websites that you would use to push out positive content?

A.   No.  That is the target number of Google search pages that we would look to clear for each of the key words outlined.

Q.   That target page No. 15 is also referenced further down on this page in the second bullet, correct?

A.   Correct.

Q.   It says "Target page:  15?"

A.   Correct.

So if an article, just to illustrate --

Q.   Nope, I didn't ask you to illustrate; I

Page 160

asked you that's what it says, targets page is 15.

How did you come up with 15?

A. Well, the goal of Coach Gordon is to land a coaching opportunity.

Based upon my experience, while, yes, the average, if I'm looking to go to a restaurant in McLean, Virginia, I may only look at the search results on the first page; but if I'm doing due diligence on hiring someone, which I oftentimes do myself, I'm going to dig significantly deeper than the first page. I'm going to dig significantly deeper than the 10th page.

So I look at the 10th page as a barometer on the bottom where you have to make an extra click, so in order to say the content is really pushed out of the eyes of somebody who's doing due diligence on making a prospective client or a prospective employee hire, I oftentimes use the marking in my own experience of page 15.

Q. Did you use any math calculations or scale to come up with the number 15?

A. No, there -- there would be no scale. The scale is that that would be out of the first 150 search results that are found which is, I believe,

Page 161

it's subjective, there's an art and science to.

I could have easily put a number there that said 20 pages, 25 pages, and made a higher estimate.

I feel that 15 is very reasonable and fair, when somebody is doing due diligence to hire somebody in a sensitive place as a coach and teacher, or for any profession that's I feel a point where it is further enough along search results.

If we can get past page 15, a reputation is clear.

Q.   The first bullet point on that page, target key words:  35 plus, what does that mean?

A.   We identified at least 35 key words.  I think we outlined maybe a few more, around that amount.  We outlined target number of key words, key words that when searched, feature the harmful content that was identified.

So there are 35 plus different phrases that when put into search results, feature a lot of that content prominently.  There are more than 35, but there are at least 35.

I felt like that was a good number, and I outlined those specific key words that our analysis,

when you asked me about process and how I got to this point, yes, I identified 35 key words that feature the harmful content, 35 plus. I listed at least 35 in the report.

Q. Okay. I'm trying to understand if there is 35 kind of negative key words -- Strike that.

I thought when I first looked at this that when you said 35 plus key words, those -- those are key words that you are going to use to suppress the negative content online?

A. No, those are the number of key words, at least -- there are more than them. I could have had an exhaustive list with more; but that's a reasonable estimate, conservative, of the number of key words, a key word being what somebody searches.

So if somebody searches Coach Pat Gordon, they're finding a population of some of the content outline.

There are another 35 plus different phrases that are obvious that feature the content out there. That's how I arrived at 35 plus key words.

Of course, you could -- you could have a lot more, but I felt that 35 was reasonable and fair

Page 163

and a fair amount to target in this campaign, given the amount of content that is out there.

Q. Your outline on this page doesn't list websites or platforms where you would push out positive content to suppress the negative, correct?

A. I cited general examples in Appendix B, and the specific places where we would put out positive content would naturally be outlined once you start. There's -- there's a lot of cat and mouse here, and you need to be mindful of expenses, so it's worthy articulating just to explain objectively that it would be very hard, when you take a person like Pat Gordon, if we approach a website and say, hey, look, there's this article that our client or our friend wrote about best practices for how to get the most out of young men as a coach.

When you approach a publication and say, hey, will you publish this article, they're going to be like oh, you mean Coach Pat Gordon, who's accused of sexual assault? Like we don't want him here.

So there wouldn't be a way to tell you, okay, these are the places we're going to publish and push content out, because you're going to have to do a lot of work, from a public relations standpoint, to

Page 164

get somebody to agree to that, because they're going to look at the negativity and ask questions about it.

I know that I encounter that every time we do a reputation repair campaign.

Q.   How many websites would you use for Pat Gordon to push out positive content?

A.   Candidly, as many as we could find to help us, that are reputable and that have a high domain authority.

So some of the ones listed, of course, there's are a bunch of self-publishing platforms. There's places like Medium, there's places like Thrive.

The -- the challenge in a campaign like this is that getting somewhere to agree to publish an article by Pat Gordon, they don't know whether the allegations are true or not; so whenever somebody has information out there, again, true or not, I'm not an expert on what is false or not, but I'm saying when there is information out there, true or not, publica- tions are very low to accept new authors because they're like look at the stuff out there, we're going to deny this publication.

Even ones -- as sadly as this is, even

Page 165

ones where you don't interact and submit to an editor, and you submit by creating a profile, I create one for Pat Gordon, they go run a check on who Pat Gordon is, and they're like, wait a minute: No, we're denying this. They don't tell you why.

I don't -- wouldn't put that, because I wouldn't know until I started the campaign. To get the first couple, we'd have to work very hard at it.

Q. So Pat Gordon's suppression campaign, that has not been started?

A. No, it's not been started, because I've not been retained to start the campaign.

Q. So the 27 months, in the last bullet on this page, that's the estimated average length of this SEO suppression campaign that you would undertake, correct?

A. Correct. That's an estimate to do the job and get the results of 35 plus key words, pushing the content past 15 plus pages.

Q. You would estimate the monthly cost of your SEO suppression campaign is somewhere between 18,000 and 23,000 per month --

A. Correct.

Q. -- times 27 months, to arrive at your

Page 166

damage estimate of somewhere in the neighborhood of 486,000 to 621,000?

A.   Correct.

Q.   Now, where did you come up with the -- the monthly range of 18,000 to 23,000?

A.   There are certainly real costs associated with a campaign.

I think, as I've articulated here, that range is based upon our experience having to produce, right?  So in line No. 3, there are 5,250 actual results that we would target conservatively in order to produce the volume of content that we're looking at here, so you would have to have independent writers write the content.

In order to work from a public relations standpoint and have people actually pitching and reach out -- reaching out to publications, and to do all the technical work, which is why we've been a successful company on reputation repair, and continue to be a go-to partner where people reach out to us not for just referrals, for people finding us, is because of the technical work, the hundreds and hundreds of hours that have to go into interlinking and making the positive content that we've put out

there rank and be featured more prominently on websites that don't want to publish us, and make those links and contents stronger than things that are published in places like the Chicago Tribune. That takes a huge amount of effort and time and -- and resources, even if you're estimating -- I've estimated this before, in reports that --

Am I allowed to use my phone to make a calculation.

Q. No.

You can tell me, though -- I want to go back to my question, because I -- I don't think any of what you said directly answered it.

Tell me, how did you come one these numbers of 18,000 to 23,000 monthly cost of your SEO suppression campaign, considering that's a pretty specific range?

A. I mean, it's -- it's also a range, and there's some latitude there; so, one, creating content, Joe, so we're looking at creating a signi-ficant body of written content, of video content, of public relations content, because when you look up Coach Pat Gordon, it's not just compromised on regular Google search, it's also compromised across

Page 168

news search, across images search, across video search, so there is going to be an ongoing production of written, video, image, and public relations content.

There's also going to be a big investment of time, from a public relations standpoint, to pitch that content.

As I explained a little bit earlier, it is --

MR. MEADOWS: Objection, nonresponsive.

I'm not asking about the work, Sameer; I'm asking about your dollar estimate, because you're here -- you're here as the damages expert.

Tell me how you came up with the range of 18,000 to $23,000?

THE WITNESS: I am explaining to you, Joe, the work that it took that's involved in order to reach out to that range. That's what I charge, given the amount of work done, given the significant and immense harm that is out there.

MR. MEADOWS: Objection, nonresponsive.

Let me ask you this: Did you do any math calculation to come up with your dollar range of 18,000 to 23,000?

Page 169

THE WITNESS: I factored in all the work that would have been done, and given all that work, here's what I've charged.

This isn't theoretical. I run a company that does that.

Whereas I know you've worked with other experts --

MR. MEADOWS: Objection, nonresponsive.

Is there a calculation anywhere in your report, like a line item calculation, where you take this, and you add this to this, and you add this, to that, and then it comes up with your range of 18,000 to 23,000?

THE WITNESS: Joe, first off, I know firsthand that when you produce a piece of content, the cost of getting it written, the cost of pitching and public relations, and in a difficult campaign like this one, the cost of an individual piece of content over the course of a campaign when produced is oftentimes between 2,500 and $3,000 per piece of content the amount of work.

BY MR. MEADOWS:

Q. You're talking about the alternative methodology below? I'm not talking about that one.

Page 170

I don't -- Let's -- let's start over, Sameer.

I'm not talking about your alternative methodology.

A.   I gave you a methodology right there.

Q.   I'm not talking about the alternative methodology, which is on page 76 at the bottom.

I'm talking about above that, you're saying in your expert report that you came up and estimated that the cost for an SEO suppression campaign for Pat Gordon would be 18,000 to $23,000 per month.

How did you arrive at that range?

A.   Well, as mentioned in the alternative methodology which I'm allowed to use here -- it's in he my report -- if we had to create 250 pieces of content, I know that's --

MR. MEADOWS:  Objection, nonresponsive.

I'm not talking about that part, Sameer.

THE WITNESS:  It's responsive.

MR. MEADOWS:  Bill, will you help me out here?

THE WITNESS:  I've given you a calcula-tion there in the alternative methodology.  Then when I explain to you how I come up with a range, which is

Page 171

like my job, like you are a defamation attorney, my job, day in and day out, is to actually put together these campaigns, implement them, and oversee them.

So I know, based upon the body of work, and how difficult a campaign is, I estimate what the range is going to be for a particular client,  then I justify that with a calculation below.

You're like no, no, we're not allowed to talk about the calculation, even though you just asked me.

That's the way that I confirm my cost, the amount of content that I'm going to have to produce.

MR. MEADOWS:  Sameer, calm down.

THE COURT REPORTER:  Yes, calm down and slow down.

BY MR. MEADOWS:

Q.   Let's calm down and -- and slow down, Sameer.

Let's start over with the question. Let's see if we can try it one more time, and perhaps Bill can jump in here and help out.

Here's the question:  For the part on page 76 of your expert report, before you get to

Page 172

alternative methodology, you make a reference to arrange of 18,000 to $23,000 per month.

I'm asking you, how did you arrive at that range?

A.    Joe, given the things in the part that I outlined that need to be done, what I tried to explain before you so eloquently and consistently, I may add, cut me off when I try to explain the truth that I've been asked here to come here and explain.

Before you cut me off, I was going through what I look at -- and based upon my experience, that is a very reasonable and conservative estimate for the monthly cost that is confirmed always by our alternative pricing methodology, where we estimate the number of pieces of content we're going to have to create, and factor within a campaign.  This is the cost that that content is going to cost to create, including the technical work and the public relations work.

Q.    I'm going to try it one more time a different way, based on what I heard you testify.

I believe you are telling me that your range of 18,000 to $23,000 per month is a guess, a reasonable educated guess, based on your experience;

Page 173

is that right?

A.    No.  Joe Meadows, sir, this is not a guess; this is an estimate, and an estimate that I always do for a reputation management and repair campaign.  It is what I would charge, based upon the methodology.

If you were here not trying to look for your answers, but you were actually a prospective client, you would allow me to go through and explain how I got to that range; but you're not letting me do that because, it's not it seems like in your best interest.

Q.    I'm trying different ways, Sameer.

I think what I heard you testify last time, I think what I heard you just testify is, is the 18,000 to $23,000 per month, is that the range that you charge everybody, or is that specific to Pat Gordon?

A.    I think, as I put the specific points there in bullets that are based upon the appendices and the analysis conducted, this is specific to Pat Gordon.

Q.    Well, what if I -- let's take your outline here, and what if I change the target pages in bullet point 2 to five target pages, what is the range now per month, SEO cost?

Page 174

A.   Well, I probably need some time to look at that; but based upon the severity of the content, that wouldn't get the job done for Pat Gordon, which is the point of him getting a new job; and I wouldn't recommend that, ever.

Q.   What if I change the first bullet point target key words from 35 plus to ten?  What would then be the dollar range per month for your SEO suppression campaign?

A.   Again, that would reduce the cost, not necessarily proportionately.  The point here is that I could have listed a lot more than 35.  That's why I put 35 plus.

Q.   Is there a -- is there a formula that you use to estimate monthly costs of SEO suppression?

A.   Based on the amount of content that's going to be produced, the severity of the content that is out there that has to be suppressed, and all of the factors here that I listed in terms of target pages, where the results have affected the reputation across multiple search engines, and of course the methodology that I went through in this report, if you did --

MR. MEADOWS:  Objection, nonresponsive.

Let me ask it again, Sameer.

Page 175

Is there a formula that you use to estimate your monthly SEO suppression charges to a client?

THE WITNESS: There is no simple formula to reputation management repair in Google's algorithm. It's based upon my experience what needs to get done to rehabilitate the reputation.

There are many variables in place, some of which I tried to explain but was cut off in the middle of.

BY MR. MEADOWS:

Q. I appreciate that answer. Now I can move on. I think I got what I needed.

Thank you, Sameer.

Let's go to alternative methodology for estimating price at page 76.

The alternative way you calculate your rehabilitative damages is you take the figure 250 times $2,250, correct?

A. Correct.

Q. The 250 is your estimate of the "unique" pieces of material that you would have to put out there online to suppress the negative, correct?

A. Correct.

Q. The $2,250 figure, that is your estimated

Page 176

cost of what it would cost for each unique piece of material that you would put out online, correct?

A.    Yes.  Based upon my experience in campaigns, in order to get the results, it ends up costing between that range, over the course of a campaign, which is how we are able to make sure that we have process in the actual costs that we estimate in the beginning.

We found through experience -- I didn't know this ten years ago, but I know this now, through reputation repair campaigns, that we are able to estimate the cost based upon the amount of content we think we're going to have to produce.

Q.    So your estimated cost for each unique piece of positive material averages out to be about $2,250, regardless of client?

A.    In a campaign this difficult, with this amount of content, it's a little bit high of a range; but, yes, when you have a longer term campaign, this cost estimate is not just to get it written, it's how it ends up averaging out over the course of a long campaign in order to get the positive content that you want to rank.

Q.    Where did you come up with the 250 figure

Page 177

for the number of unique positive material you would have to put out there?

A.    That's based upon my understanding of the depth and breadth of the negative content.  The usage of highly important key words like the word sexual, like misconduct, there's going to have to be a large volume of content that's created and produced, and that's where my estimate of 250 came from.

Q.    I mean, you could have picked 50, you could have picked 1,000.  You picked 250.

I'm trying to figure out how you came up with the figure 250?

A.    You can maybe spend some more time going through the appendices and seeing the volume of content there, Joe.  That's how I came up with it.

A minimum content needs to be created to counteract the harm.  If it wasn't such a disastrous online reputation as it is with the case of Coach Pat Gordon, maybe we could have picked 100 or 50, but it's a lot worse.

In fact, many clients come to us, and there is a lot less content that needs to be created, because it's not as bad as it is for Coach Pat Gordon.

Q. Now, do you -- do you have any type of formula that you use to figure out how much positive material you'll need to put out for any particular client?

A. That's part of the work that I did, Joe, in order to get to this point in looking at all the different search results, analyzing the strength of the different links and publications that are out there.

If the content was published on Coach Pat Gordon on a couple of local news cites, a couple of bloggers put it, versus very strong and reputable news sources, it would be a little bit different.

It's the volume of content, plus the time that it took, and the 3.5 years or so that have gone by that content's been out there, and that's why this is a hard and difficult and expansive campaign.

Q. I didn't see any formula in your expert report that results in the figure of 250 for the unique pieces of material that you would create for Pat Gordon.

A. I know you'd like to simplify it to a formula.

The 250 minimum estimate is based upon what

Page 179

has been cited in the appendices and based upon the information shared about just how bad it is with respect to that negative content that is out there.

Q.   So there's something in your report that shows how you calculate 250 for the unique pieces of material that you would create for Pat Gordon?

A.   It's -- I wish I could simplify it, Joe, to a formula, and say here's the formula that I got to 250.

That's why, when you asked me how much time it took to look at this campaign, I said 10 to 20 hours I spent looking at the search results specifically for Pat Gordon to get to this point, and I tried to include as much information out there.

There is no formula.  You can't deduce it to any formula.  There's no ORM formula that says, hey, this is how -- this is how our company has done it, this is how we've had documented success.

Based upon the nuances of Pat Gordon's campaign, I am very comfortable and stand firm on my recommendations for rehabilitative damages.

Q.   Page 77 of your report on Physical Damages --

A.   Yes.

Page 180

Q. -- you estimate physical damages to Pat Gordon between 100,000 to 1 million, correct?

A. Yes.

Q. The basis for that opinion is your interview of Pat Gordon and reliance on similar cases, correct?

A. Correct. That's why I gave a range. I'm not a doctor.

Q. Your expert report doesn't cite the similar cases, correct?

A. No. I -- I cited the things that Gordon reported in the interview. I take them at face value in seeing a grown man broken down, telling me about his physical pain. I'm going to believe that. I'm going to assume it to be true.

Based on my experience, I provided a range. I'm not a doctor, I'm an expert on -- on damages. That's why I gave a wide bookend, per se.

Q. Page 78 to 79 describes your damages opinion for emotional damages, correct?

A. Correct.

Q. What's the basis for that opinion?

A. Well, my basis on that, similarly, is an understanding of what has taken place with respect to

emotional damages.

I followed -- and that's why I've given a range here and I think -- I think we talked about this, you know, before. I interviewed him. I reviewed, and always do, literature, with respect to physical damages, emotional damages. I reviewed, you know, the article that I mentioned in the last deposition, your article about emotional damages and agreed with it. I reference that elsewhere.

MR. MEADOWS: For the record, objection. It's not my article.

The next question --

THE WITNESS: Wait a minute --

MR. MEADOWS: Did you ever do any --

THE WITNESS: Wait a minute. I need --

MR. MEADOWS: -- (inaudible) testing?

THE COURT REPORTER: Any what? I'm sorry. You're talking at the same time.

MR. MEADOWS: Here's the question, Sameer.

THE WITNESS: I wasn't done.

MR. MEADOWS: Did you do any psychological testing of Pat Gordon?

THE WITNESS: I didn't do any psycho-

logical testing.

As mentioned, I reference materials on psychological and emotional damages. The article that you'd written for four years that was out there under your name, until I asked about it, and then it was suddenly changed -- I agree with that article, and that's the primary purpose as to why I included emotional damages.

I think the article was Emotional Distress Damages in Defamation Cases by Mr. Carroll and Mr. Meadows, neither of which are a doctor. So your co-author wasn't a doctor nor a therapist nor a lawyer, and that's a great example of an article that should be used as to why emotional damages are justified.

BY MR. MEADOWS:

Q. Did you ever go to that article in the ABA website?

A. Did I ever go to that article on the ABA website?

I didn't -- I didn't have to. It was referenced in the ABA, and I think your name is still on the article at the bottom.

Q. Did you go to the ABA website to review

Page 183

that article?

A.   I don't remember.  I don't know if I have a login for ABA.

Q.   Did you conduct any mental health exam of Pat Gordon?

A.   No.

Q.   Did you conduct a mental status examination of Pat Gordon?

A.   No.

Q.   Did you ever -- Have you ever heard of MSE?

A.   Are you talking about a particular exam? Are you talking about a degree?

Q.   This exam, have you ever heard of that, an MSE exam?

A.   I -- I have heard of that.

Q.   But you didn't use it in this case?

A.   No.  Again, you're crossing -- I'm a damages expert.  I've had experience in being able to quantify and provide ranges that have been accepted, as we talked about earlier in this deposition.

My comments and my perspective in ranges is based upon the work that I've done have been accepted in cases; but I'm not a doctor, and so if I were to conduct that exam and say, yes, then, you

Page 184

know, the next question is going to be about why did I conduct the exam, if I'm not a doctor.

I didn't need to.  That's why I gave a broad range here.

Q.  Page 80, the last sentence of the second paragraph.

A.  Okay, page 80.  The last sentence of the second, okay.

Q.  Do you see the phrase "meaning his reputation is largely cemented in the general public's eyes," correct?

A.  Yes, I see that.

Q.  Now, where --

MR. CHOSLOVSKY:  Sorry.  What page are you on, Joe?  I'm sorry.

MR. MEADOWS:  Page 80.

MR. CHOSLOVSKY:  What paragraph?

MR. MEADOWS:  All right.  Let's start over.

Directing your attention, Sameer, to page 80 of your expert report, the last sentence of the second paragraph, where it states "meaning his reputation is largely cemented in the general public's eyes."

Page 185

Do you see that, Sameer?

MR. CHOSLOVSKY: I -- I --I don't see that.

Page 80, which is Reputational Damage (Defamation Per Se) is the title?

MR. MEADOWS: Yes.

MR. CHOSLOVSKY: Paragraph 2 begins, As detailed below.

MR. MEADOWS: Yes.

MR. CHOSLOVSKY: The second to last line has -- has the first words, area reading.

THE WITNESS: Towards the end of that.

The last, on point No. 3, he's talking about, on the last line, meaning his reputation is largely cemented.

It's the last part of that paragraph, Bill.

MR. CHOSLOVSKY: Thank you. I see it.

Sorry. I'll be quiet. Go on.

BY MR. MEADOWS:

Q. Let's start over.

In reference to your statement in your report at page 80, where you use the phrase "meaning his reputation is largely cemented in the general

Page 186

public's eyes," what did you mean when you used the two words, largely cemented?

A.   I meant that for people who were exposed and learned about the events that transpired associated with Coach Pat Gordon, that in their eyes, having no knowledge -- they're not part of his family, they're not part of his friends -- they would now know who he is only through the context of the sexual misconduct and serious misconduct.  3.5 years, you know, later, it's hard to unwind, which is why, you know, the campaign is so expensive and would need, you know, two-and-a-half years, I estimated the time it would take.

Q.   How did you factor in your cost of a rehabilitation campaign that, according to you, his reputation has been largely cemented in the general public's eyes?

A.   Well, my first point on that would be that you could never undo the damage that has been done to Coach Pat Gordon's reputation, because you can't put toothpaste back in the proverbial tube on all the people that only know Coach Pat Gordon as somebody who was involved in that whole CPS drama scandal.

It's -- you know, Joe, it's like a doctor

Page 187

that fixes things the best way that they can, and so you're never going to be able to go back to what it is before.

My campaign will help, but it can't completely put the -- you know, I don't know, Humpty Dumpty back together again.

Q. Did you have a percentage on how much it would help?

I mean, is it going to help 50 percent, 25 percent, 70 percent?

A. That's too subjective.

My -- my goal in the reputation campaign would be, where do I need to go to get Pat Gordon back to where he can get a coaching job? That's my ultimate goal, and how that would be successful.

Again, it's like a doctor helping a patient. You do the best that you can, but, you know, does a doctor say that medicine might only help 28 percent? It helps as much as it can.

So I'm not going to be somebody here that proffers percentages.

His reputation is harmed. There's tools, there's a process. We have experience in doing that to get his reputation back to a positive point, where

Page 188

he can get another job, and it wouldn't be inhibited by his reputation.

Those were some of the major factors I considered in outlining.

Q. Yeah, but you don't know for sure that he'll end up getting a job based on the work that you'll do?

A. Yeah. I'm not God.

I know through experience that clearing his reputation will give him the best possible chance, and what would it take to clear his reputation.

Q. Do you have a percentage -- could you put a percentage on how successful you would be at clearing his name?

A. I believe we would be highly successful.

I wouldn't give guarantees, but based upon the campaign outline, and suppressing the negative content, through our experience and through my analysis, that's where I feel quite comfortable, and where I would move forward with a campaign as a reason why we're in business.

We're in business with some sophisticated partners and clients, because we do good work. It's

Page 189

the best pill that I have to offer in terms of
clearing the reputation, the same as a doctor.

Q.   Page 86 of your report, moving on to your
three-ring structure.

A.   Okay.

Q.   For Ring 1, you estimate that the reputa-
tional damages are no less than 1.5 million, correct?

A.   Hold on.  Let me just see.

You said page 86?  Okay, yes.

Q.   Did you -- did you hear the question?

A.   Yes, I did.

Q.   All right.  Let's start over, so we clear
the record.

Directing your attention to page 86 of
your report, Sameer, for Ring 1, estimated damages,
you calculate the reputation and harm at no less than
1.5 million, correct?

A.   Correct.

Q.   Ring 1 is the inner circle that includes
family and close friends, correct?

A.   Correct.

Q.   How did you arrive at your figure of 1.5
million?

A.   Well, one, his entire family and friends

Page 190

circle has been compromised.

As I mention there, what could be more painful than your reputation being compromised to your own mother, when you didn't have a father? Your mother came from Haiti. His mother raised him.

She read these things, and she dies, knowing that the headlines out there, misunderstanding having questions about this boy that she raised, and his character -- I don't know how you can put any dollar amount on that.

Q. So how did you put 1.5 million as the dollar figure?

A. Because I interviewed Pat, and heard firsthand through literature, through experience, through the fact that his entire circle of friends and family is defining him on these events.

He hasn't been able to get a job from that. It's not like, okay, yeah, I had that, that happened, I moved on.

Like, no. Three-and-a-half years later, he's not doing the thing that he loves. With those people closest to him, his reputation has been compromised, and so --

Q. I understand how you describe Ring 1

reputation harm; I really do, Sameer.

I'm asking you how you calculated the damages for Ring 1 at no less than 1.5 million?

A. Interviewing him, experience, literature on the subject.

In fact, I think that number is probably too low, given the veracity and the depth and breadth of the harmful content.

Q. Is there literature out there that discusses Ring 1, reputational damages?

A. No. That's something I came up with, as you asked me earlier, because I felt like that would be a good way to differentiate between acquaintances and co-workers versus people near and close to you.

Q. Is there anywhere in your expert report that walks through a math calculation how you arrived at 1.5 million for your Ring 1 damages?

A. That is a conservative estimate, again, based upon experience, literature, and interviewing him.

I don't know how you quantify. We know that reputation. That's why when we talked about there is no set formula for defamation, per se, which is why damages are assumed.

Page 192

Q.   All right.  Ring 2, damages, you estimate at two -- Strike that.

Ring 2, damages, you estimate the reputational harm at no less than 2.75 million, correct?

A.   Correct.

Q.   Your Ring 2 includes acquaintances, neighbors and co-workers, who you group into a secondary circle, correct?

A.   Correct.

Q.   How did you arrive at the figure of 2.75 million as the bottom level for your Ring 2 reputation damages?

A.   Well, first and foremost, Ring 2, which is why I came up with this methodology which, as per your question before, there is no set methodology -- I happen to think -- and time will tell -- that this is actually a helpful methodology in being able to outline the damages.

Why I called them rings is because the second ring of acquaintances:  Neighbors, co-workers, is a larger ring.  It includes more people.

Q.   Ring 3, are you giving an estimate for damages for Ring 3?

A.   You're talking about, I assume, on the next

Page 193

page.

I'm giving a construct that the outer ring in Ring 3 is the largest ring, and includes millions of strangers and people that only know him as Coach Gordon, the coach who was terminated and involved in that whole sex thing at Chicago Public Schools.

Q.   What damages figure do you assign to your Ring 3, stranger damages?

A.   That's where I don't assign a damages figure.

I give a construct, Joe.  That's what an expert does, and that's what --

There is no set construct.  It's subjective defamation.

I know through my experience that I certainly have been involved in and -- and been able, for better or for worse, to see the true harm that this has on someone's quantitative life, and how they're affected financially and qualitatively through things like emotional, physical, psychological damages, and how that affects their reputation; so I gave a construct.

I -- you know, construct starts here,

Page 194

conservatively.

You said there were 3.5 million strangers, and they only know him in terms of the sexual misconduct connotation. That's a construct, but it wouldn't be fair or appropriate for me to put a set range on Ring 3.

Q. Well, how -- how did you come up with your -- your Ring 3, stranger damages construct?

A. Well, one, I mean, that's kind of the point here, is that the construct starts conservatively with 3.5 million strangers.

It's -- you know, I know that anyone like myself would really care about, hey, what happened to me, in terms of Ring 1 or Ring 2? If it were broadcast that I was accused of sexual misconduct, or I'm an alcoholic pedophile, and there are 100 million people that heard that, you know, sure, that would be damaging.

How do you quantify that? That's cer-tainly a challenge, which is why it's defamation, per se, which is why I gave a construct.

Sure, it would be easy to just put a number. I gave a construct to illustrate the point that there are definitely, in this case, millions of

Page 195

people that were exposed to that.

They don't know me, per se; they're strangers, but it's still damaging and painful.

There's no personal relationship affected, but I know if there were millions of people that thought that I was accused of sexual misconduct, that would hurt.

Q.   All right.  So I want to get to how your construct that you use and that you put in your report --

In your construct for Ring 3, stranger damages, starts at $1 for each of the 3.5 million people you say were exposed to the stories, and goes all the way to $10 for each of the same 3.5 million people, correct?

A.   Correct.

Q.   So your construct for Ring 3 damages has a floor of 3.5 million and a ceiling of 35 million, correct?

A.   Again, it's a construct.  How much would you sell your reputation --

MR. MEADOWS:  Objection, nonresponsive.

So your Ring 3, stranger damages con-struct, has a floor of 3.5 million and a ceiling of

Page 196

35 million, correct?

THE WITNESS:  I assumed within the construct, and putting something forward which, dare I say on record -- actually takes a degree of risk and experience than following the status quo, because I actually have experience enough to put together a construct -- I felt it was reasonable and conservative to say that for each person exposed to the fact that somebody who didn't know them, now knows them as the person who potentially or committed sexual misconduct, I believe that's worth at least a dollar.

Yes, I assume your reputation is at least a dollar for a stranger.

Let's just say for something else, to think that you're a pedophile, would you sell your reputation --

BY MR. MEADOWS:

Q.    Thank you.

You also used $10 per person, right?  So your range is $1 to $10 per person times your 3.5 million exposure figure, that's how you get this construct, correct?

A.    I gave a construct and a range for il-

Page 197

lustrative purposes --

Q.    All right.

A.    -- to that.

Q.    Why didn't you pick, instead of $1 at the low range, you could have picked 50 cents, right, or ten cents or one cent.  How did you come up with $1?

A.    Again, would you sell your reputation to a stranger?  What would you sell it for, at $1, it's 3.5 million, at $10, it's 35 million.

Q.    Where did you get the $1 and the $10 from?

A.    Because I assumed that most people value their reputation for at least a dollar.

Q.    Have you seen that anywhere?

A.    Joe, have you seen a methodology that's been put forth that works?

This is a construct.  I think the point is well taken by a judge or jury that the reputation harm where somebody doesn't know you, and now thinks negatively about you, is worth at least a dollar.

Q.    Have you seen in any of your pleadings, anywhere at all, talking about $1 for reputational harm, or $10 for reputational harm, associated with strangers?

A.    That's why I didn't put a range.  That's

why I called it a construct.  I think it's a reasonable way to approach damages.

Many times, when -- when damages have been awarded, there hasn't been any sort of justification; it's been a figure that's come out.

I think the thing about the number of people exposed, it's a logical way to do it.

It's something that as an expert, and as an entrepreneur, I'm proud of the fact that I came up with a construct, because this case provided me more clarity on how to look at damages, because it's so egregious.

Q.   Appendix A of your report, do you have that?

THE COURT REPORTER:  When you get to a good stopping point, may we take a break?

MR. MEADOWS:  Yes, absolutely.  I'm going to break at 4:00, if that's okay for everybody.

THE COURT REPORTER:  Sure.

BY MR. MEADOWS:

Q.   Sameer, if you could turn to Appendix A of your report.

A.   Sure.

Q.   The title of Appendix A are the "Articles

Page 199

Authored and Featuring Sameer Somal Recent Speaking Engagements, References and Continuing Legal Education Programs," correct?

A.   Correct.

Q.   On the next page at the top, it says, "Articles authored:  Sameer Somal," correct?

A.   Correct.

Q.   Whenever -- you list a bunch of articles in this section.

Whenever the web address or publication categories reference Blue Ocean Global Tech, what does that mean?

A.   It means that it was originally published there, or syndicated thereafter.

Sometimes we publish things originally on our website, sometimes we publish them originally on other people's websites.

Q.   So when you publish your own writings on the Blue Ocean Global Technology website, that's something that is self-published, not published by a third party, correct?

A.   Correct.  Many times those publications are picked up by others, or we share them with others that have been published, and others ask if they can

Page 200

republish them.

Q.   Most of the articles in your Appendix A are self-published on Blue Ocean Global Technology's own website, correct?

A.   Yes.  That's a place they were originally published.

I don't know if it's most.  I know there's many we published on our own website, and then they're published elsewhere, and vice versa.

I think there's certainly a good amount that are published on other websites first that are listed.

Q.   You -- you publish a lot of things on your own Blue Ocean Global Technology website, correct?

A.   Yes.  As an entrepreneur who owns the company, we certainly publish on our own website, and I'm at the forefront of doing that.

Q.   There's a section of your Appendix A, if you can flip to it, three-quarters of the way through, Relevant Articles Featuring Sameer Somal?

A.   Okay.  What page?

Q.   There's no page.

A.   Okay.  Sure, I -- I see that.  It looks like -- yeah, sure.  Go ahead.  I'm there.

Page 201

Q. Then the fourth article you list in the Relevant Articles Featuring Sameer Somal is called Digital Transformation Six Tips For Success. Do you see that?

A. I do.

Q. This is another self publication on Blue Ocean Global Technology's website?

A. I would have to...

Q. You have it in front of you. You can click on it if you want. I'll let you click on it.

A. Okay, yeah, I appear that, that -- so when you click on that, I don't think it's picking up the whole address.

Q. Is there a problem with the link there?

A. Well, yeah, there may be a problem with the link, because it's going to the blog.

Q. How about if you speed ahead to How Amazon Search Engine Optimization Works?

A. Okay.

Q. Your report says, this is another article that features you, and the link doesn't work for this article, either.

A. Yeah, I think when -- when it's added into like a design sigma file, like there's a space there,

Page 202

and it automatically converts into a link when it's a PDF, but it doesn't -- maybe it just didn't pick that up.

Q.   Then the next article, you say this is another article that features you.

A.   Okay.  Which -- which article now are we at?

Q.   The next one, Ten Expert Insights --

A.   Okay.

Q.   -- the link -- the link for that one doesn't work, either?

MR. CHOSLOVSKY:  I'm going to object.

Is that -- is that a question or a statement?

THE WITNESS:  I don't know which --

MR. MEADOWS:  A question.

THE WITNESS:  What is the article called?

MR. MEADOWS:  It's the next one below the one you just looked at that you couldn't find.

THE WITNESS:  Okay.  I'm sorry, I think I scrolled down a little bit.

Oh, okay.  How does content influence SEO?  No.

Can you say the name again, please?

Page 203

MR. MEADOWS?  Ten Expert Insights to Help You Update Your Online Marketing Strategy.

THE WITNESS:  Okay.

MR. CHOSLOVSKY:  I think his question, Sameer, is does that link work when you find it?

Is that your question, Joe?

MR. MEADOWS:  Let's start over.

I think we all have an idea which article we're talking about, but the link in your report to an article that you say features you, called Ten Expert Insights to Help You Update Your Online Marketing Strategy, doesn't work, correct?

THE WITNESS:  Correct.  That link appears to be a 404 error.

BY MR. MEADOWS:

Q.  Go ahead to one, two, three, four articles later, called Broken Link Building Tips For Increasing Search Rankings, Authority, and Traffic, if you click on that link for me.

A.  Okay.  Is this another 404 error?

Q.  Does the article show up for you?

Strike that.

Why did you list this article as a relevant article featuring you?

A.    Well, because I was quoted in this article.

Q.    Where?

A.    The original version of it.

Q.    Oh, not the one in your report?

A.    They may have changed the link.

I was quoted in the one in 2020.  If they changed the link when they republished it, it's not uncommon to have 404 errors.

You know, look, if you skip over all the articles that -- that do work, you know, there's some that don't here.

Q.    So let's move on.  We're almost done with this Appendix A, to Recent Speaking Engagements.

MR. CHOSLOVSKY:  Joe, I've got to excuse myself, because I've got this -- if you hear my thing beeping, I have a short call.

MR. MEADOWS:  Can you put me on mute?  I mean, is there any way we can keep going?  I know you had rain there, we started late, and I'm trying to get through this, or do you want to -- do you want to take a break for 20 minutes?

MR. CHOSLOVSKY:  The court reporter, seven minutes ago, asked if we could take a break, and you said shortly, and I need to --

Page 205

MR. MEADOWS:  I did.  I'm almost done with this.  I said 4 o'clock.

Do you need a break?

MR. CHOSLOVSKY:  I need to take a break, as well.  It's 4:02, and I told you two hours ago, I need to take a break 4:00, your time.

MR. MEADOWS:  I understand, Bill.  No problem.

Let's take a break for your benefit and everybody else's benefit.  We'll be back in 20.

(Recess taken.)

DIRECT EXAMINATION CONTINUED

BY MR. MEADOWS:

Q.   Okay.  We're back on the record.

Sameer, sticking with your Appendix A of your report, if you could turn even more pages to the section called Recent Speaking Engagements.

A.   Uh-huh.

Q.   Do you recall, in June of this year, in the State case, I asked you about this, and we had a number of duplicate engagements in your expert report?

A.   Yep.

Q.   Do we have the same problem here?

Page 206

A.    If you're asking me about it, that's probably the case.

Q.    Why don't you check.

A.    Okay.  Yeah, I don't think it was updated. I don't think the recent list is in here.  It looks duplicative.

Q.    So instead of two pages of speaking engagements, it's more accurate that it's a page and three or four?

A.    Yeah.

Well, actually, it doesn't have any from -- it doesn't have the updated list from 2022 and 2023, which would include many more; but, sure.

Q.    I'm only talking about what's in your report, what I can see.

A.    Yeah, okay.  I understand, Joe.

I'm saying that the -- the updated list would not be duplicative, and would have 2022 in it, as well, so it would still end up being the same amount.

Q.    The expert reports that we have in this case, your Recent Speaking Engagements has almost double the number that it should, correct?

A.    Yes, it's got a duplicative listing.

Page 207

Q. If you turn some pages to the References and Testimonial section.

A. Okay.

Q. You recall from earlier in this deposition I asked you some questions about the spammy Google reviews for Blue Ocean Global Technology?

A. Uh-huh.

THE COURT REPORTER: Yes?

MR. MEADOWS: Do you recall that?

THE WITNESS: Yes.

BY MR. MEADOWS:

Q. So we've discussed this now a couple of times, you and I.

Do you plan on taking any actions to get rid of the spammy reviews on your company's website?

A. Well, Joe, like -- like any law firm, or any business, we don't control who puts reviews there.

As part of our internal process, if there's spamming, and we don't recognize them, and they don't reconcile with our client list, then we -- we would probably flag them and report them.

Q. You haven't done that yet?

A. I -- I -- I don't know if we've done that

Page 208

yet or not.

When I received your email, as I mentioned earlier, last time that I shared that internally, and I said take a look at that, I don't know if we have or not. That's not something I pay attention to on a day-to-day basis.

Q. Can -- can you commit, as the CEO of the company, to addressing the spammy reviews on your company's website?

A. Can you say that --

MR. CHOSLOVSKY: Object -- objection, relevance; and I guess asked and answered a bunch of hours earlier, but relevance.

THE WITNESS: What was the question, Joe?

MR. MEADOWS: Can you commit, as the CEO of your company, to handling the spammy reviews on your company's website?

THE WITNESS: What do you mean by can I commit? Like what are you --

MR. MEADOWS: Are you going to agree to address the spammy reviews, or you're just going to let somebody else deal with it?

MR. CHOSLOVSKY: Agree with who?

MR. MEADOWS: Objection to the speaking

Page 209

objection, Bill.

MR. CHOSLOVSKY:  You asked if he's going to agree.

Agree with who?

MR. MEADOWS:  Objection to the speaking objection.

MR. CHOSLOVSKY:  Okay.  Keep objecting, that's fine.

THE WITNESS:  Joe, I -- I mentioned -- look, I have a lot going on.  I would be hard pressed to find many CEOs and founders of companies that have that as part of their mandate.

I mentioned that we have a process that looks at that.  I hope that it's addressed.

Frankly, I have too many things on my list to make sure that that gets done, when we have an internal process for that.  I don't think --

BY MR. MEADOWS:

Q.  You would agree -- you would agree with me, though, that the Google reviews of your company reflect the credibility of your company, correct?

A.  Yes, which is -- it's also something we can't control.

I said we have a process.  We have had

Page 210

spammy erroneous one-star reviews and five-star reviews, and we've always gone back and addressed those.

I didn't check up on that before here, I didn't check up on that thereafter, but I assumed it would -- it would get addressed.

Q. Do you plan on checking up on it after this deposition?

A. Maybe. Maybe I'll check up on it.

Q. It's true that all the Google reviews for your company are rated 5.0 stars, correct?

A. I haven't looked at it, but I know we have a lot of five-star reviews. I'm not sure.

Q. You don't remember back -- do you remember back in June, we went through this, and all the Google reviews for your company were rated 5.0 stars?

A. Yeah.

Q. There wasn't a single Google review less than 5.0 stars?

A. Yes. That would tell you we do a lot of good work. Is that a bad thing?

Q. Studies consistently show that negative reviews are absolutely harmful, and that people do take negative reviews into account, correct?

Page 211

A.   Yes.

Q.   The longer that the Google reviews remain online for your company, all rated 5.0 stars, the better for your business, correct?

A.   I don't know.

I think our profile and reputation speaks for itself.  We're not in need of additional positive reviews, to be frank, because we have positive reviews going back for the last ten years.

Additionally, if you go to my LinkedIn profile, that I know you did, you probably saw that 100 plus reviews on me, personally, on my LinkedIn profile, which is probably more than any other expert you've ever looked at.

Q.   Bear with me for a minute, I've got some exhibits I want to show you, Sameer.

A.   Okay.

MR. MEADOWS:  Sameer, I'm -- - Sameer, I'm sharing on screen here what was used in the State case as Exhibit 6.

For purposes of this case, we'll mark this as Exhibit 2, with Exhibit 1 being your expert report in the appendices that we discussed in this deposition.

Page 212

(Exhibit 1 marked.  Exhibit 2 marked.)

BY MR. MEADOWS:

Q.   Looking at this document, this contains your C.V., correct?

A.   Correct.

MR. MEADOWS:  Moving to the next document -- this was Exhibit 7 in the State case, and for purposes of this case, we'll have this marked as Somal Exhibit 3.

(Exhibit 3 marked.)

BY MR. MEADOWS:

Q.   This is your LinkedIn profile page, correct?

A.   Correct.

MR. MEADOWS:  Moving on to the next document, this was Exhibit 8 in the State case.  For purposes of this case, we'll have this marked as Somal Exhibit 4.

(Exhibit 4 marked.)

MR. CHOSLOVSKY:  Joe, when you say "Exhibit 8 in the State case," what does that mean?

MR. MEADOWS:  It was the Somal Exhibit 8 exhibit in the State case deposition.

MR. CHOSLOVSKY:  Oh, when you took his

Page 213

deposition in the State case, this was Exhibit 8.

MR. MEADOWS: Yes.

MR. CHOSLOVSKY: Thank you. I understand.

MR. MEADOWS: Yes.

Sameer, this is your YouTube channel page, correct?

THE WITNESS: That's correct. That's my personal YouTube channel, yeah.

MR. MEADOWS: The next document, for the record, this was Somal Exhibit 9 in the State case. For purposes of this case, we'll have this marked as Somal Exhibit 5.

(Exhibit 5 marked.)

BY MR. MEADOWS:

Q. This is your Wititia profile page?

A. Uh-huh.

THE COURT REPORTER: Yes?

THE WITNESS: Yes.

MR. MEADOWS: The next document, this was Somal Exhibit 10 in the State case, and for purposes of this case, we'll have this marked as Somal Exhibit 6.

(Exhibit 6 marked.)

BY MR. MEADOWS:

Q.   This is your Instagram page, correct?

A.   Correct.

MR. MEADOWS:   Moving on to the next document, this was Somal Exhibit 11 in the State case.  For purposes of this case, we'll have it marked as Somal Exhibit 7.

(Exhibit 7 marked.)

BY MR. MEADOWS:

Q.   This is your profile page from your personal website Sameersomal.com, correct?

A.   Correct.

MR. MEADOWS:   The next document was marked as Somal Exhibit 12 in the State case.  For this case we'll have it marked as Somal Exhibit 8.

(Exhibit 8 marked.)

BY MR. MEADOWS:

Q.   These are Google reviews of Blue Ocean Global Technology, correct?

A.   Yes.

Q.   Yes?

A.   Yes.

MR. MEADOWS:   The next document, this was Somal Exhibit 13 in the State case.  For purposes of

Page 215

this case, we'll have it marked as Somal Exhibit 9.

(Exhibit 9 marked.)

BY MR. MEADOWS:

Q. This is Google reviews for Blue Ocean Global filtered from the lowest showing 5.0 stars for all reviews, correct?

A. Correct.

Q. Did you read Doug Bania's expert report in the State case?

THE COURT REPORTER: Who was the expert?

MR. MEADOWS: Doug Bania, B-a-n-i-a.

THE WITNESS: I read it, yes, back when it was received.

BY MR. MEADOWS:

Q. Was there anything in Doug Bania's report that you agreed with?

A. I -- I don't recall. I didn't go through it in great depth, because at trial, the case settled.

Q. Was there anything in Doug Bania's expert report in the State case that you disagreed with?

A. I -- I -- I haven't, you know, don't remember the specifics; haven't gone through it.

Q. After you were deposed in June of this year

Page 216

in the State case, have you had any communications with the other proffered expert, Colin McMahon?

A. Yes, I have -- I have been in touch with Colin McMahon.

Q. When?

A. You said since the -- did you say since the deposition, was the question?

Q. Yes.

A. You know, I -- Colin and I have -- you know, as I do, I build relationships. Colin and I have talked about collaborating on some content together. We've spoken about that specifically.

Q. When was that conversation?

A. Within the last month, we've -- we've spoken on the phone once about that, once about that, and talked about different ways that we could potentially author and work on content together, given our respective expertise.

Q. What kind of content did you talk about with him?

A. Well, writing about media, public rela-tions, digital analytics. Of course, I think reputation, but general thought leadership type of content, because he recognized that we certainly have

Page 217

done a lot of that.

He'd like to do more of that, and he also has done some of that, as well, and wants to do more, yeah.

Q.   Content for marketing purposes?

A.   I think content for building our own reputations and demonstrating some of our thought leadership.

Q.   Content for marketing purposes?

A.   Yes.  I think part of that would be for -- for marketing, sure.

Q.   Content for business development?

A.   I think for educating, for educating people about subjects that are near and dear to us.

I mean, he was the Editor in Chief of the Chicago Tribune so, you know, I would say we're curious people.

I think he's in a fortunate position, and I'm in a fortunate position, where I don't think we proactively business develop.  I think things have turned a little bit, because you work hard, and a lot of people want to work with us.

I think it's about sharing knowledge and information that can help people make more informed

decisions, if that helps, from a marketing business development standpoint, great. But I think we both view each other as -- we both view ourselves as -- as educators and, you know, swimming in that blue ocean I talked about, not the red one.

Q. Is the idea to put out some joint content, in the hopes that other people will hire you, or hire Colin?

A. No, I think we -- we really do care about topics.

I think he brings a complementary perspective, and we both have a -- I don't know, a curiosity about public relations and these things surrounding, you know, digital presence.

I think it's logistic, based on our backgrounds that, you know, maybe two plus two can equal seven or eight or nine or more.

Q. Did he agree with -- did he -- Strike that.

Did he agree to work with you on putting together content?

A. We haven't formalized any content that we are going to put together, but I respect his work; he respects mine. We certainly have a few options in play that we're going to potentially work on, like

Page 219

co-authored content with many people before, in the past.

Q. What options?

A. Well, we talked about doing an interview feature, and just highlighting his expertise as former Editor in Chief of the Chicago Tribune as we interview many people. I think you read Casey Boggs' interview, probably other interviews.

You know, we're both busy, so our plan was to get back in touch on that at some point, hopefully soon.

I don't think that's, you know, mutually exclusive of both being experts on a case. I think we can publish content.

Q. Did you discuss interviewing Colin and putting that interview on your company's website?

A. I said we've done many interview features, and that certainly would be a place we'd be happy to feature him, if he's interested in that.

We didn't get detailed into the specifics. We brainstormed on ways that, I don't know, we can work -- we can work together from a content perspective, and talked about some of the ways that we've been able to highlight our own

Page 220

respective expertise and how we can do that together.

Q. So the idea of putting out joint content, did you call him about it -- Strike that.

This idea of putting out joint content, did you reach out to Colin first, or did Colin reach out to you first?

A. I -- I reached out to him.

Q. Have you had any other communications with Colin McMahon other than the one about potentially putting together some joint content?

A. Well, he really does care about giving back. He found -- we found some parallels in the fact that we're both men who care about supporting opportunities for women, and so he was very interested in our foundation, Girl Power USA, which is a 501(c)(3), so we talked about that.

Q. Any other communications?

A. Yeah, we -- we had a call, and then I also offered -- I think I offered to actually help him, if he wanted to prepare or go over anything in his preparation for deposition I think he had last week. I said that, yeah, if he wanted any help, I'd be happy to do a mock run-through, or share with him any of the ways that I think about deposition, if that's

Page 221

helpful.

Q.   Why did you reach out to him about that?

A.   Well, I didn't really reach out to him about it, it was more like it was done in -- in passing.

I felt like, as a friend, that's something that, you know, I know he hasn't done that before.  I think that was lucky for him, his first deposition has been with you.

Q.   Before this case with Chicago Public Schools, did you know Colin McMahon?

A.   No.

Q.   You guys are now friends?

A.   I would say we respect each other.

Q.   You used the term friends.  I didn't know.

A.   I mean, I think people you have conversations with, I -- I term friends, absolutely.

Q.   Did he agree to accept help from you on preparing him for his deposition?

A.   No.  No, he did not.

Q.   Why?

A.   I don't know.  I haven't talked to him about it.

Q.   Were you going to help him for free, or

Page 222

were you going to charge him money?

A. I'm laughing because, look, I just thought he might be nervous, and --

It wasn't, first of all, for free, but I've done depositions before, and frankly, the first couple of times I did, I wish I had somebody to just talk about the frame of mind, not necessarily the case about it, because I think that that's kind of off limits, in terms of us being independent.

Q. Now, do you consider yourself an expert in depositions?

A. No. I think you'd probably agree with me, based on our interaction perhaps, but I don't con-sider myself an expert.

Q. In the past ten years, have you been a party to any civil litigation?

A. Civil litigation? What do you mean by that? Like, I don't --

Q. Have you -- have you been involved in any civil court cases in the past ten years, other than as an expert witness?

A. Civil court? What do you mean by --

I -- I don't know exactly what that means.

Page 223

Can I look up --

Q. Have -- have you ever been sued by somebody in the past ten years?

A. No. No, I've never been sued.

Q. Has Blue Ocean Global Technology ever been sued by somebody, in the past ten years?

A. No. Fortunately, we've worked hard to have a positive reputation.

Q. Have you been the subject of any government investigations in the past ten years?

A. No, I don't recall. No, I don't recall any government investigations.

Q. Has Blue Ocean Global Technology been the subject of any government investigations in the past ten years?

A. No. That's something I think I'd remember; so, no.

Q. Are you aware of anybody, in the past ten years, who's made any claims of fraud against you or your company, Blue Ocean Global Technology?

A. No. That is also something I would defend vigorously, or be aware of, for certain, but I...

Q. Have you had a chance to find for me, Chris Orlando's contact information?

Page 224

A.   No, but I can grab it from my phone.

Q.   Okay.

A.   Do you want his phone number?

Q.   Yes, for potential reference purposes.

A.   Okay, yeah.  It's 310-569-5484.

MR. MEADOWS:  All right.  Give me two minutes.  Let me see if I have anything else.

I'm just going to stop video and mute this for a minute.

(Recess taken.)

DIRECT EXAMINATION CONTINUED

BY MR. MEADOWS:

Q.   We're back on the record.

One more question; I thought I asked this earlier.

Chris Orlando, do you have an email address for him?

A.   Let me try to find that.  Sorry, I turned off --

Wait, hold on.  I didn't want to get any -- okay, yeah; corlando66@yahoo.com.

MR. MEADOWS:  All right.  Thank you.

I don't have any further questions.

CROSS-EXAMINATION

Page 225

BY MR. CHOSLOVSKY:

Q. I have one topic. This is Bill Choslovsky, Pat Gordon's lawyer.

Mr. Somal, turn to page 78 of your report entitled Emotional Damages. Tell me when you're there.

A. Hold on. I'm sorry. I'm in Appendix A.

Yeah, I'm there.

Q. So read out loud into the record, I guess it's technically paragraph 2, but it's really the first sentence of this section that begins with the words, As many experts know. Read that out loud into the record.

A. "As many experts note and explain: 'Today, in the era of the MeToo movement and widespread impact of social media trolling and cyberbullying, emotional distress can be a primary component of (defamation) damages.' Emotional Distress Damages in defamation cases (2019). (Carroll and Meadows, 2019). This is especially true and applicable in Coach Gordon's case as he was falsely accused of having committed 'sexual misconduct,' which false statements were then broadcast far and wide."

Q. All right. Just focusing on that first

Page 226

sentence, so you begin this section of the report by quoting from a journal article; is that correct?

MR. MEADOWS: Objection, leading.

THE WITNESS: An article that a fellow expert witness had authored and was listed and authored, yes.

BY MR. CHOSLOVSKY:

Q. Okay. So the article you quote from on the second paragraph of page 78, the title of the article you're quoting from, just the title, is what?

A. The title of the article is Emotional Distress Damages in Defamation Cases.

Q. You list two authors of that article, correct?

A. Correct.

Q. What are their sir names?

A. Carroll and Meadows.

Q. Do you know who Carroll and Meadows are?

A. Yes. I know Nick Carroll, and I know Joe Meadows.

Q. Let's take them one at a time.

Who is Nick Carroll?

A. He is an expert witness and a consultant; yeah, an expert witness on defamation.

Page 227

Q.   Have you ever worked with him on any cases?

A.   Not in any official capacity, but we have communicated and discussed issues at hand before.

Q.   I think you just said, but I don't want to put words in your mouth, that Nick Carroll, like you, is a defamation damages expert; is that correct or incorrect?

A.   Correct.

MR. MEADOWS:  Objection, leading.

BY MR. CHOSLOVSKY:

Q.   Let me help -- let me help Joe out.

Is Nick Carroll an expert in anything?

A.   Defamation.

MR. MEADOWS:  Objection, assumes -- lack of foundation.

BY MR. CHOSLOVSKY:

Q.   Well, let's break that down.

You quoted an article, and you already answered, the article is Entitled Emotional Distress Damages in Defamation Cases written in 2019, right?

MR. MEADOWS:  Objection, asked and an-swered.

MR. CHOSLOVSKY:  I'm trying to build a foundation that you claim is lacking.

Page 228

So is that, correct, Mr. Somal?

THE WITNESS: Correct.

BY MR. CHOSLOVSKY:

Q. One of the, at least as you list it, two co-authors of that article is somebody who you said is named Nick Carroll?

A. Correct.

MR. MEADOWS: Objection, asked and answered.

MR. CHOSLOVSKY: I couldn't hear you.

THE WITNESS: Correct. Yes.

BY MR. CHOSLOVSKY:

Q. So Nick Carroll wrote an article on -- well, not on, entitled -- Emotional Distress Damages in Defamation Cases, correct?

A. Correct.

MR. MEADOWS: Objection, assumes facts in evidence.

MR. CHOSLOVSKY: Assumes facts in evi- dence, Joe, or not in evidence?

MR. MEADOWS: Assumes facts not in evi- dence.

MR. CHOSLOVSKY: Not in evidence. That's an interesting one. Okay.

Page 229

So this Nick Carroll who you know, do you believe he's an expert in anything?

THE WITNESS: Yes, defamation and defamation damages.

BY MR. CHOSLOVSKY:

Q. Okay. Is he a doctor, a medical doctor?

A. No.

Q. Is he a therapist?

A. No.

Q. Is he a lawyer?

A. No.

Q. Okay. Let's turn to the second person, who in your report you list as co-authoring the article entitled Emotional Distress Damages in Defamation Cases. You said that cat is named Joe Meadows; is that right?

A. Correct.

MR. MEADOWS: Objection to the characterization, Bill.

MR. CHOSLOVSKY: Was I being too generous or too critical?

MR. MEADOWS: You can keep going.

BY MR. CHOSLOVSKY:

Q. So the Joe Meadows who you list as being

Page 230

the co-author on page 78 of your report, is that the gentleman who has been spent the last six-plus hours deposing you?

A. That is correct.

Q. Now, you and Mr. Meadows had a back and forth, not just in this deposition, but in your State court deposition, where I think Mr. Meadows has said to you many times, now, Mr. Somal, get your facts right; I didn't author that article.

Do you remember him saying that to you?

A. Yes. I think I even followed up with you via email about that.

Q. Followed up with who?

A. You, because I didn't want you to think I was a liar.

Q. Okay. So after your State court deposition that Mr. Meadows took, and he informed you that he did not write that article, what, if anything, did you go back and do to determine whether he did write the article that you cite to on page 78 of your report?

A. Well, I went back and checked the article to make sure that he was still an author on the article.

Page 231

Q. Whenever you did that, was he still listed as an author on the article?

A. No. His name was removed from being an author, at the top of the article.

I sent that to you.

Q. Did his name still appear on the bottom of the article, where often authors state their name and their profession or where they work?

A. Yeah.

So, yes, his name was removed at the top, and still listed at the bottom as of -- yeah, when I checked it.

Q. Given the type of work you do through Blue Ocean, were you able to do any analysis or tests to determine when his name was removed from the article?

MR. MEADOWS: Objection, beyond the scope of his expert report.

THE WITNESS: I -- I definitely did.

I could -- I could see from way back, it had been done recently. Since the deposition, or since the submission of the report, it had changed.

When I submitted the report, his name was listed there as an author. Then it changed, and it wasn't listed as an author, but it was still listed

Page 232

at the bottom of the page, and I think was still listed at the bottom of the page as of when I last checked it.

BY MR. CHOSLOVSKY:

Q.   Okay.  So I believe your State court report was submitted in early June of 2023.

So if I heard you correctly, prior to its submission, your testimony is Joe Meadows was listed as a co-author on the article?

I'll stop there.  Is that correct?

A.   Yes, that -- that's correct.

Q.   Then after Joe Meadows deposed you in the State court case, and asked you questions about that article cited where you listed his name, you checked again.

Then, meaning in a few week's time period, his name had been removed as a co-author; is that a fair summary?

A.   Yeah, correct.  His name was removed at the top of the article.

Q.   Is there any way, when you looked at what-ever you looked at, to determine who was the person or entity who made that change, such that Joe Meadows' name was no longer listed as a co-author?

Page 233

A.    I wouldn't be able to determine that.

Whoever has access to the domain, likely Mr. Carroll, who I did not ask about it, of course, he -- he likely would have done it, or would know who did it.

Q.    Mr. Meadows went through some of curriculum vitae and Exhibit A to your expert report, correct?

A.    Correct.

Q.    He asked you about a few particular articles that you authored or were quoted in, and asked you about whether the links worked in those articles, correct?

A.    Correct.

Q.    About what percentage of the articles in that portion of your C.V. did he ask you about; meaning, was that a majority of the articles listed in there he asked you about their links?  Was it a quarter?  Was it less than 10 percent?  About how many of the total, on a percentage basis?

A.    Yeah, less than 10, less than 5 percent of likely what's listed there; less than 10 percent, easily.

Q.    When he asked you whether they worked, and I think you even clicked on one or two occasions, you

Page 234

said it shows, I think you said a 404 error.  Was that the term you used?

A.    Yeah.  Some of those articles, they've -- they've since moved addresses, or the -- or the article has been taken down, or they've updated it to a different version, and I'm no longer included.  Something like that, yeah.

Q.    Okay.

A.    (Inaudible) --

Q.    Have you --

THE COURT REPORTER:  Wait a minute.  What was the last part?

THE WITNESS:  I just said, that happens all the time, where links are changed, there's 404 errors.

That's not in my control, if I don't own the domain.

BY MR. CHOSLOVSKY:

Q.    Well, related to I guess that last part of your answer, it's not in your control -- as part of your last answer, you said or used the pronoun they, they change it, or they do something.

Who's the they, you're referring to?

A.    The person who owns the domain or has

Page 235

editorial permission of the domain to go in on the back end and change the content, adjust any partic- ular words, et cetera.

Q. Okay. So unless you own or control the domain name, you couldn't even fix the 404 error that Mr. Meadows was asking you about; is that correct?

A. Correct.

You know, we -- we publish a lot of content. Many times, these things change, and there's oftentimes ongoing dialogue about where an article went, what happened to it, yeah.

Q. So is that similar to if Joe Meadows' name is on an article that he claims he didn't author, or if anyone's name is on an article they claim they didn't article -- that they didn't author -- so forget Joe Meadows, let's take him out of it -- if anybody is listed on an article on an Internet page as the author, and they say, but I didn't author it, I don't know why my name's on there, is it your testimony that unless they control the domain name, that there would be no way for them to remove their name from that article? I'll stop there.

A. Yeah. That'd be the -- you know, the same as if I wanted to go and adjust Bill's bio on your,

Page 236

you know, law firm website, I wouldn't be able to do that, unless I have access to -- I have to request somebody at your firm to do that.

Q.   So that last part, since you can't do it unilaterally, you would have to ask someone else, and that someone else presumably being somebody with power, who does control or have access to that URL; is that right?

A.   That's correct.

MR. CHOSLOVSKY:  Nothing further from me.

MR. MEADOWS:  I have several follow-ups.

REDIRECT EXAMINATION

BY MR. MEADOWS:

Q.   Sameer, in reference to the article that Bill was asking you about, the Emotional Distress Damages in Defamation Cases article at page 78 of your report --

A.   Okay.

Q.   -- do you know -- have you read that article?

A.   Yes.  Yes, I read that.

Q.   When was the last time you read that article?

A.   Probably before the State case report.

Page 237

Q.   Do you recall whether or not that article has a -- a listing of emotional damages associated with different types of defamation cases?

A.   I -- a listing, I'm not sure what you mean by that; but I know it talks about a number of factors related to establishing and considerations when there are emotional distress.

I don't -- I don't remember.

Should I pull up your article?

Q.   Do you recall whether or not that article had a scale where it would assign damage amounts to certain types of defamation cases?

A.   I -- I don't recall, but I'm happy to pull up the article.

Q.   Are you aware of any literature that has a -- a scale that will assign certain types of dollar amount damages corresponding to a type of defamation case?

A.   Well, I've -- I've certainly seen in literature, and in reading, whereby there have been assignments to defamation damages, and there's been justification for those damages.

I don't --

Q.   You included that in your expert report?

Page 238

A.   No, I didn't.  I didn't include that in the expert report.

Q.   Going back to the Emotional Distress Damages and Defamation Cases article, do you know where that article was first published?

A.   If I recall, and I think you asked me, I think it was first published in the ABA.

Q.   Have you seen the article as published by the ABA?

A.   No, I have not.

Q.   Do you know if counsel for Pat Gordon, Bill, attending the deposition today, has he seen the article as published by the ABA?

A.   I -- I don't know.  He didn't -- he didn't mention it to me, so I wouldn't -- I wouldn't know. I wouldn't know.

If he did, he didn't mention it to me.

MR. MEADOWS:  No more questions.

Thank you very much, Sameer, Bill, and Ms. Hylton.

I will send the exhibits used in this deposition by email to you, Ms. Hylton.

I'll copy counsel for Plaintiff.

THE COURT REPORTER:  What about read and

Page 239

sign?

MR. CHOSLOVSKY:  We will reserve.

THE COURT REPORTER:  Okay.

Do you want me to send it to you?

Well, first, are you ordering this transcribed, Joe?

MR. MEADOWS:  I'm sorry, I missed that.

Am I ordering what?

THE COURT REPORTER:  Are you ordering me to transcribe the deposition?

MR. MEADOWS:  Yes.  Yes.

You don't have to attach the exhibits, but, yes, the deposition.

THE COURT REPORTER:  Bill, do you want a copy?

MR. CHOSLOVSKY:  No, until I say yes; so for now, no.

THE COURT REPORTER:  All right.  Then we'll have to do something different about read and sign.

I'll let Veritext contact the witness.

(Reading and signing of the deposition was not waived.)

(Deposition concluded at 4:34 p.m.)

Page 240

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter, Registered Professional Reporter and Notary Public, do hereby certify that I acted as the Registered Professional Reporter in the foregoing matter at the time and place indicated herein; that I took in shorthand the proceedings had at said time and place; that said shorthand notes were reduced to typewriting under my supervision and direction, correct transcript of the shorthand notes so taken; that said deposition was submitted to the witness for signature as requested and that any changes, if any, requested by the witness are attached hereto.

I further certify that I am neither attorney nor counsel for, or related to or employed by any of the parties in the foregoing matter, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of August, 2023.


A. Christine Hylton
Registered Professional Reporter
and Notary Public

Page 241

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

August 28, 2023

To: William Choslovsky, Esq.

Case Name: Gordon, Patrice v. Board Of Education Of The City Of Chicago, Et Al.

Veritext Reference Number: 6048659

Witness:  Sameer Somal      Deposition Date:  8/17/2023

Dear Sir/Madam:

The deposition transcript taken in the above-referenced

matter, with the reading and signing having not been

expressly waived, has been completed and is available

for review and signature.  Please call our office to

make arrangements for a convenient location to

accomplish this or if you prefer a certified transcript

can be purchased.

If the errata is not returned within thirty days of your

receipt of this letter, the reading and signing will be

deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 242

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6048659
CASE NAME: Gordon, Patrice v. Board Of Education Of The City Of Chicago, Et Al.
DATE OF DEPOSITION: 8/17/2023
WITNESS' NAME: Sameer Somal

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.


_____          _____
Date                      Sameer Somal

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20_____.


_____
Notary Public
_____
Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 243

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6048659
CASE NAME: Gordon, Patrice v. Board Of Education Of The City Of Chicago, Et Al.
DATE OF DEPOSITION: 8/17/2023
WITNESS' NAME: Sameer Somal

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____          _____
Date                       Sameer Somal

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections
        in the appended Errata Sheet;
They signed the foregoing Sworn
        Statement; and
Their execution of this Statement is of
        their free act and deed.
I have affixed my name and official seal
this _____ day of_____, 20_____.
                _____
                Notary Public


                _____
                Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 244

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 8/17/2023

PAGE/LINE(S) /          CHANGE          /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


_____          _____

Date                      Sameer Somal

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

          _____

          Notary Public


          _____

          Commission Expiration Date

**[00549 - 28th]**

Page 1

| 0 |
|---|
| **00549** 1:6 |

| 1 |
|---|

**1** 2:10 3:9 84:22 180:2 189:6,15,19 190:24 191:3 191:10,17 194:14 195:12 196:21 197:4,6 197:8,10,21 211:22 212:1

**1,000** 177:10
**1.3** 146:3
**1.5** 189:7,17,22 190:11 191:3 191:17
**10** 105:23 106:4,19 179:11 195:14 196:20,21 197:9,10,22 213:21 233:18 233:20,21
**10,000** 16:23
**100** 62:13 132:17 177:19 194:16 211:12
**100,000** 82:5 139:17 140:15 180:2
**10th** 160:12,13
**11** 58:1 103:6 103:16 214:5

**1100** 241:1
**11:00** 62:21
**12** 54:13 214:14
**12:05** 62:22
**13** 214:24
**1324** 43:11
**14006** 240:16
**15** 105:21 106:1,2,18 107:21 159:10 159:17,21 160:1,2,19,21 161:5,10 165:19
**150** 145:9 160:23
**150,000** 145:23 146:3
**16** 107:20
**17** 1:17 35:18
**18,000** 165:21 166:5 167:15 168:15,24 169:12 170:10 172:2,23 173:15
**1820** 241:2
**18902** 5:9
**19** 141:16,19 142:10
**1:20** 128:8
**1:21** 1:6

| 2 |
|---|

**2** 3:10 173:23 185:7 192:1,3 192:6,11,13 194:14 211:22 212:1 225:10
**2,250** 175:18,24 176:16
**2,500** 169:20
**2.75** 192:4,10
**20** 42:17 101:19 119:7 161:3 179:11 204:21 205:10 242:16 243:22 244:22
**200** 134:15
**2005** 27:7,13
**2012** 29:1,10
**2017** 35:11 36:2
**2018** 35:17,18 35:24 36:2 41:8,16,23 42:12,23 43:2
**2019** 31:16 225:19,20 227:20
**2020** 71:22,24 204:6
**2022** 206:12,18
**2023** 1:17 8:18 9:5 136:21 141:16 206:13 232:6 240:12

241:4
**212** 3:9,10,10 3:11
**213** 3:11,12
**214** 3:12,13
**215** 3:14
**216-523-1313** 241:3
**224** 3:5
**23,000** 165:22 166:5 167:15 168:15,24 169:13 170:10 172:2,23 173:15
**236** 3:6
**23rd** 240:12
**24** 158:3,6
**25** 40:24 42:6 42:17 132:17 161:3 187:10
**250** 170:15 175:17,20 176:24 177:8 177:10,12 178:19,24 179:5,9
**26** 140:18 143:14 146:2,3
**27** 165:13,24
**2750** 2:5
**28** 187:19 241:4
**28th** 8:18

**[2:20 - 86]**                                      Page 2

**2:20**  128:7

**3**

**3**  3:10 103:9
128:20 166:10
185:13 192:22
192:23 193:3,9
194:6,8 195:11
195:17,23
212:9,10
220:16
**3,000**  169:20
**3.5**  99:5,8,11
100:5,15 101:5
101:10 103:24
144:7,14,22
145:20,24
146:4 158:7
178:15 186:9
194:2,11
195:12,14,18
195:24 196:21
197:9
**3.9.**  146:4
**30**  92:2 128:6
158:3,6
**300**  2:5 134:15
**300,000**  30:23
**31**  78:16 92:18
**310-569-5484**
224:5
**33**  90:4
**34**  110:22
**35**  78:15 92:10
92:17 103:24
161:13,14,19

161:21,22
162:2,3,3,6,8
162:19,21,24
165:18 174:7
174:12,13
195:18 196:1
197:9

**4**

**4**  3:4,11 146:4
205:2 212:18
212:19
**40**  111:19,22
138:20
**40,000**  138:20
139:17 142:19
143:21
**400**  134:16
**404**  10:14
203:14,20
204:8 234:1,14
235:5
**4251**  5:9 46:3
**43**  114:22
115:5
**44114**  241:2
**486,000**  166:2
**4:00**  198:18
205:6
**4:02**  205:5
**4:34**  239:24

**5**

**5**  3:11 16:23
93:23 94:2
98:24 99:7

102:14,15
103:1 213:13
213:14 233:20
**5,250**  166:10
**5.0**  210:11,16
210:19 211:3
215:5
**50**  16:18 177:9
177:19 187:9
197:5
**50,000**  139:21
140:13,22
141:2,7,12,23
142:2,9,11,14
142:22,24
143:23 144:17
146:2
**500,000**  83:21
84:9
**501**  220:16

**6**

**6**  3:12 103:3
211:20 213:23
213:24
**6.4**  103:6,16
**60**  137:4
**6048659**  241:7
242:2 243:2
**60606**  2:5,10
**61**  119:16
**621,000**  166:2
**65**  124:8,11,16
**650**  62:7

**7**

**7**  3:12 104:19
105:3 212:7
214:7,8
**70**  43:11
128:17 187:10
**75**  135:4,5
143:7
**76**  148:2 155:9
155:17,22
157:14 170:6
171:24 175:15
**77**  179:22
**78**  180:19
225:4 226:9
230:1,20
236:16
**79**  180:19

**8**

**8**  3:13 212:16
212:21,22
213:1 214:15
214:16
**8/17/2023**
241:8 242:3
243:3 244:2
**80**  69:22 184:5
184:7,16,21
185:4,23
**800**  2:10
**85**  84:19
**86**  189:3,9,14

**[9 - address]** Page 3

| 9 | | | |
|---|---|---|---|
| **9** 3:13 213:11 215:1,2 | 192:17 193:17 219:24 231:14 233:1 236:1 | 94:13 97:15 112:20 | 155:24 156:4,7 156:21 157:13 |
| **9-0** 41:10,11 | **above** 170:7 | **accused** 91:14 | 166:16 171:2 |
| **90** 41:9,10,16 41:19 85:2 | 241:10 | 92:12 163:19 194:15 195:6 | 173:7 192:17 196:4,6 206:11 |
| **90,000** 141:22 142:19 143:20 | **absolute** 87:10 **absolutely** | 225:21 | 220:19 |
| **92** 93:18 | 198:17 210:23 | **acknowledge** 242:11 243:16 | **add** 40:19 123:23 140:11 |
| **95** 84:19 | 221:17 | **acquaintances** | 143:22 169:11 |
| **9:32** 1:17 | **academy** 112:5 112:9 | 191:13 192:6 192:20 | 169:11 172:8 **added** 103:15 |
| a | **accept** 164:21 221:18 | **acronym** 14:15 **act** 242:14 | 103:19,19 201:23 |
| **a.m.** 1:17 62:21 | **accepted** 183:19,23 | 243:20 **acted** 240:3 | **addendum** 143:22 |
| **aashna** 10:9,17 11:18 18:22 | **access** 233:2 236:2,7 | **action** 240:11 **actions** 66:8 | **additional** 211:7 |
| **aashna's** 10:16 **aba** 182:17,19 | **accommodate** 6:16 | 67:8 105:18 207:14 | **additionally** 211:10 |
| 182:22,24 183:3 238:7,9 | **accomplish** 241:15 | **actively** 61:10 66:21 | **address** 5:6,8 12:13,16,17 |
| 238:13 **abbreviated** | **accordance** 242:5 243:5 | **actual** 90:1 92:21 120:19 | 15:19 24:23 25:14 43:10,13 |
| 27:23 128:6 **abbreviation** | **account** 210:24 **accounting** | 126:12 145:14 149:16 154:1 | 43:14,17,18,19 43:23 44:5,7,9 |
| 14:16 | 27:10 | 166:10 176:7 | 44:10,11,18,19 |
| **ability** 130:11 **able** 70:19 78:2 | **accurate** 146:20 206:8 | **actually** 66:21 84:3 87:16,24 | 44:24 45:5,18 45:24 46:2,5 |
| 81:4 84:1 85:10 86:21 | **accurately** 69:24 | 88:20 89:21 93:8 97:17 | 46:12,16,19 47:21,23 48:11 |
| 87:5,21 108:10 109:19 114:2 | **accusa** 91:24 | 104:1 120:8 123:15 127:23 | 50:4,20,23 78:2,24 122:21 |
| 124:22 129:17 133:7 134:18 | **accusation** 91:6 **accusations** | 148:24 149:11 150:9,22 151:9 | 125:1 148:9 199:10 201:13 |
| 136:8,14 176:6 176:11 183:18 187:2 190:17 | 77:2 90:18,24 91:10 92:1 | 151:13 152:11 | 208:21 224:17 |

**[addressed - analyst]** Page 4

**addressed**
12:20 44:1
107:13 209:14
210:2,6
**addresses**
234:4
**addressing**
12:22 16:11
79:1 208:8
**adjust** 235:2,24
**admin** 137:8
**adminis** 23:6
**administration**
23:5
**administrative**
11:7
**administrativ...**
11:14
**administrator**
96:19 112:13
**adult** 106:22
112:21
**adults** 99:17,20
100:11,12
101:19
**advanced**
20:23
**advantage**
30:19
**adverse** 113:21
**adversely** 62:1
**advertis** 56:13
**advertise** 59:6
**advertising**
16:6 56:5,8

59:5,7
**advice** 19:3
**advising** 59:24
**advisor** 37:4
**affected** 174:20
193:20 195:5
**affects** 193:22
**affiliated** 37:1
**affiliation** 37:3
**affinity** 33:20
**affixed** 242:15
243:21
**afflu** 124:23
**agement** 38:14
**agencies** 83:1
126:20
**aggregate**
86:10
**agnostic** 34:3,7
**ago** 35:8,14
48:10 50:17
51:4 55:15
176:10 204:23
205:5
**agree** 21:12
75:19 112:24
164:1,15 182:6
208:20,23
209:3,4,19,19
218:18,19
221:18 222:12
**agreed** 181:9
215:16
**ahead** 25:15
90:11 152:19

200:24 201:17
203:16
**ai** 151:11
**al** 1:8 241:6
242:3 243:3
**alcoholic**
194:16
**algorithm** 79:9
152:24 158:19
175:5
**align** 121:22
**allegations**
66:12,17 96:11
98:2,15 104:10
112:14 164:17
**alleged** 64:16
64:20,22,23,23
65:9,10,19
66:2,3 108:5
109:20 129:14
**allow** 92:11
108:16 151:21
173:8
**allowed** 21:22
58:11 68:20,21
84:3 126:23
167:8 170:14
171:8
**allows** 124:24
**alongside** 91:21
**alternative**
28:15,21
169:23 170:2,5
170:13,23
172:1,14

175:14,16
**amazon** 56:10
201:17
**ambiguous**
151:24
**america** 29:3
88:23
**amidst** 106:21
**amount** 30:21
50:7,12 57:2
79:11 82:11
103:19,20
123:23 138:17
141:2 144:18
148:15,24
156:6,9 158:8
161:16 163:1,2
167:5 168:19
169:21 171:12
174:16 176:12
176:18 190:10
200:10 206:20
237:17
**amounts**
237:11
**analysis** 66:3,6
85:17,19 86:18
89:16,17,21
129:1,5 131:10
131:14,16
161:24 173:20
188:20 231:14
**analyst** 27:20
28:16

**[analytics - article]** Page 5

**analytics** 89:24 216:22
**analyze** 85:21
**analyzed** 85:22 118:22
**analyzing** 79:16 94:5 178:7
**angus** 13:17,19 13:22
**announcement** 111:11
**answer** 6:7 9:13 12:4 45:13 59:9,12 60:2 68:16,21 68:24 70:1 76:1 82:21 104:15,16 122:5 134:3,6 139:6 148:14 153:14 154:16 154:18,19 175:11 234:20 234:21
**answered** 45:12 52:9 68:10 153:10 167:13 208:12 227:19 228:9
**answering** 69:23
**answers** 108:14 173:7

**anybody** 11:10 12:17,21 44:22 86:22 87:20 91:19 112:23 223:18 235:17
**anyone's** 235:14
**anyway** 128:3
**apart** 151:1
**apartment** 43:15 44:1,11 44:24 46:22 47:3 50:3
**apologies** 122:5
**apologize** 143:21 156:22
**apparently** 69:15
**appear** 77:21 114:24 115:9 201:11 231:6 242:11 243:15
**appearances** 2:1
**appearing** 1:15
**appears** 203:13
**appended** 243:11,18
**appendices** 11:8 64:7 93:16 155:19 173:19 177:14 179:1 211:23
**appendix** 90:9 90:15,21 91:12

95:14 119:17 120:5 121:6 129:10 132:12 163:6 198:13 198:21,24 200:2,18 204:13 205:15 225:7
**applicable** 85:12 225:20
**application** 59:3
**applications** 108:12,13,18 108:22,24 109:7 132:5 134:14,17,22 134:24
**applied** 27:18 57:1 108:9 137:14
**apply** 27:16 137:11,17
**appreciate** 18:3 175:11
**appro** 127:9
**approach** 152:20 163:13 163:17 198:2
**approached** 35:10,12,15
**approaching** 83:2
**appropriate** 144:12 194:5

**approximately** 139:16 142:20
**area** 29:1 34:7 38:12 56:16 99:20 100:1,12 101:15 129:3,8 129:15 130:14 136:17 146:14 185:11
**areas** 22:20 38:15
**arena** 25:3
**argue** 141:6
**arrange** 77:13 172:2
**arranged** 30:18
**arrangement** 47:1,14,17
**arrangements** 241:14
**arrive** 158:6 165:24 170:12 172:3 189:22 192:10
**arrived** 162:21 191:16
**art** 153:1 161:1
**article** 78:17 88:3 159:23 163:14,18 164:16 181:7,8 181:11 182:3,6 182:9,13,17,19 182:23 183:1 201:1,20,22

**[article - attention]** Page 6

202:4,5,6,17
203:8,10,21,23
203:24 204:1
226:2,4,8,9,11
226:13 227:18
227:19 228:5
228:13 229:13
230:9,18,20,22
230:24 231:2,4
231:7,15 232:9
232:14,20
234:5 235:11
235:13,14,15
235:17,22
236:14,16,20
236:23 237:1,9
237:10,14
238:4,5,8,13
**articles** 25:10
78:2,15 92:17
92:23 100:17
198:24 199:6,8
200:2,20 201:2
203:16 204:10
233:10,12,14
233:16 234:3
**articulated**
166:8
**articulating**
163:11
**artificial** 36:22
**ascertain** 87:8
**aside** 5:16,17
5:17 40:7

**asked** 8:22 9:4
10:11 25:11
34:4 35:3 46:2
52:8 62:11
65:16 68:10,14
76:11 80:5
87:18 89:6
90:12 107:12
108:21 113:5
118:12 127:14
127:15 135:2
153:10 156:4
160:1 162:1
171:10 172:9
179:10 182:5
191:12 204:23
205:20 207:5
208:12 209:2
224:14 227:21
228:8 232:13
233:9,11,17,23
238:6
**asking** 9:12
12:5 41:15
72:7,8 74:22
75:1,2 101:3
116:14 129:13
132:6 155:14
155:14 157:11
168:11,12
172:3 191:2
206:1 235:6
236:15
**assault** 163:20

**assembly** 30:16
**assess** 63:16
129:17
**assessing**
113:11
**assessment**
110:12
**asset** 37:17,18
**assets** 121:17
**assign** 193:8,10
237:11,16
**assignment**
242:2 243:2
244:2
**assignments**
237:21
**assistance**
136:9
**assistant**
130:16 141:15
142:5,17 144:2
144:24 146:16
**associ** 37:11
186:4
**associate** 91:23
**associated**
25:13 30:7
37:9 44:22
94:12 98:1
104:6,7 105:15
111:24 131:17
166:6 197:22
237:2
**associating**
97:14

**association**
34:13 103:13
**associations**
25:21 98:9
**assume** 5:17
6:7 12:20 27:2
32:20 107:19
137:12 141:24
159:9 180:15
192:24 196:13
**assumed** 26:24
67:22 191:24
196:2 197:11
210:5
**assumes** 227:14
228:17,19,21
**assuming**
143:13
**assumption**
109:17,18
110:7 132:23
**ated** 37:12
186:5
**ation** 97:13
**attach** 239:12
**attached** 240:7
243:7
**attempt** 81:3
**attempted**
102:9
**attending**
238:12
**attention** 93:23
115:4 184:20
189:14 208:6

[attorney - basketball]

**attorney** 4:2 11:14 84:15 171:1 240:9,10
**attorneys** 25:8 25:19 152:3
**attract** 151:19
**attracted** 30:6 30:6
**audience** 72:4,7 74:4 96:17 116:14
**audiences** 130:1
**audio** 51:7
**august** 1:17 240:12 241:4
**authentic** 13:13
**author** 182:12 216:17 230:1,9 230:23 231:2,4 231:23,24 232:9,17,24 235:13,15,18 235:18
**authored** 199:1 199:6 219:1 226:5,6 233:10
**authoring** 229:13
**authority** 164:9 203:18
**authorize** 243:11
**authors** 164:21 226:13 228:5

231:7
**automatically** 202:1
**available** 241:12
**ave** 241:1
**average** 85:2 91:22 99:17 140:21 141:11 160:6 165:14
**averages** 176:15
**averaging** 176:21
**awarded** 198:4
**aware** 104:9 223:18,22 237:15

**b**

**b** 3:8 13:21 17:20 58:17 119:17 120:5 121:6 163:6 215:11
**bachelor** 27:9 27:13
**back** 35:4 39:13 41:2,8 41:15,22 42:12 42:23 43:2 47:12 61:3 63:4 64:3 67:6 100:23 125:19 128:15 134:24 149:4 150:24

152:8 155:24 158:21 167:12 186:21 187:2,6 187:14,24 205:10,14 210:2,14,15 211:9 215:12 219:10 220:12 224:13 230:5 230:19,22 231:19 235:2 238:3
**background** 34:5
**backgrounds** 218:16
**backwards** 116:7
**bad** 84:10 177:23 179:2 210:21
**ballpark** 16:12 50:8
**bania** 215:11
**bania's** 215:8 215:15,20
**bank** 29:3,3
**bar** 25:21
**barometer** 160:13
**barred** 54:4
**based** 8:22 36:22 41:3 42:8 43:22 55:10 66:19,24

78:4 79:12,21 98:12 109:21 114:13 117:20 122:16 127:12 129:4 131:7,22 137:3 141:18 148:5,7 149:19 151:3 158:10 158:13,16 160:5 166:9 171:4 172:11 172:21,24 173:5,19 174:2 174:16 175:5 176:3,12 177:3 178:24 179:1 179:19 180:16 183:22 188:6 188:17 191:19 218:15 222:13
**basic** 65:23 93:24 94:1
**basis** 111:1 113:13 115:13 129:1 130:5,10 180:4,22,23 208:6 233:19
**basketball** 19:18,21,22 72:14,19,21 73:8,22 91:7 95:6,9,14 96:24 107:5 116:12,12 141:15 144:2

**[basketball - brainstormed]**

145:8

**batra** 17:19,20

**bean** 58:14,15
58:16,20 59:14
62:3

**bear** 77:24 78:1
211:15

**bearing** 64:19
78:15 129:6

**beast** 152:22

**beeping** 204:16

**beer** 30:6

**beginning**
151:17 176:8

**begins** 185:7
225:11

**behalf** 4:3

**belated** 9:1

**believe** 7:24 8:1
8:6 10:4 12:10
12:18 13:8,17
17:14 18:19
20:5 21:20
22:4 29:10
34:18 35:10
39:8 44:14
51:6 58:9
59:17 61:1,9
63:18 65:2
66:19 67:7,14
69:11 70:24
73:11 74:7
75:4 77:9 80:6
80:13,24 88:16
90:22 92:17,18

95:2 103:10
104:1 108:20
108:20 112:11
113:5 114:7,7
115:16,21
116:2,8,19,20
116:22 117:4,6
118:7 122:22
139:4,4 141:4
146:12 147:17
160:24 172:22
180:14 188:16
196:11 229:2
232:5

**benefit** 153:16
205:9,10

**best** 2:9 4:4,18
69:2 81:24
121:10 163:15
173:10 187:1
187:17 188:10
189:1

**better** 117:15
193:18 211:4

**beyond** 27:13
159:9 231:16

**big** 57:9 127:17
168:5

**bigger** 123:14

**biggest** 82:23
98:18

**bill** 47:9 87:20
92:15,16
102:16 109:5
123:24 124:6

157:10 170:20
171:22 185:17
205:7 209:1
225:2 229:19
236:15 238:12
238:19 239:14

**bill's** 235:24

**bills** 136:10

**bio** 235:24

**bit** 61:3 151:24
168:8 176:18
178:13 202:21
217:21

**blend** 152:15

**blog** 201:16

**bloggers**
178:12

**blood** 29:20

**blue** 4:9 11:24
14:5,17 29:9
29:11,16,22
30:8,22 31:3,5
31:11,13,17,20
31:23,24 32:13
33:3 39:13
40:10,16,22
41:6,8,16
42:11,22 43:10
44:1,9,22
45:18 46:12,16
46:19 48:22
49:10 50:4
82:4 83:20
118:19 124:13
127:16 149:14

149:14 199:11
199:19 200:3
200:14 201:6
207:6 214:18
215:4 218:4
223:5,13,20
231:13

**board** 1:7
88:22 95:17
241:6 242:3
243:3

**body** 77:20
79:11 167:21
171:4

**boggs** 126:2,4
219:7

**book** 29:16,24
31:1

**bookend**
180:18

**books** 40:20

**bottom** 102:14
102:15 103:1
105:23 106:6
106:18 114:22
115:7 124:13
157:15 160:14
170:6 182:23
192:11 231:6
231:11 232:1,2

**boy** 190:8

**boy's** 72:19,20

**brainstormed**
219:21

**braking** 90:17
**brand** 30:4
**branding** 15:2
**breadth** 79:19
81:5 119:12
177:4 191:7
**break** 6:15
51:13 62:19
76:15,15 92:7
96:22 105:10
128:6,16
198:16,18
204:21,23
205:3,4,6,9
227:17
**breakdown**
99:17 105:17
**breaking** 80:24
86:14 90:10,23
91:17 101:12
**breaks** 6:17
**brings** 218:11
**broad** 184:4
**broadcast** 90:6
91:2 102:4
105:12 194:15
225:23
**broadcasted**
105:6
**broken** 81:23
180:13 203:17
**bucks** 1:16
**build** 15:20
30:11 216:10
227:23

**building** 16:5
121:16 203:17
217:6
**built** 121:18
**bullet** 99:2
158:2 159:18
161:12 165:13
173:22 174:6
**bullets** 173:19
**bunch** 66:20
78:22 122:1
128:4 164:11
199:8 208:12
**business** 14:24
38:22,23 40:18
41:7 49:3,8
50:16 57:3
83:6 85:7
88:23 126:13
127:13,17
128:2 188:22
188:23 207:17
211:4 217:12
217:20 218:1
**busy** 33:23
219:9
**buying** 123:5

**c**

**c** 17:11,11 32:9
39:23 40:3,5
40:10 127:4
129:10 220:16
240:1,1
**c.v.** 3:10 212:4
233:15

**ca** 241:24
**caia** 28:18
**cal** 181:23
**calcula** 170:22
**calculate** 99:10
101:4,9 140:17
175:16 179:5
189:16
**calculated**
100:24 191:2
**calculating**
80:14 139:19
140:13 143:11
146:11
**calculation**
55:9 99:13
140:8 158:14
167:9 168:23
169:9,10 171:7
171:9 191:16
**calculations**
90:3 104:11
114:12 160:20
**calendar** 60:9
**california** 18:2
57:16 58:14
60:15
**call** 4:22 5:3
20:5 43:4 78:7
101:16 103:21
113:6 118:23
128:7 204:16
220:3,18
241:13

**called** 4:14 36:9
36:15 137:13
192:19 198:1
201:2 202:17
203:10,17
205:17
**calm** 171:14,15
171:18
**cam** 124:19
**campaign** 16:6
77:17 78:6
79:10 82:20
83:16 118:24
120:9,11,20
121:20,24
123:18 125:13
125:14 149:19
150:21,22
152:21 153:23
156:7 157:3,8
158:12 159:7
163:1 164:4,14
165:7,9,12,15
165:21 166:7
167:16 169:17
169:19 170:10
171:5 172:17
173:4 174:9
176:6,17,19,22
178:17 179:11
179:20 186:11
186:15 187:4
187:12 188:18
188:21

**[campaigns - central]**

**campaigns**
14:20 16:23
23:19 78:5
82:3,12,18,23
83:15,19 84:2
84:6,8 120:17
121:15 122:18
123:15 127:22
152:13 171:3
176:4,11
**canada** 13:23
17:12 43:9
**cancellation**
95:5,8,13
96:24
**candidly** 164:7
**capacity** 227:2
**capital** 38:3
124:18
**capture** 30:5
**care** 114:1
194:13 218:9
220:11,13
**career** 140:2
142:1,2,18
**carolina** 112:9
**carroll** 182:10
225:19 226:17
226:18,19,22
227:5,12 228:6
228:13 229:1
233:3
**case** 1:6 4:22
6:24 7:3,7,8,13
7:21 8:3,18,21

8:21,23 9:4,7
11:6,11,18,19
11:23 12:13
18:7,10,13,13
18:15,17 21:8
21:15,17 23:2
23:3 24:15
26:2,11,13,20
26:24 35:13,14
35:16,22 36:3
36:5 52:5,6
53:18,20,24
54:2,3,5,5,8,18
54:19,19 55:5
55:8,21,24
57:10 58:14,20
58:22 59:10,14
59:19 60:4,6,7
60:11,15,16,17
60:22 61:6,13
61:16,17,21
62:6,9,12,14,16
63:7,8,13,14,17
64:7,14,15,21
65:11,21 67:9
67:17 69:2,13
70:19 71:3,4,6
71:11,12,16
74:7 75:13
76:9,18 77:4
77:18 80:15
81:8 82:1
84:11 85:16,23
87:13 88:7,10
89:4,10 93:20

103:4 104:9,11
104:17 105:2
107:2 108:5
109:17,20
110:13,13,15
110:21 114:17
118:5 120:11
123:1 124:1
127:24 148:3
149:7 150:3
151:2 154:23
155:7 156:4
177:18 183:16
194:24 198:10
205:20 206:2
206:22 211:20
211:21 212:7,8
212:16,17,21
212:23 213:1
213:11,12,21
213:22 214:6,6
214:14,15,24
215:1,9,18,21
216:1 219:13
221:10 222:8
225:21 232:13
236:24 237:18
241:6 242:3
243:3
**cases** 7:11 9:12
22:13 25:7,8
26:6,7,9,15,16
26:20,22 53:21
54:24 55:11
57:16,19,20,20

57:22 58:2,5
59:6 61:3 62:3
63:22 64:11
71:7 76:9 77:3
96:2 112:2
180:6,10
182:10 183:23
222:20 225:19
226:12 227:1
227:20 228:15
229:15 236:16
237:3,12 238:4
**casework** 34:21
**casey** 126:2,4
219:7
**cat** 163:9
229:15
**cate** 131:5
**categories** 81:6
97:9 199:11
**category** 23:12
96:23 97:2
105:11
**caused** 83:7
**ceiling** 195:18
195:24
**cemented**
184:10,23
185:15,24
186:2,16
**cent** 197:6
**centers** 114:1
**central** 62:22
62:23 128:8

**[cents - chris]**

**cents** 197:5,6
**ceo** 4:8 14:5,8
    39:14,24 208:7
    208:15
**ceos** 209:11
**cer** 194:19
**certain** 223:22
    237:12,16
**certainly** 17:4,4
    23:23 43:2
    52:2 64:17
    71:15,20 83:23
    87:11 95:7,23
    110:1,20 112:1
    114:5 125:19
    129:21 130:9
    131:8,22 143:4
    144:10 147:24
    166:6 193:17
    200:10,16
    216:24 218:23
    219:18 237:19
**certificate**
    243:11
**certification**
    242:1 243:1
**certified** 28:4
    240:2 241:15
**certify** 240:3,8
**cetera** 235:3
**cfa** 27:23
**cfp** 28:7
**challenge** 52:16
    164:14 194:20

**challenged**
    52:13,20,22,24
    53:2 54:3 55:7
**challenging**
    52:23
**chance** 88:4
    188:11 223:23
**change** 86:24
    156:14,16
    173:22 174:6
    232:23 234:22
    235:2,9 243:8
    244:3
**changed** 30:15
    182:6 204:5,7
    231:21,23
    234:14
**changes** 10:2
    141:5 240:7
    242:7 243:7,9
**changing** 44:5
**channel** 3:11
    213:6,9
**channels** 15:6
**charac** 12:2
**character**
    190:9 229:18
**charge** 168:18
    173:5,16 222:1
**charged** 169:3
**charges** 175:2
**chartered**
    27:20 28:15
**check** 8:13 10:1
    10:12 50:19

    84:15 165:3
    206:3 210:4,5
    210:9
**checked** 230:22
    231:12 232:3
    232:14
**checking** 129:6
    210:7
**cheng** 32:4,8,9
**chicago** 1:8 2:5
    2:10 24:3,7,10
    24:12 63:22
    64:12 66:11,21
    67:9 77:11
    87:23 88:10
    89:1,8 95:17
    96:6,10 99:20
    100:11 101:12
    105:7,19
    128:21 129:3,8
    129:14,24
    130:9,13
    136:17 167:4
    193:6 217:16
    219:6 221:10
    241:6 242:3
    243:3
**chief** 40:1
    217:15 219:6
**children**
    112:19
**chips** 30:23
**choice** 127:7
**chosen** 40:5,19
    140:2

**choslovsky** 2:4
    3:5 4:11,11
    8:10 9:1,8,10
    12:2,23 14:2
    41:24 42:2,13
    42:24 44:13,15
    45:9,11,19
    46:7 47:5
    49:20,22 52:8
    52:14 62:24
    68:9 75:17
    93:7,13 102:19
    184:14,17
    185:2,7,10,18
    202:12 203:4
    204:14,22
    205:4 208:11
    208:23 209:2,7
    212:20,24
    213:3 225:1,2
    226:7 227:10
    227:16,23
    228:3,10,12,19
    228:23 229:5
    229:20,23
    232:4 234:18
    236:10 239:2
    239:16 241:5
**chris** 45:4,8,14
    45:17 47:4,13
    47:14,17 48:8
    48:21 49:2,9
    50:5,19 223:23
    224:16

**[christine - coach]**

**christine** 1:21 157:22 240:16
**circle** 5:9 46:3 189:19 190:1 190:15 192:8
**circus** 30:2
**cirque** 30:1
**cite** 26:19 83:14 100:19 141:14 143:6 145:13 147:5 180:9 230:20
**cited** 26:18 54:24 78:14 92:18 100:17 114:6,9,14 121:1 141:18 142:10,24 143:3 145:7,13 146:13,15,19 146:21,24 147:1 158:10 163:6 179:1 180:11 232:14
**cites** 178:11
**cities** 129:8 132:2,14,17
**citing** 26:22
**city** 1:8 43:12 44:1,12,23 46:6,22 47:2 48:5 50:3 241:6 242:3 243:3

**civil** 222:16,17 222:20,22 242:5 243:5
**claim** 71:17 81:16 227:24 235:14
**claims** 223:19 235:13
**clarify** 6:6 154:2
**clarifying** 115:12
**clarity** 123:1 198:11
**classification** 39:10
**classified** 95:4
**classify** 19:20 61:20 97:2
**cle** 126:3,9
**clear** 73:12,16 87:1 101:3 106:16 107:15 137:9,21 138:9 138:23 139:1 139:21 159:15 161:11 188:11 189:12
**clearing** 188:9 188:14 189:2
**cleveland** 241:2
**click** 89:15,17 89:20 92:11 160:14 201:9 201:10,12

203:19
**clicked** 89:22 233:24
**client** 14:22,23 15:17,23 16:2 16:3,20 60:1 66:8,20 73:17 83:21 84:14 96:5 97:20 108:21 121:13 122:12 124:5 148:17,21 149:4,18,22 150:1,23 151:2 153:24 154:14 155:6 156:12 157:4,13 160:17 163:14 171:6 173:8 175:2 176:16 178:4 207:21
**client's** 14:24
**clients** 14:18 16:22 19:14 24:21 30:10 32:16 35:5 41:5 48:1 64:10 66:18 71:13 78:5 81:19 82:5,15 83:2,14 84:1,7 84:13 104:14 121:14 127:11 127:23 150:13 153:3 177:21

188:24
**clip** 91:1,11
**clips** 91:3
**close** 104:10 189:20 191:14
**closest** 190:22
**cluding** 25:21
**coach** 19:18 63:24,24 64:2 71:19 72:12,15 72:22 73:2 74:1,6 77:24 78:16 81:8 91:7 94:6,9,23 96:21 98:17 103:12 104:6,7 105:15 106:20 107:2,4,8,11,12 107:14 108:3,4 108:10 109:3 109:19 110:2 112:13 113:1 114:23 115:8 115:24 116:6 116:12,15,17 119:19 120:5 121:22 128:21 129:2,7,7 130:3,6,11,15 130:15,16,22 133:22 134:19 135:7 136:14 139:15,23 141:15 142:5,7 142:8,17 144:2

**[coach - compilation]**

144:24 145:1,7 145:8 147:14 159:5 160:3 161:7 162:16 163:16,19 167:23 177:18 177:23 178:10 186:5,20,22 193:5,5 225:21

**coaches** 111:21 111:24 145:4,6 145:8 146:9 147:2,6,12

**coaching** 19:21 98:20 113:10 113:14 114:4 120:13 130:8 131:2 133:6,8 133:17,20 134:1,4,7,19 136:6 137:10 138:10,15 140:1,22,24 141:6,8 142:17 144:1 145:12 145:23 146:15 146:16 147:24 160:4 187:14

**coastal** 112:8

**coke** 29:20

**colin** 8:3 216:2 216:4,9,10 218:8 219:15 220:5,5,9 221:11

**collaborating** 33:21 216:11

**collaboration** 40:21

**colleague** 4:4 10:9 13:17 139:5

**collection** 55:10

**collects** 43:24

**college** 130:14 141:14 145:8

**com** 145:16

**come** 29:11 51:20 61:23 63:19 67:23 78:7,24 79:6 80:19 125:19 142:13,13,23 143:5 144:14 144:21 160:2 160:21 166:4 167:14 168:23 170:24 172:9 176:24 177:21 194:7 197:6 198:5

**comes** 25:24 169:12

**comfortable** 84:12 100:4 111:18 149:10 179:20 188:20

**coming** 60:8 79:17 103:10

**comment** 69:17

**comments** 183:21

**commission** 242:19 243:25 244:25

**commit** 208:7 208:15,19

**committed** 196:10 225:22

**commodities** 28:22

**commodity** 110:3

**common** 110:17 117:6

**communicated** 227:3

**communicating** 5:14,19,22 75:10 150:23

**communicati...** 127:1,3 216:1 220:8,17

**community** 16:9 71:22 72:1,2,8,9 73:1 73:24 74:8 96:16 116:8,11

**companies** 29:18,22 30:18 30:20 31:10,20 34:10 40:21 56:7,7,14,18 57:2 125:3

209:11

**company** 11:24 12:9 14:9 15:15 25:2 31:5,8 32:21 33:7,10,13,15 36:11,15,22 37:2,9,14 39:14,16 49:13 49:15 87:6 126:11 166:19 169:4 179:17 200:16 208:8 208:16 209:20 209:21 210:11 210:16 211:3 223:20

**company's** 207:15 208:9 208:17 219:16

**comparable** 138:15

**comparative** 30:19

**compensation** 41:19 42:6,15 49:17 50:2 137:3

**compete** 29:19

**competing** 29:20 56:9

**competitive** 121:12

**compilation** 90:17

**[complementary - content]** Page 14

| | | | |
|---|---|---|---|
| **complementary** 218:11 | 93:24 94:1 | **connotation** 194:4 | 194:10,21,23 195:9,11,17,20 |
| **complete** 6:12 123:9,17 | **concrete** 60:12 | **conscious** 97:22 | 196:7,23,24 197:16 198:1 |
| **completed** 241:12 | **concur** 52:24 | **conservative** 86:9,19 90:5,6 | 198:10 |
| **completely** 187:5 | **conduct** 88:6,8 89:5,9,9 94:13 | 99:12 100:3 | **consult** 89:23 122:21 |
| **complicated** 150:2,3,10 | 98:10 104:14 106:23 113:20 | 101:2 139:20 141:4,24 142:7 | **consultant** 48:23 49:6 |
| **component** 103:15 123:14 | 123:15 183:4,7 183:24 184:2 | 144:17 146:1 162:14 172:13 | 80:24 226:23 |
| 225:17 | **conducted** 173:20 | 191:18 196:8 | **consultants** 43:21 50:2 |
| **comprehensive** 119:19 | **conducting** 120:17 122:17 | **conservatively** 140:13 141:17 | **consulting** 49:15 |
| **compromise** 128:21 | **conferences** 39:5 | 142:21 166:11 194:1,10 | **contact** 51:14 109:12 223:24 |
| **compromised** 98:22 110:1,6 | **confidence** 83:8,11,12 | **consider** 26:9 26:13 39:6,11 | 239:21 |
| 132:20 133:2 167:23,24 | **confidential** 84:16 125:24 | 39:12 120:7,22 121:9 222:10 | **containing** 13:1 |
| 190:1,3,23 | 127:18 | **considerations** 237:6 | **contains** 212:3 |
| **compromises** 110:19 130:11 | **confidentiality** 83:6 | **considered** 30:22 121:3 | **content** 15:5 16:8,11 24:22 |
| **con** 127:10 195:23 196:2 | **confirm** 171:11 | 188:4 | 24:23,24 25:6 25:12,13,14,17 |
| 222:13 | **confirmed** 146:20 172:14 | **considering** 109:13 142:6 | 77:20,22,23 78:3,12 79:1,2 |
| **concerned** 95:5 | **confirming** 106:13 | 167:16 | 79:17,18,20,21 80:1 81:7 |
| **concluded** 239:24 | **connecticut** 48:19 | **consistently** 172:7 210:22 | 85:24 86:7 87:7 89:12 |
| **conclusion** 110:7 | **connection** 5:15 18:6 | **constantly** 79:12 126:19 | 94:5,11,15,17 94:21,23 95:2 |
| **conclusions** 26:2,10,23 | 21:17 26:5 56:22 57:5 | **construct** 193:2 193:12,14,23 | 95:5,8,13,17,19 95:21,23,24 |
| 54:24 67:23 | 62:8 63:21 | 193:24 194:4,8 | 96:1,4,5 98:23 109:23 110:9 |

**[content - correct]**

110:19 111:9
111:13 113:18
113:20 119:13
119:15 122:1
124:24 125:2
127:20 129:19
132:21 133:16
134:4 148:8,21
150:7,16 151:9
151:10,12,13
152:9,9,18
155:12,13,20
158:10,17
159:9,13
160:15 161:17
161:21 162:3
162:10,17,20
163:2,5,8,23
164:6 165:19
166:12,14,24
167:20,21,21
167:22 168:4,7
169:15,19,21
170:16 171:12
172:16,18
174:2,16,17
176:12,18,22
177:4,7,15,16
177:22 178:10
178:14 179:3
188:19 191:8
202:22 216:11
216:17,19,24
217:5,6,9,12
218:6,20,21

219:1,14,23
220:2,4,10
235:2,9
**content's**
178:16
**contents** 167:3
**context** 20:16
39:3 57:1
64:18 69:18
98:8 114:14
186:8
**continue** 47:11
130:12 166:19
**continued** 63:2
128:13 205:12
224:11
**continues**
137:10
**continuing**
199:2
**contract**
137:19
**contractors**
39:21 40:20,22
42:17
**contribute**
50:12
**control** 207:17
209:23 234:16
234:20 235:4
235:20 236:7
**convenient**
241:14
**conver** 15:12

**conversa**
221:16
**conversation**
31:13 82:16
131:7 138:6
149:11 216:13
**conversations**
152:2
**conversely** 20:7
**converts** 202:1
**copy** 238:23
239:15
**copyright**
56:12
**cor** 21:9 212:12
**corlando66**
224:21
**corporate**
43:10,17 44:9
44:23 45:17
46:5,11,15,19
50:4,20
**correct** 7:11
8:18 11:20
12:9,10,13
14:7 18:24
19:7,11,14,16
21:5,18 22:1,6
22:17 23:5,9
23:22 24:4,8
24:11 27:1,5,7
27:8,11,14,15
27:21,22,24
28:6,23 31:5,6
32:1,2 33:5,6,8

33:11,12,14,16
33:17 36:5,9
36:10,12,19,21
37:16,19,21,22
37:24 39:14,15
39:17 40:17
43:7,12,13,15
43:16 49:7
54:6,7,9,11,14
54:16,17,20,22
55:11,22,23
56:1 57:17,19
58:8,24 60:15
60:16 61:17
64:8 71:22
78:8 80:10,12
81:10,11 84:20
84:23 85:1,8
86:22 89:16
93:21,22,22,24
103:6,7,8,17
105:13,17
106:23 107:2
111:21,22
124:12 131:10
131:17,18
134:15 140:19
140:20,23
141:1,3,12,13
141:16,17
142:10 143:7,8
146:18 148:3,4
148:6 155:18
158:5 159:19
159:20,22

**[correct - creating]**

Page 16

163:5 165:16
165:17,23
166:3 175:18
175:19,22,23
176:2 180:2,6
180:7,10,20,21
184:11 189:7
189:17,18,20
189:21 192:4,5
192:8,9 195:15
195:16,19
196:1,23 199:3
199:4,6,7,21,22
200:4,14
203:12,13
206:23 209:21
210:11,24
211:4 212:4,5
212:14 213:7,8
214:2,3,11,12
214:19 215:6,7
226:2,14,15
227:6,8 228:1
228:2,7,11,15
228:16 229:17
230:4 232:10
232:11,19
233:7,8,12,13
235:6,7 236:9
240:6
**correcting** 14:1
**corrections**
243:17
**correctly** 99:6
108:21 119:21

120:2 232:7
**corresponded**
29:17
**corresponden...**
44:6 66:20
67:3 97:24
**corresponding**
237:17
**cost** 78:21 82:4
83:20 122:11
122:13,23
139:20 140:15
141:23 142:2
142:21 165:20
167:15 169:16
169:16,18
170:9 171:11
172:13,17,18
173:24 174:10
176:1,1,12,14
176:20 186:14
**costing** 176:5
**costs** 84:9
119:11 140:12
140:24 166:6
174:15 176:7
**counsel** 3:15
7:15 53:1,20
55:1 60:1
238:11,23
240:9,10
**counteract**
177:17
**countries** 132:9
132:24

**country** 30:24
130:24
**county** 1:16
242:10 243:15
**couple** 16:17
51:3 57:16
77:9 117:1
165:8 178:11
178:11 207:12
222:6
**course** 15:22
16:7,10 39:5
56:11 79:15,16
83:13 86:1
101:18 106:20
130:10 149:23
151:10 162:23
164:10 169:19
174:21 176:5
176:21 216:22
233:3
**court** 1:1 10:21
10:23 13:20
15:9 17:15
19:24 36:16,20
40:2 41:10
45:21 52:13,20
53:8 54:21,23
55:8 58:15,18
83:11 104:24
106:12 112:6
119:23 120:1
127:2,5 157:19
157:23 171:15
181:17 198:15

198:19 204:22
207:8 213:18
215:10 222:20
222:22 230:7
230:16 232:5
232:13 234:11
238:24 239:3,9
239:14,18
242:7
**cover** 47:19
**coverage** 73:14
97:19 111:11
**covered** 102:5
**cps** 74:4 96:14
96:19,24 97:17
97:20,22
105:19 107:7
108:21 115:16
116:15 117:19
118:4,6,15
137:3 186:23
**create** 30:4
31:2 155:15
165:3 170:15
172:16,18
178:20 179:6
**created** 30:8
52:2 119:18
121:2 177:7,16
177:22
**creates** 11:9
**creating** 121:16
152:8 165:2
167:19,20

**[creation - defamation]** Page 17

**creation** 155:12
**credibility**
  209:21
**crisis** 97:12
**critical** 229:21
**cross** 3:5 34:23
  224:24
**crossing** 183:17
**csr** 1:21
**curiosity**
  218:13
**curious** 88:19
  98:11 217:17
**currently** 15:1
  15:13,16
**curriculum**
  28:2,14 233:6
**curves** 29:23
**customized**
  120:14
**cut** 172:8,10
  175:8
**cv** 1:6
**cyber** 33:13
**cyberbullying**
  225:16

**d**

**d** 3:1 11:1
  17:20 36:19
  58:16
**damage** 84:10
  90:3 104:10
  105:14 129:14
  131:9,13,15,16
  166:1 185:4

186:19 237:11
**damages** 22:14
  22:19 24:16
  27:3 54:13
  55:9 59:8
  60:10,13 61:14
  61:16 78:7
  79:1,5,7 80:5,9
  80:15,17 81:10
  82:2 85:5,7
  99:13 103:2,4
  103:16,21,23
  104:5 113:11
  114:12 118:12
  128:20 129:18
  139:7,13 140:8
  140:12,17
  143:12 144:8
  144:15,22
  145:15 148:3
  157:15 158:7
  168:13 175:17
  179:21,23
  180:1,18,19,20
  181:1,6,6,8
  182:3,8,10,14
  183:18 189:7
  189:15 191:3
  191:10,17,24
  192:1,3,12,18
  192:23 193:8,9
  193:10,22
  194:8 195:12
  195:17,23
  198:2,3,11

225:5,18,18
  226:12 227:6
  227:20 228:14
  229:4,14
  236:16 237:2
  237:17,21,22
  238:4
**damaging**
  194:18 195:3
**damen** 57:16
**dare** 196:3
**dash** 57:16
**data** 36:21
**date** 35:9,11,19
  50:18 59:13
  60:18,20 241:8
  242:3,9,19
  243:3,13,25
  244:20,25
**day** 42:5,15
  50:13 51:12
  79:4 114:1
  130:15 171:2,2
  208:6,6 240:12
  242:16 243:22
  244:22
**days** 60:9 99:21
  137:4 241:17
**deal** 208:22
**dealing** 112:19
**dealt** 96:14
  97:8
**dean** 63:24
  64:1

**dear** 217:14
  241:9
**decides** 149:5
**decisions** 218:1
**dedicated**
  36:11
**deduce** 179:15
**deed** 242:14
  243:20
**deemed** 112:23
  241:19
**deeper** 160:10
  160:12
**defama** 229:3
**defamation**
  22:13,14,19
  24:16,18 25:6
  25:20 26:6,7,9
  26:15,19 27:1
  38:14,24 54:8
  55:11 57:19,20
  80:9,15,23
  81:1 103:18
  104:9 107:17
  107:18 113:12
  171:1 182:10
  185:5 191:23
  193:15 194:20
  225:18,19
  226:12,24
  227:6,13,20
  228:15 229:3
  229:14 236:16
  237:3,12,17,21
  238:4

**[defamatory - different]** Page 18

**defamatory**
24:22,24 25:11
25:13,14,17
64:16,20,22
65:10,20 66:2
66:4,5,6 77:22
79:2 81:7
109:23 113:18
159:9
**default** 66:15
**defend** 223:21
**defendant** 67:8
**defendants** 1:9
2:7 4:3 65:11
65:13,20 66:4
66:10 67:19
71:22 72:8
73:1,24 74:9
107:1,22
114:24 115:9
117:2
**defined** 133:15
**defini** 89:1
**defining** 109:23
111:13 190:16
**definitely** 38:20
72:15 136:4
139:9 194:24
231:18
**degree** 27:14
86:5 183:12
196:4
**delaware** 55:21
59:10

**delay** 158:8
**delta** 141:5
**demonstrating**
217:7
**dence** 228:20
228:22
**deniability**
73:7
**denial** 76:23
107:14
**denied** 53:12
53:19
**dennis** 19:24
**deny** 21:22
164:23
**denying** 165:5
**department**
116:20 118:1
241:22
**depend** 16:3
**dependent**
14:23 90:3
99:13
**deploy** 151:16
**deposed** 36:4
70:13 139:5
215:24 232:12
**deposi** 6:21
**deposing** 230:3
**deposition** 1:13
4:19,21 5:11
5:15,24 6:6,18
7:6,20,22 8:1,2
8:7,17,22 9:5
9:18 11:22

12:11,12 13:3
13:7,11 75:7
80:4 88:21
102:6 110:11
115:22 118:16
152:4 181:8
183:20 207:4
210:8 211:24
212:23 213:1
216:7 220:21
220:24 221:9
221:19 230:6,7
230:16 231:20
238:12,22
239:10,13,22
239:24 240:6
241:8,10 242:1
242:3 243:1,3
**depositions**
222:5,11
**depth** 79:18
81:5 119:12
177:4 191:7
215:18
**describe** 63:11
77:18 190:24
**described**
119:5
**describes** 148:2
180:19
**design** 201:24
**despite** 134:19
**detail** 114:20
**detailed** 86:18
157:3 185:8

219:20
**deter** 20:7
**determination**
61:8 104:2
**determine**
59:11 86:21
89:22 230:19
231:15 232:22
233:1
**determined**
59:22
**determining**
20:4,6 22:5,7,9
22:16,21 85:6
**detroit** 95:1,3
96:23
**develop** 149:18
217:20
**development**
30:13 33:4,7
49:3,8 217:12
218:2
**developments**
126:11
**dialogue** 15:18
235:10
**dies** 190:6
**dif** 80:22
**different** 9:12
16:7 29:22
31:2 40:18
43:8 53:6
63:10,12 71:16
71:20 81:2,6
89:12 97:9

**[different - dollar]** Page 19

101:20 110:15
110:21 113:24
123:12 131:22
152:14 161:19
162:19 172:21
173:12 178:7,8
178:13 216:16
234:6 237:3
239:19
**differentiate**
191:13
**difficult** 110:9
169:17 171:5
176:17 178:17
**difficulty**
158:18
**dig** 160:10,11
**digital** 16:6
29:4 30:13
37:23 38:19,20
39:4 56:5,9,13
57:1,6,8 59:5,7
63:15 94:22
119:13 121:17
129:5,16,19
130:20 201:3
216:22 218:14
**digitally** 129:23
**diligence** 160:9
160:16 161:6
**direct** 3:4 4:16
37:3 63:2 67:8
83:3 89:24
92:1,4 128:13
205:12 224:11

**directed** 90:19
**directing** 93:23
115:4 184:20
189:14
**direction** 240:5
**directly** 39:22
40:20 78:17
135:14,17
136:3,12 138:3
139:3 167:13
**director** 36:14
**directors** 88:23
**disagreed**
215:21
**disassembly**
30:17
**disastrous**
177:17
**discipline** 16:4
**disciplines** 57:7
**disclose** 49:21
49:24 50:1
84:18
**disclosed** 60:3
61:5,7
**disclosure**
82:24
**disclosures**
61:11
**discovery**
108:14,15
115:15
**discuss** 219:15
**discussed** 9:18
11:23 107:13

108:8 207:12
211:23 227:3
**discusses**
191:10
**discussing** 15:3
**discussion**
106:21
**discussions**
107:24
**disproportion...**
30:21
**distress** 182:10
225:17,18
226:12 227:19
228:14 229:14
236:15 237:7
238:3
**district** 1:1,1
52:6 54:6 89:7
**dive** 86:11,17
**diversity** 38:1
**division** 1:2
**doctor** 19:7,8
180:8,17
182:11,12
183:23 184:2
186:24 187:16
187:18 189:2
229:6,6
**doctors** 34:2
**docu** 212:6
**document**
12:24 75:20
150:13 212:3
212:16 213:10

213:20 214:5
214:13,23
**documentation**
118:8 150:12
**documented**
149:15 155:9
179:18
**documents**
6:24 7:16
10:11 11:9,16
18:23 74:20
75:8 76:8
97:24 115:16
115:18
**doing** 5:11
35:13 47:11
50:16 56:18,21
57:3 77:15
98:21 118:3
128:1 133:12
135:19 136:10
136:15 138:14
151:7 152:11
153:24 156:21
157:1,7 160:8
160:16 161:6
187:23 190:21
200:17 219:4
**dollar** 168:12
168:23 174:8
190:10,12
196:12,14
197:12,19
237:16

**[dollars - emails]** Page 20

**dollars** 50:9 54:13 58:1 103:6,16,24,24 144:15,22 145:5
**dology** 71:4
**domain** 22:13 22:18 164:8 233:2 234:17 234:24 235:1,5 235:20
**domestically** 131:23
**domino** 97:20
**donnelly** 21:20
**donovan** 7:3,7 95:24
**double** 10:1,12 124:4 152:17 206:23
**doug** 215:8,11 215:15,20
**dovetail** 147:18
**dovetails** 147:21
**doylestown** 5:9
**dozen** 52:1 82:7,9 132:11 152:13
**dozens** 25:7,7
**drama** 186:23
**drill** 86:3
**drinker** 30:7
**drinkers** 30:6

**drive** 2:5
**du** 30:1
**duct** 106:23
**due** 59:21 60:2 60:24 61:1 160:8,16 161:6
**duggal** 10:19 10:21 11:1
**duly** 4:14
**dumpty** 187:6
**dundee** 29:4
**duplicate** 205:21
**duplicative** 206:6,18,24

**e**

**e** 3:1,8 5:7,7 13:21 17:11,13 32:8,9 36:19 58:16,16,17 60:15 127:4 240:1,1
**earlier** 46:2 67:22 82:16 92:15 107:6 118:14,16 122:6 134:23 135:13,20 136:20,23 147:19 168:8 183:20 191:12 207:4 208:3,13 224:15
**early** 73:10 232:6

**earnest** 75:20 81:3,16
**easily** 82:7 85:14 91:6 100:14 101:21 142:3 161:2 233:22
**eastern** 1:2 62:22 128:7
**easy** 194:22
**economic** 139:7 139:13 140:8 140:17 143:12 144:8,15,22 145:15
**economics** 28:3
**editor** 165:2 217:15 219:6
**editorial** 235:1
**educate** 25:1
**educated** 172:24
**educating** 217:13,13
**education** 1:7 95:18 112:3,18 112:24 113:3,7 113:10,14,19 114:16,19 199:3 241:6 242:3 243:3
**educator** 112:13 114:4
**educators** 111:20,24

218:4
**effect** 85:1
**effort** 97:22 167:5
**efforts** 29:4 79:12 152:18
**egregious** 104:20 105:2 198:12
**eight** 35:4 100:10 218:17
**either** 8:6 13:13 29:14 74:10,16 121:16 124:7 124:24 149:3 201:22 202:11
**elderly** 114:1
**electronically** 5:23
**element** 85:13
**elements** 15:3 30:1,1,5 56:11 61:18
**eloquently** 172:7
**else's** 150:4 205:10
**em** 43:4 137:19
**email** 50:22,23 97:24 208:2 224:16 230:12 238:22
**emails** 67:11,14 115:16 116:23 116:24 117:1

**[emotional - estimates]** Page 21

**emotional** 180:20 181:1,6 181:8 182:3,8 182:9,14 193:21 225:5 225:17,18 226:11 227:19 228:14 229:14 236:15 237:2,7 238:3

**employed** 28:12 117:7 147:16 240:9 240:10

**employee** 45:1 45:2 138:22 160:17 240:10

**employees** 40:17,19 41:9 41:13,17,23 42:7,12,23 117:6

**employment** 108:4 109:13 109:19 134:19 143:13

**empowering** 36:12

**ence** 124:24 146:9

**encounter** 164:3

**ended** 35:13 107:23

**endorsed** 80:13

**ends** 138:14 176:4,21

**engaged** 157:13

**engagement** 16:9 39:8 85:17,19 89:15 89:17,20 149:17,23

**engagements** 38:16 199:2 204:13 205:17 205:21 206:8 206:22

**engaging** 154:14

**engine** 15:11 159:4 201:18

**engines** 119:14 150:18 174:21

**english** 132:1,9 132:15

**enhance** 15:21

**entail** 118:24

**entered** 243:9

**enterprise** 37:6 37:11

**entire** 142:17 189:24 190:15 242:5 243:5

**entities** 41:7

**entitled** 111:20 225:5 227:19 228:14 229:14

**entity** 232:23

**entrepreneur** 38:11 123:21 198:9 200:15

**entrepreneurs...** 38:10,12

**entrusted** 112:12

**equal** 218:17

**era** 225:15

**errata** 241:17 243:7,10,18 244:1

**erroneous** 24:22 77:22 79:2 210:1

**error** 203:14,20 234:1 235:5

**errors** 10:14 204:8 234:15

**esp** 21:9,16,17 21:24 22:2

**especially** 16:22 82:22 83:1 112:18 113:1,20 151:13 225:20

**esq** 2:4,8,9 241:5

**essentially** 31:18

**establish** 29:4

**established** 124:14

**establishing** 237:6

**estate** 28:22 56:10

**esti** 145:11

**estimate** 90:5 99:4,13 100:3 101:2 103:20 122:19 123:3 140:18 141:2 145:14 154:22 158:12,13,16 161:4 162:14 165:17,20 166:1 168:12 171:5 172:13 172:15 173:3,3 174:15 175:1 175:20 176:7 176:12,20 177:8 178:24 180:1 189:6 191:18 192:1,3 192:22

**estimated** 62:12 141:17 141:22 142:21 148:3 158:3 165:14 167:7 170:9 175:24 176:14 186:12 189:15

**estimates** 51:21 86:19

**[estimating - expert]**

**estimating**
146:9 167:6
175:15
**et** 1:8 235:3
241:6 242:3
243:3
**ethics** 38:4
**events** 25:12,20
97:16 152:1
186:4 190:16
**eventually**
135:8 139:24
**everybody** 4:2
4:6 63:4 128:7
173:16 198:18
205:10
**evi** 228:19,21
**evidence** 75:4
98:18 228:18
228:20,23
**evident** 67:20
72:23 112:22
113:9 114:21
**evolution**
127:13
**evolves** 127:12
149:18
**evolving** 79:12
**exacerbated**
112:20
**exact** 35:9,11
35:19 46:17
50:7,17 73:19
138:5,17
150:21 154:5

**exactly** 45:20
45:23 75:15
89:19 137:12
138:11 157:11
222:23
**exam** 183:4,11
183:13,14,24
184:2
**examination**
3:4,5,6 4:16
63:2 128:13
183:7 205:12
224:11,24
236:12
**example** 29:24
104:4 120:16
182:13
**examples** 78:15
86:14 92:10
97:6 131:20
132:12,13,14
133:11 158:11
163:6
**exceed** 142:1
**excellent**
121:16
**exchange** 47:20
47:21
**exclude** 8:9,9
53:8,12 58:7
58:12 65:4
**excluded** 53:19
54:21,23 55:4
**exclusive**
219:13

**excuse** 204:14
**execute** 16:14
**executed**
243:10
**execution**
242:14 243:19
**executives** 34:2
39:18,19 40:6
40:10
**exempt** 138:22
**exhaustive**
162:13
**exhibit** 3:9,10
3:10,11,11,12
3:12,13,13
211:20,22,22
212:1,1,7,9,10
212:16,18,19
212:21,22,23
213:1,11,13,14
213:21,22,24
214:5,7,8,14,15
214:16,24
215:1,2 233:7
**exhibits** 3:15
211:16 238:21
239:12
**expand** 15:4
**expanding** 30:9
**expands** 126:18
**expansive** 57:7
178:17
**expenses**
163:10

**expensive**
186:11
**experi** 146:8
**experience** 25:5
34:9 56:20,23
109:21 111:23
114:13,18
122:17 145:11
145:13 146:10
158:17 160:5
160:19 166:9
172:12,24
175:5 176:3,9
180:16 183:18
187:23 188:9
188:19 190:14
191:4,19
193:16 196:5,6
**expert** 3:9 4:9
7:10 8:3,20,22
9:20 11:5,10
11:17 18:7,10
18:17 19:16,17
19:18,21 20:4
20:5,7,9,11,13
20:15,20 21:1
21:4 22:5,7,9
22:15,16,19,20
22:21,23 23:4
23:6,8,10,12,13
23:16,17,21,23
24:2,3,7,10,17
24:18 25:6
26:1,5,11,20
34:21,24 35:3

35:7,16 36:4
51:18,23 52:5
52:13,20,22
53:8 54:10
55:21 57:15,21
58:13 59:18
60:3,14,21
61:5,8 64:6
67:10,17,24
69:1,10 70:18
76:19,21 80:23
82:13 88:15
89:4 92:6 93:3
93:15,20 102:1
102:2,10
104:17,19
105:1,3,21
106:18 107:18
107:20 110:22
111:19 112:16
112:23 113:3,6
113:17 115:5
118:12,14
119:9,16
123:13 135:3
155:8 164:19
168:13 170:8
171:24 178:18
180:9,17
183:18 184:21
191:15 193:13
198:8 202:8
203:1,11
205:21 206:21
211:13,22

215:8,10,20
216:2 222:10
222:14,21
226:5,23,24
227:6,12 229:2
231:17 233:7
237:24 238:2
**expertise** 25:2
34:7 56:2,17
57:4 59:1
61:22 62:3
113:8,13 114:2
118:13 146:14
216:18 219:5
220:1
**experts** 123:13
169:7 219:13
225:12,14
**expiration**
242:19 243:25
244:25
**explain** 81:4
82:2 102:16
152:1,3,4
155:11 163:11
170:24 172:7,8
172:9 173:8
175:8 225:14
**explained**
136:5 168:8
**explaining**
168:16
**exposed** 86:8
86:20 87:9,14
87:15,17 88:3

90:5 186:3
195:1,13 196:8
198:7
**exposure** 99:4
99:4,10,22
101:4,9,22
196:22
**expressly**
241:12
**extended** 110:2
**extensive**
120:12
**extensively**
25:10
**extra** 148:19
160:14
**extraordinary**
148:23
**extrasensory**
21:9,16,18,24
22:3
**eyes** 160:16
184:11,24
186:1,5,17

**f**

**f** 17:10,13 64:7
90:15,21 91:12
95:15 240:1
**face** 77:14,14
77:16,16
180:12
**facebook** 86:15
**fact** 26:19 60:7
82:15 83:5
88:17 130:17

136:13 142:4
152:12 177:21
190:15 191:6
196:9 198:9
220:13
**factor** 139:7
140:7 143:12
143:16 172:16
186:14
**factored**
140:14,16
143:17 169:1
**factors** 78:23
149:24 152:10
174:19 188:3
237:6
**facts** 104:10
110:14,16
228:17,19,21
230:8
**fair** 27:3 66:24
68:22 70:16
75:16 76:3,11
109:16 142:15
161:6 162:24
163:1 194:5
232:18
**fairly** 119:14
**fake** 11:23
**fall** 57:9 97:8
**fallout** 97:13
**false** 24:22
105:6,10
107:22 108:5
109:20 140:3

**[false - follow]**

164:19 225:22
**falsely** 225:21
**falsity** 20:8,10
20:12,14
**family** 186:7
189:20,24
190:16
**far** 225:23
**father** 190:4
**feature** 79:19
79:24 158:20
161:17,20
162:2,20 219:5
219:19
**featured** 88:2
94:20 167:1
**features** 201:21
202:5 203:10
219:17
**featuring** 78:16
111:13 199:1
200:20 201:2
203:24
**february** 71:23
71:24
**federal** 71:17
**feel** 86:17
121:15 149:9
161:5,8 188:20
**fellow** 226:4
**felt** 161:23
162:24 191:12
196:7 221:6
**ferent** 80:23

**fic** 151:3
**ficant** 167:21
**field** 112:3,18
112:24 113:4,7
113:10,14,19
113:24 114:4
114:16,19
**fields** 146:11
**figure** 50:8
62:15 79:7
100:15,24
101:21 122:13
141:11 142:9
144:12 145:24
175:17,24
176:24 177:11
177:12 178:2
178:19 189:22
190:12 192:10
193:8,11
196:22 198:5
**file** 201:24
**filed** 7:13 53:8
53:11 58:7
**filtered** 3:13
215:5
**finance** 27:9
28:3 34:9
**financial** 27:20
28:4,11,13
34:10 38:6
**financially**
193:20 240:11
**find** 20:3 74:19
78:10 81:22

108:4 109:19
115:2 148:21
164:7 202:19
203:5 209:11
223:23 224:18
**finding** 97:10
129:4 162:17
166:21
**findings** 93:24
94:1
**fine** 4:24 209:8
**firm** 36:7
126:24 149:12
179:20 207:16
236:1,3
**firms** 23:18
34:6,14 35:5
83:1,2 124:19
125:18 126:22
127:19
**first** 4:14 17:15
17:18 24:17
35:14,16 36:3
36:5 38:13
52:5 64:3
73:11 86:5
89:19 94:3,4
97:20 99:2,12
105:5 115:23
151:6 155:23
157:2,7,8,14
158:21 160:8
160:11,23
161:12 162:7
165:8 169:14

174:6 185:11
186:18 192:13
200:11 220:5,6
221:8 222:4,5
225:11,24
238:5,7 239:5
**firsthand** 110:5
169:15 190:14
**fit** 117:15
**five** 38:9,16
45:7 146:24
173:23 210:1
210:13
**fix** 9:23 10:3
235:5
**fixes** 187:1
**flag** 207:22
**flexible** 90:14
**flip** 200:19
**floor** 20:3
195:18,24
**florida** 54:6
130:18
**flow** 41:3
**focus** 55:5 99:3
118:12 150:7
**focused** 27:3
131:10
**focusing**
225:24
**folk** 114:1
**follow** 51:1
63:16,19 71:5
71:10 76:3,5
76:12 79:6

**[follow - general]** Page 25

92:14 150:12
150:22 155:4
236:11
**followed** 71:2,4
111:2 118:22
124:1 148:12
154:4 181:2
230:11,13
**followers** 85:22
**following** 7:24
8:1 76:6 78:3
110:24 111:12
116:21 196:5
**follows** 4:15
15:22 63:7
**footnote** 141:16
141:19 142:10
**ford** 30:16
**foreclosed**
140:2
**forefront**
200:17
**foregoing**
240:3,9 242:13
243:18
**foremost**
192:13
**forget** 115:20
235:16
**form** 31:7,7
137:17 149:21
**formal** 61:15
88:8 89:5 91:6
**formalized**
218:21

**format** 11:15
63:7 64:4,6
**formats** 11:16
**formed** 60:10
60:12 61:13,15
111:1,7,15
**former** 219:6
**forming** 26:10
**formula** 85:15
174:14 175:1,3
178:2,18,23
179:8,8,15,16
179:16 191:23
**forth** 61:3
197:15 230:6
**fortunate**
217:18,19
**fortunately**
223:7
**forward** 120:9
120:10 122:24
125:13 154:14
156:8,18
188:21 196:3
**forwarded** 44:3
45:23 46:13
47:22
**found** 13:10
29:8,9 31:21
33:20,21 81:21
82:1 120:24
132:4 140:8
143:13 160:24
176:9 220:12
220:12

**foundation**
220:15 227:15
227:24
**founder** 31:24
36:8 39:16
**founders**
209:11
**four** 63:18
64:11,12 66:15
66:16 71:14
78:18 92:20
96:13 182:4
203:16 206:9
**fourth** 201:1
**frame** 222:7
**framework**
79:15 104:4
**francisco** 134:2
134:8
**frank** 211:8
**frankie** 17:7,7
17:10,10
**franklin** 2:10
**frankly** 101:6
123:21 209:15
222:5
**fraud** 223:19
**free** 221:24
222:4 242:14
243:20
**friday** 101:13
**friend** 135:15
163:14 221:6
**friends** 186:7
189:20,24

190:15 221:13
221:15,17
**front** 35:6
55:12 75:20
77:14 93:5
201:9
**frustrated**
76:14,16,16,18
**full** 5:6,7 6:12
13:18 17:8
32:7 122:14
135:6 147:23
148:10,15,18
148:22 154:19
156:5
**fully** 58:11
**funds** 28:21
29:5
**funny** 131:5
**further** 14:11
86:3 158:1
159:18 161:9
224:23 236:10
240:8,10
**future** 88:23

**g**

**g** 11:1,1 13:21
32:8,9 36:18
**gain** 134:18
**geared** 28:2
**general** 15:23
39:10 113:17
121:8 163:6
184:10,23
185:24 186:16

**[general - going]**

216:23
**generalized**
122:3
**generally** 63:11
71:13 77:19
145:9
**generated** 94:5
132:21
**generous**
229:20
**gentleman** 45:3
126:2 230:2
**genuinely** 77:6
**geographic**
132:3
**geography**
150:19
**georgetown**
27:6,13
**gether** 50:17
**getting** 62:5
68:15 98:20
100:14 122:2
130:21 138:7
143:20 156:3
164:15 169:16
174:4 188:6
**gingsberg** 2:4
**ginsbergjaco...**
2:6
**girl** 36:9 37:1
39:24 220:15
**give** 6:12 17:1,5
17:8 83:13
84:7,14 100:17

123:6 188:10
188:17 193:12
224:6
**given** 83:13
123:24 139:17
152:13 163:1
168:19,19
169:2 170:22
172:5 181:2
191:7 216:18
231:13
**gives** 114:2
123:4
**giving** 67:16,16
121:11 192:22
193:2 220:11
**global** 4:9
11:24 14:5,17
29:9,12 31:5
31:14,17,20,23
31:24 32:13
33:4 39:13
40:10,16,23
41:6,8,16
42:11,22 43:10
44:2,10,23
45:18 46:12,16
46:19 48:22
49:10 50:4
82:4 83:20
118:19 124:14
127:16 149:14
199:11,19
200:3,14 201:7
207:6 214:19

215:5 223:5,13
223:20
**go** 4:5 31:11
47:12 48:2
64:3 77:11,16
93:3 100:20
102:12 104:19
108:17 132:16
134:23 137:23
139:12 146:23
147:5,14
148:19,19
149:5 150:5
153:5 155:24
160:6 165:3
166:20,23
167:11 173:8
175:14 182:17
182:19,24
185:19 187:2
187:13 200:24
203:16 211:10
215:17 220:20
230:19 235:1
235:24
**goal** 159:7
160:3 187:12
187:15
**goals** 15:1,19
150:14,15
**god** 188:8
**goes** 14:14
118:3 135:9
141:9 195:13

**going** 5:22 6:7
12:13 35:4
43:2 51:12
61:3 64:1,2
67:6 69:2,17
92:14 93:7,9
100:16 102:8
102:11 116:7
116:21 122:14
130:22 131:4
132:15 141:22
142:16 143:14
148:20 149:22
150:6,8,24
151:2,3,4
152:9,11,15,20
153:6 158:9,9
158:11,21
160:10,11
162:9 163:18
163:22,23
164:1,22 168:2
168:5 171:6,12
172:10,16,18
172:20 174:16
176:13 177:6
177:13 180:14
180:15 184:1
187:2,9,20
198:17 201:16
202:12 204:18
208:20,21
209:2,10 211:9
218:22,24
221:24 222:1

**[going - happen]** Page 27

224:8 229:22
238:3
**golo** 55:21
59:10 62:3
**good** 4:1 5:4
6:10,20 19:22
21:7 35:7
98:21 134:19
161:23 188:24
191:13 198:16
200:10 210:21
**google** 3:13,13
11:23 12:8,18
56:10 79:13,23
84:19 89:23,23
131:23 152:7
159:14 167:24
207:5 209:20
210:10,16,18
211:2 214:18
215:4
**google's** 152:24
158:19 175:4
**gordon** 1:4 2:9
4:3,4,10,12
8:21 18:20,21
62:6,14 63:7
63:13,24 64:2
64:15 65:5,6
71:16,17,17,19
72:15 73:4,7
73:21 74:6
76:23,24 77:5
77:8 81:8
86:22 90:19

91:1,7,11,14,20
92:19 93:22
94:6,10,23
95:11 96:21
98:3,10,12,17
103:5,12 104:6
104:7 105:15
106:20 107:2,4
107:9,11,12,14
108:3 109:13
109:18 110:2
110:21 114:24
115:8,24 116:6
116:15 118:20
119:2,3,5,9,20
120:5,14 121:7
121:22 122:7,9
123:9,24 124:3
125:4,7,10
129:7,7 130:3
130:6,22 135:7
139:23 143:12
147:14,20
148:11 149:7
150:3 153:20
154:3,9,17
155:2,17 159:5
160:3 162:16
163:13,19
164:6,16 165:3
165:4 167:23
170:10 173:17
173:20 174:3
177:19,24
178:11,21

179:6,13 180:2
180:5,11
181:23 183:5,8
186:5,22
187:13 193:5
238:11 241:6
242:3 243:3
**gordon's** 11:19
71:21 72:10
74:10 78:1,16
92:8 128:21
129:2 139:15
154:23 165:9
179:19 186:20
225:3,21
**gotten** 127:17
137:8 147:24
**government**
136:8 223:9,12
223:14
**grab** 224:1
**graduated** 27:6
**great** 18:3 80:2
80:3 182:13
215:18 218:2
**grooming**
111:5
**ground** 30:23
110:17
**group** 33:22
66:15 119:14
120:6 192:7
**grouped** 97:16
**grouping** 122:3

**groups** 25:21
151:19
**grown** 180:13
**grows** 127:11
**grsm.com** 2:11
2:11
**grupo** 36:15
**guarantees**
188:17
**guess** 132:7
172:23,24
173:2 208:12
225:9 234:19
**guidelines**
15:23
**guys** 93:11
126:12 221:13

**h**

**h** 3:8 10:24
17:13,13,18,20
32:9 40:3,4
**haiti** 190:5
**half** 89:8
186:12 190:20
**hand** 227:3
240:12
**handle** 53:22
**handled** 64:10
97:17
**handles** 12:18
**handling**
208:16
**happen** 138:4
192:16

**happened**
130:18 138:4
190:19 194:13
235:11
**happens**
234:13
**happy** 6:16,18
7:17 69:14
124:6 143:22
219:18 220:23
237:13
**hard** 51:20,20
78:10 106:11
106:11 163:12
165:8 178:17
186:10 209:10
217:21 223:7
**harder** 158:9
**hardest** 151:18
**harm** 54:15
57:24 81:1
105:14 110:16
110:17 113:15
147:19 168:20
177:17 189:16
191:1 192:4
193:18 197:18
197:22,22
**harmed** 80:22
187:22
**harmful** 24:21
24:23 25:6,12
25:13,14 78:12
79:2 81:6
94:22 109:22

110:8,18 111:9
111:14 113:16
113:18,19
119:13,15
133:16 159:8
161:17 162:3
191:8 210:23
**he'll** 188:6
**head** 7:23
130:15 142:7,8
145:1,4,6,7,8
145:22 146:15
**headline** 99:24
**headlines** 88:3
93:1 97:11
190:7
**health** 19:9,13
183:4
**hear** 45:12
90:18,24 91:10
189:10 204:15
228:10
**heard** 23:11
88:11 89:1
172:21 173:13
173:14 183:10
183:13,15
190:13 194:17
232:7
**hedge** 28:21
**heightened**
111:20 112:18
113:10 114:11
**held** 20:9 21:4
24:1

**help** 11:8,10,12
11:15,17 17:2
18:16 24:6
25:1 34:1,13
34:20 35:6
62:15 82:2
109:5 124:20
136:10 138:14
164:7 170:20
171:22 187:4,8
187:9,18 203:1
203:11 217:24
220:19,22
221:18,24
227:11,11
**helped** 18:19
83:6
**helpful** 82:1
192:17 221:1
**helping** 34:17
187:16
**helps** 187:19
218:1
**henry** 30:16
**hereto** 240:7,10
**hereunto**
240:12
**hey** 121:1
127:19 139:19
140:15 142:4
151:7 163:13
163:18 179:17
194:13
**hi** 4:8

**high** 144:14,21
147:15 164:8
176:18
**higher** 144:6,8
144:18 156:21
157:10 161:3
**highlight**
219:24
**highlighted**
112:12 119:12
**highlighting**
219:5
**highly** 177:5
188:16
**hire** 84:17
127:22 135:14
135:17 136:3
137:22 160:18
161:6 218:7,7
**hired** 23:18
36:6 87:6
122:21 135:18
136:12 138:3
154:6 156:12
**hiring** 121:14
149:5 152:5
160:9
**hold** 9:10 20:11
20:13 22:23
23:16 44:15,15
75:17 93:7
99:7 189:8
224:20 225:7
**home** 44:7,10
44:19

**[homes - indicated]** Page 29

homes 114:1
honest 81:3
hook 96:13
hope 4:22
67:13 209:14
hopefully
130:15 219:11
hopes 218:7
hot 110:3
hour 62:7 89:8
hourly 62:5
149:8
hours 16:13,17
16:18 62:8,11
77:9 119:7
166:23 179:12
205:5 208:13
230:2
house 128:1
huge 86:5
123:23 167:5
huh 90:20
119:22 156:15
157:18,20
205:18 207:7
213:17
human 85:13
humanitarian
39:11,12
humpty 187:5
hundred 109:7
109:7,15
133:24 134:16
hundreds
24:21 166:22

166:23
hurt 195:7
hustler 20:2
hybrid 30:2
hylton 1:21
238:20,22
240:16
hypothetical
130:6 132:23
133:1
hypothetically
130:3

**i**

ibm 30:23
idea 48:4 203:8
218:6 220:2,4
identified 18:6
73:3 106:21
107:4 161:14
161:18 162:2
identify 40:9
84:1 107:2,4
115:17 116:6
117:11,16,23
125:15
identifying
114:23 115:8
115:24 117:5
il 196:24
illinois 1:1 2:5
2:10
illustrate
159:23,24
194:23

image 168:3
images 168:1
immense
168:20
impact 81:7
113:16 150:9
225:16
impacted 62:1
impactful
121:11
implement
14:19 124:19
171:3
implemented
78:5
implementing
150:22 156:8
implying 14:8
148:15
important
112:11 177:5
impossible
110:9
impres 86:3
inaudible 15:7
45:10,20 83:10
112:5 181:16
234:9
include 37:17
53:21 65:2
107:21 120:11
120:14,24
121:19 179:14
206:13 238:1

included 55:1
95:14 119:9,11
121:4 122:22
154:11 155:7
182:7 234:6
237:24
includes 59:7
119:17 189:19
192:6,21 193:3
including 16:6
16:8 155:19
172:18
inclusion 38:1
income 139:21
144:24 145:15
145:18 146:2
146:11
incorporated
243:12
incorrect 227:7
increasing 52:3
203:18
independent
39:21 40:20,22
76:19,21
114:12 166:13
222:9
independently
121:18
india 11:4
17:23 30:24
43:7,9
indicated 158:1
240:4

**[indicating - investing]** Page 30

indicating 134:12
indirect 91:24
individual 15:15 34:15 87:22 97:11 169:18
individuals 23:20 119:19
industry 30:14 34:3,8 121:21
inent 88:18
inferred 91:6
influence 124:23 202:22
influenced 133:15
information 24:14 50:1 51:14 64:1 70:17,21 88:14 89:21,24 121:22 149:13 164:18,20 179:2,14 217:24 223:24
informed 217:24 230:17
infringement 55:24 56:3,21 56:24 57:5 58:22,23 59:2
infringing 56:14

ing 19:19 56:14 111:24 133:23
inhibited 188:1
injury 103:5
inner 189:19
innovated 30:7
inoculating 25:15
inputs 78:20
inquiries 107:23
insights 202:8 203:1,11
insignificant 30:4
inspiration 30:11 31:1
inspired 29:15
instagram 3:12 214:2
instance 29:24 30:24 34:23 44:5 99:16 120:11 126:21 127:12 150:6 151:6 159:11
institute 99:16
institutional 37:15,17
institutions 28:13
instructed 9:24 9:24 10:7
integrated 119:18

intellectual 56:12
intelligence 36:22 121:12
intent 22:22,24 23:1
interact 165:1
interaction 222:13
interchangea... 117:14
interest 46:18 46:21 49:12 173:11
interested 219:19 220:15 240:11
interesting 13:10 104:12 228:24
interlinking 166:23
intermittently 4:19
internal 207:19 209:17
internally 12:14 150:12
international 128:22 130:1 131:20 133:11 133:14
internationally 132:14

internet 59:4 84:20 90:7 92:5 99:3,18 100:6,14 102:5 109:24 235:17
interpret 21:2
interpreted 156:24
interview 126:4 126:8 131:1 180:5,12 219:4 219:7,8,16,17
interviewed 136:13 181:4 190:13
interviewing 191:4,19 219:15
interviews 24:14 219:8
introduce 4:6 127:15
intuition 21:7
invest 148:23
invested 156:10
investiga 23:8 96:24
investigation 95:18,20
investigations 23:11 24:11,13 33:13 223:10 223:12,14
investing 28:20

**[investment - justified]**

**investment**
28:1,9,16 31:4
149:3,8 156:18
157:5 168:5
**investments**
28:3,21
**investors** 37:15
37:17
**invoices** 44:6
46:1
**involve** 57:19
59:6
**involved** 26:15
33:24 37:14
76:9 114:16
126:10 168:17
186:23 193:6
193:17 222:19
**involvement**
11:5 31:15
34:12 48:21
**involving** 112:2
**ip** 22:19
**islands** 131:7
131:10
**isolated** 55:3
**issue** 122:21
**issues** 24:23
56:22 57:6
72:13,20 73:8
73:23 96:11
107:5 113:9
114:3 227:3
**italicized**
110:23 111:4

**item** 106:19
169:10
**ization** 229:19

**j**

**j** 35:20 52:6
**jacobs** 2:4
**january** 73:10
**jmeadows** 2:11
**job** 98:20,20,21
108:9,12,13,18
108:22,24
109:2 110:10
118:3 121:16
122:19 130:8
133:5,6 135:8
135:10,20,22
135:24 136:19
137:9,11,16
138:8,16 139:8
139:24 140:9
147:15,24
165:17 171:1,2
174:3,4 187:14
188:1,6 190:17
**jobs** 108:9
131:2
**joe** 4:2 5:1,3,4
6:10 12:6
13:12 14:7
16:16 19:1,6
19:12 21:3
25:24 27:22
29:15 37:19
38:5 39:20
42:5 43:8

44:17 45:3
46:2,14 47:14
50:18 51:20
53:17,23 54:7
55:5,13 61:12
62:24 67:20
68:19 69:6,22
70:8 72:18
75:23 76:5
81:17 87:18
97:7 99:12
102:2,17
104:12 109:21
116:7 122:16
123:10 127:10
129:16 132:10
133:1 134:3,12
134:23 137:15
142:6 145:5
148:14 153:10
153:15,21
167:20 168:17
169:14 172:5
173:2 177:15
178:5 179:7
184:15 186:24
193:12 197:14
203:6 204:14
206:16 207:16
208:14 209:9
212:20 226:19
227:11 228:20
229:15,24
232:8,12,23
235:12,16

239:6
**john** 7:2,7
17:24,24 95:21
95:23
**johnson** 7:3,7
18:13 20:24
55:6 63:24
95:21,23
**joining** 4:18
**joint** 37:6,7
218:6 220:2,4
220:10
**jointly** 37:12
126:10
**joseph** 2:8
**journal** 226:2
**journey** 127:15
**judge** 21:9,11
21:16,19,20,21
81:4 104:2
197:17
**jump** 171:22
**jumping** 90:11
**june** 4:21 8:18
9:5,17 55:17
62:11 70:13,15
80:4 116:9
205:19 210:15
215:24 232:6
**jury** 81:5 104:2
197:17
**justification**
198:5 237:22
**justified** 182:15

**[justify - landing]** Page 32

**justify** 171:7

**k**

**k** 17:11,13
35:20 52:6
127:4
**keep** 47:11
82:10 204:18
209:7 229:22
**keeping** 136:7
**kept** 31:3
**key** 77:21,24
78:1 79:19
119:14 150:16
151:19,20,22
159:3,16
161:13,14,16
161:16,24
162:2,6,8,9,11
162:14,15,21
165:18 174:7
177:5
**khalifeh** 17:13
**kim** 29:17
**kind** 16:12
96:13 97:15
106:8 128:6
138:24 148:19
162:6 194:9
216:19 222:8
**knew** 73:5
**know** 6:6,15,24
11:13 14:3
16:17,18,22
21:21 22:24
23:2 25:19

26:16 31:21
35:4 40:24
45:7 46:9,11
46:15,17 47:9
47:9 48:14,15
49:19 50:22
51:19,21 52:1
52:12,19,22
53:7 55:12,16
60:5,24 61:2,7
61:12,20 64:10
64:20,22 65:9
65:9,12,19,22
65:23 68:23
69:1,12 70:7
71:16 73:3,6
73:17 74:3,16
74:16 75:3
76:7 77:6 78:9
78:22 80:1
81:21 82:7,8,9
86:8,23 88:1,9
88:24 89:6
90:12 91:20
93:11 96:2,14
96:15 98:1,5
98:11 99:15
100:10 103:12
104:5,12
106:16 108:3
108:16,19
109:8,14,24
110:12 113:17
113:22 114:1
116:9,21 117:4

117:5,24 119:6
120:23 122:20
123:4,5,5
124:5 126:24
127:23 132:1,2
132:11 133:19
134:7,9,16
135:20,21
136:8,11,14
137:2,3,21
138:3,5,11,17
138:21,21,23
138:24 139:4
139:11 140:11
140:13 141:20
145:21,21
152:10,16
154:12 164:3
164:16 165:7
169:6,14
170:16 171:4
176:10,10
178:22 181:4,7
183:2 184:1
186:8,10,11,12
186:22,24
187:5,5,18
188:5,9 190:9
191:21,21
193:4,16,24
194:3,12,12,17
195:2,5 196:9
197:18 200:7,7
202:15 204:9
204:10,18

207:24 208:5
210:12 211:5
211:11 215:22
216:9,10
217:16 218:4
218:12,14,16
219:9,12,22
221:7,7,11,15
221:22 222:23
225:12 226:18
226:19,19
229:1 233:4
235:8,19,23
236:1,19 237:5
238:4,11,14,15
238:16
**knowing** 109:2
110:5 158:17
190:7
**knowledge**
13:24 24:12
186:6 217:23
**known** 28:7,18
30:8 57:13
103:11 159:4
**knows** 196:10

**l**

**l** 5:8 11:1 17:13
18:2 60:15,15
127:4
**lack** 227:14
**lacking** 227:24
**land** 160:3
**landing** 15:7

**[language - listed]**

**language** 20:18
**large** 16:4
    101:21 119:14
    121:1 147:7
    177:6
**largely** 111:1,7
    111:15 184:10
    184:23 185:15
    185:24 186:2
    186:16
**larger** 192:21
**largest** 30:19
    193:3
**late** 204:19
**latitude** 167:19
**laughing** 222:2
**law** 19:5 27:16
    34:6 35:5 36:6
    61:19 83:1
    207:16 236:1
**laws** 61:17,21
**lawyer** 4:12
    18:24 25:21
    26:3 53:23
    55:6 91:5
    182:13 225:3
    229:10
**lawyers** 25:1,1
    33:16,18,21,22
    34:6,11,13,18
    34:20 35:1,6
    52:3 53:22
    60:5 61:2,10
    61:11,11

**lay** 148:19
**layer** 81:15
    104:4
**layers** 80:23
    81:2,6 82:2
**layman** 73:20
**lead** 101:11,16
**leaders** 88:23
**leadership**
    38:17,18
    216:23 217:8
**leading** 99:20
    101:21 226:3
    227:9
**learn** 133:14
**learned** 88:14
    186:4
**lease** 46:24
    47:13,19
**leave** 45:17
**lebanon** 17:13
**led** 24:24 29:3
    53:4
**left** 140:19
**legal** 19:2 26:2
    26:4,15 34:12
    53:21 54:24,24
    199:2 241:1
    244:1
**length** 165:14
**letter** 74:9,10
    74:12,19,23
    75:2,4,4,14,16
    76:7 116:9
    241:18

**letting** 117:5
    173:9
**level** 40:5
    192:11
**levels** 150:4
**leverage**
    124:20 152:12
**levick** 126:24
    127:2,3 128:4
**lexicon** 20:23
**liability** 26:24
    27:2 67:22
    107:19
**liar** 230:15
**license** 27:23
    28:1,10,11,20
**licensed** 19:2
    28:4,15
**life** 20:2 81:7
    140:19 193:19
**likely** 86:20
    87:17 135:7
    138:16 139:23
    233:2,4,21
**liking** 158:19
**limited** 24:13
    31:18 130:9
**limits** 222:9
**lincoln** 101:12
    147:14
**line** 30:16,17
    94:3,4 105:5
    126:17 157:15
    166:10 169:10
    185:10,14

    243:7 244:3
**linguistics**
    20:15,16,17
**link** 201:14,16
    201:21 202:1
    202:10,10
    203:5,9,13,17
    203:19 204:5,7
**linked** 92:23
    94:12 98:2
**linkedin** 3:10
    211:10,12
    212:12
**linking** 94:11
    152:8
**links** 9:6,19
    10:1,3,14
    151:18 167:3
    178:8 233:11
    233:17 234:14
**liquor** 30:6
**lished** 125:1
**list** 40:5 82:12
    84:7 108:21
    119:17 120:15
    120:21 125:19
    162:13 163:3
    199:8 201:1
    203:23 206:5
    206:12,17
    207:21 209:16
    226:13 228:4
    229:13,24
**listed** 144:2
    162:3 164:10

**[listed - lot]** Page 34

174:12,19
200:12 226:5
231:1,11,23,24
231:24 232:2,8
232:14,24
233:16,21
235:17 243:7
243:17
**listen** 77:5
**listing** 44:6
206:24 237:2,4
243:7
**lists** 40:7
**literally** 73:5
**literature**
22:12 113:15
114:5,13 181:5
190:14 191:4,9
191:19 237:15
237:20
**litigation**
222:16,17
**little** 7:16 61:3
146:3 147:22
151:24 168:8
176:18 178:13
202:21 217:21
**live** 17:9 44:23
88:10 101:12
**lived** 43:7
**lives** 46:5,11,15
48:11,14,15
**living** 130:13
**llc** 2:4

**llp** 2:9
**loath** 83:14
**local** 128:21
129:14,21,23
129:24 178:11
**located** 11:3,4
17:22,23 18:2
**location** 132:3
241:14
**locations** 129:8
131:21
**logical** 114:8
182:1 198:7
**login** 183:3
**logistic** 218:15
**london** 131:17
131:19 132:7
133:12,18
**lone** 110:23
**long** 16:1 69:12
77:8 100:20
102:3 119:4
122:5 151:3
153:5 158:11
176:21
**longer** 31:13
132:13 176:19
211:2 232:24
234:6
**look** 7:5,17
13:12 25:8
30:19 61:23
63:15 66:3
70:10 75:1,3
78:24 80:22

89:18 99:14,19
100:17 108:12
108:13,18,24
121:21 129:16
129:17 132:19
133:3,3 151:7
151:18 159:15
160:7,13
163:13 164:2
164:22 167:22
172:11 173:6
174:1 179:11
198:11 204:9
208:4 209:10
222:2 223:1
**looked** 11:23
12:11 26:17
60:8 64:16,17
66:6 76:8
78:11 85:24
94:15,17 97:5
100:18 101:14
118:22,24
122:10 129:13
131:21 132:1
143:4 155:6
162:7 202:19
210:12 211:14
232:21,22
**looking** 16:8,9
16:10 25:16
70:2 74:17,21
74:23 75:9,11
77:23 78:1
101:17 122:17

131:5,6,23
132:2 145:19
148:7 150:18
154:1,23 160:6
166:12 167:20
178:6 179:12
212:3
**looks** 13:9
74:18 138:4
200:23 206:5
209:14
**loss** 61:21
142:11 145:14
146:11
**lost** 55:7
139:16,20,21
140:12,15,22
141:6,23 142:1
144:23 145:18
146:2
**lot** 6:24 7:16
34:6,10 42:18
48:6 62:2
70:14 101:6
127:20,20
145:9 151:7
152:21 153:1
161:20 162:24
163:9,24
174:12 177:20
177:22 200:13
209:10 210:13
210:20 217:1
217:21 235:8

**[loud - matter]**

Page 35

**loud** 225:9,12
**loves** 190:21
**low** 164:21
  191:7 197:5
**lower** 142:18
  143:20,24
  144:5,9,11,18
  145:5,6
**lowest** 3:14
  141:21 142:16
  142:16 144:1
  145:22,23
  215:5
**lsat** 27:18
**lucky** 221:8
**ludwin** 53:24
  54:5 55:8
**lunch** 128:6,16
**lustrative**
  197:1
**lying** 22:17
  118:1
**lynch** 29:3
**lynn** 5:9
**lynne** 46:3

**m**

**m** 5:7,8 17:18
  32:8 40:4
**madam** 241:9
**made** 9:13
  65:10,12,20
  66:4,5,7,10,18
  67:7,18 71:13
  91:10 97:18
  98:9 105:6,11

107:22 109:17
115:14 117:13
130:12 132:12
137:9,21 138:9
138:23,24
139:17,21
161:3 223:19
232:23 242:7
**mail** 43:24 44:3
  45:23 46:13
  47:22
**mailing** 43:13
  43:18,19 44:18
**main** 38:15
  96:17
**maintenance**
  33:10
**major** 28:12
  94:12 99:24
  100:1 132:1
  188:3
**majority** 38:15
  72:4 111:13
  116:13 233:16
**make** 9:1 35:7
  61:8 67:24
  69:17,23 74:14
  87:1 94:4
  97:22 102:19
  104:2 106:13
  116:16 124:13
  130:2 138:14
  145:4 151:9
  154:22 157:16
  159:8 160:14

167:2,8 172:1
176:6 209:16
217:24 230:23
241:14
**makes** 24:18,19
**making** 77:2
  138:12 160:17
  166:24
**man** 38:13
  180:13
**manage** 23:24
  29:5
**management**
  14:14 15:14
  28:1,9 30:14
  33:16 34:17
  35:1 37:20
  39:1,4 121:15
  121:24 152:23
  155:12 173:4
  175:4
**managers**
  37:18
**managing**
  36:14
**mandate**
  209:12
**mansukhani**
  2:9
**marguerita**
  32:8
**mark** 211:21
**marked** 212:1
  212:1,8,10,17
  212:19 213:12

213:14,22,24
214:7,8,14,15
214:16 215:1,2
**market** 29:7,21
  30:2,5,9 56:10
  84:20
**marketing** 15:2
  16:5 30:7,14
  34:12 38:19,20
  39:4 40:1 48:4
  49:1,6,8 57:8
  203:2,12 217:5
  217:9,11 218:1
**markets** 133:14
**marking**
  160:18
**maryland**
  32:10
**material**
  175:21 176:2
  176:15 177:1
  178:3,20 179:6
**materials** 182:2
**math** 143:18
  160:20 168:22
  191:16
**mathala** 71:1
**mathematical**
  158:14
**mating** 145:12
**matt** 67:11
  115:20
**matter** 240:4,9
  241:11

| | | | |
|---|---|---|---|
| **matters** 38:6 | 146:17 153:15 | 230:17 231:16 | 159:2,3,12 |
| 110:12 112:17 | 154:7,15 | 232:8,12,24 | 161:13 163:19 |
| **mauborgne** | 157:24 168:10 | 233:6 235:6,12 | 167:18 177:9 |
| 29:16,18 | 168:21 169:8 | 235:16 236:11 | 186:1 187:9 |
| **mclean** 160:7 | 169:22 170:17 | 236:13 238:18 | 194:9 199:12 |
| **mcmahon** 8:4 | 170:20 171:14 | 239:7,11 | 204:18 208:18 |
| 216:2,4 220:9 | 171:17 173:2 | **mean** 7:8 10:6 | 212:21 217:15 |
| 221:11 | 174:23 175:10 | 12:16 13:6 | 221:16 222:17 |
| **meadows** 2:8 | 181:10,14,16 | 17:3 22:11 | 222:22 237:4 |
| 3:4,6 4:1,2,17 | 181:19,22 | 26:8 32:17,21 | **meaning** 13:8 |
| 4:24 5:2 9:3,17 | 182:11,16 | 33:1 42:4,14 | 20:20,22 111:8 |
| 9:22 10:22 | 184:16,18 | 52:15,19 53:2 | 115:15 122:10 |
| 11:2 12:4,7 | 185:6,9,20 | 53:11 63:23 | 184:9,22 |
| 13:4 14:4 | 195:22 196:18 | 64:23 65:2,15 | 185:14,23 |
| 15:24 17:21 | 198:17,20 | 66:9,11 67:5 | 232:16 233:16 |
| 36:18,24 41:11 | 202:16,18 | 68:23 69:12 | **means** 20:17 |
| 41:15,21 42:9 | 203:1,7,15 | 70:9 71:23 | 87:17 91:19,22 |
| 42:20 43:6 | 204:17 205:1,7 | 72:15,18 73:5 | 111:15 126:19 |
| 44:21 45:16 | 205:13 207:9 | 73:6 74:17 | 158:8 199:13 |
| 46:4,10 47:7 | 207:11 208:15 | 81:15 82:7,9 | 222:24 |
| 47:16 49:23 | 208:20,24 | 85:20 87:15 | **meant** 68:8 |
| 52:11,17 53:3 | 209:5,18 | 91:18 94:9,11 | 69:20 70:2,5 |
| 53:13 58:16,21 | 211:18 212:2,6 | 96:1,4,4,9 | 96:10 124:18 |
| 62:18,21 63:3 | 212:11,15,22 | 100:7 105:14 | 125:23 127:10 |
| 68:17,21 69:3 | 213:2,5,10,15 | 105:24 108:14 | 156:23 157:5 |
| 75:19 76:2 | 213:20 214:1,4 | 109:1 111:6 | 186:3 |
| 83:18 93:11,14 | 214:9,13,17,23 | 113:24 116:9 | **media** 15:6 |
| 101:8,23 102:7 | 215:3,11,14 | 122:8,11 124:9 | 65:3,4,5,6 66:5 |
| 102:14,17,24 | 224:6,12,22 | 124:17 125:17 | 66:7,10,17,19 |
| 108:23 109:4 | 225:19 226:3 | 125:24 126:1 | 66:23 67:4,7 |
| 109:10 113:2 | 226:17,18,20 | 126:16 132:4,7 | 67:18 85:17,19 |
| 120:3 127:6 | 227:9,14,21 | 136:12,22 | 85:22 86:2,7 |
| 128:5,10,14 | 228:8,17,21 | 138:9 143:13 | 86:12,13,18 |
| 144:13,20 | 229:15,18,22 | 145:4 147:22 | 87:1 90:7 94:5 |
| 145:2 146:5,8 | 229:24 230:5,7 | 147:22 151:16 | 94:15,17,23 |

95:2,5,8,13,17
95:19,21,22,24
96:1,4 97:16
97:21,23 98:1
98:22 99:14,18
100:5,6,9
111:1 124:15
125:6,16
129:22 132:20
140:3 216:21
225:16
**media's** 65:7
**medical** 6:11
229:6
**medicine** 19:11
187:18
**medium** 65:7
164:12
**mediums** 86:10
89:12
**meet** 77:12,16
138:14 148:21
**meeting** 60:7
71:22,24 72:1
72:2,4,9,13
73:1,24 74:5,8
96:16 106:20
107:1 110:24
111:12,16
116:8,11,13
**members**
116:14
**memory** 75:22
108:17

**men** 131:11
163:16 208:2
220:13
**men's** 72:14
73:8,22
**ment** 212:7
**mental** 183:4,7
**mention** 72:10
78:17 92:18
131:6 144:16
153:21 190:2
238:15,17
**mentioned** 13:1
13:8 17:3
31:12 38:13
39:20 43:9
45:3 46:13
56:23 67:22
71:21 72:5,12
73:2 74:3
76:23 79:15
84:16 91:21
92:8 94:16
96:16 97:14
103:14 107:19
114:20 116:17
116:19 118:14
122:16 126:21
132:3 134:23
170:13 181:7
182:2 209:9,13
**mentioning**
69:16 92:2
96:2 116:15
140:10

**mentorship**
120:13
**mercy** 152:24
**merely** 76:7
86:13 156:17
157:5
**merrill** 29:2
**messaged** 51:6
**met** 29:17
**metho** 71:3
**methodol**
174:21
**methodology**
71:2,9,11,12,15
80:6,7,14
169:24 170:3,4
170:6,14,23
172:1,15 173:5
175:14 192:14
192:15,17
197:14
**methods** 153:4
**methology** 80:7
**metoo** 225:15
**metropolitan**
100:1,11
101:15
**mexican** 37:2
**mexico** 36:23
43:9
**michael** 67:12
67:12,12,14
115:21,21
116:20

**middle** 110:23
144:3 175:9
**midwest** 244:1
**mile** 148:19
**million** 54:13
58:1 86:24
90:4,4 99:5,9
99:11 100:5,11
100:15 101:5
101:10,14
103:6,16,24,24
144:7,15,22
145:20 146:3
180:2 189:7,17
189:23 190:11
191:3,17 192:4
192:11 194:2
194:11,16
195:12,14,18
195:18,24
196:1,22 197:9
197:9
**millions** 87:22
100:2 103:11
145:4 193:4
194:24 195:5
**mind** 4:22 21:5
21:6 25:24
68:17,19 69:8
222:7
**mindful** 163:10
**mine** 218:23
**minimal** 111:10
**minimum**
103:8 177:16

**[minimum - name]** Page 38

178:24

**mining** 20:8

**minors** 112:19

**minute** 15:9
62:19 74:5
75:5 156:1
165:4 181:13
181:15 211:15
224:9 234:11

**minutes** 128:6
204:21,23
224:7

**mis** 98:9

**miscon** 106:22

**misconduct**
64:18,19 65:24
66:1,13 79:24
91:13,15,22
92:4,22,23
94:14 96:12,12
98:2,16,16
103:13 104:8
106:22,23
112:21 132:22
132:22 177:6
186:9,9 194:4
194:15 195:6
196:11 225:22

**misheard**
156:19

**missed** 239:7

**mistake** 117:13

**misunderstan...**
190:8

**mitigating**
25:15

**mock** 220:23

**model** 40:19
44:7 77:17
78:6,9,10,20
79:5,8,14 85:4
85:6,9,12
128:2 148:6

**moderate**
144:10

**moment** 93:6

**monday** 101:13

**money** 49:9
142:4 145:9
149:1 222:1

**monitor** 15:20

**monitoring**
14:9 16:9

**monitors** 12:15

**montage** 95:15

**month** 16:23
42:19 50:10
148:18 150:7
151:6 156:11
157:1,2,7,8
165:22 170:11
172:2,23
173:15,24
174:8 216:14

**monthly** 100:2
100:8,16,19
121:13 149:24
150:14 165:20
166:5 167:15

172:13 174:15
175:2

**months** 136:23
137:2 158:3,6
165:13,24

**morning** 4:1

**mostapha**
17:12,13,18

**mother** 190:4,5
190:5

**motion** 8:8,11
21:22 152:13

**motions** 7:12
53:7,11 58:7
58:12 61:11

**motivate** 39:9

**motivational**
39:6

**motive** 22:5,8

**mouse** 163:9

**mouth** 227:5

**move** 8:16 70:3
102:7 120:10
122:24 133:5,6
143:10 153:8
175:11 188:21
204:12

**moved** 83:15
130:17,18
156:18 190:19
234:4

**movement**
225:15

**moving** 29:6
79:13 102:21

120:9 125:13
154:14 156:8
189:3 212:6,15
214:4

**mse** 183:10,14

**multiple** 53:10
53:17 74:3
86:2 97:8
119:13 133:11
143:4,6 150:4
174:21

**multiply**
140:21

**mute** 204:17
224:8

**mutual** 29:5
82:24

**mutually**
219:12

## n

**n** 2:10 3:1
10:24 13:21,21
17:10,11,20
32:9 35:20
52:6 58:16,17
215:11

**name** 4:2 5:6,7
5:8 10:16,17
10:18 11:1
13:18 17:12,14
17:16,18 29:11
31:3,4,11 32:3
32:4,7,8 40:2,4
46:17 64:19
71:21 72:10

**[name - nick]**

73:15,19 74:10 78:1,16 82:20 90:22 91:2,16 91:21 92:2,8 92:18,21,22 94:12,16,18,20 96:16 97:13 98:14 106:21 107:2,4,7 110:19 111:13 112:6 116:2,18 116:22 129:6 132:20 134:5 182:5,22 188:15 202:24 231:3,6,7,10,15 231:22 232:14 232:17,19,24 235:5,12,14,20 235:22 241:6 242:3,4,15 243:3,4,21

**name's** 235:19

**named** 10:9 45:4 126:2 228:6 229:15

**names** 13:3 17:1,5,8 18:4 82:14 83:4,8 83:15 84:1,4 84:12,18 96:13 108:22 115:19 226:16

**narrate** 153:6

**narrating** 153:7

**narrative** 79:3 136:24

**nation** 147:3

**national** 128:21 129:2 130:1,14

**naturally** 120:8 129:18 163:8

**nature** 67:4 80:15 152:22

**near** 191:14 217:14

**necessarily** 7:4 28:13 42:8 123:19 174:11 222:7

**necessary** 22:14,18

**need** 6:15,19 11:8 24:5 86:17 88:17 89:11 90:2 93:16 109:1,14 112:16 113:16 121:2 163:10 172:6 174:1 178:3 181:15 184:3 186:12 187:13 204:24 205:3,4,6 211:7

**needed** 48:3 70:24 175:12

**needs** 175:5 177:16,22

**negative** 16:11 77:20,22 78:3 78:24 79:2,16 79:18,20,21 80:1 97:12 129:19 159:9 162:6,10 163:5 175:22 177:4 179:3 188:19 210:22,24

**negatively** 197:19

**negativity** 164:2

**neighborhood** 166:1

**neighbors** 192:7,20

**neither** 182:11 240:8

**nervous** 222:3

**nested** 58:14,15 58:16,20 59:13 62:3

**network** 124:15 125:15 126:18

**networking** 38:22,23

**never** 20:9 21:3 21:4 23:11 24:1 27:17,18 33:1 53:19

54:4 116:16,17 121:12 127:23 148:22 154:13 154:19 157:12 186:19 187:2 223:4

**new** 30:2 43:11 43:12,24 44:12 44:23 45:18 46:6,22 47:2 47:24 48:1,2,5 48:6,18 50:3 52:7 60:17 127:11 133:21 138:7 139:8 140:8 147:15 152:8 164:21 174:4

**news** 73:14 86:14 90:10,17 90:23 91:17 92:6,9 96:22 96:23,24 97:1 97:10 98:13 99:18,21,23 100:1,12,13,14 101:12,20 129:22 168:1 178:11,13

**nice** 92:16

**niche** 25:2 34:7 56:16 121:21

**nick** 226:19,22 227:5,12 228:6 228:13 229:1

**[night - ocean]** Page 40

**night** 73:15
**nine** 35:4,8,14
  101:14 218:17
**ninety** 84:22
**nixon** 36:7
**nodding** 7:23
**nology** 12:1
**non** 82:24
  138:22
**nonprofits**
  23:20
**nonresponsive**
  42:20 101:8
  108:23 109:4
  144:13,20
  146:5 154:7
  168:10,21
  169:8 170:17
  174:23 195:22
**noon** 62:22
**nope** 159:24
**normally** 156:3
**north** 112:9
**northern** 1:1
**notary** 240:3
  240:17 241:24
  242:10,18
  243:15,23
  244:23
**note** 112:11
  142:10 225:14
**notes** 240:5,6
**notion** 29:18
**nuanced**
  112:14 151:14

**nuances** 148:20
  149:19 151:8
  179:19
**number** 16:12
  39:21 42:16
  43:3 51:10
  82:10,23 86:9
  86:12,20 87:8
  87:23 98:7
  99:19,21 100:8
  100:15,19
  120:24 124:21
  139:21 141:24
  142:18 150:17
  150:17 151:15
  159:14 160:21
  161:2,16,23
  162:11,14
  172:15 177:1
  191:6 194:23
  198:6 205:21
  206:23 224:3
  237:5 241:7
**numbered**
  105:24,24
**numbers** 85:10
  85:14 167:15
  243:7

**o**

**o** 5:8 13:21,21
  17:11,18 18:2
  35:20 36:18,19
  37:5,5 52:6
  60:15

**o'clock** 205:2
**oath** 5:12
**objec** 53:3
**object** 9:8,11
  153:7 202:12
  208:11
**objecting** 209:7
**objection** 9:2
  9:13 12:2,23
  14:2 41:24
  42:2,13,20,24
  44:13,16 45:9
  45:19 46:7
  47:5 49:20,22
  52:8,14,17,18
  53:4 68:9
  101:8 102:9,17
  102:20 108:23
  109:4 144:13
  144:20 146:5
  154:7 168:10
  168:21 169:8
  170:17 174:23
  181:10 195:22
  208:11,24
  209:1,5,6
  226:3 227:9,14
  227:21 228:8
  228:17 229:18
  231:16
**objections**
  47:10
**objectively**
  163:11

**obstacles**
  130:19
**obtain** 70:19,22
  70:22
**obtaining**
  140:1
**obvious** 73:12
  73:20 76:22
  77:4 107:10
  162:20
**obviously**
  69:15
**occasion** 38:24
**occasions**
  233:24
**ocean** 4:9 11:24
  14:5,17 29:9
  29:12,16,19,22
  30:8 31:3,5,11
  31:13,17,20,23
  31:24 32:13
  33:4 39:13
  40:10,16,23
  41:6,8,16
  42:11,22 43:10
  44:1,9,22
  45:18 46:12,16
  46:19 48:22
  49:10 50:4
  82:4 83:20
  118:19 124:14
  127:16 149:14
  149:14 199:11
  199:19 200:3
  200:14 201:7

**[ocean - optimization]** Page 41

207:6 214:18
215:4 218:4
223:5,13,20
231:14
**odds** 144:3
**offer** 189:1
**offered** 137:13
220:19,19
**offering** 26:1,3
55:20 126:10
**offhand** 51:22
82:9
**office** 241:13
**officer** 40:1
135:9,11
138:18,19
139:18 140:1
**official** 36:5
44:6 45:1
227:2 242:15
243:21
**officially** 31:16
42:17 139:2
**officials** 25:19
116:15
**oftentimes**
33:23 56:8
82:15 160:9,18
169:20 235:10
**ogy** 174:22
**oh** 5:18 18:9
73:19 76:16
83:12 87:21
156:22 163:19
202:22 204:4

212:24
**ohio** 241:2
**okay** 5:4 6:9
8:15 17:6,10
29:15 33:3
40:8 41:4
51:15 53:14,15
62:20 64:5
65:18 68:6,23
69:5 70:1
75:11,12 78:20
80:18 92:14,16
93:3,18 99:1,8
99:9 100:9,22
102:23 105:22
106:5,7,13
114:9 115:6
126:6 128:5,7
128:9,15,19
142:15 151:18
152:20 153:5
157:14 162:5
163:22 184:7,8
189:5,9 190:18
198:18 200:21
200:23 201:11
201:19 202:6,9
202:20,22
203:3,20
205:14 206:4
206:16 207:3
209:7 211:17
224:2,5,21
226:8 228:24
229:6,12

230:16 232:5
234:8 235:4
236:18 239:3
**olaplex** 60:15
**old** 152:9
**omit** 115:19
**once** 96:19
107:13 116:16
152:16 163:8
216:15,15
**one's** 56:13
60:24 78:18
**ones** 120:22
121:4,10,11
132:10 164:10
164:24 165:1
**ongoing** 58:19
60:16 168:2
235:10
**online** 14:14
15:14 28:24
29:5 30:14
37:20 38:13,24
39:4 56:4,8,13
57:1 61:23
78:3 79:3
89:16 121:23
126:5 152:23
155:12 157:2
162:10 175:22
176:2 177:18
203:2,11 211:3
**open** 15:12
131:1,8

**operate** 29:23
**operating**
30:10,12
**operations**
30:21
**opine** 56:17
114:3
**opined** 57:24
**opinion** 54:12
67:10,17 87:1
92:4 110:21
180:4,20,22
**opinions** 21:23
22:24 26:2,4
26:10,24 54:21
54:23 60:10,12
61:13,15
147:18
**opportunities**
110:1,6,20
130:21 133:8
133:17,20,23
134:1,4,7,9,12
220:14
**opportunity**
139:20 140:12
140:15,24
141:23 142:2
142:21 160:4
**opposed** 33:18
63:24
**optimization**
15:8,10,11
201:18

**[option - page]**

**option** 132:16
**options** 15:18
 218:23 219:3
**order** 63:15
 67:22 89:17,18
 121:3 151:12
 156:18 160:15
 166:11,15
 168:17 176:4
 176:22 178:6
**ordering** 239:5
 239:8,9
**organization**
 30:12 31:2
 34:16 36:9
**organizations**
 34:12
**original** 103:10
 140:4 204:3
**originally**
 35:10 199:13
 199:15,16
 200:5
**originated**
 111:17
**origination**
 111:8
**orlando** 45:4,8
 45:14,17 47:6
 47:13,15,18
 48:9 49:9 50:5
 50:19 224:16
**orlando's** 48:21
 223:24

**orm** 14:15,17
 14:22 16:2,4
 16:13,14,19,21
 17:2 118:17,19
 118:23 119:5,8
 119:19 120:4
 121:7,8 122:6
 122:9,14 123:9
 123:17 148:10
 148:11,18
 149:12,15
 151:1 152:14
 153:19 154:3,8
 154:17 155:1,7
 156:5,21
 179:16
**ostensively**
 36:13 120:18
**outer** 193:2
**outlets** 86:2
 129:22
**outline** 78:4
 123:18 125:14
 148:7,11,12
 149:17 150:14
 150:20 154:11
 154:11,19,21
 155:3,9,16,21
 156:13,13
 162:18 163:3
 173:21 188:18
 192:18
**outlined** 98:22
 122:7 129:9
 153:23 159:16

 161:15,16,24
 163:8 172:6
**outlining**
 120:10,12
 122:8,10 123:2
 157:4 188:4
**output** 85:10
**outreach**
 127:21
**outside** 30:21
 44:10 89:8
 129:2,7,14
 130:13,23
 133:14
**overlap** 71:15
 151:5
**oversee** 171:3
**own** 12:15
 75:21,22 81:10
 111:4 114:24
 115:9 117:10
 121:17 160:18
 190:4 199:18
 200:3,8,14,16
 217:6 219:24
 234:16 235:4
**owned** 37:13
**owner** 40:14
 47:1,2 90:1
**owners** 37:18
**ownership** 37:7
 46:18,21 49:12
**owns** 200:15
 234:24

**oxford** 37:7,13
**oxprox** 37:4

**p**

**p** 17:11,18
 36:18 37:5
 60:15
**p.m.** 239:24
**pa** 5:9
**page** 3:2,11,12
 34:19 84:22
 93:23 94:2
 98:24 99:7
 102:14,15
 103:1 104:19
 105:3,21,24
 106:2,18
 107:20 110:22
 110:23 111:19
 111:22 114:22
 115:4,8 119:16
 124:8,11
 128:17 135:4
 139:13 143:7
 148:2 155:9,17
 155:21,22
 157:14 158:2
 159:5,10,17,18
 159:21 160:1,8
 160:11,12,13
 160:19 161:10
 161:12 163:3
 165:14 170:6
 171:24 175:15
 179:22 180:19
 184:5,7,14,16

**[page - patent]**

Page 43

184:20 185:4
185:23 189:3,9
189:14 193:1
199:5 200:21
200:22 206:8
212:12 213:7
213:16 214:2
214:10 225:4
226:9 230:1,20
232:1,2 235:17
236:16 243:7
244:3

**pages**  15:7
69:22 93:18
150:17 158:23
159:2,3,6,6,11
159:15 161:3,3
165:19 173:22
173:23 174:19
205:16 206:7
207:1

**paid**  41:14 43:4
62:5 126:13,13
138:7 156:4

**paign**  124:20

**pain**  180:14

**painful**  190:3
195:3

**paragraph**
70:10 105:5
107:20 135:6
155:23 157:14
158:21 184:6
184:17,22
185:7,16

225:10 226:9

**parallels**
220:12

**parameters**
30:13

**pared**  91:12

**park**  101:12
147:15

**part**  18:16
22:12 24:17
26:10 31:11,13
31:18 96:17
115:23 120:4
121:23 127:17
128:2 145:15
145:16 155:15
155:20 170:18
171:23 172:5
178:5 185:16
186:6,7 207:19
209:12 217:10
234:12,19,20
236:4 243:9

**partial**  53:19

**partic**  235:2

**particular**  70:8
70:9 79:19
84:11 89:22
97:11 122:21
151:20 171:6
178:3 183:11
233:9

**particularly**
113:19 114:15

**parties**  240:9
240:10

**partner**  166:20

**partners**
124:15 125:9
125:16 126:18
188:24

**partnership**
37:7

**parts**  43:8
152:14 155:11

**party**  135:13
135:18 137:24
199:21 222:16

**passed**  109:13

**passing**  13:8
221:5

**passman**  67:12
67:14 115:21
116:19 117:12
117:24

**past**  49:11
161:10 165:19
219:2 222:15
222:20 223:3,6
223:10,14,18

**pat**  4:10,12
11:19 63:24
71:19,21 72:10
72:15 73:4,7
73:21 74:6,9
76:22,24 77:5
77:8,24 78:16
81:8 86:22
90:19,24 91:7

91:11,14,20
92:8,19 93:22
96:21 98:3,10
98:12,17 103:5
105:15 107:9
107:11,12,14
110:2,21
116:15,17
118:20 119:2,3
119:5,9 120:14
121:7,22 122:7
122:9 123:9
125:4,6,10
129:7 147:20
148:11 149:7
150:3 153:20
154:3,9,17,23
155:2,17 159:5
162:16 163:12
163:19 164:5
164:16 165:3,4
165:9 167:23
170:10 173:16
173:20 174:3
177:18,23
178:10,21
179:6,13,19
180:1,5 181:23
183:5,8 186:5
186:20,22
187:13 190:13
225:3 238:11

**patent**  58:22,23
59:1

**[patents - pick]** Page 44

**patents** 59:3
**patient** 187:17
**patrice** 1:4
 241:6 242:3
 243:3
**pause** 75:5
**paused** 105:2
**pay** 42:17 50:5
 136:10 139:16
 208:5
**paying** 42:15
 126:13 148:24
**payments**
 42:18
**payroll** 136:4
**pays** 49:15
**pdf** 202:2
**peabody** 36:7
**pedophile**
 194:16 196:16
**pennsylvania**
 1:16 48:20
**pension** 74:12
**people** 11:14
 17:1 18:5 21:7
 26:14 30:23
 33:22 34:1,2
 39:21 41:14,18
 41:19,22 42:6
 42:10,18,21
 43:4 59:5
 66:15,16 71:14
 82:21 83:2,7
 83:15 84:17,22
 86:6,12,15,20

87:2,7,9,11,12
87:24 88:2,9
89:22 90:5
91:14 98:9
99:5,11 100:5
101:5,10,15,19
103:11 104:5
109:12,22
112:3 113:9
122:2 124:22
124:23 133:3
133:13 151:13
152:4 166:16
166:20,21
186:3,22
190:22 191:14
192:21 193:4
194:17 195:1,5
195:13,15
197:11 198:7
210:23 217:13
217:17,22,24
218:7 219:1,7
221:16
**people's** 77:2
 199:17
**pepsi** 29:20
**percent** 84:19
 84:22 85:2
 98:19 101:19
 108:11 109:3
 109:15 110:4
 132:4 187:9,10
 187:10,19
 233:18,20,21

**percentage**
 10:14 51:17
 88:4 100:12
 187:7 188:13
 188:14 233:14
 233:19
**percentages**
 187:21
**percep** 21:24
**perception**
 21:9,16,18
 22:3
**perform** 85:17
**performance**
 30:2
**performed** 82:4
**period** 45:6
 99:21 101:17
 101:22 130:18
 232:17
**permanent**
 147:23
**permission**
 235:1
**perpetuity**
 126:18 127:8
**person** 5:10
 16:24 17:4
 31:19,23 85:2
 85:7 88:5
 91:19,22
 120:19 152:6
 163:12 196:8
 196:10,20,21
 229:12 232:22

234:24
**personal** 3:12
 33:15 34:1,17
 34:24 44:19
 195:4 213:9
 214:11
**personally**
 12:16 211:12
 242:11 243:15
**perspective**
 122:12 183:21
 218:12 219:23
**pew** 99:16
 101:18
**philadelphia**
 44:11
**phone** 51:8,9
 51:10 167:8
 216:15 224:1,3
 241:3
**phrase** 94:7
 105:6 158:22
 158:22 184:9
 185:23
**phrases** 161:19
 162:20
**physical** 179:22
 180:1,14 181:6
 193:21
**piccasso** 17:7
 17:10,11
**pick** 19:21 70:8
 113:24 131:19
 197:4 202:2

**[picked - posts]**

Page 45

**picked** 131:20 132:6,7,10,11 177:9,10,10,19 197:5 199:23
**picking** 201:12
**piece** 169:15,18 169:20 176:1 176:15
**pieces** 170:15 172:15 175:21 178:20 179:5
**pill** 189:1
**pine** 43:11
**pitch** 168:6
**pitching** 166:16 169:16
**place** 5:24 15:2 15:13,17 55:3 72:14,20 77:6 77:7 95:20 131:11 161:7 175:7 180:24 200:5 219:18 240:4,5
**places** 125:19 151:8,11 163:7 163:22 164:12 164:12 167:4
**plain** 120:4
**plaintiff** 1:5 2:3 4:10,12 58:1 64:24 238:23
**plaintiff's** 54:12

**plaintiffs** 63:10 63:18,22 64:12
**plan** 5:14 14:22 16:2,14,15,19 17:2 118:20,23 119:5,8 120:4 121:7,8 122:6 122:9,15 123:9 148:10,11,13 148:18,22 149:16,18,18 149:21 150:2 151:1 153:20 154:3,8,17 155:1,7,15 156:5,21 207:14 210:7 219:9
**planned** 130:6
**planner** 28:5
**planning** 28:11 38:7
**plans** 14:18 16:22 118:17 149:15
**platforms** 14:10 56:11 121:17 163:4 164:11
**plausible** 73:6
**play** 19:21 91:9 218:24
**pleadings** 197:20

**please** 8:14 13:18 68:12 93:10 98:4,5 202:24 241:13
**ployees** 43:5
**ployer** 137:20
**plug** 85:10
**plus** 40:24 102:5 103:9 144:7,15,22 145:20 161:13 161:19 162:3,8 162:19,21 165:18,19 174:7,13 178:14 211:12 218:16 230:2
**podcasts** 15:7
**point** 60:2 61:4 68:11 82:15 107:6 123:2 127:18 133:12 136:20 144:4 147:7 149:3 152:13 156:8 161:8,12 162:2 173:23 174:4,6 174:11 178:6 179:13 185:13 186:18 187:24 194:9,23 197:16 198:16 219:10
**points** 173:18

**policies** 24:8 115:1,10 117:2 117:3,8,9,13,19 118:4,6,15
**policy** 115:17 117:18,22,22 118:2 126:24 137:3
**pollination** 34:23
**polls** 89:10
**populate** 78:15 119:15
**populated** 94:17
**population** 162:17
**portion** 52:3 233:15
**position** 19:23 135:11 140:2 217:18,19
**positions** 124:23
**positive** 159:13 163:5,7 164:6 166:24 176:15 176:22 177:1 178:2 187:24 211:7,8 223:8
**possible** 188:10
**posted** 79:18
**posts** 87:1 111:5

**[potential - professional]** Page 46

| | | | |
|---|---|---|---|
| **potential** 30:9 81:4 103:15,19 140:22 224:4 | 153:19 154:2,8 154:12,17,19 155:1 220:20 | 45:3 126:22 | **procedure** 117:16 242:5 243:5 |
| **potentially** 15:17 125:1 196:10 216:17 218:24 220:9 | **prepared** 18:18 91:1 120:20 122:4 154:10 155:3,16 | **priate** 127:10 **price** 175:15 **pricing** 172:14 **primary** 16:21 16:24 17:3 | **proceed** 69:7 **proceedings** 26:16 240:4 **process** 12:14 |
| **power** 36:9 37:1 39:24 220:15 236:7 | **prepares** 14:17 16:19 | 38:12 40:12 77:24 123:13 182:7 225:17 | 14:21 15:22 44:4 63:17,19 63:20 71:6 |
| **pr** 124:15 125:3,15 126:18 | **preparing** 10:10 16:21 221:19 | **print** 102:4 **prior** 29:2 55:10 73:10 | 78:3 79:6 118:23 123:23 124:1 148:12 |
| **practical** 148:23 | **presence** 24:1 29:4 48:5 | 74:8 111:10 145:11 232:7 | 150:11,21 151:24 154:5 |
| **practice** 19:5 19:11,13 117:4 117:6,14,15,21 | 61:23 63:16 94:22 109:23 129:5,19 | **privy** 90:1 **pro** 61:9 **proactive** 67:3 | 162:1 176:7 187:23 207:19 209:13,17,24 |
| **practiced** 28:14 | 218:14 | 67:5 | **proclivity** |
| **practices** 118:15 163:15 | **presentation** 72:3 107:3 | **proactively** 33:23 97:18 | 33:20 **produce** 127:19 |
| **pray** 127:20 **pre** 91:11 | **press** 15:5 116:23 | 217:20 **probably** 12:19 | 166:9,12 169:15 171:13 |
| **precise** 144:12 | **pressed** 66:21 78:10 209:10 | 24:5 32:24 73:17,18 76:18 | 176:13 **produced** |
| **precisely** 87:12 **precision** 81:3 | **presumably** 236:6 | 98:18 119:6 120:12 123:23 | 169:19 174:17 177:7 |
| **prefer** 5:1,1 241:15 | **pretty** 16:4,16 19:22 20:23 | 124:6 137:16 147:9 174:1 | **production** 168:2 241:22 |
| **preparation** 220:21 | 21:7 57:8 73:15,20 98:19 | 191:6 206:2 207:22 211:11 | **products** 59:5,6 **profession** |
| **preparatory** 112:5,8 | 114:21 167:16 | 211:13 219:8 222:12 236:24 | 130:12 161:8 231:8 |
| **prepare** 6:21 7:1 14:19 18:16,22 123:8 | **previous** 18:13 18:19 31:12 **previously** 7:14 28:12 39:20 | **problem** 201:14,15 205:8,24 | **professional** 19:9 109:24 |

**[professional - pull]** Page 47

110:6,20
122:19 123:2
240:2,3,17
**professionals**
33:19 34:11
**professor** 29:17
**professors**
29:16
**proffer** 22:24
**proffered**
216:2
**proffers** 187:21
**profile** 3:10,11
3:12,12 165:2
211:6,11,13
212:12 213:16
214:10
**profiles** 119:18
120:7,21 121:2
152:8
**profit** 23:20
**program**
134:21
**programs**
126:3,9 199:3
**progress** 142:4
152:17
**progresses**
141:8
**proliferated**
129:24
**proliferation**
129:18
**prom** 88:17

**prominent**
99:24
**prominently**
88:2 161:21
167:1
**promised**
145:17
**pronoun**
234:21
**property** 56:12
**proportionately**
174:11
**proposal**
149:23
**proposed** 8:3
**proprietary**
120:23 124:14
125:21
**prospective**
155:6 160:17
160:17 173:7
**proud** 198:9
**proverbial**
29:19 186:21
**provide** 19:2
51:14 56:17
114:20 121:14
122:18 154:22
183:19
**provided** 9:6
10:14 97:5
180:16 198:10
**providing**
114:14

**proximity**
132:10
**proxy** 37:9,12
**psycho** 181:24
**psychologi**
181:22
**psychological**
182:3 193:22
**pub** 124:24
**public** 9:19
15:5 23:13,15
23:17,18,19,21
23:24 24:2,3,4
24:7,10,12
38:14 63:22
64:12 66:11,21
67:9 83:1 96:6
96:10 105:7,19
124:19 125:18
126:20,24
127:19 163:24
166:15 167:22
168:3,6 169:17
172:19 193:6
216:21 218:13
221:10 240:3
240:17 242:10
242:18 243:15
243:23 244:23
**public's** 184:11
184:24 186:1
186:17
**publica** 164:20
**publication** 9:6
9:19 10:2

124:15 125:9
125:16 163:17
164:23 199:10
201:6
**publications**
86:1 87:23
100:18 121:21
124:21 166:17
178:8 199:22
**publicity**
107:23
**publicize** 67:4
**publicized** 86:1
**publicly** 116:3
123:19
**publish** 67:4
148:20 150:9
151:9 163:18
163:22 164:15
167:2 199:15
199:16,18
200:13,16
219:14 235:8
**published** 65:8
66:22 93:9
97:17 105:7,13
126:23 167:4
178:10 199:13
199:20,20,24
200:3,6,8,9,11
238:5,7,8,13
**publishing**
150:7 164:11
**pull** 7:17 26:21
33:1 75:16,21

**[pull - rain]**

Page 48

92:11 93:1,8,9
93:16 116:22
118:8 151:22
152:22 237:9
237:13
**purchased**
241:16
**purpose** 27:4
87:6 182:7
**purposes** 7:6
26:23 70:18
83:24 84:6
109:16 197:1
211:21 212:8
212:17 213:12
213:21 214:6
214:24 217:5,9
224:4
**pursued** 66:22
**push** 151:22
152:9,22 159:8
159:13 163:4
163:23 164:6
**pushed** 159:9
160:15
**pushing** 165:18
**put** 11:13,15
16:1,13,14
17:2 75:20
78:20 79:12
81:18 82:20
85:14 88:15
89:3 92:6
96:12 103:9
104:3 114:6

116:20 119:4
120:5 121:13
123:17 124:2
136:3 138:1
139:22 153:14
161:2,20 163:7
165:6 166:24
171:2 173:18
174:13 175:21
176:2 177:2
178:3,12
186:20 187:5
188:13 190:10
190:11 194:5
194:22 195:9
196:6 197:15
197:24 204:17
218:6,22 227:5
**puts** 207:17
**putting** 11:8
14:21 40:7
73:9 116:2,11
117:5 122:14
196:3 218:19
219:16 220:2,4
220:10

**q**

**qualitatively**
78:23 193:20
**qualities**
120:14
**quantify** 86:12
183:19 191:21
194:19

**quantitative**
193:19
**quantitatively**
78:23
**quantum** 78:12
156:17
**quarter** 233:18
**quarters**
200:19
**quested** 70:18
**question** 6:5,8
6:8 9:14,16
14:11,13 47:12
59:12 60:2
62:4 64:3 67:6
69:9 70:21
76:1,8 87:18
90:12 91:4
98:4 100:23
101:3,4 102:12
102:21 104:15
104:16,21,23
113:23 134:6
135:10 140:7
143:10 153:8,9
153:9,11,13
154:16,18
156:24 167:12
171:20,23
181:12,19
184:1 189:10
192:15 202:13
202:16 203:4,6
208:14 216:7
224:14

**questions** 8:22
34:4 68:18,20
68:22,24 72:5
75:8 76:22
96:17 107:12
116:14 153:2
153:15 164:2
190:8 207:5
224:23 232:13
238:18
**quiet** 185:19
**quite** 25:10
31:18 104:13
114:8 141:24
145:6 188:20
**quo** 196:5
**quote** 226:8
**quoted** 66:10
204:1,6 227:18
233:10
**quoting** 226:2
226:10

**r**

**r** 5:7 13:21,21
17:10,20 18:2
32:8,8 36:18
37:5 40:3,4
240:1
**rachita** 39:24
40:3
**radio** 99:19,23
100:13 102:5
129:22
**rain** 204:19

**[raised - recess]** Page 49

**raised**  190:5,9
**ran**  130:19
**range**  16:16
  23:19 103:3,4
  103:8,20 104:3
  122:22 123:4,7
  141:21 143:20
  144:4,5,9,11,11
  149:10 154:22
  166:5,9 167:17
  167:18 168:14
  168:18,23
  169:12 170:12
  170:24 171:6
  172:4,23 173:9
  173:15,23
  174:8 176:5,18
  180:7,17 181:3
  184:4 194:6
  196:21,24
  197:5,24
**ranges**  145:9
  146:13 183:19
  183:21
**rank**  167:1
  176:23
**rankings**
  203:18
**rare**  84:9
**rate**  62:5 98:19
  108:11 109:3
  110:5 132:4
  149:8 156:2,14
  156:16,20

**rated**  210:11,16
  211:3
**rather**  120:9
  139:11 140:11
**reach**  50:21,22
  119:12 124:22
  166:17,20
  168:18 220:5,5
  221:2,3
**reached**  97:23
  140:3 220:7
**reaching**
  145:24 150:15
  166:17
**reacted**  97:21
**reactively**
  61:10
**reacts**  152:7
**read**  7:12,16,20
  8:2,8,8,9,11,12
  55:14,15,18
  67:11 75:15
  86:22 87:5,5
  87:11,16,24
  88:4 92:24
  99:6 115:11,22
  119:21 120:2
  134:22,24
  135:1,2 139:13
  140:5 190:6
  215:8,12 219:7
  225:9,12
  236:19,21,22
  238:24 239:19
  242:5,6,12

  243:5,6,17
**reader**  21:5,6
**readership**
  87:21
**reading**  87:12
  185:11 237:20
  239:22 241:11
  241:18
**reads**  110:24
  115:8
**ready**  63:4
  93:12,13
**real**  28:21 56:9
  86:18 151:12
  151:13 166:6
**reality**  117:15
**really**  160:15
  191:1 194:13
  218:9 220:11
  221:3 225:10
**reason**  6:11
  35:3 108:7
  109:18 188:22
  243:8 244:3
**reasonable**
  87:8 144:18
  154:22 161:5
  162:13,24
  172:12,24
  196:7 198:2
**rebound**  20:1
**recall**  8:15 9:4
  9:17 21:19
  26:22 32:12
  34:22 42:10,21

  43:1 50:7,17
  53:23 58:12
  68:2,7,7 69:9
  70:12 74:2,4
  74:13,14 75:15
  80:8 81:22,22
  82:6 83:22
  96:19 108:16
  108:20 118:17
  133:10,22
  135:15 136:2
  136:24 137:12
  138:11 139:5
  205:19 207:4,9
  215:17 223:11
  223:11 237:1
  237:10,13
  238:6
**recalling**  96:7
**receipt**  241:18
**receive**  8:10
  135:8 139:24
**received**  8:6,13
  41:18 49:17
  60:19 97:24
  115:22 118:9
  208:2 215:13
**receiving**
  142:20
**recent**  199:1
  204:13 205:17
  206:5,22
**recently**  231:20
**recess**  63:1
  128:12 205:11

**[recess - relevant]**

Page 50

| | | | |
|---|---|---|---|
| 224:10 | **reduce** 174:10 | **reflect** 209:21 | 61:18 113:11 |
| **recognize** 13:3 | **reduced** 240:5 | **refresh** 21:11 | **relating** 132:21 |
| 207:20 | **rees** 2:9 4:3,4 | 75:22 108:17 | **relation** 124:19 |
| **recognized** | **refer** 7:6 42:7 | **refuted** 107:7 | **relations** 15:5 |
| 80:7,14 99:15 | **reference** 7:19 | **regardless** | 23:14,15,17,18 |
| 216:24 | 31:3 67:24 | 176:16 | 23:19,24 24:2 |
| **recognizing** | 83:24 84:6 | **registered** | 24:4 38:14 |
| 30:15 | 94:4 98:17 | 240:2,3,17 | 83:1 125:18 |
| **recollection** | 106:22 116:1 | **regular** 167:24 | 126:20 127:19 |
| 69:20 | 117:2 124:13 | **rehabilitate** | 163:24 166:15 |
| **recommend** | 130:2 157:16 | 148:9 175:6 | 167:22 168:3,6 |
| 174:5 | 172:1 181:9 | **rehabilitation** | 169:17 172:19 |
| **recommendat...** | 182:2 185:22 | 79:1 118:24 | 218:13 |
| 179:21 | 199:11 224:4 | 153:23 156:7 | **relationship** |
| **reconcile** | 236:14 241:7 | 186:15 | 38:3 124:18 |
| 207:21 | 242:2 243:2 | **rehabilitative** | 195:4 |
| **record** 5:5 63:5 | **referenced** | 78:7 79:7 | **relationships** |
| 81:17 86:23 | 21:16 76:24 | 148:2 157:15 | 121:18 124:21 |
| 94:5 102:8 | 95:3,8 159:17 | 175:17 179:21 | 125:17,20 |
| 104:24 123:20 | 182:22 241:10 | **reiterate** 53:3 | 127:18 216:10 |
| 128:11,15 | 242:11 243:15 | 134:3 154:4 | **relative** 240:10 |
| 134:18,20 | **references** | **rela** 23:21 | **relatively** 60:17 |
| 153:14 181:10 | 53:21 68:4 | 216:21 | 110:3 |
| 189:13 196:4 | 83:10,13 199:2 | **related** 23:19 | **releases** 15:5 |
| 205:14 213:11 | 207:1 | 24:23 54:23 | **relevance** 9:11 |
| 224:13 225:9 | **referral** 127:22 | 58:20 61:22 | 12:23 14:2 |
| 225:13 243:9 | **referrals** | 64:18 65:23,24 | 42:2,13,24 |
| **records** 37:10 | 166:21 | 73:8 94:18,20 | 44:16 45:11,19 |
| 37:12,14 | **referred** 41:22 | 96:11 97:11 | 46:7 47:5,9 |
| **rect** 21:10 | 82:17 83:3 | 98:15 103:20 | 49:22 208:12 |
| 212:13 | 135:16 137:17 | 107:23 113:20 | 208:13 |
| **red** 29:19 218:5 | **referring** 34:18 | 234:19 237:6 | **relevant** 94:21 |
| **redirect** 3:6 | 42:10,21 89:20 | 240:9 | 96:20 200:20 |
| 236:12 | 234:23 | **relates** 56:4,13 | 201:2 203:24 |
| | | 58:23 59:3 | |

**[reliance - republish]** Page 51

**reliance** 180:5
**relo** 131:4
**relocate** 130:23
  130:23
**relocating**
  130:3,7
**relocation**
  131:8
**rely** 26:6,7,8
  136:8
**remain** 143:14
  211:2
**remember**
  11:22 12:5
  92:17 116:24
  118:7,10,11,15
  138:13 183:2
  210:14,14
  215:23 223:16
  230:10 237:8
**remit** 42:6
**remote** 2:1 44:8
**remotely** 1:15
  5:11
**remove** 235:21
**removed** 117:6
  125:2 231:3,10
  231:15 232:17
  232:19
**removing**
  150:16
**repair** 16:10
  32:14,17,19,20
  32:24 33:2
  82:3,22 83:19

84:6,8,13
121:24 164:4
166:19 173:4
175:4 176:11
**repeat** 9:15
  25:22 70:20
  98:4
**repeated**
  106:21
**repeatedly** 91:2
  107:7
**replaced** 135:8
  135:10 139:24
**report** 3:9 6:23
  8:20,22 9:6,20
  11:6,7,11,13,18
  18:7,10,17,18
  26:1,5,11,18,20
  26:21 27:4
  36:6 54:10
  57:21 59:18
  60:14,21 63:6
  63:8,12,13,19
  64:6,7,9,13,15
  67:21,24 69:10
  69:12,19 70:3
  70:7,18 71:3
  71:11 77:15
  78:14 82:13
  85:16 88:15
  89:4 91:12,13
  92:3,7,11,19
  93:4,15,20
  94:24 96:22
  98:24 102:1,2

102:10 104:19
105:3,10,21
106:2,19
107:20 109:17
110:22 111:19
114:22 115:5
119:10,16
124:8 126:17
128:18 135:4
140:6 141:12
141:18 143:1,7
145:8 154:12
155:8,10,17
159:12 162:4
169:10 170:8
170:15 171:24
174:22 178:19
179:4,22 180:9
184:21 185:23
189:3,15
191:15 195:10
198:13,22
201:20 203:9
204:4 205:16
205:22 206:15
207:22 211:23
215:8,15,21
225:4 226:1
229:13 230:1
230:21 231:17
231:21,22
232:5 233:7
236:17,24
237:24 238:2

**reported** 1:21
  66:17 180:12
**reporter** 10:21
  10:23 13:20
  15:9 17:15
  36:16,20 40:2
  41:10 45:21
  58:15,18 83:11
  106:12 112:6
  119:23 120:1
  127:2,5 157:19
  157:23 171:15
  181:17 198:15
  198:19 204:22
  207:8 213:18
  215:10 234:11
  238:24 239:3,9
  239:14,18
  240:2,2,3,17
  242:7
**reporting**
  149:24 150:15
**reports** 10:10
  52:2 63:21
  120:24 121:13
  167:7 206:21
**represent**
  21:15 33:22
**represented**
  34:16
**representing**
  66:16
**republish**
  200:1

**[republished - retained]**                                                    Page 52

**republished**
66:19 87:12
204:7
**reputa** 15:3
110:16 189:6
192:3
**reputable**
146:15,19
147:5,10 164:8
178:12
**reputation**
12:15 14:14
15:2,14,20,20
15:21 29:1,6
30:14 32:24
33:15,24 34:15
34:17,24 35:6
37:20 38:13
39:1,4 56:4,13
56:22 57:5,8
82:3,22 83:16
83:19 84:6,8
84:13 85:4,7
98:22 110:12
112:2,17
121:14,24
128:22 129:2
129:14,17
130:20 131:9
131:13,16
132:19 133:2
133:13 136:12
139:1 145:16
148:9 149:6
152:23 155:12

157:2 161:10
164:4 166:19
173:4 174:20
175:4,6 176:11
177:18 184:10
184:23 185:14
185:24 186:16
186:20 187:12
187:22,24
188:2,10,12
189:2,16 190:3
190:22 191:1
191:22 192:12
193:23 195:21
196:13,17
197:7,12,17
211:6 216:23
223:8
**reputational**
54:15 57:24
80:17 81:10
114:3 147:19
185:4 191:10
197:21,22
**reputations**
34:2 217:7
**request** 55:1
134:24 236:2
243:9,11
**requested**
240:7,7
**require** 89:23
123:3 156:9
**required** 79:10
241:24

**requires** 85:13
**research**
101:19 120:12
**researched**
78:11
**reserve** 239:2
**reserved** 47:10
**reside** 13:22
**residence** 48:18
48:19,19
**residences**
48:16,17
**resides** 32:6,9
**resolution**
137:5
**resource** 79:9
119:1
**resources**
79:10,11 167:6
**respect** 8:20
24:21 25:11
34:23,24 56:18
56:24 59:4
61:24 81:1
86:6 89:20
90:23 103:5
104:5 108:10
112:2 114:8
122:22 129:6
132:2 138:2
152:8 158:18
179:3 180:24
181:5 218:22
221:14

**respective**
216:18 220:1
**respects** 218:23
**response** 8:11
8:12
**responsive**
170:19
**rest** 142:1
**restaurant**
160:6
**result** 65:8 66:7
66:9 67:8,18
109:8 132:20
140:3 145:18
**resulted** 105:18
**results** 71:8
79:9 84:23
92:5 108:19
110:16 121:3
122:3 129:6
131:21 132:17
148:8 150:1,10
150:18 151:4
152:6 154:1,24
159:4,6 160:8
160:24 161:9
161:20 165:18
166:11 174:20
176:4 178:7,19
179:12
**retain** 52:4
**retained** 3:15
25:7 35:16
165:12

**[retroactively - sameer]** Page 53

**retroactively**
146:23
**returned**
241:17
**review** 7:2
22:12 55:10
114:5,8 117:19
118:4,6 125:1
129:5 182:24
210:18 241:13
242:1 243:1
**reviewed** 6:23
6:23 24:14
26:17 116:24
181:5,6
**reviewing**
77:20 113:15
**reviews** 3:13,13
11:24 12:8,11
12:19,22 13:1
13:2,9,16 14:1
14:9 207:6,15
207:17 208:8
208:16,21
209:20 210:1,2
210:10,13,16
210:23,24
211:2,8,9,12
214:18 215:4,6
**rid** 207:15
**ridiculous**
154:20
**right** 5:21 6:19
7:8 14:6 18:3
35:17,24 36:4

40:14 41:12
55:14 62:18
65:5 67:13
69:7 70:16
74:18 75:10
77:10 84:5
102:7 106:1
110:14 115:3
115:11,23
118:10 139:12
143:15 156:5,7
158:4 166:10
170:4 173:1
184:18 189:12
192:1 195:8
196:20 197:2,5
224:6,22
225:24 227:20
229:16 230:9
236:8 239:18
**ring** 80:16 81:9
81:14 103:9
189:4,6,15,19
190:24 191:3
191:10,17
192:1,3,6,11,13
192:20,21,22
192:23 193:3,3
193:3,9 194:6
194:8,14,14
195:11,17,23
**rings** 81:2
192:19
**risk** 25:15
138:2 196:4

**risks** 25:12
**rita** 32:4,4
**robertson**
13:19,21,22
18:14
**robinson** 7:3,7
55:6 64:1
95:24
**rockville** 32:10
**rodman** 19:24
**roofer** 123:4
**room** 6:2
**rough** 51:21
**roughly** 84:19
139:17
**rpr** 1:21
**rules** 76:4,5,6
76:12 92:15
108:16 116:21
242:5 243:5
**run** 152:19
165:3 169:4
220:23
**runs** 31:23
118:1

**s**

**s** 2:5 3:8 5:7,8
10:24 13:21,21
17:11,11,18,20
17:20 18:2,2
40:4 58:16
243:8,8 244:3
**sadly** 164:24
**sailors** 17:24

**sake** 120:16
121:11
**salaries** 145:12
145:14,19
146:9,16 147:3
147:6,13
**salary** 135:9
138:16,21
140:1,22 141:9
141:15,22
142:11,17
144:1 145:23
146:13
**sales** 39:2,3,5
**sameer** 1:14
3:3 4:8,13,21
4:23 5:5,7 6:3
14:12 18:24
45:13 47:12
51:17 52:19
53:6 63:6
68:17 69:5
70:6,10 75:1,5
75:7,18,19
76:3,11,15,20
80:5 93:3,15
100:20 102:11
102:15 103:1
106:8 109:11
115:4 127:21
128:17 129:12
140:5 146:9,24
147:2 153:5,12
153:17 168:11
170:1,18

**[sameer - see]**

Page 54

171:14,19
173:12 174:24
175:13 181:20
184:20 185:1
189:15 191:1
198:21 199:1,6
200:20 201:2
203:5 205:15
211:16,18,18
213:6 236:14
238:19 241:8
242:4,9 243:4
243:13 244:20
**sameersomal....**
214:11
**sample** 119:17
147:8
**samuel** 20:24
**san** 134:2,8
**sat** 87:24
**sation** 15:13
**saw** 7:24 8:1
12:19 66:20
67:14 72:3,18
85:24 86:6,20
87:2,9 88:2
108:22 115:16
115:18 117:20
126:4 211:11
**saying** 52:20
66:11,14,16
74:5 96:20
100:4 104:22
116:16 138:3
138:13 140:10

140:14 142:19
143:19,24
164:19 170:8
206:17 230:10
**says** 32:18
91:13 106:19
115:17 158:2
159:21 160:1
179:16 199:5
201:20
**sbest** 2:11
**scale** 85:14
158:14,15
160:20,22,23
237:11,16
**scandal** 90:23
92:3 104:7,8
186:23
**school** 23:5,6,8
23:10,13,15,21
23:24 24:1
27:16 88:24
135:9,11,12,13
135:16,17,24
136:1,2,4,17
137:9,19,22
139:3,18 140:1
147:15
**schooling** 27:13
**schools** 24:4,8
24:11,13 63:22
64:12 66:11,21
67:9 96:6,10
105:7,19 112:3
193:7 221:11

**science** 27:9,14
36:22 153:1
161:1
**scientific** 20:17
**scope** 231:16
**scotia** 29:3
**screen** 75:6
87:4 211:19
**scrolled** 202:21
**scrutiny** 111:20
**scully** 2:9
**se** 22:7 180:18
185:5 191:23
194:21 195:2
**seal** 240:12
242:15 243:21
**search** 15:11
79:9 84:20,23
92:5 119:13
129:6 131:21
148:8 150:9,17
150:18 152:6
154:1,24 159:4
159:15 160:7
160:24 161:9
161:20 167:24
168:1,1,2
174:21 178:7
179:12 201:18
203:18
**searched** 159:4
159:5 161:17
**searches** 77:21
162:15,16

**searching**
92:12
**season** 95:6,9
95:14
**second** 8:14
75:17 92:3
105:5 126:16
135:6 158:2
159:18 184:5,8
184:22 185:10
192:20 226:9
229:12
**secondary**
27:12 192:8
**section** 111:19
112:11 114:6
114:10 126:17
130:2 139:12
199:9 200:18
205:17 207:2
225:11 226:1
**securities** 61:17
61:19,21,22,24
**security** 33:11
135:9,11
138:16,18,19
139:18 140:1
**see** 8:13 75:23
77:5 81:17
87:7 92:16
94:7 99:8
103:2 105:8
108:1 109:8
111:3 122:2
128:10,23

**[see - show]**

139:12 143:17
151:7 152:16
157:17 158:24
171:21 178:18
184:9,12 185:1
185:2,18 189:8
193:18 200:23
201:4 206:15
224:7 231:19
**seeing** 91:20
110:4 113:15
118:7 177:14
180:13
**seek** 52:3
133:13
**seemingly** 30:4
**seems** 148:14
173:10
**seen** 34:5 81:12
81:13,14,16,20
84:24 85:3
104:17 105:1
197:13,14,20
237:19 238:8
238:12
**self** 67:20 72:23
112:22 113:9
114:21 164:11
199:20 200:3
201:6
**sell** 195:21
196:16 197:7,8
**send** 42:18
238:21 239:4

**senior** 37:4
124:23
**sense** 151:9
**sensitive** 79:23
91:22 112:13
112:14 113:1
114:15 123:11
123:16 161:7
**sensitivity**
114:11
**sent** 12:24
134:24 231:5
**sentence**
106:19 107:21
110:24 114:23
115:7,24 184:5
184:7,21
225:11 226:1
**seo** 77:17 78:6
148:5 165:15
165:21 167:15
170:9 173:24
174:8,15 175:2
202:23
**series** 111:5
**serious** 64:18
65:24 66:12
92:22 94:13
96:12 98:16
103:13 104:8
106:23 132:22
186:9
**services** 19:13
32:18 33:3
34:10 42:16

**set** 59:13
150:16 151:14
151:23 191:23
192:15 193:14
194:6 240:12
**sets** 110:6
**settled** 54:19,19
215:19
**seven** 204:23
218:17
**several** 35:12
48:16 50:9,17
52:1 82:9
83:22 88:9
97:9 101:1
109:7,15
133:24 134:16
152:13 236:11
**severity** 174:2
174:17
**sex** 193:6
**sexual** 64:18
65:24 66:12
79:24 91:13,14
91:22 92:3,22
94:13 96:12
98:16 103:13
104:8 106:22
112:21 132:21
158:18 163:20
177:5 186:9
194:4,15 195:6
196:11 225:22
**shape** 137:17

**share** 30:5
56:10 75:6
82:14,18 83:8
84:3 121:12
127:14 150:13
199:23 220:23
**shared** 7:14
13:11 86:1,13
86:15,15 92:10
114:14 129:23
138:12 179:2
208:3
**shareholder**
40:12
**sharing** 84:12
211:19 217:23
**sharma** 39:24
40:4
**sheet** 243:7,10
243:18 244:1
**shifted** 44:7
**shingles** 123:6
**short** 72:3
128:16 204:16
**shorter** 151:21
**shorthand**
240:2,4,5,6
**shortly** 204:24
**show** 7:18 68:3
68:15 74:11
75:8,24 99:17
133:13 155:20
203:21 210:22
211:16

**[showed - source]**

Page 56

**showed** 115:15
**showing** 69:19
  74:24 90:10
  150:1 215:5
**shows** 77:23
  179:5 234:1
**sic** 40:4
**side** 76:17 81:3
**sided** 116:10
**sider** 222:14
**sidney** 132:8
**sigma** 201:24
**sign** 239:1,20
**signature** 240:7
  240:16 241:13
**signed** 242:13
  243:18
**signi** 167:20
**significant** 57:2
  147:19 156:9
  168:19
**significantly**
  71:20 160:10
  160:11
**signing** 239:22
  241:11,18
**similar** 63:17
  64:10,13 71:6
  124:1,1,4
  130:19 180:5,9
  235:12
**similarities**
  63:9
**similarly**
  180:23

**simple** 79:8
  175:3
**simplify** 178:22
  179:7
**simply** 121:1
**sincerely**
  241:21
**single** 55:2
  210:18
**sions** 86:4
**sir** 173:2
  226:16 241:9
**sit** 77:13
**sitting** 87:3
  88:5 118:10
**situ** 97:12
**situation** 63:16
  148:17
**situations** 25:1
  112:1
**six** 144:23
  145:3 201:3
  230:2
**size** 147:8
**skills** 111:23
**skip** 204:9
**slide** 73:9
**slides** 72:18
  116:11
**slow** 106:17
  171:16,18
**slug** 78:19
**small** 10:13
**smart** 123:10
  123:20

**social** 15:6 37:6
  37:11 85:17,19
  85:21 86:7,12
  86:13,18 87:1
  225:16
**sole** 40:14
**soleil** 30:1
**solutions** 241:1
  244:1
**somal** 1:14 3:3
  4:7,8,13 5:8
  199:1,6 200:20
  201:2 212:9,18
  212:22 213:11
  213:13,21,22
  214:5,7,14,15
  214:24 215:1
  225:4 228:1
  230:8 241:8
  242:4,9 243:4
  243:13 244:20
**somal's** 102:11
**somebody**
  20:24 22:17
  24:20 80:22
  81:23 82:17
  87:3,15 89:7
  97:10 107:12
  114:16 117:23
  122:20 137:16
  137:18 148:24
  149:12,12
  160:16 161:6,7
  162:15,16
  164:1,17

  186:22 187:20
  196:9 197:18
  208:22 222:6
  223:2,6 228:5
  236:3,6
**somebody's**
  145:16
**someone's**
  22:22 81:7
  97:13 193:19
**somewhat**
  120:23
**soon** 219:11
**sophisticated**
  188:23
**sorry** 5:17
  17:17 32:21
  45:21 90:13
  104:21 106:10
  106:15 112:7
  115:2 124:9,10
  135:23 156:19
  157:22 181:18
  184:14,15
  185:19 202:20
  224:18 225:7
  239:7
**sort** 44:5 48:4
  59:9 122:19
  137:8,23
  158:13 198:4
**sounds** 5:4 6:10
  6:20 62:2
**source** 16:21
  98:18 123:13

**[source - state]**

Page 57

142:23,24
143:3 146:15
146:18,19,20
146:21 147:1
147:10
**sources** 65:3
101:20 141:20
143:2,4,6
146:20,24
178:13
**southern** 52:6
54:6
**space** 201:24
**spamming**
207:20
**spammy** 12:11
12:19 13:2,9
13:16 14:1
207:5,15 208:8
208:16,21
210:1
**speak** 12:21
13:15 18:5,9
18:11 25:20
37:20,23 38:1
38:3,6,10,11,15
38:17,19,22
39:2,3 51:5
125:3,6,9
126:23 132:5
152:2
**speaker** 39:7
39:10
**speaking** 38:12
39:8 52:17

53:4 110:4
132:2,9,15
152:1 199:1
204:13 205:17
206:7,22
208:24 209:5
**speaks** 89:12
109:15 211:6
**speci** 151:2
**special** 56:2
**specialty** 59:7
**specific** 15:19
15:23 24:2
26:13,18 33:18
34:11 50:2
63:23 64:2
78:11 82:10
86:12 110:13
120:13,20
121:20 133:22
146:12 148:8
149:7 152:6
161:24 163:7
167:17 173:16
173:18,20
**specifically**
86:11 122:4
151:17 179:13
216:12
**specifics** 119:8
135:21 138:5
154:23 215:23
219:21
**specify** 52:15

**speed** 201:17
**spell** 10:22
13:20 17:8,12
17:15 18:1
32:5 36:16
**spelled** 36:18
**spend** 57:2
79:3 156:24
177:13
**spending** 48:7
157:11
**spent** 31:17
62:8,12,15
119:6 179:12
230:2
**spoke** 32:11
48:8 51:3
136:22
**spoken** 18:11
18:12,14 25:12
36:1 38:8,18
38:20,23 39:5
216:12,15
**sports** 120:13
**spray** 127:20
**stage** 148:22
153:22,24
154:5,13 155:7
157:12
**stages** 150:4,24
151:1,3,4,15,23
152:14 153:10
**stance** 126:2
**stand** 22:2
52:24 77:7

179:20
**standard**
117:16 120:6
120:21 145:18
158:14,15
**standpoint**
11:12 15:3,14
113:18 119:1
163:24 166:16
168:6 218:2
**star** 210:1,1,13
**stars** 210:11,16
210:19 211:3
215:5
**start** 14:24
24:17 65:16
115:3 148:17
152:16 163:8
165:12 170:1
171:20 184:18
185:21 189:12
203:7
**started** 25:2
28:24 50:16
157:9 165:7,10
165:11 204:19
**starting** 4:7
25:22 157:13
**starts** 15:12
57:10 193:24
194:10 195:12
**state** 5:5 7:8,13
7:21 8:18,23
9:4,7 11:23
12:12 21:8,11

**[state - submitted]**

21:15,19,20,21
48:14,15 62:12
63:8,13 71:4
71:12 96:2
99:3 102:8
114:23 116:10
119:16 130:4,7
135:7 205:20
211:19 212:7
212:16,21,23
213:1,11,21
214:5,14,24
215:9,21 216:1
230:6,16 231:7
232:5,13
236:24 242:10
243:15
**stated** 12:10
46:3 67:21
97:18,18
117:22
**statement**
66:24 115:13
116:16 185:22
202:14 242:13
242:14 243:19
243:19
**statements**
64:16,17,21,23
65:7,10,12,20
66:2,4,5,7,10
66:18,22 67:7
67:17,18 68:1
71:14 105:6,11
107:22 108:5

109:20 140:3
225:23
**states** 1:1 29:6
30:20,22 42:8
107:21 128:20
129:9 131:24
133:15 141:16
184:22
**station** 101:13
**statistic** 84:24
85:3
**statistics** 99:15
**status** 183:7
196:5
**stay** 84:22
**stems** 97:16
**step** 125:13
**sticking** 98:24
205:15
**stop** 50:15
106:8 224:8
232:10 235:22
**stopping**
198:16
**stories** 85:22
86:22 87:11,11
87:13 88:18
89:16 91:17
92:6 95:11
96:22,23,24
97:1,7 98:2,8
98:15 105:16
105:18,20
140:4 195:13

**storm** 111:1
**story** 86:15
87:16 89:1
92:9 97:10
98:23 99:21,23
101:11,16
**stranger**
103:21,23
193:9 194:8
195:11,23
196:14 197:8
**strangers** 193:4
194:3,11 195:3
197:23
**strategic**
125:20 126:11
**strategies**
25:14
**strategy** 29:16
34:14 73:18
78:4 157:3
203:2,12
**street** 2:10
43:11
**strength** 79:17
79:21 178:7
**strict** 82:24
**strictly** 127:18
**strike** 57:14
64:14 71:1
85:5 89:14
94:3 131:14,15
156:1 162:6
192:2 203:22
218:18 220:3

**strong** 88:4
178:12
**stronger** 167:3
**struc** 80:19
**struct** 195:24
196:3
**structure** 20:18
64:9,13 80:16
81:9,15 85:11
189:4
**student** 112:21
**students**
113:20
**studies** 210:22
**study** 20:17
**stuff** 164:22
**subject** 191:5
223:9,14
**subjective**
80:14 85:15
161:1 187:11
193:15
**subjectivity**
86:6
**subjects** 217:14
**submission**
231:21 232:8
**submit** 61:9
165:1,2
**submitted** 55:3
57:21 59:16,18
60:21 63:6,8
90:9 91:12
92:19 109:6,8
231:22 232:6

**[submitted - takes]**

Page 59

240:6
**submitting**
13:10
**subscribed**
242:10 243:14
244:21
**substantial**
52:2
**success** 98:19
108:11 109:3
110:5 130:13
132:4 141:8
151:20,21
179:18 201:3
**successful**
109:3 166:19
187:15 188:14
188:16
**succession** 38:7
**suddenly** 182:6
**sudhansu**
17:19,19 18:12
18:14,16
**sue** 65:5,6
**sued** 223:2,4,6
**suggested** 55:9
**suite** 2:5,10
39:23 40:10
241:2
**summary**
119:11 129:4
232:18
**superior** 241:1
**supervision**
240:5

**supplemental**
102:9
**supplementat...**
102:10
**supplies** 123:5
**supporting**
220:13
**supposed** 76:19
**suppress** 159:7
162:9 163:5
175:22
**suppressed**
174:18
**suppressing**
150:15 188:18
**suppression**
77:17 78:6
148:5 150:20
165:9,15,21
167:16 170:9
174:9,15 175:2
**sure** 8:12 17:7
20:24 21:14
35:18 36:2,13
41:20 42:3
45:22 51:16
53:17 60:6
62:10,17 69:17
69:23 74:14
85:3 89:19
97:19,23
106:13 125:22
141:5 176:6
188:5 194:17
194:22 198:19

198:23 200:23
200:24 206:13
209:16 210:13
217:11 230:23
237:4
**surprisingly**
107:22
**surround** 23:1
**surrounded**
94:24
**surrounding**
94:6,9,23
98:23 218:14
**survey** 89:6
147:2,6,9,11,12
**surveys** 88:6,8
99:16
**sus** 74:11
**susan** 2:9 4:4
4:18
**suspended**
72:21 73:11
91:8 98:17
116:13 137:4
**suspension**
74:9,10
**suspicious** 12:8
**swered** 227:22
**swimming**
218:4
**sworn** 4:15
5:11 242:10,13
243:14,18
244:21

**syndicated**
199:14

**t**

**t** 3:8 13:21
17:18,20 32:8
40:3 58:16
240:1,1
**tail** 30:3 151:22
**tainly** 194:20
**take** 6:15,17,18
16:1 51:13
52:23 62:18
70:1 76:15,15
78:4 119:4
122:11 127:11
128:5 138:2
140:18 144:6
156:7 158:9
163:12 169:10
173:21 175:17
180:12 186:13
188:11 198:16
204:21,23
205:4,6,9
208:4 210:24
226:21 235:16
**taken** 63:1
72:14 77:7
92:20 98:10
128:12 180:24
197:17 205:11
224:10 234:5
240:6 241:10
**takes** 16:13
151:4 158:8

**[takes - testified]**

167:5 196:4
**talk** 10:5,6,8
36:9 37:1
39:24 51:8,9
68:20 72:18
77:8,14 124:9
127:15 158:22
171:9 216:19
222:7
**talked** 51:6
72:23 83:16
92:15 130:20
181:3 183:20
191:22 216:11
216:16 218:5
219:4,23
220:16 221:22
**talking** 16:5
39:23 47:7
53:24 71:8,9
72:20 73:8,21
73:22,23 82:8
90:15 91:24
98:15 99:22,23
100:9 106:8
107:11 116:17
117:3,9 118:16
133:2 156:17
169:23,24
170:2,5,7,18
181:18 183:11
183:12 185:13
192:24 197:21
203:9 206:14

**talks** 237:5
**tandem** 91:16
91:18,19
**target** 79:13
158:23 159:2,3
159:8,11,12,14
159:17,21
161:12,16
163:1 166:11
173:22,23
174:7,19
**targeted**
150:16
**targets** 160:1
**teacher** 88:24
112:13 113:1
161:7
**teaching**
120:13
**team** 9:24 10:7
12:18,22 13:1
13:15 16:19
17:1 72:14,19
72:21 73:9,22
91:7 107:5
116:12 124:6
**tech** 11:24
199:11
**technical**
166:18,22
172:19
**technicality**
73:18
**technically**
225:10

**technology** 4:9
14:6,17 29:9
29:12 30:13
32:1,13 33:4
39:13 40:10,16
40:23 41:6,8
41:16 42:11,22
43:11 44:2,10
44:23 45:18
46:12,16,19
48:22 49:10
50:5 82:4
83:20 118:19
127:16 149:14
199:19 200:14
207:6 214:19
223:5,13,20
**technology's**
124:14 200:3
201:7
**television** 86:2
**tell** 17:9 24:5
68:4 69:14
70:2,5 130:22
131:3,4 137:15
163:21 165:5
167:11,14
168:14 192:16
210:20 225:5
**telling** 114:10
118:2 172:22
180:13
**template**
117:10

**templates**
115:18 117:20
**ten** 62:19 84:7
86:24 100:10
119:6 174:7
176:10 197:6
202:8 203:1,10
211:9 222:15
222:20 223:3,6
223:10,15,18
**terization** 12:3
**term** 33:2 68:1
69:10,11,21
70:12 81:2
158:11 176:19
221:15,17
234:2
**terminated**
71:18,19 72:22
91:8 104:7
117:23 137:6
193:5
**terms** 54:15
85:12 92:7
112:24 132:9
174:19 189:1
194:3,14 222:9
**ternally** 208:4
**terrified**
136:13
**testified** 4:15
58:4 85:1 98:7
101:24 117:12
122:6 132:8
147:15

**[testify - three]**

**testify** 21:22
54:17 55:9
57:12 172:21
173:13,14
**testimonial**
207:2
**testimony** 5:12
6:13,22 7:20
53:5,19 56:18
58:11 62:2
102:11 153:7
232:8 235:20
242:6,7 243:6
243:9,12
**testing** 77:23
151:7 181:16
181:23 182:1
**tests** 231:14
**thank** 14:11
36:20 40:13
58:18 80:2
109:11 115:12
120:1 127:5
153:12,17
157:23 175:13
185:18 196:19
213:3 224:22
238:19
**thanks** 62:24
92:16 143:9
**that'd** 235:23
**theater** 30:1
**theoretical**
169:4

**therapist**
182:12 229:8
**thing** 50:20
158:15 190:21
193:6 198:6
204:15 210:21
**things** 11:15
21:4 22:12
32:15 33:9
70:14 72:13
95:12 97:23
123:1 150:8
167:3 172:5
180:11 187:1
190:6 193:21
199:15 200:13
209:15 217:20
218:13 235:9
**think** 8:9 10:13
20:14,22 21:6
25:23 26:12,14
31:12,16,21
32:7,9 34:4,18
34:22 35:2,7
35:18 39:9
52:21 53:11
58:2 60:8
61:11,21 66:24
67:13,20 71:24
72:2,23 73:5
73:10,15 75:16
78:14,16,18
80:1,21 82:7
83:5 85:9,9
86:13 88:19,20

89:7,11 90:9
90:16 92:2
93:18 95:3,4
96:7 97:22
100:7,16 101:6
102:5 104:13
107:15 108:15
112:16,22,22
115:18,20
116:7 117:10
117:24 118:1
124:5 125:20
130:17,17
131:5,6 135:1
135:12 136:18
136:18,20,24
137:13 138:1
138:15,19
139:5,11
142:15 143:21
143:23 144:12
145:7,19 156:2
161:15 166:8
167:12 173:13
173:14,18
175:12 176:13
181:3,3 182:9
182:22 191:6
192:16 196:16
197:16 198:1,6
200:10 201:12
201:23 202:20
203:4,8 206:4
206:5 209:17
211:6 216:22

217:6,10,13,18
217:19,20,23
218:2,9,11,15
219:7,12,13
220:19,21,24
221:8,16 222:8
222:12 223:16
227:4 230:7,11
230:14 232:1
233:24 234:1
238:6,7
**thinking** 98:12
152:5
**thinks** 197:18
**third** 135:13,17
135:18 137:24
157:15 199:21
**thirty** 241:17
**thought** 27:17
27:18,19 49:4
102:2 141:23
156:20 162:7
195:6 216:23
217:7 222:2
224:14
**thoughtful**
25:16
**thousand** 50:9
**thousands** 65:3
152:10
**three** 78:18
80:16 81:9,14
81:14 86:24
90:4 92:19
109:7 137:6

**[three - traditional]**

139:16 145:22
149:8 156:3
157:6 189:4
190:20 200:19
203:16 206:9
**thrive** 164:13
**thrown** 127:7
**tiated** 70:6
**tied** 95:11 96:6
**tiff** 120:5
**till** 144:2
**time** 6:18 13:14
25:16 31:9,17
31:18 32:11
41:3 45:6 48:7
48:8 55:15
57:2 62:15
79:3,11 88:20
100:20 101:22
119:1 123:24
124:2,5,20
128:8 142:3
144:3 145:15
147:23 148:24
149:3,8 152:14
153:6 156:6,9
156:18 157:5
157:11 158:8
164:3 167:5
168:6 171:21
172:20 173:14
174:1 177:13
178:14 179:10
181:18 186:13
192:16 205:6

208:3 226:21
232:16 234:14
236:22 240:4,4
**timeline** 137:1
157:16 158:1,3
**times** 33:22
35:12 51:24
52:1,12 53:7
72:6 74:4 83:7
87:19 98:7
101:1 117:1
120:16 122:24
140:21 145:3
145:22 146:2,3
149:9 156:3
157:6 165:24
175:18 196:21
198:3 199:22
207:13 222:6
230:8 235:9
**tinuously**
127:11
**tion** 6:22 15:4
22:1 53:4 97:1
170:23 229:4
**tional** 110:17
189:7 192:4
**tioned** 131:12
208:3
**tions** 23:9,22
92:1 164:21
216:22 221:17
**tips** 201:3
203:17

**title** 92:22
111:22 185:5
198:24 226:9
226:10,11
**tively** 89:2
**today** 5:15 6:13
6:22 51:12,13
225:14 238:12
**together** 10:11
11:8,13,15
14:21 16:1,13
16:14 17:2
64:11 81:18
96:6,13 97:16
114:7 119:4
120:5 122:14
126:12 152:15
171:2 187:6
196:6 216:12
216:17 218:20
218:22 219:22
220:1,10
**told** 55:17 80:6
89:3 108:6
110:11 131:1
133:5,6 134:13
136:2 205:5
**took** 8:17 9:18
27:18 30:5,11
31:1 72:20
77:5 80:4
95:20 100:3
144:4,10
145:22 168:17
178:15 179:11

212:24 230:17
240:4
**tools** 187:22
**toothpaste**
186:21
**top** 103:16
128:20 199:5
231:4,10
232:20
**topic** 225:2
**topics** 97:8
218:10
**toronto** 17:11
131:17,19
132:6 133:9,12
**total** 63:18
86:20 99:4,10
101:9 103:1,4
150:17 233:19
**totality** 82:8
**touch** 216:3
219:10
**towards** 28:2
150:15 185:12
**track** 82:10
150:14
**trademark**
55:24 56:3,21
56:24 57:4
**trademarks**
56:9 59:4
**traditional**
90:7 99:14
100:5,9 102:4

**[traffic - understanding]**

**traffic** 203:18
**trail** 97:22
**train** 111:23
**transcend**
 128:3
**transcends**
 129:24
**transcribe**
 239:10
**transcribed**
 239:6 242:7
**transcript** 7:22
 8:2 240:6
 241:10,15
 242:5,12 243:5
 243:11,17
**transfer** 42:16
**transformation**
 37:23 201:3
**transpired**
 186:4
**tration** 23:7
**travel** 132:24
**trial** 54:17,18
 57:10 58:4
 59:13 60:18,19
 215:18
**tribune** 87:23
 167:4 217:16
 219:6
**tried** 172:6
 175:8 179:14
**trip** 94:24 95:3
 96:23

**triple** 124:4
 152:18
**trolling** 225:16
**true** 164:17,18
 164:20 180:15
 193:18 210:10
 225:20
**trusted** 34:13
**truth** 20:4,6
 69:4,4,13 82:1
 118:2 172:8
**truthful** 6:12
**truthfully**
 69:23
**try** 6:6 53:6
 75:21 116:22
 133:1 137:10
 171:21 172:8
 172:20 224:18
**trying** 74:19
 162:5 173:6,12
 177:11 204:19
 227:23
**tube** 186:21
**ture** 80:20
**turn** 128:17
 198:21 205:16
 207:1 225:4
 229:12
**turned** 115:18
 134:20 217:21
 224:18
**tv** 100:13
 101:22

**twenty** 144:23
 145:3
**two** 7:11 48:10
 65:23 93:18
 94:12 96:2
 131:20 132:1
 132:11 186:2
 186:12 192:2
 203:16 205:5
 206:7 218:16
 218:16 224:6
 226:13 228:4
 233:24
**type** 28:9,11
 31:2 39:10
 40:18 178:1
 216:23 231:13
 237:17
**types** 65:23
 94:13 237:3,12
 237:16
**typewriting**
 240:5
**typical** 30:10
 30:12
**typically** 29:18
 117:7 150:13

---

**u**

---

**u** 11:1 13:21
 17:20,20 32:8
 36:18,19
**uh** 90:20
 119:22 157:18
 157:20 205:18
 207:7 213:17

**ular** 235:3
**ultimate** 64:9
 187:15
**ultimately**
 72:22 94:21
**unable** 108:4
**unauthorized**
 95:4
**uncommon**
 204:8
**under** 5:12
 31:20 77:6
 97:9 182:5
 240:5
**undersigned**
 240:2
**understand**
 5:12 6:5 7:8,9
 13:5 15:13
 21:13 77:3
 100:24 102:18
 110:8 116:5
 129:11,11
 141:10 162:5
 190:24 205:7
 206:16 213:4
**understandable**
 83:17
**understanding**
 14:24 15:16,17
 66:1 71:10
 77:21 113:16
 117:21 177:3
 180:24

**[understood - viewing]** Page 64

understood 6:8
undertake
  165:16
undifferen 70:5
undifferentiat...
  68:1,8 69:10
  69:15,21 96:8
  96:9 97:15
  98:9
undo 186:19
unemployed
  137:1,5,6
  143:14
unilaterally
  236:5
unique 33:22
  79:10 85:8
  87:22 100:8
  110:13,15
  114:3,18 119:2
  119:3 121:7
  175:20 176:1
  176:14 177:1
  178:20 179:5
united 1:1 29:6
  30:20,22 42:8
  129:9 131:23
  133:15 141:15
university 27:6
  37:8,13
unofficial 45:2
unprecedented
  104:14
unstated
  117:22

unwind 186:10
update 203:2
  203:11
updated 10:15
  206:4,12,17
  234:5
ups 236:11
url 78:19 92:21
  236:7
usa 220:15
usage 177:4
use 31:4 42:16
  43:17,19,22
  44:19 45:24
  47:23 69:16
  73:19 74:1,9
  83:3 120:22
  141:21 142:16
  147:10 150:24
  151:11 158:23
  159:13 160:18
  160:20 162:9
  164:5 167:8
  170:14 174:15
  175:1 178:2
  183:16 185:23
  195:9
used 28:11
  30:15 33:2
  40:24 57:15
  58:13 60:14
  69:12,15,18
  70:11,12 71:12
  74:2 77:18
  78:6,10 79:22

87:14 91:16
96:8 107:7
117:8,14 121:9
122:2 132:11
132:14 133:11
139:20 141:11
141:11 142:18
142:23 182:14
186:1 196:20
211:19 221:15
234:2,21
238:21
users 87:22
using 44:17
  47:21 50:3
  59:23 69:9
  111:6,18
  117:13,18
  132:13 143:24
usual 117:21
utilized 28:14
  29:24
utilizing 56:8
  120:18

**v**

v 127:4 241:6
  242:3 243:3
vague 9:2
  52:14
validity 79:20
  147:7
valuation 28:3
  61:22,24
value 29:23
  142:3 180:12

197:11
variables 175:7
varies 41:1
various 9:5
vast 23:19
  38:15 77:20
  78:12 111:12
  116:13
venture 37:7
veracity 191:7
veritext 239:21
  241:1,7 244:1
versa 200:9
version 204:3
  234:6
versus 29:20
  51:18 63:13
  66:4 178:12
  191:14
viable 132:16
vice 200:9
vicinity 89:1
video 72:3
  90:10,16 91:1
  91:11 95:15
  107:11,16
  167:21 168:1,3
  224:8
videoconfere...
  1:13
videos 15:6
view 87:7 218:3
  218:3
viewing 87:4

**[vigorously - welcome]**                                    Page 65

| | | | |
|---|---|---|---|
| **vigorously** 223:22 | 69:1,4,17,23 74:14 75:3,3,9 75:10,16 76:14 82:20 83:16 92:12 100:23 109:5 121:3 123:17,19 124:4 127:24 138:2 143:11 151:19 154:2,4 155:24 158:22 163:20 167:2 167:11 176:23 195:8 201:10 204:20,20 211:16 217:22 224:3,20 227:4 230:14 239:4 239:14 | **watching** 107:16 | **weak** 76:17 77:3 |
| **violated** 114:24 115:9 | | **way** 30:10 53:6 69:1 79:13 82:2 96:15 118:2 122:18 123:6 137:1,17 140:17 150:20 152:10 153:15 163:21 171:11 172:21 175:16 187:1 191:13 195:14 198:2,7 200:19 204:18 231:19 232:21 235:21 | **wealth** 29:5 31:5,14,17,24 |
| **viral** 99:3 | | | **web** 3:12 199:10 |
| **virgin** 131:7,10 | | | **website** 32:14 32:17,18,20,22 33:2,4,7,10 34:19 89:23 90:1 163:13 182:18,20,24 199:16,19 200:4,8,14,16 201:7 207:15 208:9,17 214:11 219:16 236:1 |
| **virginia** 160:7 | | | |
| **virtual** 77:10 | | | |
| **visitors** 100:2,8 100:16,19 | | | |
| **vitae** 233:7 | | | |
| **vocational** 19:16,17 | | | |
| **voice** 151:12 | | | |
| **volume** 84:20 89:12 118:8 121:1 158:10 158:17 166:12 177:7,14 178:14 | | **ways** 80:21 173:12 216:16 219:21,24 220:24 | **websites** 15:4 79:17 100:1 119:17 120:6 120:18,21 121:2 159:12 163:4 164:5 167:2 199:17 200:11 |
| **voting** 37:10,12 37:14 | **wanted** 43:22 53:21 70:21 76:7 108:8,9 130:23 220:20 220:22 235:24 | **wchoslovsky** 2:6 | |
| **vs** 1:6 | | **we've** 40:19,24 41:14 43:3,3,4 45:4 78:5 121:4,15,18 126:1,2 127:17 130:19 158:7 166:18,24 179:18 207:12 207:24 210:2 216:12,14,14 219:17,24 223:7 | |
| **w** | **wanting** 81:24 158:19 | | **week** 57:10 82:17 220:21 |
| **wacker** 2:5 | **wants** 15:18 73:17 75:23 79:24 102:20 130:11,14 136:5 142:8 148:1 153:15 217:3 | | **week's** 101:16 232:16 |
| **wait** 15:9 74:5 102:13 165:4 181:13,15 224:20 234:11 | | | **weeks** 48:10 51:4 |
| **waived** 239:23 241:12,19 | | | **welcome** 153:18 |
| **walks** 191:16 | | | |
| **want** 47:10,23 49:19,24 50:1 50:19 68:11 | **watched** 101:20 107:10 | | |

**[went - worked]** Page 66

**went**  123:22 145:21 147:10 174:22 210:15 230:22 233:6 235:11
**whereof**  240:12
**wide**  16:16 180:18 225:23
**widely**  86:1 99:15
**widespread** 225:15
**william**  2:4 4:11 241:5
**winded**  122:5
**wines**  30:3
**wise**  64:6
**wish**  68:24 179:7 222:6
**wititia**  3:11 213:16
**witness**  3:2 4:8 4:9,14 9:9,15 9:21 10:24 12:5,24 14:3 15:11 17:17 34:21 35:3,17 36:4,17,21 40:3 41:13,18 42:1,3,14 43:1 44:14,17 45:10 45:14,20,22 46:8 47:6,13 49:21 51:18,23 52:5,10,13,20

52:21,22 53:5 53:9,10 55:21 57:15 58:13,19 62:20 68:13,19 68:23 80:24 83:12 101:11 102:13,16,23 109:1,6 112:8 119:24 120:2 123:14 127:3 128:9 134:12 144:16,23 146:7,10 154:10 157:21 168:16 169:1 169:14 170:19 170:22 175:3 181:13,15,21 181:24 185:12 196:2 202:15 202:17,20 203:3,13 207:10 208:14 208:18 209:9 213:8,19 215:12 222:21 226:4,5,23,24 228:2,11 229:3 231:18 234:13 239:21 240:6,7 240:12 241:8 242:1,4,11 243:1,4,15
**woman**  88:22

**women**  36:12 220:14
**word**  70:8,9 73:4,7 74:1 87:14 96:8 117:8,18 127:8 127:10 150:24 151:20,22 158:18,19 159:3 162:15 177:5
**words**  20:21,22 21:2 77:21,24 78:1 79:19,22 79:24 111:6 119:14 150:16 151:19 159:8 159:16 161:13 161:14,16,17 161:24 162:2,6 162:8,9,11,14 162:22 165:18 174:7 177:5 185:11 186:2 225:12 227:5 235:3
**work**  18:21 24:24 28:24 34:1,5,7,10 35:5 39:22 40:21 41:3,14 44:8 45:4 49:16 51:17,18 51:18 56:21 79:14 83:7

84:17 93:8 104:17 105:1 122:1 123:3,13 123:15 124:18 127:11 128:1 137:23 140:19 148:16 149:1,2 151:17 152:7 153:3 154:1 157:3 158:10 163:24 165:8 166:15,18,22 168:11,17,19 169:1,2,21 171:4 172:19 172:19 178:5 183:22 188:6 188:24 201:21 202:11 203:5 203:12 204:10 210:21 216:17 217:21,22 218:19,22,24 219:22,22 231:8,13
**worked**  23:17 24:20,23 25:7 29:2 42:11,22 104:11 109:22 112:1 126:1,2 126:3,12 127:24 152:21 169:6 223:7 227:1 233:11 233:23

**[workers - zoom]**

**workers** 191:14 192:7,20
**working** 4:3 9:19 34:20 48:7 59:24 60:6 126:19 135:12,16 139:2,2
**works** 61:2 137:1 152:17 197:15 201:18
**world** 30:15 42:18 43:8 133:3
**worldwide** 99:5 99:11 101:5,10
**worry** 102:22
**worse** 177:20 193:18
**worth** 196:11 197:19
**worthy** 163:10
**write** 151:13 166:14 230:18 230:19
**writers** 166:14
**writing** 139:23 151:10 216:21
**writings** 199:18
**written** 15:4 25:10 149:16 149:20 150:11 153:19 154:3,8 154:10,11,17 154:19 155:1,3

155:7 167:21 168:3 169:16 176:20 182:4 227:20
**wrong** 134:11
**wrote** 163:15 228:13

**x**

**x** 3:1,8 37:5,5 60:15 87:23

**y**

**y** 36:19
**yahoo.com.** 224:21
**yaquedo** 36:15
**yeah** 5:19 7:1 7:24 11:9 12:14,15 17:17 25:5 28:12 31:22 32:23 35:9,13,23 42:3,14 50:11 57:7 58:3 65:6 67:15 68:13 69:6,12 72:2,7 74:15,21 76:21 77:11 88:22 89:3 90:16 95:7,22 98:6 99:8,8 113:22 117:8 127:9 138:24 139:15 140:24 141:4 141:13 143:2

149:20 188:5,8 190:18 200:24 201:11,15,23 206:4,10,16 210:17 213:9 217:4 220:18 220:22 224:5 224:21 225:8 226:24 231:9 231:11 232:19 233:20 234:3,7 235:11,23
**year** 32:12 135:13,21 136:20 138:20 140:22 141:2 205:19 215:24
**years** 35:4,8,14 38:9,16 45:7 50:17 137:7 139:16 140:18 143:14 144:23 145:3 158:7 176:10 178:15 182:4 186:9,12 190:20 211:9 222:15,20 223:3,6,10,15 223:19
**yellow** 30:3
**yep** 205:23
**york** 43:11,12 43:24 44:12,23 45:18 46:6,22 47:2,24 48:1,2

48:5,6,18 50:3 52:7 133:21
**young** 163:16
**youtube** 3:11 213:6,9

**z**

**zero** 98:19 108:10 109:2 109:14 110:4 132:4 133:23 134:11,11,15 134:21
**zoom** 5:16,18 51:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.